**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- X
                                                        :
BELLA INGBER, SABRINA MASLAVI ("Maslavi"),             :   INDEX NO.
and SAUL TAWIL,                                         :
                                                        :   **COMPLAINT**
                    Plaintiffs,                         :
                                                        :
        -against-                                       :   Jury Trial Demanded
                                                        :
NEW YORK UNIVERSITY,                                    :
                                                        :
                    Defendant.                          :
                                                        :
------------------------------------------------------- X

Plaintiffs Bella Ingber ("Ingber"), Sabrina Maslavi ("Maslavi"), and Saul Tawil

("Tawil"), for their complaint against defendant New York University ("NYU"), allege as

follows:

**PRELIMINARY STATEMENT**

1.      The age-old virus of antisemitism is alive and well at New York University.  This

case arises from NYU's egregious civil rights violations that have created a hostile educational

environment in which plaintiffs and other Jewish NYU students have been subjected to pervasive

acts of hatred, discrimination, harassment, and intimidation.  For years, NYU—acutely aware of

ongoing and disgraceful acts of anti-Jewish bigotry—has reacted with, at best, deliberate

indifference, refusing to enforce its own anti-discrimination and conduct policies that it readily

applies to protect other targets of bigotry, and instead fostering an environment in which students

and faculty members are permitted to repeatedly abuse, malign, vilify, and threaten Jewish

students with impunity.  Regularly confronted with such genocidal chants as, "Hitler was right,"

"gas the Jews," "death to kikes," and "from the river to the sea," and other abuse, plaintiffs not

only have been deprived of the ability and opportunity to fully and meaningfully participate in NYU's educational and other programs, but they have suffered and have been put at severe risk of extreme emotional and physical injury.

2.      Antisemitism has been a growing institutional problem on NYU's campus and other United States university campuses for decades, increasing by over forty percent in 2022 alone, and worsening even further since the October 7, 2023 Hamas massacre in Israel.  NYU is among the worst campuses for Jewish students, and NYU has long been aware of the festering Jewish hatred permeating the school.  In fact, although NYU, when it was facing government action three years ago, agreed to "address and ameliorate incidents and complaints of discrimination and harassment based on shared ancestry and ethnic characteristics, including anti-Semitism," NYU has done no such thing.  Instead, NYU, including its administrators and professors, has not just tolerated, but has fostered and fomented, this hostile environment, with students and faculty repeatedly abusing, demonizing, and threatening Jewish students with impunity.  In enabling this campus antisemitism—which spews the same anti-Jewish vitriol the Nazis propagated eighty years ago—NYU has violated Title VI of the Civil Rights Act of 1964, breached its duties to plaintiffs and all other Jewish students it agreed to protect, and made plain that the representations and promises it made to plaintiffs on which they relied in enrolling at and paying tuition to NYU were false.

3.      The latest and worst outbreak of antisemitism at NYU occurred in the wake of October 7 when Hamas terrorists invaded the State of Israel—the sole Jewish country in the world—and tortured, raped, slaughtered, burned, and mutilated over 1,200 people, including infants, children and the elderly, and young people attending a music festival, in what would be the deadliest day for Jews since the Holocaust.  Since its formation, Hamas has made explicit

that its goal is the destruction of the State of Israel and all Jews everywhere, and Hamas spokespersons publicly proclaim their determination to continue their attacks until their genocidal aims are achieved.

4.     Shockingly, numerous students and faculty members at NYU have openly and enthusiastically endorsed Hamas's October 7 massacre and applauded Hamas—which the U.S. State Department has designated a foreign terrorist organization.  Many have resorted to harassment and violence in supporting Hamas and condemning Israel's response in self-defense. The horrific October 7 attack thus lit a match to an already combustible antisemitic campus environment that NYU had created by tolerating and greenlighting antisemitic activity for years.

5.     Faced with pleas for help and protection from plaintiffs and other Jewish NYU students fearing for their safety and unable to escape relentless harassment, NYU has continued to do nothing.  Mobs of students, often accompanied and encouraged by professors, have been given *carte blanche* to harass and intimidate NYU's Jewish population.  As a result of NYU's actions and inactions, antisemitism at NYU now thrives like never before, endangering the safety, well-being, and indeed lives of NYU's Jewish students.  Nearly every day since the attack, plaintiffs and other Jewish students have been forced to run a campus gauntlet of verbal and physical harassment, threats, and intimidation.  Moreover, Jewish students' complaints are ignored, slow-walked, or met with gaslighting by NYU administrators, including NYU President Linda Mills, who, among other things, falsely dismiss antisemitism on campus as being blown out of proportion.

6.     NYU has not "addressed and ameliorated" campus antisemitism, as the university committed to do three years ago.  In fact, shockingly, NYU has done the opposite—it has deliberately sought to burnish its antisemitic credentials and make the campus environment even

more hostile and frightening for Jewish students.  For example, on October 9, just two days after the horrific terrorist attack in Israel, NYU announced the appointment of Eve Tuck to establish a so-called "Center for Indigenous Studies" at NYU.  Professor Tuck, who has a long history of anti-Israel statements, wasted no time praising the murder of Jews.  Four days after the Hamas massacre, she called the "Palestinian resistance" "life and future affirming," and two weeks later, signed a viciously antisemitic open letter defaming Israel.  NYU did not censure or terminate Professor Tuck—as it has done for far less egregious conduct where antisemitism was not involved—but remained silent for a month, when it belatedly issued a statement on her behalf purporting to condemn Hamas's terrorism—which, given her previous statements, could not have been more disingenuous.

7.      As a result of NYU's brazen disregard for its obligations to protect its Jewish students from antisemitism, they have suffered severe injury to themselves and their educational experience.  Each plaintiff has been the target of repeated verbal and physical threats, and made to feel unsafe on campus, as they are forced to confront angry mobs of students and faculty members extolling the Hamas massacre, and calling for the deaths of Jews and the annihilation of Israel.  As a result of the hostile environment created by NYU, plaintiffs are traumatized: their schoolwork has suffered and they often stay in their dorms or apartments or go home to be with their families, rather than venturing out to face harassment from fellow students in class or the library or rampaging mobs in the streets hurling anti-Jewish epithets.

8.      Fearing for their lives and sickened by the virulent antisemitic hate speech that is part of their daily life at college, plaintiffs reached out for help from the university, including from, among others: NYU President Mills; Rafael Rodriguez, the Associate Vice President and Dean of Students; and Jennie Torres, Investigator in the Incident Review and Victim Services

Unit at NYU's Department of Campus Safety.  Rather than implementing urgently needed protective and disciplinary measures to restore campus order and safety, these administrators gaslighted the Jewish students, insisting that their fears were exaggerated and that they should just call the Wellness Exchange, a hotline for students coping with emotional challenges.

9.      No college student should be forced to endure such outrageous, demoralizing, and life-threatening treatment anywhere, much less at an institution that touts in its Code of Ethical Conduct its purported "adherence to the highest ethical standards," "respect for and compliance with the law," and "respect for the rights and dignity of others."  Rather than adhering to these principles, NYU has abandoned its Jewish students, leaving them dangerously unprotected, unsafe, defenseless, and fearful.

10.     The effect of NYU's inaction and, indeed, complicity in the torrent of anti-Jewish hatred that has engulfed its campus has been the normalization of antisemitism in the NYU community.  Whereas pro-Hamas faculty and students are permitted to engage in vicious antisemitic hate speech, Jewish students are told to keep quiet, maintain a low profile, avoid making waves, and call a wellness hotline.

11.     Because NYU has repeatedly thumbed its nose at Title VI's prohibitions against discrimination, and has demonstrably and shamefully breached its obligations to its Jewish students, NYU must now be compelled through injunctive relief to implement institutional, far-reaching, and concrete remedial measures, including by, among other things: (i) terminating deans, administrators, professors, and other employees responsible for the antisemitic abuse permeating the school, whether because they engaged in it or permitted it, and (ii) suspending or expelling students who engage in such conduct.  NYU must also pay damages to plaintiffs—who

have been robbed of their college experience—to compensate them for the hostility they have been forced to endure as a consequence of NYU's unlawful conduct.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and § 1343 over the claims arising under Title VI of the Civil Rights Act of 1964 ("Title VI") (42 U.S.C. § 2000d *et seq.*).  This Court has supplemental jurisdiction over plaintiffs' related state law claims under 28 U.S.C. § 1367(a) because those claims arise out of the same case or controversy as plaintiffs' federal claims.

13.     This Court has personal jurisdiction over defendant because NYU is based and operates in New York.

14.     Venue in this District is proper under 28 U.S.C. § 1391 because it is the judicial district in which a substantial part of the events or omissions giving rise to plaintiffs' claims occurred and where NYU is located.

## PARTIES

15.     Plaintiff Bella Ingber is a Jewish student at NYU and has attended NYU since September 2021.  She is a junior in NYU's College of Arts and Sciences.

16.     Plaintiff Sabrina Maslavi is a Jewish student at NYU and has attended NYU since September 2023.  She is a junior in NYU's Gallatin School of Individualized Study.

17.     Plaintiff Saul Tawil is a Jewish student at NYU and has attended NYU since September 2021.  He is a junior in NYU's School of Professional Studies' Schack Institute of Real Estate.

18.     Defendant NYU is a private, not-for-profit university, located in New York, New York.  At all times relevant to this Complaint, NYU was and continues to be a recipient of

federal funding, making it subject to Title VI.  NYU is also an "educational institution" and place of "public accommodation" within the meaning of the New York State Human Rights Law and the New York City Human Rights Law.  As of June 30, 2023, NYU's Endowment Fund stood at $5.9 billion.  In 2022 and 2021, grant and contract revenue that NYU obtained from U.S. governmental sources totaled over $761 million and $585 million, respectively.

## FACTS

**A.    Federal, State, and Local Laws Protect Against Antisemitism**

19.     Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, prohibits discrimination on the basis of race, color, or national origin in any program or activity that receives federal funding or other federal financial assistance.  Title VI protects all students, including Jewish students, in federally funded programs or activities.

20.     Since at least September 2004, it has been the policy of the Office of Civil Rights ("OCR") of the U.S. Department of Education ("DOE"), the agency responsible for enforcing Title VI, to investigate claims related to antisemitism.  And in an October 26, 2010 letter to federally funded schools, OCR confirmed that such schools must address antisemitic harassment under Title VI.  According to OCR's letter, such harassment violates Title VI when it creates a "hostile environment" in which "the conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school" or when the harassment is "encouraged, tolerated, not adequately addressed, or ignored by school employees."

21.     OCR, in its letter, made clear that schools must take "immediate and appropriate action to investigate or otherwise determine what occurred" when responding to harassment claims, and, when such investigations reveal that discriminatory harassment occurred, schools

"must take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring."

22.     Both the Trump and Biden Administrations have since confirmed the urgent necessity under Title VI to combat antisemitism.  In December 2019, President Trump issued Executive Order 13899 on Combating Anti-Semitism (the "Executive Order"), directing the executive branch to enforce Title VI against discrimination "rooted in anti-Semitism as vigorously as against all other forms of discrimination prohibited by Title VI," and in doing so, to consider the definition of antisemitism promulgated by the International Holocaust Remembrance Alliance ("IHRA"), an intergovernmental organization comprising over thirty-five countries.

23.     Under the IHRA definition, the following are "contemporary examples of antisemitism":

- "Calling for, aiding, or justifying the killing or harming of Jews in the name of a radical ideology or an extremist view of religion";

- "Making mendacious, dehumanizing, demonizing, or stereotypical allegations about Jews as such or the power of Jews as collective—such as, especially but not exclusively, the myth about a world Jewish conspiracy or of Jews controlling the media, economy, government, or other societal institutions";

- "Accusing Jews as a people of being responsible for real or imagined wrongdoing committed by a single Jewish person or group, or even for acts committed by non-Jews";

- "Denying the fact, scope, mechanisms (*e.g.* gas chambers) or intentionality of the genocide of the Jewish people at the hands of National Socialist Germany and its supporters and accomplices during World War II (the Holocaust)";

- "Accusing the Jews as a people, or Israel as a state, of inventing or exaggerating the Holocaust";

- "Accusing Jewish citizens of being more loyal to Israel, or to the alleged priorities of Jews worldwide, than to the interests of their own nations";

- "Denying the Jewish people their right to self-determination, *e.g.*, by claiming that the existence of a State of Israel is a racist endeavor";

- "Applying double standards by requiring of [Israel] a behavior not expected or demanded of any other democratic nation";

- "Using the symbols and images associated with classic antisemitism (*e.g.*, claims of Jews killing Jesus or blood libel) to characterize Israel or Israelis";

- "Drawing comparisons of contemporary Israeli policy to that of the Nazis";

- "Holding Jews collectively responsible for actions of the state of Israel"; and

- "Criminal acts are antisemitic when the targets of attacks, whether they are people or property – such as buildings, schools, places of worship and cemeteries – are selected because they are, or are perceived to be, Jewish or linked to Jews[.]"

24.     On January 4, 2023, the DOE, citing the "rise in anti-Semitic incidents," released a fact sheet entitled "Protecting Students from Discrimination Based on Shared Ancestry or Ethnic Characteristics," which notes that Title VI's protections extends to "students who experience discrimination, including harassment, based on their shared ancestry or ethnic characteristics or citizenship or residency in a country with a dominant religion or distinct religious identity."

25.     On May 25, 2023, President Biden released The U.S. National Strategy to Counter Antisemitism, which his administration described as the "most ambitious and comprehensive U.S. government-led effort to fight antisemitism in American history," and the DOE launched its Antisemitism Awareness Campaign.  As part of that campaign, OCR released a letter reminding schools of their legal obligations under Title VI to provide all students, including Jewish students, a school environment free from discrimination and to take immediate and appropriate action to respond to harassment that creates a hostile environment.  On September 28, 2023, as part of President Biden's National Strategy to Counter Antisemitism,

eight federal agencies confirmed again that Title VI prohibits antisemitic forms of discrimination in federally funded programs and activities.

26.     In the wake of Hamas's October 7 terrorist attack against Israel, which, according to President Biden, contributed to an "alarming" rise in antisemitism at schools and on college campuses, OCR announced that it was expediting its processing of discrimination complaints involving antisemitism, and at least seven bills have been introduced in both houses of Congress condemning support for Hamas, Hezbollah, and other terrorist organizations at American universities which has created a hostile educational environment for Jewish students, faculty, and staff. On October 18, 2023, the U.S. Senate passed a resolution condemning "antisemitic student activities," which named NYU twice, and on November 2, 2023, the U.S. House passed a resolution condemning support for Hamas, Hezbollah, and other terrorist organizations at American universities.

27.     On November 7, 2023, OCR released a letter "remind[ing] colleges, universities, and schools that receive federal financial assistance of their legal responsibility under Title VI . . . to provide all students a school environment free from discrimination based on race, color, or national origin, including shared ancestry or ethnic characteristics." The letter states: "It is your legal obligation under Title VI to address prohibited discrimination against students and others on your campus—including those who are perceived to be Jewish [or Israeli] . . . in the ways described in this letter." Given the rise in antisemitism on campus, the DOE also announced plans to hold technical assistance webinars to ensure that students facing discrimination on campus have the information they need to file a formal complaint with OCR.

**B.     NYU Fails to Enforce Its Own Policies to Protect Jewish Students**

28.     NYU has issued at least eight applicable policies designed and intended to protect students from discrimination, harassment, and intimidation at NYU: (i) NYU's Non-

Discrimination and Anti-Harassment Policy and Complaint Procedures for Students; (ii) Student

Conduct:  Mission, Values, and Learning Goals; (iii) Guidance and Expectations on Student

Conduct; (iv) Student Conduct Policy; (v) Student Conduct Procedures; (vi) Faculty Handbook;

(vii) Code of Ethical Conduct; and (viii) Rules for the Maintenance of Public Order.

29.     Among other things, NYU asserts that, as a result of its issuance and enforcement

of these policies—which, it says apply wherever students are—including on social media and in

nearby Washington Square Park—its students enjoy an environment that is an "unrivaled setting

to learn and grow."  NYU repeatedly assures and represents to students that it intends to enforce

its policies and that discrimination, harassment, and intimidation of the type plaintiffs have

experienced is impermissible and will not be tolerated.

30.     NYU's assertions, assurances, and representations have proven false.  As alleged

in detail herein, Jewish students are routinely targeted for antisemitic discrimination, harassment,

and intimidation, without consequence, by their peers and professors.  Even though every

instance of antisemitic behavior alleged herein is prohibited by one or more of NYU's policies,

the university has done nothing to enforce these policies to remedy or prevent that behavior, and

certainly nothing approaching the manner in which NYU has enforced them with respect to

misconduct not involving antisemitism.  NYU selectively enforces its own rules, deeming Jewish

students unworthy of the protections it readily affords to non-Jewish students victimized by

discrimination, harassment, and intimidation.

    **i.**    **NYU's Non-Discrimination and Anti-Harassment Policy**

31.     NYU's Non-Discrimination and Anti-Harassment Policy and Complaint

Procedures for Students (the "Discrimination Policy") states that it "demonstrates [NYU]'s

strong commitment to prevent discrimination and harassment against students on the bases of

several protected characteristics," such as shared ancestry and ethnic characteristics, including

antisemitism, and that when complaints against students are made, NYU's Office of Equal

Opportunity will investigate, and students found to have violated the Discrimination Policy will

face disciplinary measures, including suspension.  NYU faculty is also subject to the

Discrimination Policy: "Where allegations are made against employees for possible violation of

this policy (including allegations that the university has engaged in retaliation), the matter will be

investigated and resolved utilizing the procedures of the Non-Discrimination and Anti-

Harassment Policy and Complaint Procedures for Employees."

32.     The Discrimination Policy incorporates the widely accepted definition of

antisemitism promulgated by the IHRA.

### ii.     Student Conduct:  Mission, Values, and Learning Goals

33.     According to NYU, the "mission" of its Office of Student Conduct and

Community Standards ("OSC") is to "support[] the maintenance of a safe, accountable, and

inclusive community" and to "resolve[] situations in which a student's behavioral choices may

be negatively impacting themselves or others[.]"  Regarding accountability, NYU states: "As

members of the NYU community, students are expected to uphold their responsibilities to

maintain a safe and productive campus community, which includes adherence to NYU policies.

When these polices are violated, students will be held accountable and are expected to recognize

how their actions and decisions affect the larger community."

### iii.    NYU's Guidance and Expectations on Student Conduct

34.     In NYU's Guidance and Expectations on Student Conduct (the "Guidance") NYU

asserts that it "reaffirm[s]—amidst a concerning rise in hate and intimidation nationally and

internationally—our expectations for student conduct."

35.     According to the Guidance: "All students deserve the opportunity to live and learn

in peace.  Our aim is to maintain our academic mission, abide by our principles, safeguard the

well-being of all members of the community, and act in accord with long-established rules even in this fraught moment." The phrase "long-established rules" hyperlinks to the NYU Student Conduct Policy described below.

36.     The Guidance provides as follows:

- **Nondiscrimination and anti-harassment ("NDAH")**: "The University's NDAH Policy, which specifically prohibits antisemitic . . . discrimination and harassment, applies to all members of the community at all times. Advocacy on current events is not a license to discriminate. Some examples of activities that may violate the NDAH Policy [include:] . . . Targeting someone for harassment or intimidation on the basis of their identity, their religious attire, their name, their language spoken; use of dissemination of tropes about protected groups (eg, . . . 'Jews control the media'), including instances involving substitute code words. Calls for genocide of an entire people or group."

- **Intimidation and violence**: "The University has zero tolerance for any form of violence, threats, or intimidation. This includes, but is not limited to, using language advocating for killing people or groups of people, and all relevant synonyms (e.g. eradicate, destroy, massacre, exterminate, etc.)."

- **Behavior during protest activities**: "Protests and demonstrations may not use amplified sound (*e.g.*, bullhorns, speakers, drums) indoors or directly adjacent to classrooms or residence halls. Physically accosting someone who is participating in a protest, attempting to grab or move their signs or equipment, and/or sabotaging their equipment are examples of violations. All organizers and participants of a protest or demonstration are responsible for the conduct of the event, and must cooperate with the University and its directives, including with respect to safety and security. These rules apply to counter-protests as well."

- **University activities and events**: "We do not permit 'heckler's veto'; it is a violation to interrupt, impede, disrupt, or otherwise interfere with any University event, including student group or club events. . . . [H]olding signs or banners is permissible so long as they do not block the view of other attendees, are not affixed to any University property consistent with a building's relevant policies, and do not contain threats or other content that would violate the NDAH or contribute to a hostile environment under the NDAH."

- **Signs, posters, banners, etc.:**

    o       "*Removing Signs*: Individuals may not remove, deface, or cover over an-other individual or group's sign or poster."

- o   "*Sign Content*:  Signs containing material that violates the NDAH policy or contribute to a hostile environment under the NDAH aren't permitted.  A sign with a bigoted message or symbol or that advocates violence against anyone in the University community are clear, sanctionable violations."

- **Social media and online activity**: "The University does not discipline social media content writ large, however the University will take student disciplinary action for conduct occurring outside the University context, including online, when such conduct substantially disrupts the regular operation of the University; threatens the health, safety, or security of the University community; or results in a violation of the NDAH (such as a hostile environment).  Social media posts may also be taken into account to establish context or intent, where relevant, in reviewing other forms of misconduct."

### iv.   NYU's Student Conduct Policy

37.    Under NYU's University Student Conduct Policy (the "Student Conduct Policy"), NYU asserts the "right to require the cooperation of its [community] members in the performance of its educational functions, and to oversee and regulate the conduct and behavior of such members which, actually or has potential to, impede, obstruct, or threaten the maintenance of order and achievement of the University's educational goals," sets forth standards of "non-academic misconduct" which are "applicable to all undergraduate and graduate students and Student Organizations at NYU," and provides that NYU "may take student disciplinary action for conduct occurring outside the University context which substantially disrupts the regular operation of the University or threatens the health, safety or security of the University community."

38.    NYU's Student Conduct Policy proscribes the following behavior:

- "Engaging in or threatening to engage in behavior(s) that, by virtue of their intensity, repetitiveness, or otherwise, endanger or compromise the health or safety of oneself, another person, or the general University community.  This includes, but is not limited to, threatening, tormenting, mocking, intimidating, maliciously or inappropriately ridiculing another's work or comments beyond the scope of scholarly inquiry, and exploiting known psychological or physical vulnerabilities or impairment.";

- "Physical violence, actual or threatened, against any individual or group of persons.";

- "Vandalizing, damaging, destroying, defacing, or tampering with university property or the property of others.";

- "Engaging in behavior prohibited under the NYU Non-Discrimination and Anti-Harassment Policy for Students or for Employees.";

- "Disorderly, disruptive, or antagonizing behavior that interferes with the safety, security, or health of the community, and/or the regular operation of the University."; and

- "Behaviors that, by virtue of their intensity and/or repetitiveness, interfere with an educational activity (e.g., classroom, remote or online learning environments, advising session, lecture, workshop . . . deliberately engaging in other behaviors that unreasonably and illegitimately distracts from or interferes with the educational experience or otherwise violates University policy."

39.     Under the Student Conduct Policy, "[w]hether acting in an official or unofficial capacity, Student Organizations and individuals within those organizations may be held accountable for violations."

40.     NYU has a history of selectively enforcing the Student Conduct Policy.  As alleged below, NYU has not enforced this and its other policies when Jewish students, like plaintiffs, are victims.

###     v.     Student Conduct Procedures

41.     Alleged violations of the Student Conduct Policy are reviewed and resolved pursuant to the Student Conduct Procedures ("Conduct Procedures").  OSC is listed as the "Responsible Officer" and the Conduct Procedures apply to all students.

42.     Where a violation is found, the Conduct Procedures provide for sanctions, including, but not limited to: written warning, censure, no contact directive, educational assignment, mandatory health referral, restitution, restriction of privileges, residential probation,

residence hall reassignment, dismissal from housing, university disciplinary probation, transcript notation, suspension from NYU, and expulsion from NYU.

43.     Under the Conduct Procedures, pending investigations of allegations, the Dean of Students can implement "interim measures," including suspension, no contact orders, and other restrictions of privileges.

### vi.     NYU's Faculty Handbook

44.     The NYU Faculty Handbook provides that "all faculty are expected to carry out their institutional responsibilities in accordance with applicable legal and ethical principles, including the principles found in the NYU Code of Ethical Conduct and in this Handbook."

45.     NYU's Faculty Handbook prohibits conduct that is "prejudicial to the teaching, research, or welfare or reputation of the University, or [] conduct not protected by academic freedom unbecoming a member of the faculty."

46.     As with its other policies, NYU has utterly failed to enforce the Faculty Handbook when it comes to antisemitic mistreatment, abuse, and harassment of Jewish students.

### vii.     NYU's Code of Ethical Conduct

47.     NYU's Code of Ethical Conduct, which is incorporated by reference into the Faculty Handbook, sets forth the "general principles to which we subscribe and to which we expect every member of the University—every part-time and fulltime employee, faculty member, officer, trustee, overseer, and advisory board member—to adhere," including:

- **Adhering to the Highest Ethical Standards**: "Every member of the University shall, at all times, conduct his or her activities in accordance with the highest professional and community ethical standards."

- **Respect for and Compliance with the Law**: "Every member of the University is expected to become familiar with those laws, regulations, and University rules which are applicable to his or her position and duties, and to comply with both their letter and spirit. The University will implement

programs to further members' awareness and to monitor and promote compliance[.]"

- **Respect for the Rights and Dignity of Others**: "New York University is committed to a policy of equal treatment, opportunity, and respect in its relations with its faculty, administrators, staff, students, and others who come into contact with the University.  Every member of the University is prohibited from discriminating on the basis of race, color, religion, sexual orientation, gender and/or gender identity or expression, marital or parental status, national origin, citizenship status, veteran or military status, age, disability, and any other legally protected status; physically assaulting, emotionally abusing, or harassing anyone; and depriving anyone of rights in his or her physical or intellectual property, under University policy, or under federal, state, and local laws."

48.      Again, NYU has utterly failed to enforce this Code of Ethical Conduct to protect its Jewish students.

**viii.    NYU's Rules for the Maintenance of Public Order**

49.      NYU requires its students and faculty members to comply with its Rules for the Maintenance of Public Order, for the "maintenance of public order on campus and other University property used for education purposes[.]"

50.      These rules provide that "all members of the University community—students, faculty members, and members of the staff—shall comply with city, state, and federal laws and ordinances affecting the maintenance of order on University premises."  According to the Rules, "[c]onduct that is violative of such laws and ordinances occurring on University premises may be subject to both University discipline and public sanctions as circumstances may warrant or dictate," and "[c]onduct that is violative of such laws and ordinances off University premises" will also be subject to discipline if such conduct "seriously affects the interests of the University or the position of the member within the University community, or occurs in close proximity to University premises and is connected to violative conduct on University premises," including:

- "Interference with or disruption of the regular operations and activities of the University.";

- "Denial of, or unreasonable interference with, the rights of others—including persons not members of the University community who are present as invitees or licensees—on University premises.  These rights include the right of academic freedom as well as constitutionally protected rights."; and

- "Unauthorized access to or occupation of nonpublic areas on University premises but not limited to classrooms, seminar rooms, laboratories, libraries, faculty and administrative offices, auditoriums, and recreational facilities."

51.     When Jewish students have been the victims of antisemitic abuse and harassment, NYU has not enforced its Rules for the Maintenance of Public Order as it has when non-Jewish students are victimized.

**C.     NYU's History of Antisemitism and Civil Rights Violations**

    **i.     Reported Incidents of Antisemitism from 2014 through 2020**

52.     Antisemitism on NYU's campus is hardly a new phenomenon; to the contrary, it started decades before Hamas's October 7 attack.  Over the last ten years, however, there has been a steadily increasing incidence of antisemitic attacks at NYU.  Despite repeated assurances and promises by NYU that it would take meaningful and concrete steps to address and remedy the hostile antisemitic environment that pervades the university, administrators have done little to nothing to rectify the problem.  In fact, their representations about meaningful remedial measures were plainly intended to string along victimized Jewish students, for whom the harassment, vilification, and abuse has not only continued unabated, but has soared to alarming and dangerous levels.

53.     In April 2014, ostensibly to protest Israeli government actions, members of NYU's Students for Justice in Palestine ("SJP"), anti-Zionist student group formally recognized by NYU and a chapter of the national SJP, slipped mock eviction notices under the doors of student rooms at NYU's Palladium Hall, a dormitory well known to have a high concentration of Jewish students because it has an automatic elevator that observant Jews can use on Shabbat

without violating religious strictures.  An NYU spokesperson blithely dismissed the incident—which caused anguish and fear among Jewish students—as merely a disappointing prank that went too far.  The NYU Residence Life and Housing Office was tasked with looking into the matter and "following up appropriately," but no action was taken against SJP.  By contrast, when a similar incident took place at Northeastern University a few months earlier, the university immediately suspended the responsible SJP group.  Just weeks after distributing the eviction notices, NYU's SJP conducted an antisemitic "die-in" rally with such pro-terrorism and genocidal chants as "resistance is justified when a people are occupied" and "Zionist state, tear it down."

54.     SJP is forthright that one of its core objectives is to impede, undermine, and interfere with the ability of Jewish students to be participants in NYU's educational and other activities: as the then-president of SJP stated in 2019, "our point is to make being Zionist uncomfortable on the NYU campus."  As a study published by the Network Contagion Research Group, an independent research institute, has shown, the presence of SJP on university campuses "significantly" correlates with antisemitic activity.  In 2019, NYU awarded SJP its "President's Service Award," praising it for "giving [] time, energy and talents, [that had] positively impacted the culture of this institution and members of our community."  In contrast, other institutions—such as Fordham University, Brandies University, Florida's State University System, and Lafayette College—have refused to recognize it or banned or suspended it from campus, recognizing that the group provides material support to Hamas, a designated foreign terrorist organization.

55.     Not only were there no repercussions for SJP's blatant antisemitism in 2014, but NYU itself, through its Hagop Kevorkian Center for Near Eastern Studies and Gallatin School of

Individualized Study, gave SJP free rein to pursue its antisemitic campaign.  In March 2016, a guest speaker at an SJP event gave a speech in a packed campus lecture hall, demonizing and delegitimizing Israel, denying that Jews have the right to self-determination, arguing for an end to the Jewish state, claiming that Zionism is responsible for the "carnage" in the Middle East, and advocating boycott, divestment and sanctions ("BDS") efforts against Israel—all classic expressions of antisemitism.

56.     In April 2016, the so-called "Center for Human Rights and Global Justice" at NYU School of Law hosted an event with multiple panels called "The Palestinian Right of Return: A Legal and Political Analysis."  The so-called "Palestinian Right to Return" is understood to be a call for the destruction of Israel.  During the conference, panelists placed quotation marks around the phrase "Jewish State," denying Jews the right to self-determination, and advocated BDS efforts at NYU.

57.     Also in April 2016, NYU School of Law held an event entitled "Palestine in Focus: Reports from the Ground," at which the panelists made explicitly antisemitic statements that endorsed terrorism, telling students that Palestinians "have the right to resist occupation by any way[]" and that the "freedom fighters . . . are seeking an end and right to self-determination."

58.     On November 17, 2016, a note with a swastika—the symbol of the Nazis, which is still used to threaten and harass Jews around the world—was posted on the door of a Jewish student's dormitory room.  The student alerted NYU Campus Safety and filed a police report.  Two months later, in January 2017, "Jews are a virus" was written in black marker on a campus trash recycling bin.  That same month, SJP held an event on NYU's campus at which participants endorsed a global campaign to free from an Israeli jail Ahmad Saadat—the head of the Popular

Front for the Liberation of Palestine, a designated terrorist organization —who was responsible for numerous deliberate attacks on Jewish civilians, including the assassination of an Israeli government minister.

59.     Also in 2016, NYU Professor Amin Husain spoke at a pro-Palestinian rally in Times Square, boasting of his attacks against Israel during the first Palestinian Intifada, which occurred during roughly 1987-1993: "I was throwing rocks, Molotov cocktails, the like."  He is also the co-founder of a group called "Decolonize This Place," which, on October 8, 2023—the day after the Hamas massacre—posted an image condemning Israel and praising the "heroic Palestinian resistance."

60.     On Saturday, December 8, 2017, during the Jewish Sabbath, NYU's chapter of the national so-called Jewish Voice for Peace ("JVP") organization, an anti-Zionist and anti-Israel fringe organization whose members include both Jews and non-Jews, interrupted Shabbat observances at NYU's Bronfman Center for Jewish Student Life (the "Bronfman Center") to protest NYU's "Jewish institutions [which] foster superficial 'interfaith relations' while normalizing Israeli apartheid.  Since October 7, at least one chapter of JVP has been suspended for planning and carrying out unauthorized campus demonstrations alongside SJP.

61.     In January 2018, multiple swastikas were scratched into computer desks at an NYU dormitory common room and drawn on a dormitory bulletin board.  In February 2018, the lounge in an NYU residence hall was twice vandalized with swastikas.

62.     In April 2018, fifty NYU student groups pledged to participate in the BDS movement by, among other things, "boycotting NYU's pro-Israel clubs . . . by not co-sponsoring events with them."  The groups also pledged to boycott such off-campus groups as the Anti-

Defamation League, a Jewish organization founded well before modern Israel whose mission is "to stop the defamation of the Jewish people, and to secure justice and fair treatment to all."

63.     Later that month, JVP and SJP held an event called "BDS Work-in at the [NYU Bobst] Library."  The event announcement encouraged students to "come out to [the NYU Bobst Library] for a fun fun fun and easy action to put pressure on NYU admin and the Board of Trustees to divest from Israeli apartheid! . . . 53 NYU student groups have endorsed BDS!  Let's make sure [President] Andy Hamilton knows how we feel!"

64.     Around the same time, the NYU Politics Department, SJP, JVP, and the Young Democratic Socialists of America co-sponsored a talk entitled, "The Time to Act is Now: A Talk and Open Discussion on the Urgent Situation in Gaza," with Norman Finkelstein, a notorious antisemitic agitator, during which he repeatedly described Gaza as a "concentration camp."

65.     In April 2018, in celebration of Israel's 70th Independence Day, two pro-Israel student groups at NYU organized a gathering in Washington Square Park.  The pro-Israel students brought their concerns to the NYU administration about safety at the event, given that SJP had called for a boycott of all NYU pro-Israel groups, and had posted a flyer on its Facebook event page quoting the founder of the Popular Front for the Liberation of Palestine, who called for a "revolt" to publicize "Israel Apartheid Week."  Israel Apartheid Week is an annual program organized by virulent anti-Israel activists in cities across the globe, focused on support for BDS and vociferous slander of Israel as a "racist," "apartheid" state.  SJP was forced to take down the flyer but no significant action was taken against the group.

66.     Following the pro-Israel groups' announcement of their event, SJP and other NYU student groups organized a "Rally for Palestinian Right of Return."  That rally was to take place simultaneously with the pro-Israel event because they "refuse[d] to let such a disturbing

public celebration of colonialism and apartheid on [NYU's] campus and in our park go by without a response."  Around the time of these events, the president of SJP made the group's goal perfectly clear: "Our point is to make being Zionist uncomfortable on the NYU campus." Despite its antisemitic agitation and its proclamation that its mission was to target a group of Jewish students, NYU took no action, and SJP was, and is, permitted to remain on campus.

67.     SJP's so called "response" to the pro-Israel event at Washington Square Park, described above, included desecrating Israeli flags.  Attendees at the SJP rally threw a flag to the ground, stomped on it, and burned it.  Two NYU students were arrested: one faced charges of reckless endangerment and resisting arrest, and the other faced charges of assault, disorderly conduct, robbery, and criminal mischief.

68.     SJP's intimidation tactics at the pro-Israel event also included distributing flyers depicting assault rifles.  Toward the end of the event, a protestor disrupted a performance of Israel's national anthem, forcibly grabbing the microphone and shouting "Free Palestine."  The pro-Israel singer who was performing Israel's national anthem was reportedly injured.  NYU did nothing to punish the offenders.

69.     Then, in late October 2018, thirty student groups pledged that their members would not apply to NYU's Tel Aviv program, arguing that both NYU and the students in the Tel Aviv campus are complicit in what the student groups alleged was Israel's discrimination against Palestinians: "Our participation would render us complicit in the state of Israel's targeted discrimination against activists and Palestinian and Muslim students."  According to the Secretary of SJP, "[t]he pledge is above all a coalition of clubs affirming their respect for the academic boycott of Israel.  While people may view an act like this as symbolic regarding the

scope of the campus, we would invert the idea and emphasize that a significant amount of NYU clubs are declaring that they understand Israel to be an immoral and apartheid state."

70.     Around the same time, a letter was sent by anonymous students via email within the chemistry department urging it to "refrain from teaching or participating in academic events at NYU Tel Aviv."

71.     On December 12, 2018, an NYU student posted threatening messages on social media, forcing the Bronfman Center to close and enhance its security protocol.  According to the student, he "expressed extremely aggressive views towards Zionists because they believe in the genocide of ethnic and religious minorities."  The same student stated on social media, "I hope every Zionist kkkunt @ nyu is crying right now."  Posts by the student also included positive references to Hitler, a post telling followers to "remember to spit on zionists, it's proper etiquette," and an acknowledgement that his Twitter account had been suspended because "i expressed my desire for zionists to die."

72.     Not only did NYU take no steps to discipline SJP for its continual antisemitic statements and actions, on April 4, 2019, NYU awarded SJP the President's Service Award, which is awarded to individual students or student organizations that have had "an extraordinary and positive impact on the University community" and that promote "learning, leadership, and quality of student life at [NYU]."  Shockingly, NYU praised SJP for "giving [its] time, energy and talents, [that had] positively impacted the culture of this institution and members of our community."

73.     On April 21, 2019, an NYU alumnus, married to a professor in NYU's Tisch School of the Arts, published an op-ed entitled "Anti-Semitism at NYU" in *The Wall Street Journal* criticizing NYU for awarding SJP the President's Service Award, given that SJP

"push[es] BDS," which "demoniz[es] Israel" and "led a boycott of Zionist student clubs."  The op-ed also called out recent incidents: "Jewish students were assaulted at an Israeli Independence Day celebration last year in Washington Square Park, where two anti-Israel student agitators were arrested after desecrating Israeli flags.  The NYU Jewish Center received threats; swastikas were found in a residence hall.  The student government passed an anti-Israel BDS . . . resolution."

74.     One week later, NYU's then-President Andrew Hamilton published a response in *The Wall Street Journal* to the op-ed, entitled "NYU is Committed to its Jewish Community," in which he asserted that NYU has "long been known as a welcoming campus for Jewish students." He tried to distance himself from the SJP award given in his name, claiming that "[h]ad it been up to [him], SJP would not have received the award . . . because SJP's behavior has been divisive," and  that NYU's supposed "strong record of support for the Jewish community surely must count for more than a single student award."  Dismissing the incident rather than directly addressing the problem reflects NYU's reflexive defensive practice: It takes no steps to address, ameliorate, and prevent antisemitism, and instead simply rests on its non-existing laurels. President Hamilton ended his piece with empty clichés and yet another hollow promise: "Anti-Semitism is real; it should be fought.  But tarring NYU as anti-Semitic is wrong and unfair. NYU is committed to its Jewish community, and that is not ever going to change."

75.     In May 2019, more than 140 alumni and faculty members of NYU School of Medicine signed a letter to President Hamilton, urging him to combat a "climate of anti-Semitism at NYU that creates a hostile environment for Jewish students" and warning him that in recent months antisemitism had been "normalized" on NYU's campus.

76.     Later that week, on May 21, 2019, at the NYU Arts and Science graduation, a student graduation speaker, Steven Thrasher, called BDS a "duty" and delegitimized Israel with the false accusation of "apartheid."  In his speech, Thrasher stated: "I'm so proud, so proud, of NYU's chapters of Students for Justice in Palestine and Jewish Voices for Peace[,]... the NYU Student Government and of my colleagues . . . for supporting the boycott, divestment, and sanctions movement against the apartheid state government in Israel.  Because this is what we are called to do. This is our NYU legacy[.]"

77.     That same month, an incoming freshman, whose great-grandfather had founded NYU's Music Department and had been a professor at NYU for decades, publicly withdrew her enrollment, stating: "It has now become clear to me that as a Jew, if I were to attend NYU I would be affiliating myself with an institution that accommodates faculty members and student organizations that are dedicated to anti-Zionism and anti-Semitism."  As she put it, she would not attend an institution where her "very existence is being threatened."

78.     In February 2022, another swastika was found on scaffolding on an NYU building.  NYU, as always, took no concrete, let alone effective, steps to put an end to the outrageous antisemitism on its campus; instead, NYU spokesperson John Beckman paid lip service to NYU's "condemn[ation]" of "this act of revolting vandalism," and assured students that NYU would "continue to reject and oppose anti-Semitism."

79.     In response to NYU's statement, a Jewish NYU student, in *Washington Square News,* NYU's student newspaper, described the clear pattern: NYU would allow hate to fester, feign shock and condemnation in response to disgusting antisemitic incidents, but fail to address them with anything meaningful.  The author detailed how "simply stating that the university will 'reject and oppose anti-Semitism' provides no comfort or concrete solution toward the protection

of Jewish students on campus." She was unequivocal in describing her experience: "I'm a Jewish student at NYU and I feel unsafe on campus."

80.     At the same time NYU was turning a blind eye to the increasingly hostile antisemitism gripping its campus, it was receiving a massive influx of foreign, concealed donations from authoritarian regimes. From 2014 through 2019, despite statutory disclosure requirements, NYU received over $263 million in undocumented funding. During the same period, Qatar—which shelters and protects Hamas leaders and helps fund the terrorist organization—contributed over $2.7 billion in undocumented funding to institutions of higher education in the United States. A November 2023 study found a correlation on U.S. university campuses between the amount of such donations and heightened antisemitic incidents and demonization of Israel. The study concluded, among other things, that "[f]rom 2015-2020, Institutions that accepted money from Middle Eastern donors, had, on average, 300% more antisemitic incidents than those institutions that did not."

## ii.     NYU Fails to Fulfill Its Commitment to Resolve Claims of Antisemitism

81.     In April 2019, an NYU student filed a complaint with OCR (the "OCR Complaint") alleging that, in violation of Title VI, over the prior two years, Jewish students and students supporting Israel had experienced "extreme anti-Semitism on the NYU Campus." The OCR Complaint explained that the antisemitism largely stemmed from NYU SJP's actions and NYU's failure and refusal to adequately address them. According to the OCR Complaint, the student met with administrators throughout 2018 to express how uncomfortable Jewish students felt on campus. For example, during a student government meeting in mid-April 2018, on Israel's Independence Day, antisemitic students berated an NYU administrator, to the point where the administrator had to leave the meeting, after which the complainant herself was harassed by the angry mob. The student also questioned SJP's receipt of the President's Service

Award and discussed the resulting distress among Jewish students.  In response to her concerns, university administrators told the student "not to draw attention to [the award to SJP]."

82.     As a result of these allegations, OCR opened an investigation, and in September 2020, NYU entered into an agreement resolving the complaint (the "OCR Agreement") which included three detailed action items and reporting requirements.

83.     Action Item I required NYU, among other things, revise its Discrimination Policy to prohibit discrimination on the basis of shared ancestry and ethnic characteristics, including antisemitism (as defined in the Executive Order), include procedures for responding antisemitism, and address antisemitism involving student clubs.

84.     Action Item II required NYU's President or a designee, among other things, to issue a statement that NYU does not tolerate discrimination or harassment based on antisemitism, and that NYU would take all necessary actions, including student discipline, to address and ameliorate such misconduct.

85.     Action Item III required NYU to: include a component on national origin discrimination and harassment, including antisemitism, for each new training and/or orientation session NYU offered or required for the academic years 2020-2022; provide training on the Discrimination Policy to relevant staff and administrators responsible for responding to reports or complaints; and have NYU's Office of General Counsel provide training to senior leadership on the Discrimination Policy and prohibitions against discrimination and harassment based on antisemitism.  During the academic year 2020-2021, (a) NYU Planned to present an interactive customizable program about antisemitism, and (b) have NYU's Center for Multicultural Education and Programs partner with the Bronfman Center to develop a training model to combat antisemitism.

86.     As discussed herein, the Action Items were not complied with and were

insufficient in any event.

### iii.     NYU Fails to Enforce Its Own Policies, Enabling Antisemitism to Continue to Flourish on Campus

87.     Despite numerous antisemitic incidents on campus, complaints by students, the

formal complaint filed with OCR, the OCR investigation, and the OCR Agreement, NYU

continued to fail and to refuse to take any meaningful actions to combat, address, and ameliorate

antisemitism.

88.     On July 12, 2020, an NYU student posted on the Brandeis Center-affiliated

Instagram account "jewishoncampus"—in which students can post their antisemitic experiences:

"I was in a performing comedy class at NYU and the professor knew I was Jewish because I had

to miss a performance that he scheduled for Yom Kippur.  For two improv sketches, including

the final performance which was in front of an audience, he made the sketches I was in about the

Holocaust.  I was forced to perform and crack jokes, even as he said that I was a smokestack at

Auschwitz.  As if the genocide of my people and my family is a joke."

89.     In September 2020, just a few days after NYU signed the OCR Agreement,

swastikas were drawn on the NYU Silver Center for Arts and Sciences building accompanied by

the phrases, "Jews = N*****s" and "Kill the N****r."

90.     On or about February 9, 2021, the NYU Hagop Kevorkian Center for Near East

Studies held an event titled "Global Uprising – Insurrection and Reaction – Uprisings Against

the Left," at which one of the participants gave a speech supporting Hamas.  That same month,

another swastika was spray painted onto an NYU building.

91.     On October 5, 2021, the Instagram account "jewishoncampus" posted another

quote from an NYU student: "My professor compared the United States healthcare system to a

'concentration camp.'  He then went on to compare figures in the healthcare system to Dr. Mengele and stated that the system we have today is like the 'death panels' they had at concentration camps."

92.    On April 11, 2022, NYU School of Law's SJP chapter issued an antisemitic statement stating that it stands "unequivocally with Palestinians resisting their oppression," describing the media as "Zionist-funded," and referring to the "Zionist grip on the media" as "omnipresent."  Within twenty-four hours, eleven NYU student groups replied to the entire law school listserv to express their support for the statement.

93.    In response, NYU School of Law Dean Trevor Morrison emailed NYU's law students that the school was aware of what he called the "debate" taking place on the listserv. Rather than disciplining the students spewing antisemitic statements, Dean Morrison "reminded" students that they are required to abide by NYU's Discrimination Policy and stated that the School of Law would be investigating.  The President of NYU's Law Students for Israel noted that "[b]latantly anti-Semitic re-marks can be made in public with zero consequences at this law school . . . This has gone on for years, and it has only gotten worse."

94.    Around the same time, a group of Jewish students sent a letter to Dean Morrison expressing concern that a member of the NYU School of Law's SJP chapter, who had recently graduated, used the law student listserv to say, "to all the Zionists, we're keeping receipts."  Two NYU School of Law students who were collecting signatures for the letter received harassing messages online with threats and statements such as "from the river to the sea," a call for Israel and its people to be eradicated.  One of the students reported the harassment to the administration, which did not respond.

95.     On April 20, 2022, a week after NYU School of Law's SJP issued its statement,
Dean Morrison responded that debate should be conducted in a respectful manner, claiming that
phrases like "Zionist grip on the media" were only "close to the antisemitic trope that Jewish
people control the media."  The same day, President Hamilton published a statement directed
only to members of the Bronfman Center community, stating that the phrase was "profoundly
troubling" and that "[o]ne of antisemitism's most enduring fabrications is the invocation of
Jewish control of the media, a trope which dates back to the loathsome 'Protocols of the Elders
of Zion' and carries on, sadly, to this day."

96.     On May 9, 2022, the Instagram account "jewishoncampus" posted another NYU
student's report of antisemitic harassment: "In my climate change class we watched a video
about Thomas Midgley Jr., the man who invented putting lead in gasoline.  This guy caused the
death of a lot of people, after the video a student said 'damn this guy makes Hitler look good.'
Another student agreed, the rest chucked [sic], and the teacher said 'I know right.'  The other
Jewish girl in the class and I looked at each other mortified, stunned.  There is no need to
compare these two events."

97.     On May 31, 2022, the Brandeis Center wrote to OCR a letter stating that
notwithstanding its OCR Agreement commitments, NYU continued to have an "anti-Semitism
problem"  and urging that OCR continue monitoring NYU because the university had not
complied with its obligations to resolve the issues underlying the OCR Complaint.  The letter
described the many ways that NYU had failed to comply with the OCR Agreement.  First, the
OCR Agreement required NYU's Discrimination Policy to describe the forms of antisemitism
that can manifest in the NYU environment.  But the amended Discrimination Policy (which is
still in place) only generally refers to "certain rhetorical and physical manifestations directed

toward Jewish or non-Jewish individuals and/or their property, towards Jewish institutions, and towards religious facilities"; it does not specify the forms antisemitism can present at NYU. Second, the Discrimination Policy does not provide "representative examples" of discrimination based on antisemitism.  In fact, the type of conduct that prompted the OCR Complaint in the first place is notably absent from the Discrimination Policy.  As the complainant put it, "if what I went through at NYU two years ago wouldn't have fallen under their new antisemitism policy, then what's the point of their policy?"  Third, even though NYU agreed to adopt and disseminate the revised Discrimination Policy and conduct training by October 15, 2020, it failed to do so, if at all, until nearly a year after the deadline.

98.     On July 1, 2022, an NYU graduate student employed by NYU vandalized a mail service bag containing items shipped from an Israeli vendor, defacing it with the slogans "Free Palestine" and "Fuck [Israel]."  NYU initially fired the student and filed charges of vandalism and antisemitism, but subsequently dropped the charges and rehired the offender.  The student then released a statement asserting that "[t]he fact that I was targeted and almost lost my job for writing a pro-Palestine statement on a piece of trash shows the impact right-wing Israel advocacy groups have on our university administration."

99.     On August 17, 2022, the Instagram account "jewishoncampus" posted yet another statement from an NYU student who experienced antisemitism on campus: "During the first class of the semester, my teacher, who was also my assigned academic advisor, said 'I hate Jews-they're rich and spoiled.'  She then shared a story about a Jewish woman who wouldn't walk in the rain to preserve her designer shoes and encouraged students to share negative experiences they'd had with the Jewish people, including one girl who said that Jews were all racists who hated non-Jews."

100.     In a September 25, 2022 report issued by watchdog group StopAntisemitism, NYU received a failing grade for antisemitism on campus.  The report stated that NYU students do not feel "safe to be a Jew" on campus and "report a hostile and antisemitic environment" at NYU.

101.     NYU's inaction continued to signal to students and faculty that they could engage in antisemitism at NYU with impunity.  For example, on or about May 3, 2023, while a Jewish student was in the NYU John A. Paulson Center hanging posters opposing the growing antisemitic BDS movement on campus, another NYU student harassed her, telling her that she was the "reason why antisemitism is on the rise," and a "white supremacist," "fascist," and "bigot."  The Jewish student filed a harassment report and met with the heads of NYU Student Affairs, NYU Campus Security, and NYU Global Spiritual Life, all of whom assured the student that they would investigate the incident.  On May 9, 2023, the student met with Mathew Shepard, Interim Director of the Office of Student Conduct and Community Standards, to report that she was very concerned about seeing her harasser walking around campus.  Shepard replied that the incident was not a big deal, and that she should be prepared to see the student again on campus because NYU would not be taking action.  In fact, the student did see her harasser on campus again.  Having suffered no consequences for his first verbal attack, the harasser began and continues to stalk and harass her on social media.

**D.    NYU's Deliberate Indifference to the Antisemitism on Campus Creates and Heightens the Hostile Environment for Jewish Students**

102.     As a result of NYU's actions and inactions described above, including hiring antisemitic professors, permitting antisemitic speakers and messages, and repeatedly failing and refusing to enforce its own policies by taking disciplinary measures against students and professors who violate those policies by engaging in antisemitic harassment, NYU has made it

clear that it will permit, tolerate, and condone antisemitic activity. Such deliberate indifference and discriminatory application of NYU's policies created an environment in which antisemitic activity would necessarily increase, and elevated the risk to Jewish students, following Hamas's October 7 massacre.

      **i.**    **October 7, 2023: Hamas Terrorists Attack Innocent Civilians in Israel**

103.    At 6:30 a.m. on October 7, Hamas—which has been a designated Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act (INA) since 1997—launched an unprovoked surprise attack on Israel, engaging in depraved acts of violence and torture against Israeli citizens. Thousands of armed terrorists breached the Gaza security fence and invaded southern Israel while simultaneously firing thousands of rockets toward Israeli civilians and population centers. Once in Israel, the terrorists, acting as well-armed death squads, dispersed into Israeli towns shooting, raping, torturing, burning, mutilating, and beheading unarmed civilians, including infants, children, and the elderly, and taking hundreds of hostages and engaging in mass murder and rape at a music festival near Gaza's border with Israel.

104.    The IDF eventually neutralized the terrorists and regained control over the affected area. By the end of the day, Hamas killed over 1,200 people and abducted over 200 people.

105.    On October 18, President Biden described the October 7 slaughter as follows:

> Scores of innocents—from infants to elderly grandparents, Israelis and Americans—taken hostage. Children slaughtered. Babies slaughtered. Entire families massacred. Rape, beheadings, bodies burned alive. Hamas committed atrocities that recall the worst ravages of ISIS, unleashing pure unadulterated evil upon the world. There is no rationalizing it, no excusing it. Period. The brutality we saw would have cut deep anywhere in the world, but it cuts deeper here in Israel. October 7th, which was a sacred to—a sacred Jewish holiday, became the deadliest day for the Jewish people since the

> Holocaust.  It has brought to the surface painful memories and scars
> left by a millennia of antisemitism and the genocide of the Jewish
> people.

106.    Shockingly, numerous students and faculty members at NYU have openly enthusiastically Hamas's October 7 mass rape, murder and kidnapping and applauded Hamas. Many have resorted to harassment and violence in supporting Hamas and condemning Israel's response in self-defense.  They have accused Israel of:  "committing genocide" (even though the Arab population of Gaza has more than quadrupled since 1967); "occupying Gaza" (even though Israel completely removed itself in 2005 from Gaza, which also shares a border with Egypt); "targeting civilians" (even though Israel goes to great lengths to avoid civilian casualties while Hamas deliberately inflicts them; and "apartheid" (even though, unlike virtually every other country in the Middle East, all citizens in Israel enjoy equal rights).  Further evidencing and underscoring the antisemitism and antisemitic double standards motivating their activities, these students and faculty members are never heard to condemn, let alone rally against, countries which, unlike Israel, can be fairly accused of such crimes—including, for example, such Arab and Muslim countries as Syria and Yemen, which have killed hundreds of thousands of Arab civilians, including tens of thousands of Palestinians, and Pakistan, which is now expelling almost two million Afghan Muslims.

### ii.    NYU's Facially Inadequate Response to October 7 Fanned the Flames of Still More Campus Antisemitism

107.    Following Hamas's October 7 massacre of Israeli civilians, NYU continued to act with deliberate indifference, opening the floodgates to soaring antisemitic harassment, abuse, intimidation, and violence.  NYU students have publicly detailed their fear and trauma in the face of raging and unchecked antisemitism on campus.  As Ingber stated in an interview, "being a Jew at NYU right now is scary . . . [W]e are seeing an uptick in anti-Israel protests that are

turning antisemitic.  There are signs that read 'globalize the Intifada,' which is a historical call

for the extermination of Jews and call for violence against Jews."  Ingber recounted that students

are horrified and frightened as chants of "gas the Jews" and "Hitler was right" ring out on

campus, and students and professors serve up a "constant contextualization and justification of

Hamas's brutal terror attack at NYU," both in the classroom and around the school.  In a viral

video, another student added that "it's scary being Jewish on campus now because of all this."

In the same video, another student said she would withdraw from NYU the next semester.  The

antisemitic fervor that has gripped NYU, and NYU's failure and refusal to address and

ameliorate it, have led some Jewish students to withdraw from NYU already.

108.    The October 7 attack fell on the Jewish Sabbath and a Jewish holiday, Shemini

Atzeret.  Like other observant Jews, Ingber and Tawil were not using electricity on October 7.

When Ingber turned her phone on late that night, she was shocked and horrified to learn about

the Hamas massacre, as well as the glorification of Hamas's savagery and antisemitism that her

classmates were already posting on social media.

109.    On October 8, plaintiffs waited for their university's President to issue a statement

condemning Hamas's mass murder, just as NYU presidents had done for other minority groups

in the past.  But NYU issued no such statement.  Rather, on October 8, President Mills sent an

email to the NYU community that avoided condemning Hamas's massacre or expressing support

for NYU's Jewish student population: "No doubt you have heard the news of the multi-pronged

and deadly terrorist attack on Israel.  The fighting is uncommonly intense, with widespread

violence, injuries and loss of life, as well as hostage-taking of Israelis by Hamas."  President

Mills went on to assure that members of the NYU Tel Aviv program were safe and to remind

students that "[a]s a university community, we remain committed to dialogue and peaceful discourse."

110.    NYU's refusal to condemn Hamas's slaughter did nothing other than fan the flames of the antisemitism that was already endemic to life at NYU by emboldening antisemitic students and faculty members to escalate their attacks on Jewish students.  Facing criticism, two days later, President Mills "updated" her statement on the NYU website by adding a condemnation of Hamas's attack; otherwise, however, the statement remained just as tepid and disheartening for plaintiffs.  Even in her updated statement, President Mills did not offer a word of support for NYU's Jewish community, or acknowledge Jews at all.

111.    In response to President Mills's statement, SJP's NYU chapter published the following statement, signed by twenty-eight other student groups:

> Palestinian resistance, ***in any form it takes***, remains a direct consequence and result of the Israeli occupation.  While President Mills claims that we, as a university community, are committed to 'peaceful discourse,' we recognize that there is no peace in a colonized people living under occupation, subjugation, and apartheid. ***The path to peace is only possible through the fights*** for Palestinian rights and liberation and an end to colonial apartheid.

112.    SJP's statement echoed the sentiments of its national leadership, which, on October 7, justified and reveled in Hamas's mass rape, kidnapping, and slaughter, describing the massacres of Israelis as "***a historic win for the Palestinian resistance***," and calling for "[n]ot slogans and rallies, but ***armed confrontation*** with the oppressors."

113.    The next day, Ryna Workman, the President of NYU School of Law Student Bar Association ("SBA"), posted the following message on the organization's weekly newsletter:

> I want to express, first and foremost, my unwavering and absolute solidarity with Palestinians in their resistance against oppression toward liberation and self-determination.   Israel bears full responsibility for this tremendous loss of life.  This regime of state-sanctioned violence created the conditions that made resistance

necessary.  I will not condemn Palestinian resistance. . . .  Palestine
will be free.

114.    That same day, Troy McKenzie, Dean of NYU School of Law, issued a tepid

response, advising that the SBA president's statement "was not from NYU School of Law" and

"certainly does not express my own views, because I condemn the killing of civilians and acts of

terrorism as always reprehensible."  But Dean McKenzie conspicuously avoided any

condemnation of Workman or any announcement that Workman would be investigated to

determine if they violated any of NYU's rules and policies, while, like President Mills, refraining

from condemning the support for terrorism vociferously voiced by students or faculty members

and making clear that such vicious hate speech is unwelcome on campus.  In other words, he,

like President Mills, refrained from issuing the kind of clear, forthright, and immediate

condemnation NYU would have issued had the target been any group other than Jews protected

under Title VI.

115.    Then, on October 9, SJP's NYU chapter posted a picture on their Instagram page

promoting an October 12 rally.  The comments to the post included antisemitic statements such

as "FROM THE RIVER TO THE SEA, PALESTINE WILL BE FREE" and "Liberation is on its

way."  In a second Instagram post the same day, SJP asserted that "[t]he recent escalation in

Palestinian resistance over the past twenty-four hours is a direct and historic response to decades

of colonial violence and oppression[.]"  Maslavi, who saw the posts and comments as yet another

sign of the growing antisemitic wave on campus, was terrified to be Jewish on campus.  The next

day, Maslavi was too fearful to attend two of her scheduled classes and instead went to stay with

her family away from campus.

116.    On October 10, Maslavi emailed Jessica Pavone, the Chief of Staff to NYU

Gallatin School Dean Victoria Rosner, expressing her "deep concerns and fears" surrounding the

campus environment.  Maslavi explained that the administration's handling of the matter made her feel "unsafe and apprehensive about continuing [her] education at NYU."  Dean Pavone did not respond, instead forwarding her email to Patrick McCreery, Gallatin's Associate Dean. Associate Dean McCreery in turn forwarded Maslavi's email to Dean Rodriguez, who he said was "working to ensure student safety in this matter."  Dean Rodriguez has not responded to the email.

117.    That day, Maslavi, who is Vice President of the NYU chapter of Students Supporting Israel ("SSI"), also emailed President Mills directly, asking her to "take a strong stand against acts of violence and terror" and "create an atmosphere where all students can feel safe, regardless of their background or beliefs."  President Mills did not respond to Maslavi.

### iii.    NYU's Failure to Prevent or Respond to the Student-Organized National Day of Resistance

118.    On October 11, plaintiffs learned that SJP chapters across the country were holding a "National Day of Resistance" the following day.  For that event, SJP created and disseminated posters and pamphlets directing students to "mobilize" in "resistance" and featuring graphics of armed figures on paragliders—a reference to one of the methods the Hamas terrorists used to penetrate the Gaza border and perpetrate atrocities against Israeli civilians.

119.    The NYU SJP chapter posted on its Instagram account its intent to participate in the National Day of Resistance.  Many comments to the post included phrases such as "liberation is on its way" and "from the river to the sea Palestine will be free."

120.    That evening, Tawil went to Washington Square Park to attend a student-organized vigil for the victims of the Hamas attack.  Upon arriving, he saw numerous loud, menacing, anti-Israel protesters.  Fearing for his safety, Tawil removed his yarmulke to hide his Jewish identity and left the area.

121.     Maslavi was traumatized by the alarming antisemitic activity on campus.  On the afternoon of October 12, she emailed the professor of her Risky Business: Law, Economics, and Society in the Ancient World class, David Ratzan, who is also Jewish, advising that she was unsure if she could come to class because "NYU has not said anything about how they will ensure the safety of their students[.]"  Although Professor Ratzan conceded he was concerned for his own safety, he held the class as scheduled.

122.     Maslavi also emailed Dean Rodriguez, who had still not responded to her message from the prior day, to tell him that the "recent events and the way they have been handled by the university administration have left me feeling unsafe and apprehensive about coming to NYU tomorrow during SJP's day of resistance. What are you guys doing to protect your students??????"  In his response several hours later, Dean Rodriguez merely directed Maslavi to campus resources such as Campus Safety and the Wellness Exchange, a hotline for students coping with emotional challenges and added that "*we currently lack specific information about events* at NYU related to tomorrow's National Day of Resistance, it's likely that . . . some of our students may decide to organize impromptu gatherings."

iv.     **Student and Faculty Organize Antisemitic Protest in Washington Square Park**

123.     On October 16, Maslavi and other Jewish students distributed and hung, on and around campus, posters displaying the names, pictures, and ages of the more than 200 people Hamas had abducted and were holding as hostages.  Almost as soon as the posters went up, they were torn down and thrown in the trash by NYU students and others.  Posters that were not torn down were vandalized with slogans such as "Free Palestine" and smiley faces drawn over the hostages' faces.

124.     Maslavi and other Jewish students who observed the vandalism of the hostage posters filed a complaint, via emails, with NYU's Bias Hotline and with Patricia McSteen,

Senior Associate Vice President of the Department of Campus Safety.  Maslavi and the others detailed how the posters were being torn down and defaced, and demanded appropriate action be taken.  Maslavi did not receive a response to her emails that day.

125.    Disheartened by the lack of response, that night, Maslavi drafted and distributed a petition calling attention to the matter.  By the next morning, that petition gained 3,000 signatures.  Maslavi then sent that petition to McSteen and the Bias Hotline.  The petition identified two students as tearing down the posters and demanded that the university hold these students accountable and take disciplinary action.  Contrary to NYU's policies prohibiting such conduct, NYU did not respond to the petition or Maslavi's email, and posters continue to be torn down to this day.

126.    Not surprisingly, in the absence of any effort by NYU to address such misconduct, defacement of hostage posters at NYU has continued unabated.  On or about November 10, for example, Darren King, a postdoctoral fellow who teaches economics at NYU's Courant Institute of Mathematical Sciences, was filmed ripping down dozens of posters outside the NYU Stern Building.  Like those Maslavi reported, NYU has done nothing to discipline King for his out-and-out violations of university policies.

127.    Following the horrific October 7 terrorist attacks, antisemitism on campus grew so popular and prevalent that it gave rise to a new NYU organization.  Faculty for Justice in Palestine ("FJP"), a faculty group on campus dedicated to supporting SJP organizing and BDS campaigning.  The NYU chapter has over 225 members and describes Israel's response to the October 7 massacre as "colonial racial violence" and "ethnic cleansing."

128.    On October 17, 2023, at 6:00 p.m., FJP and SJP held a rally at Washington Square Park.  Maslavi and Ingber, along with other SSI members, also went to the park to hold a silent

vigil in support of Israel.  At the rally, Maslavi and Ingber heard and observed SJP and FJP

members burn an Israeli flag; make slit-your-throat gestures at the Jewish students present,

including plaintiffs; and scream at plaintiffs and the other Jewish students: "from the river to the

sea, Palestine will be free; "Hitler was right. The good Jews are from Germany" (*i.e.*, those who

were slaughtered by the Nazis); "Gas the Jews"; "Fuck the Jews"; and "Death to Kikes."  The

SJP and FJP rallygoers also threatened Jewish students present with rape, including one of

Ingber's friends, who was shaking with fear.

129.    Fearing for her safety in the face of the virulent antisemitism, Maslavi asked a

police officer to walk her to a subway station so she could go home to her parents' house.

During the trip home, she suffered a panic attack, fearing that one of the menacing protesters was

following her home.  That night, Maslavi became more distraught upon learning that the

antisemitic SJP and FJP mob had continued to rail against Israel and Jews into the night,

including by projecting antisemitic statements onto the NYU Library.

130.    NYU has done nothing—it has not investigated, condemned, or taken any action

against the SJP and FJP students and faculty members at the rally who engaged in the antisemitic

activity described above, who threatened to murder and rape Jewish students.

131.    As the protest finally wound down, at approximately 8:15 p.m., Tawil was riding

his bike down West 4th Street, past Washington Square Park.  Passing Tisch Hall at the Stern

School of Business, Tawil saw several people standing on the steps being berated by a screaming

woman.  Tawil approached and advised one of the people, who was Jewish, not to engage

further.  A crowd gathered, including approximately six men wearing keffiyehs who got in a

man's face as if they were going to attack him.  They then surrounded a woman, who had

seemingly been at the pro-Israel vigil, screaming that she was a "murderer" with "fake tears."

132.    Tawil moved behind a truck on the sidewalk to videotape the harassment.  One of the men approached Tawil, screamed that "you have my fucking face on film," and forced him to open his phone's camera roll and delete the video.  Tawil did so, and the man then yelled in Tawil's face, "get the fuck out of here you dirty fucking Jew."  Tawil got on his bike and fled.

133.    Upon arriving home, Tawil called Campus Safety.  A dispatcher stated that someone would call him back to obtain information about the incident.  No one called Tawil back until 1:59 a.m., when he was asleep.

134.    The next day, October 18, 2023, Tawil called Campus Safety back but he was told he would have to call back and speak to someone on the night shift who was familiar with his report from the night before.  That same day, Tawil received an email from NYU Victim Services, offering to meet.  Two days later, on October 20, Jennie Torres, Investigator in the Incident Review and Victim Services Unit at NYU's Department of Campus Safety, offered to talk to Tawil, but claimed her next availability was the evening of October 24 (a week after the incident occurred) or the afternoon of October 26.

135.    Tawil spoke to Torres on October 24, providing information about the incident. Torres responded that there was nothing NYU could do for him, other than direct him to NYU's Wellness Exchange, the hotline for students coping with emotional challenges.  In response, Tawil noted to Torres that, given the numerous cameras that record activity all over NYU's campus, NYU Campus Safety officials could and should check the video footage from the night of the event to determine the identities of the perpetrators who had assaulted him and forced him to delete the footage he had taken.  Torres stated that Tawil could file a police report with the NYPD to obtain the footage, but that Campus Security would not release video footage without a subpoena.

136.    Tawil further asked Torres whether, given the numerous acts of antisemitic harassment and threats on campus, NYU would be providing enhanced security for Jewish students.  Torres advised that NYU had purportedly already increased security.  Tawil then reminded Torres that, in response to a surge in anti-Asian violence in 2021 and 2022, NYU had taken steps to protect Asian students, including advising them to be cautious and report incidents of anti-Asian harassment, and asked whether NYU would do the same given the explosion of anti-Jewish incidents.  Torres stated that no such announcement would be issued because NYU had already issued a statement.  The statement she referred to, however, was an email from NYU concerning the rise of tensions on campus that had nothing to do with incidents of anti-Jewish threats and harassment.  Torres concluded the meeting by telling Tawil that someone from the NYU Bias Response line would contact him.

137.    On October 24, Tawil received an email from Oliver Davis, Assistant Director of Diversity and Inclusion in the Office of Equal Opportunity.  Davis's response read like a copied-and-pasted automatic reply, and misdated the incident that Tawil had reported:

> Thank you for sharing your concerns related to the incident occurring on October 16 [*sic*], 2023 at Stern.  We understand that the tragic violence suffered by hundreds of hostages held in Gaza and other unfolding tragedies have deeply disturbed our community. The Office of Student Conduct, which handles the Non-Discrimination and Anti-Harassment Policy for Students, is aware of the incident and has jurisdiction over the matter.  We would like to take this opportunity to reaffirm the University's values of Equity, Diversity and Inclusion, which includes NYU's prohibition on antisemitism, discrimination, or harassment toward our community members.

138.    Davis's email included links to the "Wellness Exchange" and directed Tawil to NYU's Campus Safety "regarding safety related concerns that may arise," noting, "[w]e appreciate you raising this matter with our office."  Neither the Office of Equal Opportunity nor the Office of Student Conduct, as referenced in Davis's email, have contacted Tawil.

139.    Maslavi returned to campus on Wednesday, October 18.  On her trip back, she saw a picture of the fountain in Washington Square Park with the water dyed red, and "Free Palestine" written on the ground in front of it.  Maslavi was emotionally unnerved by this sight, as it caused her to relive the events of October 17.  Still fearing for her safety, she returned to her parents' house the next day.

###### v.    NYU Responds to Plaintiffs' Mounting Concerns and Demands for Protection with an Empty Promise to "Get a Handle" on the Situation

140.    On the morning of October 18, 2023, at 9:06 a.m., one of Ingber's friends emailed Dean Rodriguez requesting an "urgent" meeting to discuss the growing antisemitism on campus. An hour later, Dean Rodriguez's secretary responded to the email, stating that the Dean "has been quite busy navigating these difficult days" and asking Ingber's friend for the specific details of her requested meeting.  Ingber's friend responded right away, explaining that she needed to speak to the Dean regarding antisemitism on campus, that it was "extremely urgent," and that she was "not able to go to any of [her] classes because the environment is so hostile."  At about 12:22 p.m., Dean Rodriguez sent a meeting invitation for that afternoon.  Following Ingber's request that Ingber be permitted to join the meeting, the invitation was forwarded to Ingber.

141.    At 2:00 p.m., Ingber and her friend attended a meeting with NYU administrators, including Dean Rodriguez; Melissa Carter, Senior Director and Head of Mindfulness Education and Programs for Global Spiritual Life; and Rabbi Yehuda Sarna, Executive Director of the Bronfman Center for Jewish Student Life.  The meeting was held at NYU's Kimmel Center for University Life.  The purpose of the meeting was for the Jewish student attendees to express their fear and safety concerns over the surging campus antisemitism, and to understand what, if anything, NYU was going to do about it.  At the meeting, Ingber and her friend explained that the out-of-control antisemitism, and NYU's failure to address it, had made their lives unbearable,

describing the disturbing events that had occurred.  Among other things, Ingber and her friend provided detailed accounts of the SJP/FJP antisemitic rally where other NYU students and faculty members hurled at them threats of murder and rape.

142.    During this meeting, Ingber's friend who had requested the meeting told the NYU representatives that she not only felt unsafe on campus but was even afraid to attend her classes, given that in one class, Organic Chemistry, she would have to see another student who she witnessed scream "Death to Kikes!" at the October 17 rally.  For her part, Ingber stated, among other things, that as the granddaughter of Holocaust survivors, it was extraordinarily upsetting that NYU was not taking steps to identify and discipline NYU students and faculty members engaged in antisemitic acts, including those who screamed "Gas the Jews!"  Dean Rodriguez claimed that he would try to "get a handle on the situation."

### vi.    NYU Students and Faculty Violate NYU's Code and Turn the Bobst Library into a Staging Ground for an Antisemitic Hate-Fest

143.    The Elmer Holmes Bobst Library (the "Library") is the primary library at NYU. Located in the center of campus, the Library is an important part of the academic experience for many NYU students.  Students rely on the Library as the principal location for studying and as a refuge from NYU's bustling city campus.  On October 20, 2023 however, NYU permitted the Library to be taken over by NYU students and faculty members who used it as the staging ground for an antisemitic rally featuring hours of genocidal chants calling for the destruction of Israel and violence against its Jewish inhabitants.

144.    Elmer Holmes Bobst, after whom NYU named the Library, was a pharmaceutical executive and well-documented antisemite who wrote infamous letters to then-President Richard Nixon, asserting that "[t]he Jews have troubled the world from the very beginning," that "[i]f this beloved country of ours ever falls apart, the blame rightly should be attributed to the malicious

action of Jews in complete control of our communications," and that the Jews were "a nasty, lousy group . . . acting like uncivilized people."  And to design the Library, NYU chose the architect Philip Johnson, a well-known Nazi sympathizer who attended the infamous rally in Madison Square Garden in 1939 in support of the Nazis.

145.    Midterm exams for undergraduate NYU students for the 2023 fall semester occurred during the second half of October.  Because midterms are a critical component of a student's grade for the semester, many students flock to the library during this period to study.

146.    On October 20, just days into midterms, while Maslavi was home, she was informed about an incident at the Library.  It began at approximately 2:50 p.m., when more than one hundred SJP and FJP students and faculty members entered the Library and, in direct violation of NYU's Student Conduct Policy and NYU Library Conduct Code, hung signs on the Library's upper levels and began to shout antisemitic slogans and chants calling for violence against Jews.

147.    Upon commandeering the Library, the antisemitic mob zip-tied a "Free Palestine" poster several stories high in the center of the Library, and hung other banners on the walls. Using an amplified sound system, the students and professors shouted such slogans as "from the river to the sea, Palestine will be free" and "resistance is justified when people are occupied."

148.    As the protest began, students who were studying in the Library approached members of the NYU faculty who were present, inquiring as to the situation.  In response, the professors engaged in disgraceful profiling, demanding to know if the students were "pro-Palestinian."  If a student answered affirmatively, the professors handed the student a mask to join the demonstration; if not, the NYU faculty members refused to engage with them.

149.    Aside from joining in group chants, the faculty attendees made statements endorsing the eradication of Israel and violence against citizens, including expressions of glee, approval, and admiration for Hamas's October 7 slaughter, rape, burning, torture, dismemberment, and kidnapping of Israeli civilians.  Among other things, NYU faculty members made the following statements:

- "2023 will be recorded historically as the year that Palestinians stood boldly in the face of colonial fascism.";

- "[W]e realize that phrases like "war crimes," "genocide," "apartheid," "criminality," and "inhumanity" seem unfit and atrociously insufficient to describe what the state of Israel has and continues to do[.]";

- "An occupying colonial power cannot claim the right to self-defense against the people under its brutal occupation. There is no moral equivalence between the colonizer and the colonized—however much the media attempts to claim otherwise.";

- "The great irony in the Zionist claim of victimhood is revealed in the genocide being committed by its military, fulfilling their aims of emptying Palestine of Palestinians."; and

- "The criminalization of resistance, including the self-criminalization of the right to resist, where all blood that is shed is blamed on the oppressed[.]"

150.    Faculty members directly and explicitly invoked and implicated almost every example of antisemitism listed in the IHRA's definition of antisemitism—the definition that NYU adopted in 2020.  These hate-filled and false statements glorified Hamas's sadistic terrorist attack, denigrated the victims who suffered unspeakable acts of torture, and absurdly compared Israeli actions to those of the Nazis—when in fact Hamas rivals the Nazis and ISIS in inhuman depravity.  The NYU faculty and students at the Library rally reveled in Hamas's butchery of civilians, describing it as "bold" resistance against "colonial fascism."  They asserted that the term "genocide"—which was invented to describe the horrors of the mass slaughter, gassing, and burning of Jews by the millions (a third of world Jewry) during the Holocaust—was "atrociously

insufficient" to describe Israel's policies, even though Hamas's October 7 slaughter killed more Jews in a single day than any other event since the Holocaust. They also asserted that Israel had no right to defend itself against the atrocities Hamas had committed.

151.    At one point, a Jewish student who was at the library got up to witness the spectacle before her: NYU faculty and students celebrating the massacre, mutilation, kidnapping, and rape of Jews.

152.    L'Heureux Lewis-McCoy, an Associate Professor of Sociology of Education at NYU's Steinhardt School, and a member of FJP, took out his phone and began filming the student, in an apparent attempt to intimidate her. It worked. The student began to cry, covering her mouth in a futile effort to muffle her sobs. Even then, Professor Lewis-McCoy did not relent, let alone try to comfort her, as any civilized person would have done—he continued to focus his camera on the sobbing student's face, shifting his weight so that he could lean on the Library's guardrails to make himself more comfortable as he recorded her tears.

153.    To say the least, Professor Lewis-McCoy's conduct violated NYU's policies, including Section VI of NYU's Code of Ethical Conduct, which states that "[e]very member of the University is prohibited from . . . emotionally abusing, or harassing anyone; and depriving any-one of rights in his or her physical or intellectual property, under University policy, or under federal, state, and local laws."

154.    Confirming that NYU views Jewish students at the university as legitimate targets for harassment, intimidation, and cruelty by NYU professors, NYU has not taken any disciplinary action against Professor Lewis-McCoy. To the contrary, he continues to teach NYU students.

155.     Nor has NYU initiated any disciplinary actions against the other faculty members

or students who participated in the Library hate fest even though it violated clear NYU policies.

156.     NYU's Library Conduct Code expressly prohibited the antisemitic rally:

> Users will refrain from engaging in behavior that leads to the denial
> of, or unreasonable interference with, the rights of others; or which
> disrupts the regular operations and activities of the Library.
> Behavior which is considered to be in violation of the NYU
> Libraries Conduct Code includes, but is not limited to . . . creating a
> disturbance or behaving in a manner which interferes with normal
> use of the Library (including rowdiness, noise, offensive
> interpersonal behavior, and the use of cellular phones in the stacks
> and study areas). . . . Violations of the NYU Libraries Conduct Code
> may be referred for disciplinary action under applicable Library
> and/or University disciplinary processes.   Where appropriate,
> instances of misconduct may be referred to local, state or federal law
> enforcement officials.

157.     NYU's Policy on Posting Flyers, Notices and Posters in Bobst Library similarly

prohibited the conduct:

> Posting of non-library notices (including posters, notes,
> announcements, flyers, advertisements, signs, etc.) in the public
> areas of the library, with the exception of the designated community
> bulletin boards, is not permitted.  Public areas include study rooms,
> lobbies, seminar rooms, doors, elevators, hallways, windows,
> restrooms, stairwells, book stacks, tables and the building entrance.
> Notices posted in these areas will be removed.

158.     The students and faculty who participated in the antisemitic SJP and FJP rally

also violated NYU's Discrimination Policy, which prohibits, among other things, discrimination

and harassment on the basis of religion or ethnicity.

159.     The Discrimination Policy provides: "Where allegations are made against

students for possible violation of this policy, the matter will be investigated and resolved in

accordance with the University Student Conduct Policy," and "[w]here allegations are made

against employees for possible violation of this policy (including allegations that the University

has engaged in retaliation), the matter will be investigated and resolved utilizing the procedures

of the Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for
Employees." Further, NYU's Student Conduct: Mission, Values, and Learning Goals policy
states: "When [NYU's] policies are violated, students will be held accountable[.]"

160. Throughout the afternoon of October 20, both Ingber, as the co-President of SSI,
and Maslavi, as the Vice President of SSI, received a steady stream of email and text message
updates from the Jewish students in the Library. Those updates described the rally attendees'
calls for violence, their exultation over the mass murder and maiming of Jews, and the
participation of scores of faculty members. Alarmed and sickened, Maslavi called NYU's
Campus Safety. A dispatcher answered and told Maslavi that NYU's Campus Safety did not
have authority from NYU to halt the protest—even though it was taking place directly under the
nose of NYU's president and her staff, whose office is on the Library's 12th floor.

161. Over a half-hour after the protest began, Campus Safety finally instructed the
faculty members to untie the posters. After they untied the posters, however, they continued
holding them in place, and the mob of faculty and students continued chanting for the destruction
of Israel and in support of Hamas for another twenty-five minutes.

162. Following the protest, another Jewish student who was in touch with Masalvi and
other Jewish student leaders emailed Dean Rodriguez to complain about the rally and explain the
anguish it was inflicting on the Jewish students who were in the Library studying for midterms.
The student later received an email response from Dean Rodriguez that was filled with
inaccuracies. For example, Dean Rodriguez falsely stated that "our team members showed up
immediately and responded to the situation. They were asked to remove the banners and to
conclude their demonstrations, which they did." Of course, no such thing had occurred, as the
demonstrators did not stop their antisemitic rally—a fact Maslavi and this student knew from the

first-hand accounts they received in real-time.  Campus Safety did not show up immediately; in fact, the rally was well underway and gathering steam by the time NYU's Campus Safety showed up.  Even then, NYU's Campus Safety did nothing to stop, halt, or interfere with the rally; to the contrary, the members of NYU's Campus Safety who arrived at the Library stood idly by its entrances, watching the hate-fest proceed uninterrupted from the time they arrived until nearly 4:00 p.m., when the rally-goers left on their own volition.

163.    That NYU students and faculty members were permitted to hold an antisemitic rally only steps from President Mills's office without any consequence sent a clear and alarming message to the NYU community, including both its Jewish students and their antisemitic tormentors: NYU does not and will not discipline students and faculty who flagrantly violate applicable policies by engaging in antisemitic abuse, harassment, and intimidation.

164.    Plaintiffs were deeply shaken by these events.  Maslavi was both enraged and terrified, in disbelief that NYU had permitted professors and students to take over the Library to extol and endorse Hamas's massacre and call for the annihilation of Israel and its inhabitants.  For Maslavi, the antisemitic Library rally not only reflected NYU's utter indifference to the sense of fear and isolation felt by Jewish students forced to endure NYU's pervasive and hostile anti-Jewish environment, but also confirmed that NYU was deliberately seeking to make that environment even more hostile and more threatening for Jewish students.

165.    Ingber was equally traumatized by the Library rally.  She had an upcoming midterm exam and had intended to print out an exam outline at the Library on the day of the rally.  Learning about the rally, she was afraid to enter the Library, and emailed Dean Rodriguez seeking his assistance in getting her an extension.  Dean Rodriguez did not respond to her until October 23, the day of her exam.  While he reported that he was able to accommodate her

52

request for an extension, she continued to be extremely shaken by the rally, and could not bring herself to go to the Library to study for her next two midterm exams.

166.    Tawil learned of the antisemitic Library rally while he was in his apartment near NYU.  Like Maslavi and Ingber, the antisemitic Library rally caused Tawil significant emotional distress, discomfort, and fear.  Shortly thereafter, Tawil's parents asked him to come home because they feared for his safety, and he agreed.  As he prepared to leave, Tawil watched videos of the protest, thinking over and over to himself, "how could this be my school?"

167.    The Library was not the only building coopted by antisemitic NYU students and faculty members.  On the afternoon of October 23, 2023, as Maslavi walked past the Stern School of Business building, she was greeted with signs urging passersby to "honor the martyrs of Palestine."

### vii.    SJP Holds a National Student Walkout and Calls for Violence Against Jews

168.    On October 25, NYU's SJP held an event called "National Student Walkout."  In the early afternoon that day, Maslavi passed hordes of NYU students and faculty screaming the following antisemitic chants in support of violence against Jews: "We want all of it!"; "Intifada Revolution!"; and "Long Live the Intifada!"  People in the crowd held signs stating that "Resistance is Justified When People Are Occupied" and "Palestinian return by any means necessary."  Each of these slogans is an explicit antisemitic entreaty for violence against Jews.  At no point did NYU attempt to stop or interfere with this antisemitic rally, or conduct an investigation to identify the NYU students and faculty members who engaged in this antisemitic activity.

169.    The term "intifada" specifically refers to a coordinated strategy by Palestinian terrorists, at the instigation of and with the support of Palestinian authorities, to perpetrate violent attacks against Israeli civilians.  The professed objective of those who would engage in an

intifada is to kill and injure as many Jews as possible.  Terrorists engaged in two intifadas against

Jews in Israel that resulted in the slaughter and dismemberment—mostly but not exclusively by

suicide bombs, many of which consisted of nails dipped in rat poison—of hundreds of Israeli

civilians who were riding on buses, visiting restaurants and clubs, and attending Passover Seders.

The first intifada occurred between December 1987 and September 1993, the second from

September 2000 to February 2005.  Until the October 7, 2023 Hamas massacre, these two

Intifadas killed more Jewish civilians than any other event since the Holocaust.

170.    Also on October 25, at 10:21 a.m., President Mills and Jason Pina, NYU's Vice

President for University Life, released a statement titled "Plans for Student Safety and Well-

Being," which stated:

> Over the past few weeks our university has been experiencing a
> great deal of turmoil in response to events affecting our community
> both near and far.  We have heard from many of you who are deeply
> concerned about your safety.  Confident we can be a foundation of
> civil discourse, we want to emphasize our university's standing as a
> place of reflection, free expression, shared respect and security.
> There is no place for hate at NYU, including antisemitism and
> Islamophobia.
>
> In light of this, we are implementing a ten-point plan that addresses
> both student safety and emotional well-being, always paramount
> values, particularly amid times of tragedy.

171.    Rather than condemning the virulent antisemitism that had gripped the NYU

campus, the statement equivocated.  And, while the statement asserted that NYU would increase

campus safety and enforce NYU's codes of conduct, neither has occurred.

### viii.    President Mills Gaslights Concerned Jewish Students and Attempts to Enlist Their Help in Downplaying the Virulent Antisemitism at NYU

172.    The same day, President Mills held a meeting in her office on the 12th floor of the

Library with student representatives from SSI, other Jewish groups at NYU, and the Bronfman

Center's Rabbi Sarna.  At the meeting, recently appointed President Mills introduced herself and

recounted her own experiences with antisemitism, and the fact that she was a daughter of Holocaust survivors.  The Jewish student representatives then gave their accounts of the rising antisemitism on campus they had experienced since October 7.  The meeting was then interrupted by the sounds of students participating outside in the National SJP Walkout. President Mills acknowledged that the events occurring outside her office could be perceived as threatening but encouraged her students to be brave.  President Mills indicated that NYU would do nothing about the events on campus, because, she said, SJP and others were engaging in "free speech."

173.     Because Jewish students had repeatedly advised President Mills that they were traumatized by bias-related incidents that included threats of violence, they reasonably believed that they would have an ally and protector in an NYU president whose academic career, according to NYU's website, had focused on trauma, bias and violence.  They were wrong.  Far from responding to their concerns, President Mills gaslighted the Jewish students with a series of lies and evasions, further confirming NYU's deliberate indifference toward the antisemitic abuse, harassment, and intimidation that was a fact of their everyday life as Jewish students at NYU.

174.     At another meeting, on November 1 with President Mills, attended by eight Jewish students and Rabbi Sarna, the students presented President Mills with a petition signed by 4,000 members of the NYU community expressing concern over NYU's increasingly hostile antisemitic environment.  The students shared stories about the antisemitic harassment they had faced, the extent to which they felt unsafe on campus, especially given NYU's failure to take action to identify perpetrators of antisemitic activity and to curtail and prevent antisemitic gatherings by NYU students and faculty members.  While President Mills stated that she felt for

the students' safety concerns, she falsely insisted that reports about antisemitism on campus were being blown "out of proportion."  Among other patently false statements, she further insisted that NYU was powerless to act because many incidents involved "non-NYU students" and took place "off-campus" (*i.e.*, at Washington Square Park).  President Mills's contention that the perpetrators were not NYU students was false, as the antisemitic Library rally goers included hundreds of NYU students and professors.  And similarly false were her statements concerning Washington Square Park, as NYU's policies expressly contemplate that NYU will take into account "off-campus" activities in evaluating violations of those policies, and on numerous occasions NYU has enforced disciplinary measures against students and faculty members whose misconduct and violations of those policies occurred off-campus.  And in any event, NYU's website features Washington Square Park as the "heart of campus," and many official NYU events, including commencement, and events organized by student groups, such as the October 17 and October 23 rallies, are held at Washington Square Park.

175.    At the November 1 meeting, President Mills chided the Jewish students for being "alarmist," and turned the conversation to how the fearful Jewish students could help her navigate what a crisis that was reflecting poorly on her leadership.  President Mills made the outrageous request that the Jewish students help her "spread the message" that allegations of antisemitism at NYU were overblown and exaggerated, and that NYU was safe for Jewish students—in other words, to help her cover up and minimize the very campus antisemitism that was traumatizing them.  At no point during the November 1 meeting did President Mills discuss measures NYU would implement to combat antisemitism on campus, such as by disciplining NYU students and faculty members who engaged in antisemitic misconduct, as required under NYU's policies.

176.     On November 2, less than twenty-four hours after the meeting with President

Mills, SJP and other student groups held a "Picket for Palestine" rally outside the Library that

again featured antisemitic chants and posters.  One man held signs reading, "Jewish Supremacy –

Pure Evil" and "Religious killers," with a Star of David and the years "1948-2023."  At one point

he ripped the sign, threw the part containing the word "Jewish" on the ground and spat at it, and

then proceeded to spit in the direction of a group of Jews nearby.  At times he put his hand into

the waistband of his pants, as if he held a gun, and stared threateningly at students walking by.

NYU administrators and members of Campus Safety were present but did nothing.  When

students reported the man to Campus Safety, they were told there was nothing they could do

because of "free speech."  By contrast, Campus Security ordered a group of Jewish students, who

were standing nearby with an Israeli flag and some hostage posters, to move across the street in

order to "de-escalate" the situation.

177.     Later that day, a student sent an email to Angie Kamath, Dean of NYU's School

of Professional Studies ("SPS"), expressing fear about being at NYU as a Jewish student in light

of the antisemitic climate.  In a response email, Dean Kamath stated that the safety of students

was a priority, and that SPS would be issuing a campus-wide email addressing "Safety and

Wellbeing at NYU."  No such email was ever sent.

178.     On November 4, hostage posters hanging on a traffic controller system, located

directly outside the Library, were defaced.  Vandals covered pictures of the hostages with

pictures of people, who purportedly were Palestinian, that contained the word "Murdered"

superimposed over a Jewish star.  When Jewish students reported this vandalism to NYU, they

received emails from the bias hotline advising that because the posters were "off campus," NYU

could take no action.

179.    On November 7, 2023, a group of Jewish students, including Maslavi and Ingber, held a "silent sit-in," in support of Israel and in opposition to antisemitism, an event that President Mills had endorsed during the November 1 meeting.  This event occurred on the Library's ground floor, and was supposed to last from noon to 8:00 p.m.  As Jewish students began preparing the site of the event shortly before noon, an NYU student, Elias Lopez, approached Maslavi, and gave her a death stare.  When she asked him if he had a question, the student berated her, asking "What is all this Zionist shit doing in my school?"  When the event began, Ingber, Maslavi, and the other Jewish students were draped in combined American and Israeli flags and sat at tables featuring pictures of the hostages and posters stating "#EndJewHatred."

180.    At approximately 3:55 p.m., Lopez again approached the students and began to stare at Maslavi.  When Maslavi asked if Lopez had a problem, he responded, "Yeah, you and Israel."  He then left.

181.    Approximately 30 minutes later, Lopez returned, asking Maslavi to explain the flag she was wearing.  Maslavi and Ingber stated that the flag represented the relationship between the United States and Israel.  Lopez then snapped his fingers at Ingber's face and proceeded to clap his hands in front of her and the other students' faces, saying "Palestine will be free from you eventually."  A freelance photographer, known to the Jewish students as Benny, filmed the incident.

182.    The Library exit has a metal security gate that people must pass through as they exit.  As Lopez walked toward the Library exit, he turned toward Ingber, made a comment about whether she was "indigenous," and told her that she should get skin cancer.  Ingber was now right behind him.  Lopez then jammed the metal security gate onto Ingber's right hand, which

caused her sharp pain.  Members of Campus Safety guarding the entrance of the Library witnessed Lopez slamming the gate onto Ingber's hand, but even after Ingber pleaded for help, the security personnel ignored her.  Ingber followed Lopez as he left the Library and, while standing on the street outside the Library, told Lopez that his slamming the gate on her hand had been recorded on video by Benny.  In response, Lopez turned around and punched Benny in the face and threw his phone on the street.  As Lopez lunged toward Ingber, Benny tackled and restrained him.  When Campus Security finally intervened, they apprehended Benny.  When the NYPD arrived several minutes later, officers interviewed several eyewitnesses, including Ingber, and arrested Lopez for assault.

183.    Approximately 20 minutes after Lopez's arrest, Dean Rodriguez and Melissa Carter, Senior Director for Global Spiritual Life at NYU, arrived at the Library. Notwithstanding that the silent sit-in was to continue until 8:00 p.m., as NYU administrators had expressly authorized, Dean Rodriguez told the group of Jewish students—who had been sitting silently—that they should "pack it up" and "disperse."  When the Jewish students asked Dean Rodriguez why they had to leave, he stated because their staying "wouldn't look good" given that NYU "can't guarantee your safety."

184.    Dean Rodriguez's shutting down the silent sit-in held by plaintiffs and other Jewish students stands in stark contrast to NYU's stunning inaction in response to the rallies and other actions of SJP and FJP members, whose antisemitic and other misconduct violated numerous provisions of numerous NYU codes and policies.  Whereas NYU has repeatedly failed to prevent, shut down, or otherwise interfere with NYU students who protest Israel and engage in antisemitic and other acts that violate NYU's codes and policies, NYU forced the Jewish students to abandon their silent sit-in, even after those students were subjected to verbal and

physical assault.  Moreover, even though President Mills had expressly urged the Jewish students to hold their silent sit-in, NYU failed to provide sufficient security to protect them, and, instead, ordered them to disperse precisely because NYU was refusing to protect them.

185.   In response to the unprovoked, antisemitic assault resulting in Lopez's arrest, NYU spokesperson John Beckman stated that "[t]he university is disturbed by this episode; physical violence is rare on our campus, and NYU has zero tolerance for violence."  He also outrageously suggested that Ingber, the victim, was to blame, stating that "we recommend that all members of the NYU community take steps to de-escalate situations in which they find themselves, and that they take special care both to avoid engaging in or rising to provocations."

186.   Incredibly, NYU has not suspended or expelled Lopez, or taken any other disciplinary action against him, instead permitting him to continue as an NYU student to attend classes with Ingber, his victim.

187.   In response to a survey distributed to NYU Jewish groups, other students recounted egregious acts of antisemitism, including:

- Professor Sara Garzon—during an art history class—defended the teachings of a Nazi, "equated being a nazi to the faults found in 99% of humans" and "bystander in America to children in cages on the Mexican/American border." Many students have refused to attend class since this incident.

- Professor Valerie Forman insisted on discussing in class the conflict in the Middle East, which was completely unrelated to the subject she was teaching, and asserted that "Hamas was a military group, not a terrorist organization, and Israel was a group of colonizers."  Professor Forman also claimed that not many Jews had been killed, and that there was no proof of babies being beheaded and nodded in agreement at the statement the "Israeli people . . . deserve what had happened to them."

- A few days after Hamas's October 7 attack, Professor Marie Cruz Soto addressed her class, asserting that Israel is a colonizing power and deserves to be destroyed, Hamas is part of the resistance, violence from Israel permeates the entire world and directly causes violence in America and for people of color globally and "rich Jewish donors that control NYU" are trying to silence her.

- Professor Mustafa Saifuddin ended one of his classes early to enable the students to attend an anti-Israel rally.

- Professor Andrew Ross spoke at the Walkout for Solidarity with Palestine, formed FJP, and has supported BDS since the 1990s.

- A student recounted: "As I held the poster of 9-month old Kfir, one of the 200 Jewish hostages taken by Hamas in the October 7th Massacre of Israelis, a fellow student yelled at me: 'I support the abduction of Zionist babies.'"

- A student recounted: "Students yelled at me calling me a 'Nazi.'"

- One student reported that a classmate called Israelis "animals," said the Israeli victims on October 7 deserved to die because they are "settlers on illegal land," and repeatedly yelled "free Palestine," even if the topic being discussed had nothing to do with the Israeli-Palestinian conflict.

- While recording a group of students taking down posters (which contained facts about Hamas), the student recording said, "Can you please not do that? That's factual information." The group of students began walking behind this student and her friend, calling them "Zionist," saying "you support genocide," and calling them "white." The student reported that after she stopped recording, the group continued to taunt and follow them. Further, there was no campus security outside, and the student felt unsafe and concerned the group would continue chasing them or get physical.

### E.    NYU's Double Standard in Addressing Antisemitism

188.    NYU has failed to investigate and address the antisemitic incidents described above, which occurred at NYU after the October 7 Hamas terrorist attack, even though such incidents violate numerous provisions of NYU's policies. NYU's deliberate indifference in response to these antisemitic incidents, in which Jewish students are victims, is dramatically at odds with how NYU readily takes action to enforce its codes and policies to investigate and address bias-related incidents when the victims are not Jewish. This discriminatory double standard has helped to create, and has contributed to, aggravated, and exacerbated, the hostile educational environment, and the antisemitic abuse and harassment, that plaintiffs and other Jewish students have been forced to endure at NYU.

189.    For example, NYU frequently invokes purported free speech concerns to support and protect students and faculty members who support Hamas terrorists and antisemitism, even as it condemns and disciplines faculty members for trivial reasons, or who espouse viewpoints and take positions that NYU selectively deems inappropriate.

190.    In September 2016, NYU censured Professor Michael Rectenwald after he made a number of social media posts that criticized campus trends such as "safe spaces" and "trigger warnings," arguing that they were symptoms of a broader movement of political correctness. NYU did not hesitate to issue a forceful condemnation and mete out harsh discipline: NYU forced Rectenwald to take a leave of absence for the rest of the semester.  Yet none of the professors who have engaged in the antisemitic acts described above, including abuse, harassment, and intimidation of Jewish students, and calling for violence against Jews and the annihilation of Israel, have been subjected to similar discipline.

191.    NYU has seen fit to terminate professors for offenses that are orders of magnitude less serious than antisemitic abuse, harassment, and intimidation directed at Jewish students.  In October 2023, NYU terminated a renowned professor of the chemistry department, Maitland Jones, who for decades had taught a popular organic chemistry class and had authored an influential textbook on the subject.  Maitland's offense, which NYU deemed sufficiently severe to warrant termination, was that students had complained that his organic chemistry class was too difficult.

192.    NYU's appalling double standard is also reflected in its faculty hiring decisions. Other than Jews and Israel, it would be unimaginable for NYU to recruit and hire faculty members who call for violence against a minority group or citizens of a particular country, or for the annihilation of any other country in the world.  Yet NYU routinely recruits, hires, promotes,

and touts faculty members who express antisemitic views, endorse violence against Jews, call for Israel's destruction, and justify, encourage, and celebrate violence against Israel and its citizens.

193.    For example, on October 9, 2023, only two days after the Hamas massacre—as Israel was still defending against the Hamas death squads on Israeli territory and still extinguishing burning corpses and finding decapitated heads and mutilated body parts strewn throughout its southern region—NYU proudly announced that it had hired a notorious antisemite who cheered Hamas's savage attack.  That professor was Eve Tuck, who purported to specialize in so-called "critical race and indigenous studies" at the University of Toronto.  Professor Tuck—hired to establish a so-called "Center for Indigenous Studies" at NYU—has a well-documented history of antisemitic and anti-Israel statements.  On October 7, 2023, Professor Tuck issued the following statement: "Unprovoked is a dishonest framing. A free Palestine is possible because of how Palestinians have worked to keep alive and remake other framings, other futures."  Tuck also wrote on Bluesky, a microblogging social platform, that the "[r]esistance …is life and future affirming."  Less than three weeks later, Tuck doubled down on her rhetoric, signing a letter (along with another NYU professor, Lou Cornum, from the Department of Social and Cultural Analysis) blaming Israel for Hamas's barbaric attack while erasing millennia of Jewish history and of the Jewish people's connection to the land of Israel: "Colonized peoples have the right to defend themselves and to resist colonial violence. We support Palestinian liberation and their right as an oppressed people to resist colonialism and genocide."

194.    Far from condemning Professor Tuck's anti-Israel and antisemitic rhetoric, NYU's Interim Provost Georgina Dopico released a statement proclaiming that "[i]t's an honor . . . to welcome Professor Tuck to NYU . . . Professor Tuck's collaborative approach will

strengthen NYU and bring together scholars from multiple disciplines and geographies to advance innovative and important research."

195.    The plaudits NYU saw fit to bestow upon Tuck were in stark contrast to NYU's responses when it decided that other faculty members had disparaged and discriminated against other minority groups.  For example, in the July 2020 publication of the academic journal *Society*, Professor Lawrence Mead, of the NYU Department of Politics, asserted that the economic gap between whites and racial minorities is driven by the cultural differences between European and non-Western cultures.  NYU's reaction was swift, decisive, and severe: It immediately released a statement emphatically condemning him.

196.    NYU is unstinting in condemning or disciplining those who make what it deems are offensive and inappropriate statements about race or political correctness, or who grade students too harshly on their organic chemistry exams.  Yet NYU not only tolerates but promotes and touts faculty members who spew antisemitic views, support the murder of Jews, and demand the annihilation of Israel.

197.    NYU's double standard is also on full display when comparing its correct response to the attacks against other groups to the attacks against Jews on its campus.  For example, in February 2022, following a surge in violence against Asian Americans that was the focus of national attention, NYU's Office of Global Inclusion, Diversity, and Strategic Innovation issued a "Statement on Surge in Anti-Asian Violence and Rise in Hate Crimes Against Historically Marginalized Groups – Resources Included" forcefully (and appropriately) condemning such unacceptable conduct, stating that:

> We must always firmly repudiate acts of violence, racism, bias, and any manifestation of -isms.  They are counter to the values of New York University.  Especially now, we must recognize that many of our NYU students, faculty, staff, and alumni do not feel safe—and

have not felt safe—just going about their routines of daily life in New York City. . . . It is each of our responsibility to condemn all acts of discrimination as we recognize and proactively address the ongoing impact on historically marginalized groups.

198.    A few weeks later, on March 29, 2022, then-President Hamilton sent an email to students reading in part:

Even as COVID-19 seems to have abated somewhat, the odious, accompanying rise in anti-Asian prejudice and violence remains seemingly undiminished . . .  Almost as troubling are the pervasive, random attacks of the kind we saw around our own campus in February, to say nothing of the jostling, verbal affronts, or other forms of harassment that Asian New Yorkers describe confronting on a daily basis.  []Our most potent weapons for combating anti-Asian bias are our collective and unequivocal denouncement of anti-Asian racism and violence; our determination to act together to oppose it; our reassurance to the Asian and Pacific Islander members of our community that we understand their fear, that we stand with them, and that we will continue to strive to make NYU a place where they feel welcome and safe here[.]

199.    Similarly, following George Floyd's murder, NYU's President was quick to condemn the act, stating that "[o]nce again, we find ourselves filled with sorrow, outrage, and grief over a loss of yet another Black person's life at the hands of law enforcement that was tragic, unjust, and avoidable."  A year later, the President followed up that "[t]his afternoon, a jury of Minnesotans convicted former police officer Derek Chauvin on all counts.  It is an example of justice from a system that all too often delivers injustices, especially to people of color and the poor."

200.    And following the Colorado Springs night club shooting, the President again unwaveringly supported the community that was attacked: "[o]n behalf of the NYU community, I want to express our collective heartbreak at the horrific slaughter at Club Q.  Fueled by a lethal mix of gun violence and hatred . . . we [] offer our deepest sympathies . . . and our compassion

and solidarity to the LGBTQ+ community, who have been made to suffer so much from bigotry, bloodshed, injustice, and ignorance."

201.    Yet NYU has issued no such statement to condemn the soaring and alarming increase in antisemitism and antisemitic violence that has plagued NYU's Jewish students following the October 7 Hamas massacre.

202.    At the beginning of the current school year, on September 1, 2023, NYU sent an email about Asian students harassed at an off-campus, public transportation station.  The email, from Fountain Walker, NYU's Vice President of Global Campus Safety, was addressed to the "NYU Community" with the subject line, "Incident at the 9th Street PATH Station – Asian Students Harassed."  It read in part:

> The Department of Campus Safety has received reports that at about 11:40 p.m. on Wednesday night, three NYU students of Asian descent were harassed and threatened at the 9th St. PATH station. The incident appears to be racially motivated.  Thankfully, no one was physically injured.  Still, it was a scary episode for those involved, one that is emblematic of the increase in racially motivated incidents aimed at people of Asian origin in New York and nationally, a trend that is troubling and shameful. . . . We have reported the incident to both the NYPD and the Port Authority Police Department, and we have conveyed our concerns to both departments about the fact that this incident occurred in a transit location that is frequented by NYU commuters.

203.    Again, in sharp contrast, NYU has not sent any similar email alerting the community to anti-Jewish abuse and harassment, of the sort that Tawil experienced.  The above email concerning harassment of Asian students was sent less than two months before Tawil was harassed, but when Tawil reported to NYU that he was harassed in front of an NYU building, there was no such email or warning to Jewish students, or any students at all.

204.    NYU's failure and refusal to discipline antisemitic students and student groups like SJP also stands in stark contrast to the discipline NYU has meted out in response to bias

incidents against other minority groups.  For example, in May 2020, NYU suspended a fraternity indefinitely after "racist GroupMe messages" were leaked on Twitter.  According to an NYU spokesperson, the messages were "not in line with NYU's community values" and "[t]he sentiments expressed in the[] posts are abhorrent, at odds with [NYU] community's values, and counter to the inclusive community we seek to create for everyone at NYU."  But NYU has not taken any disciplinary action at all against the perpetrators of the antisemitic abuse and harassment detailed herein, much less disciplinary action analogous to the indefinite suspension of a fraternity.

205.    In September 2020, a group of NYU students gathered in Washington Square Park without wearing masks or practicing social distancing.  NYU seized on the incident to promptly and readily threaten disciplinary action, sending an email to all students that "[w]e are investigating the circumstances from last night and any students who have violated our expectations will be subject to disciplinary action."  In October 2020, NYU suspended students for violating social-distancing policies.  By contrast, NYU took no action against a student who engaged in violence against a Jewish student in the Library; to the contrary, the student was permitted right back into the Library the very next day.

206.    Every single incident of antisemitic behavior—every instance of abuse, harassment, and intimidation—detailed herein flagrantly violates NYU's policies.  Yet time and again, antisemitic incident after antisemitic incident, NYU has taken no disciplinary action.  As a result of such discrimination and deliberate indifference, NYU has created, nurtured, and fostered a hostile educational environment for Jewish students.

**F.    Plaintiffs Have Been Denied Equal Access to NYU's Educational Opportunities**

207.    As plaintiffs navigate NYU's campus and attempt to participate as members of NYU's community, by attending classes, engaging in extracurricular activities, and interacting

with other NYU students and faculty members, each of them is acutely aware that, solely because of their Jewish identity and ancestry, NYU views and treats them as second-class citizens within the NYU community, undeserving of the protections that NYU affords to non-Jewish students.  As a result of NYU's persistent and unlawful failure and refusal to comply with its obligations to prohibit discrimination and harassment against Jewish students, plaintiffs, unlike other NYU students, have been deprived of the benefits that those other students enjoy at NYU, including but not limited to physical protection; emotional support; the sense of belonging and inclusion; the ability to speak freely in class and in written course work concerning their Jewish identities; their rights as individual human beings to express their identities; their rights as American citizens to freely express their viewpoints, including but not limited to their views of Israel; and their right to express their love and admiration for Israel, their ancestral homeland, where they have many friends and family members.  To the contrary, as a result of NYU's actions and inactions alleged herein, plaintiffs have been made to feel that they are different from and less important than other students, some of whom, along with certain NYU faculty members, are able, with impunity and without consequence, to mock, taunt, jeer, deride, malign, castigate, ridicule, demonize, vilify, assault, abuse, harass, intimidate, isolate, ostracize, exclude, and marginalize them.

208.    The antisemitic events and incidents described herein have devastated the ability of plaintiffs to participate in NYU's educational and other programs.  NYU's actions and inactions concerning antisemitism and anti-Jewish abuse, intimidation, harassment, and discrimination, as described herein, have created and fostered a hostile environment that has traumatized plaintiffs and made their college life at NYU unbearable.  Plaintiffs do not feel physically safe on NYU's campus or in NYU's classrooms or other facilities.  Each of them fears

the harassment, abuse, and intimidation they might face, on any given day, from the professors who are supposed to teach them, and who are required to treat them with respect and dignity pursuant to the policies that NYU is required to enforce equally for all students.  Each plaintiff likewise fears the physical violence, harassment, abuse, and intimidation they might face, on any given day, from the students who are required to treat them with respect and dignity pursuant to those policies.

209.    As a result of NYU's actions and inactions as alleged herein, none of the plaintiffs feel safe walking the campus, being in NYU facilities, or going to class.  Maslavi is often late to or absent from class because of the anxiety she suffers as a result of the abuse, harassment, intimidation, and assault that she and other Jewish students are forced to endure.  She is afraid that other students and faculty members might identify her as Jewish and, as a result, target her because of her Jewish identity.  Her ability to participate in her education at NYU has suffered, and she is frequently unable to focus, study, and perform her course work to the best of her ability.  Most alarming, Maslavi suffers from the fear that at any given moment at NYU, she will be subjected to physical violence at the hands of other students and faculty members, because of her Jewish ancestry.

210.    As the co-president of SSI, Ingber suffers from anxiety that students and faculty will recognize her, as she frequently draws dirty looks and taunts from other students on campus. As a result of the harassment and abuse she has suffered, she does not wear jewelry and accessories that might signal her Jewish identity around campus.  Because many SJP members hide their faces with keffiyehs, she is anxious and frightened in class, unable to know if the student sitting next to her are the same people who taunt her with genocidal chants.  Once a straight A student with a 3.86 GPA, her constant fear has caused her grades to slip precipitously.

When Ingber engages in activity central to her life and her Jewish identity, such as visiting Hillel

or Chabad on the Jewish Sabbath, she is terrified for her safety.  Her constant anxiety, triggered

by NYU's hostile antisemitic environment, has been aggravated by the fact that she is still

mourning friends and family who were the victims of Hamas's October 7 massacre.

## COUNT I
### (Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*)

211.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as

though fully stated herein.

212.    NYU receives financial assistance from the United States Department of

Education and is therefore subject to suit under Title VI of the Civil Rights Act of 1964.

213.    Discrimination against Jews—including based on actual or perceived shared

ancestry, race, ethnic characteristics, or national origin—is prohibited under Title VI, as reflected

not only in decades of Title VI jurisprudence, but also in the written policies of the Office of

Civil Rights of the United States Department of Education.

214.    Plaintiffs are and identify as Jewish, and their status and identification as Jews

brings them within the scope of Title VI's protections.  Plaintiffs are currently enrolled as

students at NYU.

215.    The acts and omissions of NYU and its administrators have subjected plaintiffs to

discrimination on the basis of their actual and/or perceived Jewish shared ancestry, race, ethnic

characteristics, or national origin.

216.    NYU and its administrators had actual notice that harassment, over which NYU

had substantial control and the authority to remediate, was so severe, pervasive, and objectively

offensive that it created a hostile environment based on shared Jewish ancestry and ethnicity that

deprived plaintiffs of full access to NYU's educational programs, activities, and opportunities.

217.   NYU and its administrators have intentionally discriminated against plaintiffs because of their actual and/or perceived shared Jewish ancestry, race or ethnic characteristics, or national origin, as exhibited by their deliberate indifference to the antisemitic abuse, harassment, and intimidation of plaintiffs in violation of Title VI.  Specifically, NYU and its administrators failed to cure or otherwise adequately, appropriately, and meaningfully address, ameliorate, or remedy the discrimination against plaintiffs, and the hostile environment that Jewish students, including plaintiffs, are forced to endure at NYU because they are Jewish.  Additionally, NYU has failed to take effective steps reasonably calculated to end the harassment, eliminate any hostile environment, and prevent the harassment from recurring.  Such unlawful deliberate indifference caused plaintiffs to be subjected to a hostile educational environment.

218.   The environment at NYU, which has been rendered hostile for plaintiffs as a result of their Jewish identity and ancestry, is sufficiently severe, pervasive, persistent, and offensive such that it has deprived plaintiffs, as Jewish students, of equal access to the educational opportunities and benefits that NYU provides to non-Jewish students.

219.   NYU and its administrators have actively and intentionally engaged in this pattern of severe and/or pervasive discrimination.

220.   NYU and its administrators also directly and intentionally discriminated against plaintiffs, with plaintiffs' actual or perceived shared ancestry or ethnic characteristics a substantial or motivating factor in NYU's actions.

221.   NYU's actions or conduct had, and continue to have, a differential or disparate impact upon plaintiffs, as Jewish students.

222.   NYU has failed to act or has acted with leniency and/or delay in applying its policies when a known or reported incident involved antisemitism or where the victim was a

Jewish student, including plaintiffs.  As detailed above, NYU's actions and conduct were, and continue to be, intended to treat plaintiffs differently as Jewish students as compared to incidents involving other similarly situated non-Jewish students.

223.     NYU's violations of Title VI were the actual, direct and proximate causes of plaintiffs' injuries.

224.     As a result of the foregoing, plaintiffs have suffered, and continue to suffer, substantial damages in an amount to be determined at trial.

225.     Plaintiffs are also entitled to appropriate injunctive relief under Title VI, as NYU had knowledge of, and has been and continues to be deliberately indifferent to, a racially hostile environment that is severe, persistent, and pervasive.

226.     Plaintiffs are entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## <u>COUNT II</u>
### (New York Executive Law (Human Rights Law) § 296 *et seq.*)

227.     Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

228.     Educational institutions like NYU are prohibited from discriminating against or permitting the harassment of students by reason of their actual or perceived race, religion, or national origin, including against students who are actually or perceived to be Jewish, under New York Executive Law § 296.

229.     Plaintiffs are and identify as Jewish.

230.     Plaintiffs have been excluded from participation in and have been denied the full benefits of NYU's educational and other programs and facilities based on their Jewish race, religion, and national origin.

231.    As a result of NYU and its administrators' actions, inactions and conduct described herein, plaintiffs are treated differently because they are Jewish than similarly situated non-Jewish NYU students.

232.    NYU and its administrators have permitted severe and pervasive harassment, abuse, and intimidation of, and discrimination against, plaintiffs, on the basis of their race, religion, and national origin, by other NYU students, faculty members, officials, and other employees.  As a result of NYU and its administrators' deliberate indifference, plaintiffs have been denied the full benefits and use of NYU's educational programs and facilities.

233.    NYU and its administrators have failed to cure or otherwise adequately, appropriately, and meaningfully address, ameliorate, or remedy the discrimination against plaintiffs, and the hostile environment that Jewish students, including plaintiffs, are forced to endure at NYU because they are Jewish.

234.    The hostile environment at NYU is sufficiently severe, persistent, and pervasive that it can be said to deprive Jewish students, including plaintiffs, of equal access to the educational opportunities and benefits provided by NYU.

235.    NYU and its administrators also directly discriminated against plaintiffs, based on plaintiffs' actual or perceived race, religion, or national origin.

236.    NYU's actions or conduct had, and continue to have, a differential or disparate impact upon plaintiffs, as Jewish students.

237.    In applying its policies, NYU and its administrators failed to act or acted with leniency and/or delay when a known or reported incident involved antisemitism or the victim was a Jewish student, including plaintiffs.  As detailed above, such incidents have not and continue to not be given the same treatment as compared to incidents involving other non-Jewish

students.  Discrimination—based on plaintiffs' actual or perceived shared ancestry, race or ethnic characteristics—was a substantial or motivating factor in NYU's actions, which were intentional.

238.    NYU's actions were the actual, direct and proximate causes of plaintiffs' injuries.

239.    As a result of the foregoing, plaintiffs have suffered, and continue to suffer, substantial damages in an amount to be determined at trial.

240.    Plaintiffs are also entitled to appropriate injunctive relief under New York Executive Law § 296, as NYU and its administrators had knowledge of, and have been and continue to be deliberately indifferent to a racially hostile environment that is severe, persistent, and pervasive.

241.    Plaintiffs are entitled to attorneys' fees and costs pursuant to N.Y. Exec. Law § 297(10).

## COUNT III
### (New York Civil Rights Law § 40-c)

242.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

243.    New York Human Rights Law § 291 provides that the opportunity to obtain education and use places of public accommodation, such as NYU, without discrimination because of age, race, creed, or national origin is a civil right.

244.    Discrimination against Jewish students—including based on actual or perceived race, creed, or national origin—is prohibited under New York Civil Rights Law § 40-c ("NYCRL").

245.    Plaintiffs are and identify as Jewish.

246. The acts and omissions of NYU, which include the acts and omissions of NYU faculty, officials, and other employees, violated plaintiffs' rights under the NYCRL by discriminating against them on the basis of race, religion or national origin.

247. NYU and its administrators have subjected plaintiffs to severe and pervasive harassment and discrimination based on their Jewish race, religion, and national origin, in violation of the NYCRL. NYU and its administrators' actions and conduct are intended to treat plaintiffs differently as Jews than similarly situated non-Jewish students. NYU has failed to cure or otherwise adequately address this discrimination against plaintiffs or the racially hostile environment suffered by plaintiffs and other Jewish students on NYU's campus.

248. The acts and omissions of NYU faculty, officials, and other employees, have also aided and incited unlawful discrimination against plaintiffs by others on the basis of their Jewish race, religion, or national origin.

249. NYU and its administrators' violations of the NYCRL were the actual, direct and proximate causes of plaintiffs' injuries.

250. As a result of the foregoing, plaintiffs have suffered, and continue to suffer, substantial damages and are entitled to statutory damages of $500 per violation pursuant to NYCRL § 40-d.

251. Plaintiffs are also entitled to injunctive relief, as NYU had knowledge of, and has been and continues to be deliberately indifferent to a discriminatory hostile environment based on race, religion, or national origin that is severe, persistent, and pervasive.

252. By this action, plaintiffs seek to vindicate the public interest by enforcing fundamental civil rights protections for students, including students who face discrimination and harassment at school based on national origin or creed.

253.     Plaintiffs have complied with the procedural requirements of NYCRL § 40-d by serving notice of this Complaint upon the State Attorney General at or before the commencement of the action.

**COUNT IV**
**(New York City Human Rights Law – N.Y.C. Admin. Code § 8-107(4), (17))**

254.     Plaintiffs repeat and reallege the allegations of the preceding paragraphs above as though fully set forth herein.

255.     Discrimination against Jewish students—including based on actual or perceived race, creed, or national origin—is prohibited under § 8-107(4) of the New York City Administrative Code.

256.     As a result of NYU's deliberate indifference to a hostile environment based on race, religion, or national origin that is severe and pervasive, plaintiffs have been subjected to discrimination by NYU based on, and because of, their Jewish race, creed, or national origin.

257.     Plaintiffs have thus been denied the full and equal enjoyment, on equal terms and conditions, of NYU's accommodations, advantages, services, facilities or privileges, in violation of N.Y.C. Admin. Code § 8-107(4).

258.     Under § 8-107(17), an unlawful discriminatory practice is established where a covered entity maintains a policy or practice resulting in a disparate impact to the detriment of any group protected by § 8-107.

259.     NYU's actions and omissions have resulted in a disparate impact to the detriment of Jewish students at NYU, in violation of § 8-107(17).

260.     These violations of plaintiffs' rights under the New York City Human Rights Law are the actual, direct, and proximate cause of injuries suffered by plaintiffs as alleged herein.

261.    As a result of the foregoing, plaintiffs have suffered, and continue to suffer, substantial damages, and are entitled to monetary and punitive damages in an amount to be determined at trial.

262.    Plaintiffs are entitled to attorneys' fees and costs pursuant to N.Y.C. Admin. Code § 8-502(g).

263.    By this action, plaintiffs seek to vindicate the public interest by enforcing fundamental state civil rights protections for students, including students who face discrimination and harassment at school based on their actual or perceived race, national origin or creed.

264.    Plaintiffs have complied with the procedural requirements of New York City Human Rights Law § 8-502 by serving notice of this Complaint upon the City Commission on Human Rights and the Corporation Counsel.

## COUNT V
### (Breach of Contract)

265.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

266.    At all relevant times, an implied or express contractual relationship existed between NYU and each plaintiff by virtue of plaintiffs' enrollment at NYU and as defined by and through NYU codes, policies, and procedures governing student conduct, including but not limited to the Discrimination Policy and the Student Conduct Policy.  Through the documents and materials it publishes and provides to students, NYU makes express and implied contractual commitments to its students concerning bias-related abuse, harassment, intimidation, and discrimination.

267.     New York law recognizes that the relationship between a student and a college is contractual in nature, and that the terms of student handbooks, university bulletins, regulations, codes, policies, and procedures become part of that contract.

268.     Plaintiffs complied with their obligations under these contracts.

269.     NYU breached their agreements with plaintiffs, and failed to comply with their obligations under these contracts, throughout the course of plaintiffs' enrollment at NYU, including by, among other things, failing to comply with the following provisions, among others:

- "Where allegations are made against students for possible violation of this policy, the matter will be investigated and resolved in accordance with the University Student Conduct Policy[.]" (Discrimination Policy at Investigation and Resolution Procedures section.)

- "Where allegations are made against employees for possible violation of this policy (including allegations that the University has engaged in retaliation), the matter will be investigated and resolved utilizing the procedures of the Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Employees." (*Id.*)

- "Upon receipt of a report of alleged misconduct, the Office of Student Conduct shall review the matter and determine an appropriate forum for resolution based on its assessment of potential sanctions for the conduct in question and whether the nature of the conduct, taking into account the seriousness of the allegations, can be adequately addressed through an in-formal resolution." (Conduct Procedures at Section III.)

- "As members of the NYU community, students are expected to uphold their responsibilities to maintain a safe and productive campus community, which includes adherence to NYU policies. When these polices are violated, students will be held accountable and are expected to recognize how their actions and decisions affect the larger community." (Student Conduct: Missions, Values, and Learning Goals at Values section.)

- "The University does not discipline social media content writ large, how-ever the University will take student disciplinary action for conduct occur-ring outside the University context, including online, when such conduct substantially disrupts the regular operation of the University; threatens the health, safety, or security of the University community; or results in a violation of the NDAH (such as a hostile environment)." (Guidance at Section 8.)

- "The University has zero tolerance for any form of violence, threats, or intimidation. This includes, but is not limited to, using language advocating for killing people or groups of people, and all relevant synonyms (e.g. eradicate, destroy, massacre, exterminate, etc.)." (*Id.* at Section 2.)

270.    NYU also has breached the implied covenant of good faith and fair dealing in every contract, by unfairly applying NYU's policies and procedures in a discriminatory way, improperly motivated by racial and national origin bias.

271.    Among other things, NYU breached the implied covenant by applying and selectively enforcing NYU's student handbooks, university bulletins, regulations, codes, policies, and procedures in a discriminatory way that was improperly motivated by racial and national origin bias and responding to and treating incidents of abuse, harassment, intimidation or discrimination against Jewish students, including plaintiffs, in a more lenient, tolerant, indifferent, forgiving, and nonchalant manner than it treated similar incidents against other minority groups and by failing to apply and enforce its student handbooks, university bulletins, regulations, codes, policies, and procedures when responding to and treating incidents of abuse, harassment, and intimidation of, or discrimination against, Jewish students, including plaintiffs.

272.    As a proximate and foreseeable consequence of the foregoing breaches, plaintiffs have been damaged in amounts to be determined at trial.

## COUNT VI
### (New York General Business Law §§ 349, 350)

273.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs above as though fully set forth herein.

274.    Section 349(a) of the General Business Law provides consumer protection by declaring as unlawful "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York. Section 350 similarly prohibits

"false advertising in the conduct of any business, trade or commerce or in the furnishing of any service" in New York.

275.    NYU's conduct, statements, and representations described above, were consumer-oriented and were aimed at, and had a broad impact on, a large consumer group, namely, prospective and current students of NYU.  These statements include those reflected, embodied, and set forth in NYU's (i) Non-Discrimination and Anti-Harassment Policy; (ii) Student Conduct:  Mission, Values, and Learning Goals; (iii) Guidance and Expectations on Student Conduct; (iv) Student Conduct Policy; (v) Student Conduct Procedures; (vi) Faculty Handbook; (vii) Code of Ethical Conduct; (viii) Rules for the Maintenance of Public Order; and (iv) and website, including its Mission Statement and University Initiative pages.

276.    NYU has not acted in accordance with, and has not followed through on, its statements against discrimination, abuse, and harassment, and has instead engaged in the following false acts or practices that are deceptive or misleading in a material way, that were aimed at the consumer public (namely, prospective and current students), and that were likely to mislead a reasonable prospective or current student acting reasonably under the circumstances:

- By falsely leading plaintiffs to believe that NYU would apply, enforce, and follow the rules and policies, and the commitments contained therein, reflected, embodied and set forth in NYU's (i) Non-Discrimination and Anti-Harassment Policy; (ii) Student Conduct:  Mission, Values, and Learning Goals; (iii) Guidance and Expectations on Student Con-duct; (iv) Student Conduct Policy; (v) Student Conduct Procedures; (vi) Faculty Handbook; (vii) Code of Ethical Conduct; (viii) Rules for the Maintenance of Public Order, copies of which were available on NYU's website; and (ix) website, including its Mission Statement and University Initiatives pages; and

- By falsely causing plaintiffs to believe that if they paid tuition and fees to NYU, then NYU would uphold, adhere to, abide by, and comply with its stated rules and policies, and the commitments contained therein, to foster, ensure, maintain, and create an environment free of discrimination, abuse, harassment, and intimidation, and provide an adequate and appropriate setting and environment in which all students, of whatever race, ethnicity, and

ancestry, could freely express their identity and ancestry, could learn and grow, and could participate fully and meaningfully in NYU's educational and other programs.

277.    Plaintiffs saw, heard, and were aware of NYU's false and misleading statements and representations described above before they enrolled at NYU, and after they were enrolled in NYU.

278.    NYU's false and misleading statements and practices described above caused plaintiffs injury by causing them to enroll at NYU, and to pay tuition and fees to NYU, and to continue to maintain enrollment at NYU and continue to pay tuition and fees to NYU, based on the reasonable understanding that NYU would apply, enforce, and follow through on its codes and policies, and the commitments contained therein, concerning protecting students from harassment, abuse, intimidation and discrimination based on their race, ethnicity, and ancestry, would otherwise seek to protect students from such hateful and bigoted conduct, and would take actions and implement measures to adequately, appropriately, and sufficiently address such misconduct to foster, ensure, and maintain a safe educational and campus environment.  NYU did not take such actions.

279.    NYU's failure, refusal, lack of ability and intention, and lack of commitment to combating, addressing, and ameliorating these deplorable actions, and to making good on and complying with its aforementioned statements, constitute deceptive practices and/or false advertising, and have caused plaintiffs to sustain actual damages, including the loss of the value of the tuition and fees they have paid NYU, emotional distress, loss of educational and extracurricular opportunities, economic injuries, and other direct and consequential damages.

280.    Accordingly, plaintiffs are entitled to statutory and/or actual damages in amounts to be determined at trial and to treble damages pursuant to General Business Law § 349(h), based on NYU's willful or knowing violations.

281.    Plaintiffs are entitled to attorneys' fees and costs pursuant to General Business Law § 349(h)

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs Bella Ingber, Sabrina Maslavi, and Saul Tawil, and each of them, pray and request that a judgment be entered in each of their favor, and against NYU awarding them:

A.    Injunctive relief enjoining NYU and its agents from establishing, implementing, instituting, maintaining, or executing policies, practices, procedures, or protocols that penalize or discriminate against Jewish students, including plaintiffs, in any way and ordering NYU to take all necessary and appropriate remedial and preventative measures including by, among other things, (i) terminating deans, administrators, professors and other employees responsible for the antisemitic abuse permeating the school, whether because they engaged in it or permitted it, and (ii) suspending or expelling students who engage in such conduct;

B.    Compensatory and punitive damages in amounts to be determined at trial;

C.    Statutory penalties, including treble damages, for violations of General Business Law § 349(h) and N.Y. Civ. Rights Law § 40-c, pursuant to N.Y. Civ. Rights Law § 40-d;

D.    Their reasonable attorneys' fees, the costs of suit, and expenses;

E.    Pre-judgment interest and post-judgment interest at the maximum rate allowable by the law; and

F.      Such other and further relief as the Court deems just and proper.


Dated:   New York, New York
         November 14, 2023

                                        Respectfully submitted,

                                        KASOWITZ BENSON TORRES LLP

                                        By: */s/ Marc E. Kasowitz*
                                             Marc E. Kasowitz
                                             Daniel R. Benson
                                             Mark P. Ressler
                                             Andrew L. Schwartz
                                             Joshua E. Roberts
                                             Jillian R. Roffer
                                             Yarden Hodes
                                             William Wolfe Taub
                                             1633 Broadway
                                             New York, New York 10019
                                             Tel:  (212) 506-1700


                                        *Attorneys for Plaintiffs*