# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------- X
BELLA INGBER, SABRINA MASLAVI,              :
NEVO YEMINI, AVIGAIL TEILER, and            :   Case No. 23-cv-10023-PAC
STUDENTS AGAINST ANTISEMITISM,              :
INC.,                                       :   AMENDED COMPLAINT
                                            :
                Plaintiffs,                 :
                                            :   Jury Trial Demanded
        -against-                           :
                                            :
NEW YORK UNIVERSITY,                        :
                                            :
                Defendant.                  :
------------------------------------------------- X
```

Plaintiffs Bella Ingber ("Ingber"), Sabrina Maslavi ("Maslavi"), Nevo Yemini ("Yemini"), Avigail Teiler ("Teiler," and collectively with Ingber, Maslavi, and Yemini, the "Individual Plaintiffs"), and Students Against Antisemitism, Inc. ("SAA"), for their amended complaint against defendant New York University ("NYU"), allege as follows:

## PRELIMINARY STATEMENT

1.      The age-old virus of antisemitism is alive and well at New York University.  This case arises from NYU's egregious civil rights violations that have created a hostile educational environment in which Jewish and Israeli NYU students, including the Individual Plaintiffs and members of SAA, an organization formed to fight campus antisemitism, have been subjected to pervasive acts of hatred, discrimination, harassment, and intimidation.  For years, NYU—acutely aware of ongoing and disgraceful acts of anti-Jewish bigotry—has reacted with, at best, deliberate indifference, refusing to enforce its own anti-discrimination and conduct policies that it readily applies to protect other targets of bigotry, and instead fostering an environment in which students and faculty members are permitted to repeatedly abuse, malign, vilify, and

threaten Jewish and Israeli students with impunity.  Regularly confronted with such genocidal chants as, "Hitler was right," "gas the Jews," "death to kikes," and "from the river to the sea," and other abuse, Jewish and Israeli students not only have been deprived of the ability and opportunity to fully and meaningfully participate in NYU's educational and other programs, but they have suffered and have been put at severe risk of extreme emotional and physical injury.

2.     Antisemitism has been a growing institutional problem on NYU's campus and other United States university campuses for decades, increasing by over forty percent in 2022 alone, and worsening even further since the October 7, 2023 Hamas massacre in Israel.  NYU is among the worst campuses for Jewish and Israeli students, and NYU has long been aware of the festering Jewish hatred permeating the school.  In fact, although NYU, when it was facing government action three years ago, agreed to "address and ameliorate incidents and complaints of discrimination and harassment based on shared ancestry and ethnic characteristics, including anti-Semitism," NYU has done no such thing.  Instead, NYU, including its administrators and professors, has not just tolerated, but has fostered and fomented, this hostile environment, with students and faculty repeatedly abusing, demonizing, and threatening Jewish and Israeli students with impunity.  In enabling this campus antisemitism, NYU has violated Title VI of the Civil Rights Act of 1964 and similar laws, breached its duties to its Jewish and Israeli students it agreed to protect, and made plain that the representations and promises it made to Individual Plaintiffs and SAA members on which they relied in enrolling at and paying tuition to NYU were false.

3.     The latest and worst outbreak of antisemitism at NYU occurred in the wake of October 7 when Hamas terrorists invaded the State of Israel—the sole Jewish country in the world—and tortured, raped, slaughtered, burned, and mutilated over 1,200 people, including

infants, children and the elderly, and young people attending a music festival, in what would be the deadliest day for Jews since the Holocaust.  Since its formation, Hamas has made explicit that its goal is the destruction of the State of Israel and all Jews everywhere, and Hamas spokespersons publicly proclaim their determination to continue their attacks until their genocidal aims are achieved.

4.      Shockingly, numerous students and faculty members at NYU have openly and enthusiastically endorsed Hamas's October 7 massacre and applauded Hamas—which the U.S. State Department has designated a foreign terrorist organization.  Many have resorted to harassment and violence in supporting Hamas and condemning Israel's response in self-defense. The horrific October 7 attack thus lit a match to an already combustible antisemitic campus environment that NYU had created by tolerating and greenlighting antisemitic activity for years.

5.      Faced with pleas for help and protection from Jewish and Israeli NYU students, including the Individual Plaintiffs and SAA members, fearing for their safety and unable to escape relentless harassment, NYU has continued to do nothing.  Mobs of students, often accompanied and encouraged by professors, have been given *carte blanche* to harass and intimidate NYU's Jewish and Israeli population.  As a result of NYU's actions and inactions, antisemitism at NYU now thrives like never before, endangering the safety, well-being, and indeed lives of NYU's Jewish and Israeli students.  Nearly every day since the attack, Individual Plaintiffs and SAA members and other Jewish and Israeli students have been forced to run a campus gauntlet of verbal and physical harassment, threats, and intimidation.  Moreover, Jewish and Israeli students' complaints are ignored, slow-walked, or met with gaslighting by NYU administrators, including NYU President Linda Mills, who, among other things, falsely dismiss antisemitism on campus as being blown out of proportion.

6.      NYU has not "addressed and ameliorated" campus antisemitism, as the university committed to do three years ago.  In fact, shockingly, NYU has done the opposite—it has deliberately sought to burnish its antisemitic credentials and make the campus environment even more hostile and frightening for Jewish and Israeli students.  For example, on October 9, just two days after the horrific terrorist attack in Israel, NYU announced the appointment of Eve Tuck to establish a so-called "Center for Indigenous Studies" at NYU.  Professor Tuck, who has a long history of anti-Israel statements, wasted no time praising the murder of Jews.  Four days after the Hamas massacre, she called the "Palestinian resistance" "life and future affirming," and two weeks later, signed a viciously antisemitic open letter defaming Israel.  NYU did not censure or terminate Professor Tuck—as it has done for far less egregious conduct where antisemitism was not involved—but remained silent for a month, when it belatedly issued a statement on her behalf purporting to condemn Hamas's terrorism—which, given her previous statements, could not have been more disingenuous.

7.      This action does not seek to challenge legitimate free speech or academic freedom.  Rather, it arises from NYU's egregious application of double standards of discipline and behavior invidious to Jewish and Israeli students and NYU's brazen disregard for its obligations to protect its Jewish and Israeli students from antisemitism and bigotry—as a result of which they have suffered severe injury to themselves and their educational experience.  Each of the Individual Plaintiffs and SAA members has been the target of repeated verbal and physical threats, and made to feel unsafe on campus, as they are forced to confront angry mobs of students and faculty members extolling the Hamas massacre, and calling for the deaths of Jews and the annihilation of Israel.  As a result of the hostile environment created by NYU, the Individual Plaintiffs and SAA members are traumatized: their schoolwork has suffered and they

often stay in their dorms or apartments or go home to be with their families, rather than venturing out to face harassment from fellow students in class or the library or rampaging mobs in the streets hurling anti-Jewish epithets.

8.     Fearing for their lives and sickened by the virulent antisemitic hate speech that is part of their daily life at college, the Individual Plaintiffs and SAA members reached out for help from the university, including from, among others: NYU President Mills; and Rafael Rodriguez, the Associate Vice President and Dean of Students.  Rather than implementing urgently needed protective and disciplinary measures to restore campus order and safety, these administrators gaslighted the Jewish and Israeli students, insisting that their fears were exaggerated and that they should just call the Wellness Exchange, a hotline for students coping with emotional challenges.

9.     No college student should be forced to endure such outrageous, demoralizing, and life-threatening treatment anywhere, much less at an institution that touts in its Code of Ethical Conduct its purported "adherence to the highest ethical standards," "respect for and compliance with the law," and "respect for the rights and dignity of others."  Rather than adhering to these principles, NYU has abandoned its Jewish and Israeli students, leaving them dangerously unprotected, unsafe, defenseless, and fearful.

10.     The effect of NYU's inaction and, indeed, complicity in the torrent of anti-Jewish hatred that has engulfed its campus has been the normalization of antisemitism in the NYU community.  Whereas pro-Hamas faculty and students are permitted to engage in vicious antisemitic hate speech and conduct—of the type NYU has not tolerated and would never tolerate if directed at other protected classes—Jewish and Israeli students are told to keep quiet, maintain a low profile, avoid making waves, and call a wellness hotline.

11.     In short, NYU has permitted endemic antisemitism to exclude Jewish and Israeli students from full and equal participation in, and to deprive them of the full and equal benefits of, their educational experience at NYU, and has invidiously discriminated against them by, among other things, failing to protect them in the same way NYU has protected other groups— all based on their race, ethnicity, religion, and/or national origin.  That NYU has done so for many years and continues to this day—even in the face of its own agreement three years ago to remedy its endemic antisemitism—further confirms that it has responded with at best deliberate indifference, that NYU cannot be left to its own devices, and that its response has been clearly ineffective and clearly unreasonable.

12.     Because NYU has repeatedly thumbed its nose at Title VI's and similar laws' prohibitions against discrimination, and has demonstrably and shamefully breached its obligations to its Jewish and Israeli students, NYU must now be compelled through injunctive relief to implement institutional, far-reaching, and concrete remedial measures.  NYU must also pay damages to plaintiffs—who have been robbed of their college experience—to compensate them for the hostility they have been forced to endure as a consequence of NYU's unlawful conduct.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and § 1343 over the claims arising under Title VI of the Civil Rights Act of 1964 ("Title VI") (42 U.S.C. § 2000d *et seq.*).  This Court has supplemental jurisdiction over plaintiffs' related state law claims under 28 U.S.C. § 1367(a) because those claims arise out of the same case or controversy as plaintiffs' federal claims.

14.     This Court has personal jurisdiction over defendant because NYU is based and operates in New York.

15.     Venue in this District is proper under 28 U.S.C. § 1391 because it is the judicial district in which a substantial part of the events or omissions giving rise to plaintiffs' claims occurred and where NYU is located.

## PARTIES

16.     Plaintiff Students Against Antisemitism, Inc. is a not-for-profit corporation organized under the laws of the State of Delaware, formed to defend human and civil rights, including the right of individuals to equal protection and to be free from antisemitism in higher education.  SAA is composed of voluntary members, including students at higher education institutions, who support SAA's mission and who have been personally aggrieved or otherwise impacted by antisemitism and discrimination in higher education.  SAA's members include current Jewish and Israeli NYU students experiencing a severe and pervasive hostile educational environment, which causes them to lose the full benefits of NYU's educational and extracurricular opportunities.

17.     Plaintiff Bella Ingber is a Jewish student at NYU and has attended NYU since September 2021.  She is a junior in NYU's College of Arts and Sciences.  She is also a member of SAA.

18.     Plaintiff Sabrina Maslavi is a Jewish student at NYU and has attended NYU since September 2023.  She is a junior in NYU's Gallatin School of Individualized Study.  She is also a member of SAA.

19.     Plaintiff Nevo Yemini is an Israeli-American Jewish student at NYU and has attended NYU since September 2020.  He is a senior in NYU's School of Professional Studies. He is also a member of SAA.

20.     Plaintiff Avigail Teiler is a Jewish student at NYU and has attended NYU since September 2022.  She is a masters student at NYU's Silver School of Social Work.  She is also a member of SAA.

21.     SAA Member #1 is a Jewish student at NYU, enrolled in NYU School of Law and the Stern School of Business.

22.     SAA Member #2 is a Jewish student at NYU, enrolled in NYU's College of Arts and Sciences.

23.     SAA Member #3 is a Jewish student at NYU, enrolled in NYU's Tisch Center of Hospitality.

24.     SAA Member #4 is a Jewish student at NYU, enrolled in NYU's Silver School of Social Work.

25.     Defendant NYU is a private, not-for-profit university, located in New York, New York.  At all times relevant to this Complaint, NYU was and continues to be a recipient of federal funding, making it subject to Title VI.  NYU is also an "educational institution" and place of "public accommodation" within the meaning of the New York State Human Rights Law and the New York City Human Rights Law.  As of June 30, 2023, NYU's Endowment Fund stood at $5.9 billion.  In 2022 and 2021, grant and contract revenue that NYU obtained from U.S. governmental sources totaled over $761 million and $585 million, respectively.

## FACTS

**A.      Federal, State, and Local Laws Protect Against Antisemitism**

26.      Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*, prohibits discrimination on the basis of race, color, or national origin in any program or activity that receives federal funding or other federal financial assistance.  Title VI protects all students, including Jewish students, in federally funded programs or activities.

27.      Since at least September 2004, it has been the policy of the Office of Civil Rights ("OCR") of the U.S. Department of Education ("DOE"), the agency responsible for enforcing Title VI, to investigate claims related to antisemitism.  And in an October 26, 2010 letter to federally funded schools, OCR confirmed that such schools must address antisemitic harassment under Title VI.  According to OCR's letter, such harassment violates Title VI when it creates a "hostile environment" based on "actual or perceived shared ancestry or ethnic identity as Jews," in which "the conduct is sufficiently severe, pervasive, or persistent so as to interfere with or limit a student's ability to participate in or benefit from the services, activities, or opportunities offered by a school" or when the harassment is "encouraged, tolerated, not adequately addressed, or ignored by school employees."

28.      OCR, in its letter, made clear that schools must take "immediate and appropriate action to investigate or otherwise determine what occurred" when responding to harassment claims, and, when such investigations reveal that discriminatory harassment occurred, schools "must take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment and its effects, and prevent the harassment from recurring."

29.      The Obama, Trump, and Biden Administrations have since confirmed the urgent necessity under Title VI to combat antisemitism.  In June 2010, President Obama's State Department adopted a working definition of antisemitism developed by the European Monitoring

Center on Racism and Xenophobia.  The State Department also adopted contemporary examples

of antisemitism, which include ways that antisemitism manifests itself with regard to the state of

Israel:

- "Using the symbols and images associated with classic anti-Semitism to characterize Israel or Israelis";

- "Drawing comparisons of contemporary Israeli policy to that of the Nazis";

- "Blaming Israel for all inter-religious or political tensions";

- "Applying double standards by requiring of it a behavior not expected or demanded of any other democratic nation"; and

- "Denying the Jewish people their right to self-determination, and denying Israel the right to exist."

30.     In December 2019, President Trump issued Executive Order 13899 on Combating

Anti-Semitism (the "Executive Order"), directing the executive branch to enforce Title VI

against discrimination "rooted in anti-Semitism as vigorously as against all other forms of

discrimination prohibited by Title VI," and in doing so, to consider the definition of antisemitism

promulgated by the International Holocaust Remembrance Alliance ("IHRA"), an

intergovernmental organization comprising over thirty-five countries.  Under the IHRA

definition, the following are "contemporary examples of antisemitism":

- "Calling for, aiding, or justifying the killing or harming of Jews in the name of a radical ideology or an extremist view of religion";

- "Making mendacious, dehumanizing, demonizing, or stereotypical allegations about Jews as such or the power of Jews as collective—such as, especially but not exclusively, the myth about a world Jewish conspiracy or of Jews controlling the media, economy, government, or other societal institutions";

- "Accusing Jews as a people of being responsible for real or imagined wrongdoing committed by a single Jewish person or group, or even for acts committed by non-Jews";

- "Denying the fact, scope, mechanisms (*e.g.* gas chambers) or intentionality of the genocide of the Jewish people at the hands of National Socialist Germany and its supporters and accomplices during World War II (the Holocaust)";

- "Accusing the Jews as a people, or Israel as a state, of inventing or exaggerating the Holocaust";

- "Accusing Jewish citizens of being more loyal to Israel, or to the alleged priorities of Jews worldwide, than to the interests of their own nations";

- "Denying the Jewish people their right to self-determination, *e.g.*, by claiming that the existence of a State of Israel is a racist endeavor";

- "Applying double standards by requiring of [Israel] a behavior not expected or demanded of any other democratic nation";

- "Using the symbols and images associated with classic antisemitism (*e.g.*, claims of Jews killing Jesus or blood libel) to characterize Israel or Israelis";

- "Drawing comparisons of contemporary Israeli policy to that of the Nazis";

- "Holding Jews collectively responsible for actions of the state of Israel"; and

- "Criminal acts are antisemitic when the targets of attacks, whether they are people or property – such as buildings, schools, places of worship and cemeteries – are selected because they are, or are perceived to be, Jewish or linked to Jews."

31.    As the historical birthplace of the Jewish people, the land of Israel is at the core of Jewish identity, ancestral tradition, religion, and culture.  The movement for the reestablishment, development, and protection of the Jewish nation in the land of Israel, known as Zionism, arises from Jews' ethnic and historic roots in that land and their right to self-determination.  Zionism is central to Individual Plaintiffs' and SAA members' Jewish identities, and many are descendants of survivors of the Nazis, with family and friends in Israel.

32.    Anti-Zionism is discriminatory and antisemitic when expressed in terms of, for example: applying double standards not applicable to other countries or peoples in assessing Israel's legitimacy and conduct; denying the Jewish people's right to self-determination or the right of the State of Israel to exist; denying that Israel has the right to self-defense against

terrorism, invasion, or the murder, rape, and kidnapping of its citizens; accusing Israel of being

inherently racist or comparable to the Nazis; or invoking classic antisemitic canards against

Israel and its people.  "When people criticize Zionists," Dr. Martin Luther King, Jr. explained,

"they mean Jews.  You're talking antisemitism."

33.     The widespread anti-Israel hate that has gripped NYU and other colleges since

October 7, 2023 confirms that anti-Zionism is antisemitism.  At rallies and events across the

country, and especially at NYU, known or visibly Jewish students have been maligned as

"murderers," "colonizers," "racists," "white supremacists," "killers and rapists of children,"

"genocidal," and "Zionists."

34.     Antisemitism is a core tenet of Harakat al-Muqawama al-Islamiya, known by its

Arabic acronym, Hamas—an extreme Islamist terrorist group explicitly committed to the

destruction of Israel and its Jewish inhabitants, the creation of an Islamic state in Israel's place,

and the annihilation of all Jews around the world.  Hamas's 1988 charter states: "The Day of

Judgment will not come about until Muslims fight the Jews and kill them."  In October 1997, the

U.S. State Department designated Hamas, which has controlled Gaza since 2007, a Foreign

Terrorist Organization.

35.     In keeping with its charter and goals, since its inception, Hamas has carried out

numerous indiscriminate terror attacks on Israeli civilians, including bombings, rocket barrages,

shootings, and stabbings, including during two so-called "Intifadas" against Jews in Israel,

carried out mostly by suicide bombs, many of which included nails dipped in rat poison.  During

the Second Intifada, from approximately September 2000 through February 2005, Hamas

claimed responsibility for over fifty suicide bombings, including the August 9, 2001 bombing of

a Jerusalem pizzeria, which killed seven children; the December 2, 2001 double-suicide bombing

in the crowded Ben Yehuda pedestrian mall in Jerusalem, killing eleven; and the March 27, 2002 suicide bombing at a Passover Seder at the Park Hotel in Netanya, killing thirty. Over the next twenty years, Hamas killed scores more through similar suicide bombings, public bus attacks, booby traps, shootings, and other acts of terror.

36.     On January 4, 2023, the DOE, citing the "rise in anti-Semitic incidents," released a fact sheet entitled "Protecting Students from Discrimination Based on Shared Ancestry or Ethnic Characteristics," which notes that Title VI's protections extend to "students who experience discrimination, including harassment, based on their shared ancestry or ethnic characteristics or citizenship or residency in a country with a dominant religion or distinct religious identity."

37.     On May 25, 2023, President Biden released The U.S. National Strategy to Counter Antisemitism, which his administration described as the "most ambitious and comprehensive U.S. government-led effort to fight antisemitism in American history," and the DOE launched its Antisemitism Awareness Campaign. As part of that campaign, OCR released a letter reminding schools of their legal obligations under Title VI to provide all students, including Jewish students, a school environment free from discrimination and to take immediate and appropriate action to respond to harassment that creates a hostile environment. On September 28, 2023, as part of President Biden's National Strategy to Counter Antisemitism, eight federal agencies confirmed again that Title VI prohibits antisemitic forms of discrimination in federally funded programs and activities.

38.     In the wake of Hamas's October 7 terrorist attack against Israel, which, according to President Biden, contributed to an "alarming" rise in antisemitism at schools and on college campuses, OCR announced that it was expediting its processing of discrimination complaints

involving antisemitism, and at least seven bills have been introduced in both houses of Congress condemning support for Hamas, Hezbollah, and other terrorist organizations at American universities which has created a hostile educational environment for Jewish students, faculty, and staff.  On October 18, 2023, the U.S. Senate passed a resolution condemning "antisemitic student activities," which named NYU twice, and on November 2, 2023, the U.S. House passed a resolution condemning support for Hamas, Hezbollah, and other terrorist organizations at American universities.

39.    On November 7, 2023, OCR released a letter "remind[ing] colleges, universities, and schools that receive federal financial assistance of their legal responsibility under Title VI . . . to provide all students a school environment free from discrimination based on race, color, or national origin, including shared ancestry or ethnic characteristics."  The letter states: "It is your legal obligation under Title VI to address prohibited discrimination against students and others on your campus—including those who are perceived to be Jewish [or Israeli] . . . in the ways described in this letter."  Given the rise in antisemitism on campus, the DOE also announced plans to hold technical assistance webinars to ensure that students facing discrimination on campus have the information they need to file a formal complaint with OCR.

**B.    NYU Fails to Enforce Its Own Policies to Protect Jewish Students**

40.    NYU has issued at least eight applicable policies designed and intended to protect students from discrimination, harassment, and intimidation at NYU: (i) NYU's Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Students; (ii) Student Conduct:  Mission, Values, and Learning Goals; (iii) Guidance and Expectations on Student Conduct; (iv) Student Conduct Policy; (v) Student Conduct Procedures; (vi) Faculty Handbook; (vii) Code of Ethical Conduct; and (viii) Rules for the Maintenance of Public Order.

41.     Among other things, NYU asserts that, as a result of its issuance and enforcement of these policies—which, it says apply wherever students are—including on social media and in nearby Washington Square Park—its students enjoy an environment that is an "unrivaled setting to learn and grow." NYU repeatedly assures and represents to students that it intends to enforce its policies and that discrimination, harassment, and intimidation of the type plaintiffs have experienced is impermissible and will not be tolerated.

42.     NYU's assertions, assurances, and representations have proven false. As alleged in detail herein, Jewish students are routinely targeted for antisemitic discrimination, harassment, and intimidation, without consequence, by their peers and professors. Even though every instance of antisemitic behavior alleged herein is prohibited by one or more of NYU's policies, the university has done nothing to enforce these policies to remedy or prevent that behavior, and certainly nothing approaching the manner in which NYU has enforced them with respect to misconduct not involving antisemitism. NYU selectively enforces its own rules, deeming Jewish students unworthy of the protections it readily affords to non-Jewish students victimized by discrimination, harassment, and intimidation.

**i.     NYU's Non-Discrimination and Anti-Harassment Policy**

43.     NYU's Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Students (the "Discrimination Policy") states that it "demonstrates [NYU]'s strong commitment to prevent discrimination and harassment against students on the bases of several protected characteristics," such as shared ancestry and ethnic characteristics, including antisemitism, and that when complaints against students are made, NYU's Office of Equal Opportunity will investigate, and students found to have violated the Discrimination Policy will face disciplinary measures, including suspension. NYU faculty is also subject to the Discrimination Policy: "Where allegations are made against employees for possible violation of

this policy (including allegations that the university has engaged in retaliation), the matter will be investigated and resolved utilizing the procedures of the Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Employees."

44.     The Discrimination Policy incorporates the widely accepted definition of antisemitism promulgated by the IHRA.

### ii.     Student Conduct:  Mission, Values, and Learning Goals

45.     According to NYU, the "mission" of its Office of Student Conduct and Community Standards ("OSC") is to "support[] the maintenance of a safe, accountable, and inclusive community" and to "resolve[] situations in which a student's behavioral choices may be negatively impacting themselves or others[.]"  Regarding accountability, NYU states: "As members of the NYU community, students are expected to uphold their responsibilities to maintain a safe and productive campus community, which includes adherence to NYU policies. When these polices are violated, students will be held accountable and are expected to recognize how their actions and decisions affect the larger community."

### iii.     NYU's Guidance and Expectations on Student Conduct

46.     In NYU's Guidance and Expectations on Student Conduct (the "Guidance") NYU asserts that it "reaffirm[s]—amidst a concerning rise in hate and intimidation nationally and internationally—our expectations for student conduct."

47.     According to the Guidance: "All students deserve the opportunity to live and learn in peace.  Our aim is to maintain our academic mission, abide by our principles, safeguard the well-being of all members of the community, and act in accord with long-established rules even in this fraught moment."  The phrase "long-established rules" hyperlinks to the NYU Student Conduct Policy described below.

48.   The Guidance provides as follows:

- **Nondiscrimination and anti-harassment ("NDAH")**: "The University's NDAH Policy, which specifically prohibits antisemitic . . . discrimination and harassment, applies to all members of the community at all times.  Advocacy on current events is not a license to discriminate.  Some examples of activities that may violate the NDAH Policy [include:] . . . Targeting someone for harassment or intimidation on the basis of their identity, their religious attire, their name, their language spoken; use of dissemination of tropes about protected groups (eg, . . . 'Jews control the media'), including instances involving substitute code words.  Calls for genocide of an entire people or group."

- **Intimidation and violence**: "The University has zero tolerance for any form of violence, threats, or intimidation.  This includes, but is not limited to, using language advocating for killing people or groups of people, and all relevant synonyms (e.g. eradicate, destroy, massacre, exterminate, etc.)."

- **Behavior during protest activities**: "Protests and demonstrations may not use amplified sound (*e.g.*, bullhorns, speakers, drums) indoors or directly adjacent to classrooms or residence halls.  Physically accosting someone who is participating in a protest, attempting to grab or move their signs or equipment, and/or sabotaging their equipment are examples of violations.  All organizers and participants of a protest or demonstration are responsible for the conduct of the event, and must cooperate with the University and its directives, including with respect to safety and security.  These rules apply to counter-protests as well."

- **University activities and events**: "We do not permit 'heckler's veto'; it is a violation to interrupt, impede, disrupt, or otherwise interfere with any University event, including student group or club events. . . .  [H]olding signs or banners is permissible so long as they do not block the view of other attendees, are not affixed to any University property consistent with a building's relevant policies, and do not contain threats or other content that would violate the NDAH or contribute to a hostile environment under the NDAH."

- **Signs, posters, banners, etc.:**

   o   "*Removing Signs*: Individuals may not remove, deface, or cover over an-other individual or group's sign or poster."

   o   "*Sign Content*:  Signs containing material that violates the NDAH policy or contribute to a hostile environment under the NDAH aren't permitted.  A sign with a bigoted message or symbol or that advocates violence against anyone in the University community are clear, sanctionable violations."

- **Social media and online activity**: "The University does not discipline social media content writ large, however the University will take student disciplinary action for conduct occurring outside the University context, including online, when such conduct substantially disrupts the regular operation of the University; threatens the health, safety, or security of the University community; or results in a violation of the NDAH (such as a hostile environment). Social media posts may also be taken into account to establish context or intent, where relevant, in reviewing other forms of misconduct."

### iv.    NYU's Student Conduct Policy

49.    Under NYU's University Student Conduct Policy (the "Student Conduct Policy"), NYU asserts the "right to require the cooperation of its [community] members in the performance of its educational functions, and to oversee and regulate the conduct and behavior of such members which, actually or has potential to, impede, obstruct, or threaten the maintenance of order and achievement of the University's educational goals," sets forth standards of "non-academic misconduct" which are "applicable to all undergraduate and graduate students and Student Organizations at NYU," and provides that NYU "may take student disciplinary action for conduct occurring outside the University context which substantially disrupts the regular operation of the University or threatens the health, safety or security of the University community."

50.    NYU's Student Conduct Policy proscribes the following behavior:

- "Engaging in or threatening to engage in behavior(s) that, by virtue of their intensity, repetitiveness, or otherwise, endanger or compromise the health or safety of oneself, another person, or the general University community. This includes, but is not limited to, threatening, tormenting, mocking, intimidating, maliciously or inappropriately ridiculing another's work or comments beyond the scope of scholarly inquiry, and exploiting known psychological or physical vulnerabilities or impairment.";

- "Physical violence, actual or threatened, against any individual or group of persons.";

- "Vandalizing, damaging, destroying, defacing, or tampering with university property or the property of others.";

18

- "Engaging in behavior prohibited under the NYU Non-Discrimination and Anti-Harassment Policy for Students or for Employees.";

- "Disorderly, disruptive, or antagonizing behavior that interferes with the safety, security, or health of the community, and/or the regular operation of the University."; and

- "Behaviors that, by virtue of their intensity and/or repetitiveness, interfere with an educational activity (e.g., classroom, remote or online learning environments, advising session, lecture, workshop . . . deliberately engaging in other behaviors that unreasonably and illegitimately distracts from or interferes with the educational experience or otherwise violates University policy."

51.  Under the Student Conduct Policy, "[w]hether acting in an official or unofficial capacity, Student Organizations and individuals within those organizations may be held account-able for violations."

52.  NYU has a history of selectively enforcing the Student Conduct Policy.  As alleged below, NYU has not enforced this and its other policies when Jewish and/or Israeli students, like plaintiffs, are victims.

**v.   Student Conduct Procedures**

53.  Alleged violations of the Student Conduct Policy are reviewed and resolved pursuant to the Student Conduct Procedures ("Conduct Procedures").  OSC is listed as the "Responsible Officer" and the Conduct Procedures apply to all students.

54.  Where a violation is found, the Conduct Procedures provide for sanctions, including, but not limited to: written warning, censure, no contact directive, educational assignment, mandatory health referral, restitution, restriction of privileges, residential probation, residence hall reassignment, dismissal from housing, university disciplinary probation, transcript notation, suspension from NYU, and expulsion from NYU.

55.     Under the Conduct Procedures, pending investigations of allegations, the Dean of Students can implement "interim measures," including suspension, no contact orders, and other restrictions of privileges.

### vi.    NYU's Faculty Handbook

56.     The NYU Faculty Handbook provides that "all faculty are expected to carry out their institutional responsibilities in accordance with applicable legal and ethical principles, including the principles found in the NYU Code of Ethical Conduct and in this Handbook."

57.     NYU's Faculty Handbook prohibits conduct that is "prejudicial to the teaching, research, or welfare or reputation of the University, or [] conduct not protected by academic freedom unbecoming a member of the faculty."

58.     As with its other policies, NYU has utterly failed to enforce the Faculty Handbook when it comes to antisemitic mistreatment, abuse, and harassment of Jewish and/or Israeli students.

### vii.   NYU's Code of Ethical Conduct

59.     NYU's Code of Ethical Conduct, which is incorporated by reference into the Faculty Handbook, sets forth the "general principles to which we subscribe and to which we expect every member of the University—every part-time and fulltime employee, faculty member, officer, trustee, overseer, and advisory board member—to adhere," including:

- **Adhering to the Highest Ethical Standards**: "Every member of the University shall, at all times, conduct his or her activities in accordance with the highest professional and community ethical standards."

- **Respect for and Compliance with the Law**: "Every member of the University is expected to become familiar with those laws, regulations, and University rules which are applicable to his or her position and duties, and to comply with both their letter and spirit. The University will implement programs to further members' awareness and to monitor and promote compliance[.]"

- **Respect for the Rights and Dignity of Others**: "New York University is committed to a policy of equal treatment, opportunity, and respect in its relations with its faculty, administrators, staff, students, and others who come into contact with the University.  Every member of the University is prohibited from discriminating on the basis of race, color, religion, sexual orientation, gender and/or gender identity or expression, marital or parental status, national origin, citizenship status, veteran or military status, age, disability, and any other legally protected status; physically assaulting, emotionally abusing, or harassing anyone; and depriving anyone of rights in his or her physical or intellectual property, under University policy, or under federal, state, and local laws."

60.     Again, NYU has utterly failed to enforce this Code of Ethical Conduct to protect its Jewish and Israeli students.

**viii.    NYU's Rules for the Maintenance of Public Order**

61.     NYU requires its students and faculty members to comply with its Rules for the Maintenance of Public Order, for the "maintenance of public order on campus and other University property used for education purposes[.]"

62.     These rules provide that "all members of the University community—students, faculty members, and members of the staff—shall comply with city, state, and federal laws and ordinances affecting the maintenance of order on University premises."  According to the Rules, "[c]onduct that is violative of such laws and ordinances occurring on University premises may be subject to both University discipline and public sanctions as circumstances may warrant or dictate," and "[c]onduct that is violative of such laws and ordinances off University premises" will also be subject to discipline if such conduct "seriously affects the interests of the University or the position of the member within the University community, or occurs in close proximity to University premises and is connected to violative conduct on University premises," including:

- "Interference with or disruption of the regular operations and activities of the University.";

- "Denial of, or unreasonable interference with, the rights of others—including persons not members of the University community who are present as invitees

or licensees—on University premises.  These rights include the right of academic freedom as well as constitutionally protected rights."; and

- "Unauthorized access to or occupation of nonpublic areas on University premises but not limited to classrooms, seminar rooms, laboratories, libraries, faculty and administrative offices, auditoriums, and recreational facilities."

63.     When Jewish and/or Israeli students have been the victims of antisemitic abuse and harassment, NYU has not enforced its Rules for the Maintenance of Public Order as it has when non-Jewish and/or non-Israeli students are victimized.

**C.     NYU's History of Antisemitism and Civil Rights Violations**

     **i.     Reported Incidents of Antisemitism from 2014 through 2020**

64.     Antisemitism on NYU's campus is hardly a new phenomenon; to the contrary, it started decades before Hamas's October 7 attack.  Over the last ten years, however, there has been a steadily increasing incidence of antisemitic attacks at NYU.  Despite repeated assurances and promises by NYU that it would take meaningful and concrete steps to address and remedy the hostile antisemitic environment that pervades the university, administrators have done little to nothing to rectify the problem.  In fact, their representations about meaningful remedial measures were plainly intended to string along victimized Jewish and/or Israeli students, for whom the harassment, vilification, and abuse has not only continued unabated, but has soared to alarming and dangerous levels.

65.     In April 2014, ostensibly to protest Israeli government actions, members of NYU's Students for Justice in Palestine ("SJP"), an anti-Zionist student group formally recognized by NYU and a chapter of the national SJP, slipped mock eviction notices under the doors of student rooms at NYU's Palladium Hall, a dormitory well known to have a high concentration of Jewish students because it has an automatic elevator that observant Jews can use on Shabbat without violating religious strictures.  An NYU spokesperson blithely dismissed the

incident—which caused anguish and fear among Jewish students—as merely a disappointing prank that went too far.  The NYU Residence Life and Housing Office was tasked with looking into the matter and "following up appropriately," but no action was taken against SJP.  By contrast, when a similar incident took place at Northeastern University a few months earlier, the university immediately suspended the responsible SJP group.  Just weeks after distributing the eviction notices, NYU's SJP conducted an antisemitic "die-in" rally with such pro-terrorism and genocidal chants as "resistance is justified when a people are occupied" and "Zionist state, tear it down."

66.     SJP is forthright that one of its core objectives is to impede, undermine, and interfere with the ability of Jewish students to be participants in NYU's educational and other activities: as the then-president of SJP stated in 2019, "our point is to make being Zionist uncomfortable on the NYU campus."  SJP was founded by the chair of American Muslims for Palestine ("AMP") whose leadership overlaps with the leadership of organizations that have been shut down by federal authorities, whose assets were frozen by the U.S. Treasury Department, or that were found liable in civil actions for providing material support to Hamas.  SJP receives funding and training from AMP as well as from universities.  SJP and its affiliates sponsor antisemitic events, host antisemitic speakers, and are leading organizers of Boycott, Divestment, and Sanctions ("BDS") campaigns against Israeli businesses.  They use confrontational tactics to target Jewish and Israeli students, including disrupting Jewish events, constructing mock "apartheid walls," and disseminating anti-Jewish propaganda laced with falsehoods and blood libels.  A recent study published by the Network Contagion Research Group, an information verification think tank, found the presence of SJP on campuses "significantly correlated with antisemitic activity."  In 2019, NYU awarded SJP its "President's Service Award," praising it for

"giving [] time, energy and talents, [that had] positively impacted the culture of this institution and members of our community."  In contrast, other institutions—such as Fordham University, Brandies University, Florida's State University System, and Lafayette College—have refused to recognize it or banned or suspended it from campus, recognizing that the group provides material support to Hamas, a designated foreign terrorist organization.

67.     Not only were there no repercussions for SJP's blatant antisemitism in 2014, but NYU itself, through its Hagop Kevorkian Center for Near Eastern Studies and Gallatin School of Individualized Study, gave SJP free rein to pursue its antisemitic campaign.  In March 2016, a guest speaker at an SJP event gave a speech in a packed campus lecture hall, demonizing and delegitimizing Israel, denying that Jews have the right to self-determination, arguing for an end to the Jewish state, claiming that Zionism is responsible for the "carnage" in the Middle East, and advocating BDS efforts against Israel—all classic expressions of antisemitism.

68.     In April 2016, the so-called "Center for Human Rights and Global Justice" at NYU School of Law hosted an event with multiple panels called "The Palestinian Right of Return: A Legal and Political Analysis."  The so-called "Palestinian Right to Return" is understood to be a call for the destruction of Israel.  During the conference, panelists placed quotation marks around the phrase "Jewish State," denying Jews the right to self-determination, and advocated BDS efforts at NYU.

69.     Also in April 2016, NYU School of Law held an event entitled "Palestine in Focus: Reports from the Ground," at which the panelists made explicitly antisemitic statements that endorsed terrorism, telling students that Palestinians "have the right to resist occupation by any way[]" and that the "freedom fighters . . . are seeking an end and right to self-determination."

24

70.     On November 17, 2016, a note with a swastika—the symbol of the Nazis, which is still used to threaten and harass Jews around the world—was posted on the door of a Jewish student's dormitory room.  The student alerted NYU Campus Safety and filed a police report. Two months later, in January 2017, "Jews are a virus" was written in black marker on a campus trash recycling bin.  That same month, SJP held an event on NYU's campus at which participants endorsed a global campaign to free from an Israeli jail Ahmad Saadat—the head of the Popular Front for the Liberation of Palestine, a designated terrorist organization —who was responsible for numerous deliberate attacks on Jewish civilians, including the assassination of an Israeli government minister.

71.     Also in 2016, NYU Professor Amin Husain spoke at a pro-Palestinian rally in Times Square, boasting of his attacks against Israel during the first Palestinian Intifada, which occurred during roughly 1987-1993: "I was throwing rocks, Molotov cocktails, the like."  He is also the co-founder of a group called "Decolonize This Place," which, on October 8, 2023—the day after the Hamas massacre—posted an image condemning Israel and praising the "heroic Palestinian resistance."

72.     On Saturday, December 8, 2017, during the Jewish Sabbath, NYU's chapter of the national so-called Jewish Voice for Peace ("JVP") organization, an anti-Zionist and anti-Israel fringe organization whose members include both Jews and non-Jews, interrupted Shabbat observances at NYU's Bronfman Center for Jewish Student Life (the "Bronfman Center") to protest NYU's "Jewish institutions [which] foster superficial 'interfaith relations' while normalizing Israeli apartheid."  Since October 7, at least one chapter of JVP has been suspended for planning and carrying out unauthorized campus demonstrations alongside SJP.

73.      In January 2018, multiple swastikas were scratched into computer desks at an NYU dormitory common room and drawn on a dormitory bulletin board.  In February 2018, the lounge in an NYU residence hall was twice vandalized with swastikas.

74.      In April 2018, fifty NYU student groups pledged to participate in the BDS movement by, among other things, "boycotting NYU's pro-Israel clubs . . . by not co-sponsoring events with them."  The groups also pledged to boycott such off-campus groups as the Anti-Defamation League, a Jewish organization founded well before modern Israel whose mission is "to stop the defamation of the Jewish people, and to secure justice and fair treatment to all."

75.      Later that month, JVP and SJP held an event called "BDS Work-in at the [NYU Bobst] Library."  The event announcement encouraged students to "come out to [the NYU Bobst Library] for a fun fun fun and easy action to put pressure on NYU admin and the Board of Trustees to divest from Israeli apartheid! . . . 53 NYU student groups have endorsed BDS!  Let's make sure [President] Andy Hamilton knows how we feel!"

76.      Around the same time, the NYU Politics Department, SJP, JVP, and the Young Democratic Socialists of America co-sponsored a talk entitled, "The Time to Act is Now: A Talk and Open Discussion on the Urgent Situation in Gaza," with Norman Finkelstein, a notorious antisemitic agitator, during which he repeatedly described Gaza as a "concentration camp."

77.      In April 2018, in celebration of Israel's 70th Independence Day, two pro-Israel student groups at NYU organized a gathering in Washington Square Park.  The pro-Israel students brought their concerns to the NYU administration about safety at the event, given that SJP had called for a boycott of all NYU pro-Israel groups, and had posted a flyer on its Facebook event page quoting the founder of the Popular Front for the Liberation of Palestine, who called for a "revolt" to publicize "Israel Apartheid Week."  Israel Apartheid Week is an annual program

organized by virulent anti-Israel activists in cities across the globe, focused on support for BDS and vociferous slander of Israel as a "racist," "apartheid" state.  SJP was forced to take down the flyer but no significant action was taken against the group.

78.     Following the pro-Israel groups' announcement of their event, SJP and other NYU student groups organized a "Rally for Palestinian Right of Return."  That rally was to take place simultaneously with the pro-Israel event because they "refuse[d] to let such a disturbing public celebration of colonialism and apartheid on [NYU's] campus and in our park go by without a response."  Around the time of these events, the president of SJP made the group's goal perfectly clear: "Our point is to make being Zionist uncomfortable on the NYU campus."  Despite its antisemitic agitation and its proclamation that its mission was to target a group of Jewish students, NYU took no action, and SJP was, and is, permitted to remain on campus.

79.     SJP's so called "response" to the pro-Israel event at Washington Square Park, described above, included desecrating Israeli flags.  Attendees at the SJP rally threw a flag to the ground, stomped on it, and burned it.  Two NYU students were arrested: one faced charges of reckless endangerment and resisting arrest, and the other faced charges of assault, disorderly conduct, robbery, and criminal mischief.

80.     SJP's intimidation tactics at the pro-Israel event also included distributing flyers depicting assault rifles.  Toward the end of the event, a protestor disrupted a performance of Israel's national anthem, forcibly grabbing the microphone and shouting "Free Palestine."  The pro-Israel singer who was performing Israel's national anthem was reportedly injured.  NYU did nothing to punish the offenders.

81.     Then, in late October 2018, thirty student groups pledged that their members would not apply to NYU's Tel Aviv program, arguing that both NYU and the students in the Tel

Aviv campus are complicit in what the student groups alleged was Israel's discrimination against Palestinians: "Our participation would render us complicit in the state of Israel's targeted discrimination against activists and Palestinian and Muslim students."  According to the Secretary of SJP, "[t]he pledge is above all a coalition of clubs affirming their respect for the academic boycott of Israel.  While people may view an act like this as symbolic regarding the scope of the campus, we would invert the idea and emphasize that a significant amount of NYU clubs are declaring that they understand Israel to be an immoral and apartheid state."

82.    Around the same time, a letter was sent by anonymous students via email within the chemistry department urging it to "refrain from teaching or participating in academic events at NYU Tel Aviv."

83.    On December 12, 2018, an NYU student posted threatening messages on social media, forcing the Bronfman Center to close and enhance its security protocol.  According to the student, he "expressed extremely aggressive views towards Zionists because they believe in the genocide of ethnic and religious minorities."  The same student stated on social media, "I hope every Zionist kkkunt @ nyu is crying right now."  Posts by the student also included positive references to Hitler, a post telling followers to "remember to spit on zionists, it's proper etiquette," and an acknowledgement that his Twitter account had been suspended because "i expressed my desire for zionists to die."

84.    Not only did NYU take no steps to discipline SJP for its continual antisemitic statements and actions, on April 4, 2019, NYU awarded SJP the President's Service Award, which is awarded to individual students or student organizations that have had "an extraordinary and positive impact on the University community" and that promote "learning, leadership, and quality of student life at [NYU]."  Shockingly, NYU praised SJP for "giving [its] time, energy

and talents, [that had] positively impacted the culture of this institution and members of our community."

85.     On April 21, 2019, an NYU alumnus, married to a professor in NYU's Tisch School of the Arts, published an op-ed entitled "Anti-Semitism at NYU" in *The Wall Street Journal* criticizing NYU for awarding SJP the President's Service Award, given that SJP "push[es] BDS," which "demoniz[es] Israel" and "led a boycott of Zionist student clubs."  The op-ed also called out recent incidents: "Jewish students were assaulted at an Israeli Independence Day celebration last year in Washington Square Park, where two anti-Israel student agitators were arrested after desecrating Israeli flags.  The NYU Jewish Center received threats; swastikas were found in a residence hall.  The student government passed an anti-Israel BDS . . . resolution."

86.     One week later, NYU's then-President Andrew Hamilton published a response in *The Wall Street Journal* to the op-ed, entitled "NYU is Committed to its Jewish Community," in which he asserted that NYU has "long been known as a welcoming campus for Jewish students." He tried to distance himself from the SJP award given in his name, claiming that "[h]ad it been up to [him], SJP would not have received the award . . . because SJP's behavior has been divisive," and that NYU's supposed "strong record of support for the Jewish community surely must count for more than a single student award."  Dismissing the incident rather than directly addressing the problem reflects NYU's reflexive defensive practice: It takes no steps to address, ameliorate, and prevent antisemitism, and instead simply rests on its non-existing laurels. President Hamilton ended his piece with empty clichés and yet another hollow promise: "Anti-Semitism is real; it should be fought.  But tarring NYU as anti-Semitic is wrong and unfair. NYU is committed to its Jewish community, and that is not ever going to change."

87.     In May 2019, more than 140 alumni and faculty members of NYU School of Medicine signed a letter to President Hamilton, urging him to combat a "climate of anti-Semitism at NYU that creates a hostile environment for Jewish students" and warning him that in recent months antisemitism had been "normalized" on NYU's campus.

88.     Later that week, on May 21, 2019, at the NYU Arts and Science graduation, a student graduation speaker, Steven Thrasher, called BDS a "duty" and delegitimized Israel with the false accusation of "apartheid."  In his speech, Thrasher stated: "I'm so proud, so proud, of NYU's chapters of Students for Justice in Palestine and Jewish Voices for Peace[,]… the NYU Student Government and of my colleagues . . . for supporting the boycott, divestment, and sanctions movement against the apartheid state government in Israel.  Because this is what we are called to do. This is our NYU legacy[.]"

89.     That same month, an incoming freshman, whose great-grandfather had founded NYU's Music Department and had been a professor at NYU for decades, publicly withdrew her enrollment, stating: "It has now become clear to me that as a Jew, if I were to attend NYU I would be affiliating myself with an institution that accommodates faculty members and student organizations that are dedicated to anti-Zionism and anti-Semitism."  As she put it, she would not attend an institution where her "very existence is being threatened."

90.     In February 2022, another swastika was found on scaffolding on an NYU building.  NYU, as always, took no concrete, let alone effective, steps to put an end to the outrageous antisemitism on its campus; instead, NYU spokesperson John Beckman paid lip service to NYU's "condemn[ation]" of "this act of revolting vandalism," and assured students that NYU would "continue to reject and oppose anti-Semitism."

91.     In response to NYU's statement, a Jewish NYU student, in *Washington Square News,* NYU's student newspaper, described the clear pattern: NYU would allow hate to fester, feign shock and condemnation in response to disgusting antisemitic incidents, but fail to address them with anything meaningful.  The author detailed how "simply stating that the university will 'reject and oppose anti-Semitism' provides no comfort or concrete solution toward the protection of Jewish students on campus."  She was unequivocal in describing her experience: "I'm a Jewish student at NYU and I feel unsafe on campus."

92.     At the same time NYU was turning a blind eye to the increasingly hostile antisemitism gripping its campus, it was receiving a massive influx of foreign, concealed donations from authoritarian regimes.  From 2014 through 2019, despite statutory disclosure requirements, NYU received over $68 million in undocumented funding.  During the same period, Qatar—which shelters and protects Hamas leaders and helps fund the terrorist organization—contributed over $2.7 billion in undocumented funding to institutions of higher education in the United States.  A November 2023 study found a correlation on U.S. university campuses between the amount of such donations and heightened antisemitic incidents and demonization of Israel.  The study concluded, among other things, that "[f]rom 2015-2020, Institutions that accepted money from Middle Eastern donors, had, on average, 300% more antisemitic incidents than those institutions that did not."

### ii.     NYU Fails to Fulfill Its Commitment to Resolve Claims of Antisemitism

93.     In April 2019, an NYU student filed a complaint with OCR (the "OCR Complaint") alleging that, in violation of Title VI, over the prior two years, Jewish students and students supporting Israel had experienced "extreme anti-Semitism on the NYU Campus."  The OCR Complaint explained that the antisemitism largely stemmed from NYU SJP's actions and NYU's failure and refusal to adequately address them.  According to the OCR Complaint, the

student met with administrators throughout 2018 to express how uncomfortable Jewish students felt on campus.  For example, during a student government meeting in mid-April 2018, on Israel's Independence Day, antisemitic students berated an NYU administrator, to the point where the administrator had to leave the meeting, after which the complainant herself was harassed by the angry mob.  The student also questioned SJP's receipt of the President's Service Award and discussed the resulting distress among Jewish students.  In response to her concerns, university administrators told the student "not to draw attention to [the award to SJP]."

94.     As a result of these allegations, OCR opened an investigation, and in September 2020, NYU entered into an agreement resolving the complaint (the "OCR Agreement") which included three detailed action items and reporting requirements.

95.     Action Item I required NYU, among other things, to revise its Discrimination Policy to prohibit discrimination on the basis of shared ancestry and ethnic characteristics, including antisemitism (as defined in the Executive Order), include procedures for responding antisemitism, and address antisemitism involving student clubs.

96.     Action Item II required NYU's President or a designee, among other things, to issue a statement that NYU does not tolerate discrimination or harassment based on antisemitism, and that NYU would take all necessary actions, including student discipline, to address and ameliorate such misconduct.

97.     Action Item III required NYU to: include a component on national origin discrimination and harassment, including antisemitism, for each new training and/or orientation session NYU offered or required for the academic years 2020-2022; provide training on the Discrimination Policy to relevant staff and administrators responsible for responding to reports or complaints; and have NYU's Office of General Counsel provide training to senior leadership

on the Discrimination Policy and prohibitions against discrimination and harassment based on antisemitism.  During the academic year 2020-2021, (a) NYU planned to present an interactive customizable program about antisemitism, and (b) have NYU's Center for Multicultural Education and Programs partner with the Bronfman Center to develop a training model to combat antisemitism.

98.     As discussed herein, the Action Items were not complied with and were insufficient in any event.

### iii.   NYU Fails to Enforce Its Own Policies, Enabling Antisemitism to Continue to Flourish on Campus

99.     Despite numerous antisemitic incidents on campus, complaints by students, the formal complaint filed with OCR, the OCR investigation, and the OCR Agreement, NYU continued to fail and to refuse to take any meaningful actions to combat, address, and ameliorate antisemitism.

100.    On July 12, 2020, an NYU student posted on the Brandeis Center-affiliated Instagram account "jewishoncampus"—in which students can post their antisemitic experiences: "I was in a performing comedy class at NYU and the professor knew I was Jewish because I had to miss a performance that he scheduled for Yom Kippur.  For two improv sketches, including the final performance which was in front of an audience, he made the sketches I was in about the Holocaust.  I was forced to perform and crack jokes, even as he said that I was a smokestack at Auschwitz.  As if the genocide of my people and my family is a joke."

101.    In September 2020, just a few days after NYU signed the OCR Agreement, swastikas were drawn on the NYU Silver Center for Arts and Sciences building accompanied by the phrases, "Jews = N*****s" and "Kill the N****r."

102.    On or about February 9, 2021, the NYU Hagop Kevorkian Center for Near East Studies held an event titled "Global Uprising – Insurrection and Reaction – Uprisings Against the Left," at which one of the participants gave a speech supporting Hamas.  That same month, another swastika was spray painted onto an NYU building.

103.    On October 5, 2021, the Instagram account "jewishoncampus" posted another quote from an NYU student: "My professor compared the United States healthcare system to a 'concentration camp.'  He then went on to compare figures in the healthcare system to Dr. Mengele and stated that the system we have today is like the 'death panels' they had at concentration camps."

104.    On April 11, 2022, NYU School of Law's SJP chapter issued a statement that it stands "unequivocally with Palestinians resisting their oppression," describing the media as "Zionist-funded," and referring to the "Zionist grip on the media" as "omnipresent."  Within twenty-four hours, eleven other NYU student groups replied to the entire law school listserv to express their support for the statement and call out "Ashkenazi Jewish whiteness."  One student, a member of SJP who was awarded the distinguished honor of the Filomen M. D'Agostina Scholarship, used the law student listserv to say, "to all the Zionists, we're keeping receipts." SAA Member #1, an Ashkenazi Jew and first-year law student at the time, was horrified that such antisemitic vitriol was permitted on a law school listserv that was actively monitored by NYU's administration.  Nevertheless, the administration failed to abide by its own rules and policies by, for example, warning students that they would be subject to disciplinary action, up to and including suspension or expulsion from the University, or release a prompt statement condemning the antisemitic vitriol.

105.    On April 12, a group of Jewish students, including SAA Member #1, sent a letter to NYU School of Law Dean Trevor W. Morrison and Dean of Students and Assistant Dean for Diversity and Inclusion Lindsay Kendrick expressing their concern about the listserv debacle that took place the day before.  The students explained that these hate-filled threats were "far from unique":

> It is our contention that speech that, in any other context and by other speakers, would have been swiftly condemned as the glorification and incitement of violence was instead supported by a number of student groups – each representing a large swath of the student body – in part because the speakers have been institutionally distinguished.  Absent clarification to the contrary, NYU Law, through its chosen representatives, has made clear to the broader NYU community that it is commendable – or, at the very least, acceptable – to advocate for violent resistance against Israelis.

106.    Prior to sending the April 12 letter to Dean Morrison, the law students that drafted the letter attempted to garner as many signatures as they could by publishing it online.  After just one day, however, they were bombarded with expletives and threats, including "from the river to the sea," "quiet u baby" and "f**ck u."  The Jewish students that saw these threatening messages reported feeling too unsafe to add their signatures to the letter, and so the organizers eventually took the petition offline.  One of the Jewish students reported the harassment to the administration:

> "This is what your students are writing to me. I DO NOT FEEL SAFE GOING TO SCHOOL LIKE THIS. . . . and [] the administration [has] not responded.  There needs to be an investigation.  I just got 25 hate messages sent to me from an 'anonymous' writer.  You ignored my previous email and you just allow this type of antisemitism to f[e]ster.  How does a school accept students like this?"

107.    That day, Dean Morrison emailed NYU's law students that the school was aware of what he called the "debate" taking place on the listserv.  Rather than disciplining the students spewing antisemitic statements, Dean Morrison merely and ineffectively "reminded" students

that they are required to abide by NYU's Discrimination Policy and stated that the School of

Law would be investigating.  As the President of NYU's Law Students for Israel noted,

"[b]latantly anti-Semitic remarks can be made in public with zero consequences at this law

school . . . This has gone on for years, and it has only gotten worse."

108.    On April 20, 2022, over a week after the SJP statement, NYU's differing

responses—one to the general NYU community and one limited to NYU's Jewish community—

further evidenced NYU's unwillingness to take effective action to remedy its longstanding

violation of the Individual Plaintiffs' and SAA members' rights.  Dean Morrison issued a

statement to the general community—a statement much weaker than it would have been had the

target of the bigoted vitriol been any other protected group—stating only that "we should do

better" in conducting debates respectfully and that phrases like "Zionist grip on the media" were

"close" to the "antisemitic trope that Jewish people control the media."  The same day, President

Hamilton in a statement—directed only to the Jewish members of the Bronfman Center

community and not to those responsible for the vitriol—acknowledged that the phrase was

"profoundly troubling" and that "[o]ne of antisemitism's most enduring fabrications is the

invocation of Jewish control of the media, a trope which dates back to the loathsome 'Protocols

of the Elders of Zion' and carries on, sadly, to this day."

109.    On May 9, 2022, the Instagram account "jewishoncampus" posted another NYU

student's report of antisemitic harassment: "In my climate change class we watched a video

about Thomas Midgley Jr., the man who invented putting lead in gasoline.  This guy caused the

death of a lot of people, after the video a student said 'damn this guy makes Hitler look good.'

Another student agreed, the rest chucked [sic], and the teacher said 'I know right.'  The other

Jewish girl in the class and I looked at each other mortified, stunned.  There is no need to compare these two events."

110.    On May 31, 2022, the Brandeis Center wrote to OCR a letter stating that notwithstanding its OCR Agreement commitments, NYU continued to have an "anti-Semitism problem" and urging that OCR continue monitoring NYU because the university had not complied with its obligations to resolve the issues underlying the OCR Complaint.  The letter described the many ways that NYU had failed to comply with the OCR Agreement.  First, the OCR Agreement required NYU's Discrimination Policy to describe the forms of antisemitism that can manifest in the NYU environment.  But the amended Discrimination Policy (which is still in place) only generally refers to "certain rhetorical and physical manifestations directed toward Jewish or non-Jewish individuals and/or their property, towards Jewish institutions, and towards religious facilities"; it does not specify the forms antisemitism can present at NYU. Second, the Discrimination Policy does not provide "representative examples" of discrimination based on antisemitism.  In fact, the type of conduct that prompted the OCR Complaint in the first place is notably absent from the Discrimination Policy.  As the complainant put it, "if what I went through at NYU two years ago wouldn't have fallen under their new antisemitism policy, then what's the point of their policy?"  Third, even though NYU agreed to adopt and disseminate the revised Discrimination Policy and conduct training by October 15, 2020, it failed to do so, if at all, until nearly a year after the deadline.

111.    On July 1, 2022, an NYU graduate student employed by NYU vandalized a mail service bag containing items shipped from an Israeli vendor, defacing it with the slogans "Free Palestine" and "Fuck [Israel]."  NYU initially fired the student and filed charges of vandalism and antisemitism, but subsequently dropped the charges and rehired the offender.  The student

then released a statement asserting that "[t]he fact that I was targeted and almost lost my job for writing a pro-Palestine statement on a piece of trash shows the impact right-wing Israel advocacy groups have on our university administration."

112.    On August 17, 2022, the Instagram account "jewishoncampus" posted yet another statement from an NYU student who experienced antisemitism on campus: "During the first class of the semester, my teacher, who was also my assigned academic advisor, said 'I hate Jews-they're rich and spoiled.'  She then shared a story about a Jewish woman who wouldn't walk in the rain to preserve her designer shoes and encouraged students to share negative experiences they'd had with the Jewish people, including one girl who said that Jews were all racists who hated non-Jews."

113.    In a September 25, 2022 report issued by watchdog group StopAntisemitism, NYU received a failing grade for antisemitism on campus.  The report stated that NYU students do not feel "safe to be a Jew" on campus and "report a hostile and antisemitic environment" at NYU.

114.    On April 20, 2023, NYU's Jewish Law Students Association sponsored a discussion "Antisemitism: An Assault on Human Rights and Our Shared Humanity" to educate students on the proliferation of antisemitism.  The event was met with the same hatred it was meant to address.  For example, outside of the event, "ZIONISTS NOT WELCOME" was chalked in big letters on the sidewalk.  And when the lecture began, half the audience rose from their seats and disrupted the speaker with the chants "from the river to the sea, Palestine will be free" and "Zionists are not welcome here."  Jewish attendees at the event were shocked and disturbed by the threats and disruptions.  One student reported the incident to Larissa McDowell,

the Assistant to the Dean of Students, requesting a meeting with Dean Kendrick, and attaching evidence of the protest.  The administration did nothing in response.

115.    A few days later, on Israel's Memorial Day, Yom HaZikaron—mourning the loss of fallen Israeli soldiers and victims of terrorism—Yemini, an Israeli-American, while walking to his class at NYU's Paulson Center, was confronted by "Free Palestine" and "end genocide" signs hung all over the lobby and a group of protesters chanting those slogans in violation of NYU policies.  Yemini found it difficult to concentrate in his classes the rest of the day.

116.    NYU's inaction continued to signal to students and faculty that they could engage in antisemitism at NYU with impunity.  For example, on or about May 3, 2023, while a Jewish student was in the NYU Paulson Center hanging posters opposing the growing antisemitic BDS movement on campus, another NYU student harassed her, telling her that she was the "reason why antisemitism is on the rise," and a "white supremacist," "fascist," and "bigot."  The Jewish student filed a harassment report and met with the heads of NYU Student Affairs, NYU Campus Security, and NYU Global Spiritual Life, all of whom assured the student that they would investigate the incident.  On May 9, 2023, the student met with Mathew Shepard, Interim Director of the Office of Student Conduct and Community Standards, to report that she was very concerned about seeing her harasser walking around campus.  Shepard replied that the incident was not a big deal, and that she should be prepared to see the student again on campus because NYU would not be taking action.  In fact, the student did see her harasser on campus again.  Having suffered no consequences for his first verbal attack, the harasser began and continues to stalk and harass her on social media.

117.    At the start of the 2023 fall semester, SAA Member #2, a freshman, enrolled in a Middle Eastern studies course taught by Professor Arang Keshavarzian.  During her second week

of classes, Keshavarzian asked the class to recite the names of countries located in the Middle East.  One student offered the State of Israel, to which Keshavarzian replied, "that's interesting," before moving on to another student.  SAA Member #2, a visibly Jewish student, based on her religious clothing, approached Keshavarzian after class and asked him to clarify his comment. Keshavarzian replied: "The Middle East is an Islamic region and is supposed to be an Islamic region.  Israel is not an Islamic country."

118.    During class the next day, Keshavarzian's teaching assistant had written the names on the white board of every country the students had mentioned, except for Israel. Instead, "Palestine" appeared in its place.  SAA Member #2, the only visibly Jewish person in the room, decided to stay silent out of fear of angering the teaching assistant, who could impact her grades, and her classmates, who she feared would harass her in the future.  She left class feeling extremely distressed about the discrimination she had just experienced.

119.    After class, SAA Member #2 recounted her experience to another Jewish student at NYU, who explained that Jewish students quickly learn to avoid a growing list of professors in the Middle Eastern department given their antisemitism and anti-Israel bias, and that Keshavarzian was high on that list.  SAA Member #2 reported the incident to Interim Dean Matthew Santirocco, and dropped the class.

**D.    NYU's Deliberate Indifference to the Antisemitism on Campus Creates and Heightens the Hostile Environment for Jewish Students**

120.    As a result of NYU's actions and inactions described above, including hiring antisemitic professors, permitting antisemitic speakers and messages, and repeatedly failing and refusing to enforce its own policies by taking disciplinary measures against students and professors who violate those policies by engaging in antisemitic harassment, NYU has made it clear that it will permit, tolerate, and condone antisemitic activity.  Such deliberate indifference

40

and discriminatory application of NYU's policies created an environment in which antisemitic activity would necessarily increase, and elevated the risk to Jewish students, following Hamas's October 7 massacre.

### i. October 7, 2023: Hamas Terrorists Attack Innocent Civilians in Israel

121.    At 6:30 a.m. on October 7, Hamas—which has been a designated Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act (INA) since 1997—launched an unprovoked surprise attack on Israel, engaging in depraved acts of violence and torture against Israeli citizens.  Thousands of armed terrorists breached the Gaza security fence and invaded southern Israel while simultaneously firing thousands of rockets toward Israeli civilians and population centers.  Once in Israel, the terrorists, acting as well-armed death squads, dispersed into Israeli towns shooting, raping, torturing, burning, mutilating, and beheading unarmed civilians, including infants, children, and the elderly, and taking hundreds of hostages and engaging in mass murder and rape at a music festival near Gaza's border with Israel.

122.    The IDF eventually neutralized the terrorists and regained control over the affected area.  By the end of the day, Hamas killed over 1,200 people and abducted over 200 people.

123.    On October 18, President Biden described the October 7 slaughter as follows:

> Scores of innocents—from infants to elderly grandparents, Israelis and Americans—taken hostage.  Children slaughtered.  Babies slaughtered.  Entire families massacred.  Rape, beheadings, bodies burned alive.  Hamas committed atrocities that recall the worst ravages of ISIS, unleashing pure unadulterated evil upon the world.  There is no rationalizing it, no excusing it.  Period.  The brutality we saw would have cut deep anywhere in the world, but it cuts deeper here in Israel.  October 7th, which was a sacred to—a sacred Jewish holiday, became the deadliest day for the Jewish people since the Holocaust.  It has brought to the surface painful memories and scars

left by a millennia of antisemitism and the genocide of the Jewish
people.

124.    Shockingly, numerous students and faculty members at NYU have openly and
enthusiastically celebrated Hamas's October 7 mass rape, murder and kidnapping and applauded
Hamas.  Many have resorted to harassment and violence in supporting Hamas and condemning
Israel's response in self-defense.  They have accused Israel of:  "committing genocide" and
"ethnic cleansing" (even though the Arab population of Gaza has more than quadrupled since
1967); "occupying Gaza" (even though Israel completely removed itself in 2005 from Gaza,
which also shares a border with Egypt); "targeting civilians" (even though Israel goes to great
lengths to avoid civilian casualties while Hamas deliberately inflicts them); and "apartheid"
(even though, unlike virtually every other country in the Middle East, all citizens in Israel enjoy
equal rights).  Further evidencing and underscoring the antisemitism and antisemitic double
standards motivating their activities, these students and faculty members are never heard to
condemn, let alone rally against, countries which, unlike Israel, can be fairly accused of such
crimes—including, for example, such Arab and Muslim countries as Syria and Yemen, which
have killed hundreds of thousands of Arab civilians, including tens of thousands of Palestinians,
Pakistan, which is now expelling almost two million Afghan Muslims, China, which has
imprisoned its Muslims in reeducation camps, or Somalia and Nigeria, where Christians are
regularly murdered.

**ii.    NYU's Facially Inadequate Response to October 7 Fanned the Flames of Still
        More Campus Antisemitism**

125.    Following Hamas's October 7 massacre of Israeli civilians, NYU continued to act
with deliberate indifference, opening the floodgates to soaring antisemitic harassment, abuse,
intimidation, and violence.  NYU students have publicly detailed their fear and trauma in the
face of raging and unchecked antisemitism on campus.  As Ingber stated in an interview, "being

a Jew at NYU right now is scary . . . [W]e are seeing an uptick in anti-Israel protests that are turning antisemitic.  There are signs that read 'globalize the Intifada,' which is a historical call for the extermination of Jews and call for violence against Jews."  Ingber recounted that students are horrified and frightened as chants of "gas the Jews" and "Hitler was right" ring out on campus, and students and professors serve up a "constant contextualization and justification of Hamas's brutal terror attack at NYU," both in the classroom and around the school.  In a viral video, another student added that "it's scary being Jewish on campus now because of all this."  In the same video, another student said she would withdraw from NYU the next semester.  The antisemitic fervor that has gripped NYU, and NYU's failure and refusal to address and ameliorate it, have led some Jewish students to withdraw from NYU already.

126.    The October 7 attack fell on the Jewish Sabbath and a Jewish holiday, Shemini Atzeret.  Like other observant Jews, Ingber was not using electricity on October 7.  When Ingber turned her phone on late that night, she was shocked and horrified to learn about the Hamas massacre, as well as the glorification of Hamas's savagery and antisemitism that her classmates were already posting on social media.

127.    On October 8, Individual Plaintiffs and SAA members waited for their university's President to issue a statement condemning Hamas's mass murder, just as NYU presidents had done for other minority groups in the past.  But NYU issued no such statement.  Rather, on October 8, President Mills sent an email to the NYU community that avoided condemning Hamas's massacre or expressing support for NYU's Jewish student population: "No doubt you have heard the news of the multi-pronged and deadly terrorist attack on Israel.  The fighting is uncommonly intense, with widespread violence, injuries and loss of life, as well as hostage-taking of Israelis by Hamas."  President Mills went on to assure that members of the

NYU Tel Aviv program were safe and to remind students that "[a]s a university community, we remain committed to dialogue and peaceful discourse."

128.    NYU's refusal to condemn Hamas's slaughter did nothing other than fan the flames of the antisemitism that was already endemic to life at NYU by emboldening antisemitic students and faculty members to escalate their attacks on Jewish students.  Facing criticism, two days later, President Mills "updated" her statement on the NYU website by adding a condemnation of Hamas's attack; otherwise, however, the statement remained just as tepid and disheartening for Individual Plaintiffs and SAA members.  Even in her updated statement, President Mills did not offer a word of support for NYU's Jewish community, or acknowledge Jews at all.

129.    In response to President Mills's statement, SJP's NYU chapter published the following statement, signed by twenty-eight other student groups:

> Palestinian resistance, *in any form it takes*, remains a direct consequence and result of the Israeli occupation.  While President Mills claims that we, as a university community, are committed to 'peaceful discourse,' we recognize that there is no peace in a colonized people living under occupation, subjugation, and apartheid.  *The path to peace is only possible through the fights* for Palestinian rights and liberation and an end to colonial apartheid.

130.    SJP's statement echoed the sentiments of its national leadership, which, on October 7, justified and reveled in Hamas's mass rape, kidnapping, and slaughter, describing the massacres of Israelis as "*a historic win for the Palestinian resistance*," and calling for "[n]ot slogans and rallies, but *armed confrontation* with the oppressors."

131.    The next day, Ryna Workman, the President of NYU School of Law Student Bar Association ("SBA"), posted the following message on the organization's weekly newsletter:

> I want to express, first and foremost, my unwavering and absolute solidarity with Palestinians in their resistance against oppression toward liberation and self-determination.    Israel bears full

responsibility for this tremendous loss of life.  This regime of state-sanctioned violence created the conditions that made resistance necessary.  I will not condemn Palestinian resistance. . . .  Palestine will be free.

132.     That same day, Troy McKenzie, Dean of NYU School of Law, issued a tepid response, advising that the SBA president's statement "was not from NYU School of Law" and "certainly does not express my own views, because I condemn the killing of civilians and acts of terrorism as always reprehensible."  But Dean McKenzie conspicuously avoided any condemnation of Workman or any announcement that Workman would be investigated to determine if they violated any of NYU's rules and policies, while, like President Mills, refraining from condemning the support for terrorism vociferously voiced by students or faculty members and making clear that such vicious hate speech is unwelcome on campus.  In other words, he, like President Mills, refrained from issuing the kind of clear, forthright, and immediate condemnation NYU would have issued had the target been any group other than Jews protected under Title VI.

133.     Then, on October 9, SJP's NYU chapter posted a picture on their Instagram page promoting an October 12 rally.  The comments to the post included antisemitic statements such as "FROM THE RIVER TO THE SEA, PALESTINE WILL BE FREE" and "Liberation is on its way."  In a second Instagram post the same day, SJP asserted that "[t]he recent escalation in Palestinian resistance over the past twenty-four hours is a direct and historic response to decades of colonial violence and oppression[.]"  Maslavi, who saw the posts and comments as yet another sign of the growing antisemitic wave on campus, was terrified to be Jewish on campus.  The next day, Maslavi was too fearful to attend two of her scheduled classes and instead went to stay with her family away from campus.

134.     On October 10, Maslavi emailed Jessica Pavone, the Chief of Staff to NYU

Gallatin School and Dean Victoria Rosner, expressing her "deep concerns and fears"

surrounding the campus environment.  Maslavi explained that the administration's handling of

the matter made her feel "unsafe and apprehensive about continuing [her] education at NYU."

Dean Pavone did not respond, instead forwarding her email to Patrick McCreery, Gallatin's

Associate Dean.  Associate Dean McCreery in turn forwarded Maslavi's email to Dean

Rodriguez, who he said was "working to ensure student safety in this matter."  Dean Rodriguez

has not responded to the email.

135.     That day, Maslavi, who is Vice President of the NYU chapter of Students

Supporting Israel ("SSI"), also emailed President Mills directly, asking her to "take a strong

stand against acts of violence and terror" and "create an atmosphere where all students can feel

safe, regardless of their background or beliefs."  President Mills did not respond to Maslavi.

### iii.     NYU's Failure to Prevent or Respond to the Student-Organized National Day of Resistance

136.     On October 11, Individual Plaintiffs and SAA members learned that SJP chapters

across the country were holding a "National Day of Resistance" the following day.  For that

event, SJP created and disseminated posters and pamphlets directing students to "mobilize" in

"resistance" and featuring graphics of armed figures on paragliders—a reference to one of the

methods the Hamas terrorists used to penetrate the Gaza border and perpetrate atrocities against

Israeli civilians.

137.     The NYU SJP chapter posted on its Instagram account its intent to participate in

the National Day of Resistance.  Many comments to the post included phrases such as "liberation

is on its way" and "from the river to the sea Palestine will be free."

46

138.    That evening, a Jewish student at NYU's School of Professional Studies' Schack Institute of Real Estate went to Washington Square Park to attend a student-organized vigil for the victims of the Hamas attack.  Upon arriving, he saw numerous loud, menacing, anti-Israel protesters.  Fearing for his safety, he removed his yarmulke to hide his Jewish identity and left the area.

139.    Maslavi was traumatized by the alarming antisemitic activity on campus.  On the afternoon of October 12, she emailed the professor of her Risky Business: Law, Economics, and Society in the Ancient World class, David Ratzan, who is also Jewish, advising that she was unsure if she could come to class because "NYU has not said anything about how they will ensure the safety of their students[.]"  Although Professor Ratzan conceded he was concerned for his own safety, he held the class as scheduled.

140.    Maslavi also emailed Dean Rodriguez, who had still not responded to her message from the prior day, to tell him that the "recent events and the way they have been handled by the university administration have left me feeling unsafe and apprehensive about coming to NYU tomorrow during SJP's day of resistance. What are you guys doing to protect your students??????"  In his response several hours later, Dean Rodriguez merely directed Maslavi to campus resources such as Campus Safety and the Wellness Exchange, a hotline for students coping with emotional challenges and added that "*we currently lack specific information about events* at NYU related to tomorrow's National Day of Resistance, it's likely that . . . some of our students may decide to organize impromptu gatherings."

### iv.    Student and Faculty Organize Antisemitic Protest in Washington Square Park

141.    On October 16, Maslavi and other Jewish students distributed and hung, on and around campus, posters displaying the names, pictures, and ages of the more than 200 people Hamas had abducted and were holding as hostages.  Almost as soon as the posters went up, they

were torn down and thrown in the trash by NYU students and others.  Posters that were not torn down were vandalized with slogans such as "Free Palestine" and smiley faces drawn over the hostages' faces.

142.    Yemini, who lost two of his cousins during the October 7 terrorist attack and had friends who fled Hamas's assault, was horrified that hostage posters were defaced with graffiti, including terms such as "propaganda" and "Zionism" with a stop sign drawn over it.

143.    Maslavi and other Jewish students who observed the vandalism of the hostage posters filed a complaint, via emails, with NYU's Bias Hotline and with Patricia McSteen, Senior Associate Vice President of the Department of Campus Safety.  Maslavi and the others detailed how the posters were being torn down and defaced, and demanded appropriate action be taken.  Maslavi did not receive a response to her emails that day.

144.    Disheartened by the lack of response, that night, Maslavi drafted and distributed a petition calling attention to the matter.  By the next morning, that petition gained 3,000 signatures.  Maslavi then sent that petition to McSteen and the Bias Hotline.  The petition identified two students as tearing down the posters and demanded that the university hold these students accountable and take disciplinary action.  Contrary to NYU's policies prohibiting such conduct, NYU did not respond to the petition or Maslavi's email, and posters continue to be torn down to this day.

145.    Not surprisingly, in the absence of any effort by NYU to address such misconduct, defacement of hostage posters at NYU has continued unabated.  On or about November 10, for example, Darren King, a postdoctoral fellow who teaches economics at NYU's Courant Institute of Mathematical Sciences, was filmed ripping down dozens of posters

outside the NYU Stern Building.  Like those Maslavi reported, NYU has done nothing to discipline King for his out-and-out violations of university policies.

146.     Following the horrific October 7 terrorist attacks, antisemitism on campus grew so popular and prevalent that it gave rise to a new NYU organization—Faculty for Justice in Palestine ("FJP"), a faculty group on campus dedicated to supporting SJP organizing and BDS campaigning.  The NYU chapter has over 225 members and describes Israel's response to the October 7 massacre as "colonial racial violence" and "ethnic cleansing."

147.     On October 17, 2023, at 6:00 p.m., FJP and SJP held a rally at Washington Square Park.  Maslavi and Ingber, along with other SSI members, also went to the park to hold a silent vigil in support of Israel.  At the rally, Maslavi and Ingber heard and observed SJP and FJP members burn an Israeli flag; make slit-your-throat gestures at the Jewish students present, including plaintiffs; and scream at plaintiffs and the other Jewish students: "from the river to the sea, Palestine will be free; "Hitler was right. The good Jews are from Germany" (*i.e.*, those who were slaughtered by the Nazis); "Gas the Jews"; "Fuck the Jews"; and "Death to Kikes."  The SJP and FJP rallygoers also threatened Jewish students present with rape, including one of Ingber's friends, who was shaking with fear.

148.     Fearing for her safety in the face of the virulent antisemitism, Maslavi asked a police officer to walk her to a subway station so she could go home to her parents' house.  During the trip home, she suffered a panic attack, fearing that one of the menacing protesters was following her home.  That night, Maslavi became more distraught upon learning that the antisemitic SJP and FJP mob had continued to rail against Israel and Jews into the night, including by projecting antisemitic statements onto NYU's Bobst Library.

149.    NYU has done nothing—it has not investigated, condemned, or taken any action against the SJP and FJP students and faculty members at the rally who engaged in the antisemitic activity described above, who threatened to murder and rape Jewish students.

150.    As the protest finally wound down, at approximately 8:15 p.m., a Jewish student was riding his bike down West 4th Street, past Washington Square Park.  Passing Tisch Hall at the Stern School of Business, he saw several people standing on the steps being berated by a screaming woman.  The student approached and advised one of the people, who was Jewish, not to engage further.  A crowd gathered, including approximately six men wearing keffiyehs who got in a man's face as if they were going to attack him.  They then surrounded a woman, who had seemingly been at the pro-Israel vigil, screaming that she was a "murderer" with "fake tears."

151.    The Jewish student moved behind a truck on the sidewalk to videotape the harassment.  One of the men approached the student, screamed that "you have my fucking face on film," and forced him to open his phone's camera roll and delete the video.  The student did so, and the man then yelled in his face, "get the fuck out of here you dirty fucking Jew."  The student got on his bike and fled.

152.    Upon arriving home, the student called Campus Safety.  A dispatcher stated that someone would call him back to obtain information about the incident.  No one called the student back until 1:59 a.m., when he was asleep.

153.    The next day, October 18, 2023, the student called Campus Safety back but he was told he would have to call back and speak to someone on the night shift who was familiar with his report from the night before.  That same day, he received an email from NYU Victim Services, offering to meet.  Two days later, on October 20, Jennie Torres, Investigator in the

Incident Review and Victim Services Unit at NYU's Department of Campus Safety, offered to talk to the student, but claimed her next availability was the evening of October 24 (a week after the incident occurred) or the afternoon of October 26.

154.    The student spoke to Torres on October 24, providing information about the incident.  Torres responded that there was nothing NYU could do for him, other than direct him to NYU's Wellness Exchange, the hotline for students coping with emotional challenges.  In response, the student noted to Torres that, given the numerous cameras that record activity all over NYU's campus, NYU Campus Safety officials could and should check the video footage from the night of the event to determine the identities of the perpetrators who had assaulted him and forced him to delete the footage he had taken.  Torres stated that the student could file a police report with the NYPD to obtain the footage, but that Campus Security would not release video footage without a subpoena.

155.    He further asked Torres whether, given the numerous acts of antisemitic harassment and threats on campus, NYU would be providing enhanced security for Jewish students.  Torres advised that NYU had purportedly already increased security.  The student then reminded Torres that, in response to a surge in anti-Asian violence in 2021 and 2022, NYU had taken steps to protect Asian students, including advising them to be cautious and report incidents of anti-Asian harassment, and asked whether NYU would do the same given the explosion of anti-Jewish incidents.  Torres stated that no such announcement would be issued because NYU had already issued a statement.  The statement she referred to, however, was an email from NYU concerning the rise of tensions on campus that had nothing to do with incidents of anti-Jewish threats and harassment.  Torres concluded the meeting by telling the student that someone from the NYU Bias Response Line would contact him.

156.    On October 24, the student received an email from Oliver Davis, Assistant

Director of Diversity and Inclusion in the Office of Equal Opportunity.  Davis's response read

like a copied-and-pasted automatic reply, and misdated the incident that the student had reported:

> Thank you for sharing your concerns related to the incident occur-
> ring on October 16 [*sic*], 2023 at Stern.  We understand that the
> tragic violence suffered by hundreds of hostages held in Gaza and
> other unfolding tragedies have deeply disturbed our community.
> The Office of Student Conduct, which handles the Non-
> Discrimination and Anti-Harassment Policy for Students, is aware
> of the incident and has jurisdiction over the matter.  We would like
> to take this opportunity to reaffirm the University's values of Equity,
> Diversity and Inclusion, which includes NYU's prohibition on
> antisemitism, discrimination, or harassment toward our community
> members.

157.    Davis's email included links to the "Wellness Exchange" and directed the student

to NYU's Campus Safety "regarding safety related concerns that may arise," noting, "[w]e

appreciate you raising this matter with our office."  Neither the Office of Equal Opportunity nor

the Office of Student Conduct, as referenced in Davis's email, have contacted the student.

158.    Maslavi returned to campus on Wednesday, October 18.  On her trip back, she

saw a picture of the fountain in Washington Square Park with the water dyed red, and "Free

Palestine" written on the ground in front of it.  Maslavi was emotionally unnerved by this sight,

as it caused her to relive the events of October 17.  Still fearing for her safety, she returned to her

parents' house the next day.

**v.    NYU Responds to Plaintiffs' Mounting Concerns and Demands for Protection
       with an Empty Promise to "Get a Handle" on the Situation**

159.    On the morning of October 18, 2023, at 9:06 a.m., one of Ingber's friends emailed

Dean Rodriguez requesting an "urgent" meeting to discuss the growing antisemitism on campus.

An hour later, Dean Rodriguez's secretary responded to the email, stating that the Dean "has

been quite busy navigating these difficult days" and asking Ingber's friend for the specific details

of her requested meeting.  Ingber's friend responded right away, explaining that she needed to speak to the Dean regarding antisemitism on campus, that it was "extremely urgent," and that she was "not able to go to any of [her] classes because the environment is so hostile."  At about 12:22 p.m., Dean Rodriguez sent a meeting invitation for that afternoon.  Following Ingber's request that Ingber be permitted to join the meeting, the invitation was forwarded to Ingber.

160.    At 2:00 p.m., Ingber and her friend attended a meeting with NYU administrators, including Dean Rodriguez; Melissa Carter, Senior Director and Head of Mindfulness Education and Programs for Global Spiritual Life; and Rabbi Yehuda Sarna, Executive Director of the Bronfman Center for Jewish Student Life.  The meeting was held at NYU's Kimmel Center for University Life.  The purpose of the meeting was for the Jewish student attendees to express their fear and safety concerns over the surging campus antisemitism, and to understand what, if anything, NYU was going to do about it.  At the meeting, Ingber and her friend explained that the out-of-control antisemitism, and NYU's failure to address it, had made their lives unbearable, describing the disturbing events that had occurred.  Among other things, Ingber and her friend provided detailed accounts of the SJP/FJP antisemitic rally where other NYU students and faculty members hurled at them threats of murder and rape.

161.    During this meeting, Ingber's friend told the NYU representatives that she not only felt unsafe on campus but was even afraid to attend her classes, given that in one class, Organic Chemistry, she would have to see another student who she witnessed scream "Death to Kikes!" at the October 17 rally.  For her part, Ingber stated, among other things, that as the granddaughter of Holocaust survivors, it was extraordinarily upsetting that NYU was not taking steps to identify and discipline NYU students and faculty members engaged in antisemitic acts,

including those who screamed "Gas the Jews!"  Dean Rodriguez claimed that he would try to "get a handle on the situation."

### vi.   NYU Students and Faculty Violate NYU's Code and Turn the Bobst Library into a Staging Ground for an Antisemitic Hate-Fest

162.   The Elmer Holmes Bobst Library (the "Library") is the primary library at NYU. Located in the center of campus, the Library is an important part of the academic experience for many NYU students.  Students rely on the Library as the principal location for studying and as a refuge from NYU's bustling city campus.  On October 20, 2023 however, NYU permitted the Library to be taken over by NYU students and faculty members who used it as the staging ground for an antisemitic rally featuring genocidal chants calling for the destruction of Israel and violence against its Jewish inhabitants.

163.   Elmer Holmes Bobst, after whom NYU named the Library, was a pharmaceutical executive and well-documented antisemite who wrote infamous letters to then-President Richard Nixon, asserting that "[t]he Jews have troubled the world from the very beginning," that "[i]f this beloved country of ours ever falls apart, the blame rightly should be attributed to the malicious action of Jews in complete control of our communications," and that the Jews were "a nasty, lousy group . . . acting like uncivilized people."  And to design the Library, NYU chose the architect Philip Johnson, a well-known Nazi sympathizer who attended the infamous rally in Madison Square Garden in 1939 in support of the Nazis.

164.   Midterm exams for undergraduate NYU students for the 2023 fall semester occurred during the second half of October.  Because midterms are a critical component of a student's grade for the semester, many students flock to the Library during this period to study.

165.   On October 20, just days into midterms, while Maslavi was home, she was informed about an incident at the Library.  It began at approximately 2:50 p.m., when more than

one hundred SJP and FJP students and faculty members entered the Library and, in direct violation of NYU's Student Conduct Policy and NYU Library Conduct Code, hung signs on the Library's upper levels and began to shout antisemitic slogans and chants calling for violence against Jews.

166.    Upon commandeering the Library, the antisemitic mob zip-tied a "Free Palestine" poster several stories high in the center of the Library, and hung other banners on the walls. Using an amplified sound system, the students and professors shouted such slogans as "from the river to the sea, Palestine will be free" and "resistance is justified when people are occupied."

167.    As the protest began, students who were studying in the Library approached members of the NYU faculty who were present, inquiring as to the situation.  In response, the professors engaged in disgraceful profiling, demanding to know if the students were "pro-Palestinian."  If a student answered affirmatively, the professors handed the student a mask to join the demonstration; if not, the NYU faculty members refused to engage with them.

168.    Aside from joining in group chants, the faculty attendees made statements endorsing the eradication of Israel and violence against citizens, including expressions of glee, approval, and admiration for Hamas's October 7 slaughter, rape, burning, torture, dismemberment, and kidnapping of Israeli civilians.  Among other things, NYU faculty members made the following statements:

- "2023 will be recorded historically as the year that Palestinians stood boldly in the face of colonial fascism.";

- "[W]e realize that phrases like "war crimes," "genocide," "apartheid," "criminality," and "inhumanity" seem unfit and atrociously insufficient to describe what the state of Israel has and continues to do[.]";

- "An occupying colonial power cannot claim the right to self-defense against the people under its brutal occupation. There is no moral equivalence between the colonizer and the colonized—however much the media attempts to claim otherwise.";

- "The great irony in the Zionist claim of victimhood is revealed in the genocide being committed by its military, fulfilling their aims of emptying Palestine of Palestinians."; and

- "The criminalization of resistance, including the self-criminalization of the right to resist, where all blood that is shed is blamed on the oppressed[.]"

169.    Faculty members directly and explicitly invoked and implicated almost every example of antisemitism listed in the IHRA's definition of antisemitism—the definition that NYU adopted in 2020.  These hate-filled and false statements glorified Hamas's sadistic terrorist attack, denigrated the victims who suffered unspeakable acts of torture, and absurdly compared Israeli actions to those of the Nazis—when in fact Hamas rivals the Nazis and ISIS in inhuman depravity.  The NYU faculty and students at the Library rally reveled in Hamas's butchery of civilians, describing it as "bold" resistance against "colonial fascism."  They asserted that the term "genocide"—which was invented to describe the horrors of the mass slaughter, gassing, and burning of Jews by the millions (a third of world Jewry) during the Holocaust—was "atrociously insufficient" to describe Israel's policies, even though Hamas's October 7 slaughter killed more Jews in a single day than any other event since the Holocaust.  They also asserted that Israel had no right to defend itself against the atrocities Hamas had committed.

170.    At one point, a Jewish student who was at the Library got up to witness the spectacle before her: NYU faculty and students celebrating the massacre, mutilation, kidnapping, and rape of Jews.

171.    L'Heureux Lewis-McCoy, an Associate Professor of Sociology of Education at NYU's Steinhardt School, and a member of FJP, took out his phone and began filming the student, in an apparent attempt to intimidate her.  It worked.  The student began to cry, covering her mouth in a futile effort to muffle her sobs.  Even then, Professor Lewis-McCoy did not relent, let alone try to comfort her, as any civilized person would have done—he continued to

focus his camera on the sobbing student's face, shifting his weight so that he could lean on the Library's guardrails to make himself more comfortable as he recorded her tears.

172.    To say the least, Professor Lewis-McCoy's conduct violated NYU's policies, including Section VI of NYU's Code of Ethical Conduct, which states that "[e]very member of the University is prohibited from . . . emotionally abusing, or harassing anyone; and depriving any-one of rights in his or her physical or intellectual property, under University policy, or under federal, state, and local laws."

173.    Confirming that NYU views Jewish students at the university as legitimate targets for harassment, intimidation, and cruelty by NYU professors, NYU has not taken any disciplinary action against Professor Lewis-McCoy.  To the contrary, he continues to teach NYU students.

174.    Nor has NYU initiated any disciplinary actions against the other faculty members or students who participated in the Library hate fest even though it violated clear NYU policies.

175.    NYU's Library Conduct Code expressly prohibited the antisemitic rally:

> Users will refrain from engaging in behavior that leads to the denial of, or unreasonable interference with, the rights of others; or which disrupts the regular operations and activities of the Library. Behavior which is considered to be in violation of the NYU Libraries Conduct Code includes, but is not limited to . . . creating a disturbance or behaving in a manner which interferes with normal use of the Library (including rowdiness, noise, offensive interpersonal behavior, and the use of cellular phones in the stacks and study areas). . . . Violations of the NYU Libraries Conduct Code may be referred for disciplinary action under applicable Library and/or University disciplinary processes.  Where appropriate, instances of misconduct may be referred to local, state or federal law enforcement officials.

176.    NYU's Policy on Posting Flyers, Notices and Posters in the Library similarly prohibited the conduct:

Posting of non-library notices (including posters, notes, announcements, flyers, advertisements, signs, etc.) in the public areas of the library, with the exception of the designated community bulletin boards, is not permitted.  Public areas include study rooms, lobbies, seminar rooms, doors, elevators, hallways, windows, restrooms, stairwells, book stacks, tables and the building entrance. Notices posted in these areas will be removed.

177.    The students and faculty who participated in the antisemitic SJP and FJP rally also violated NYU's Discrimination Policy, which prohibits, among other things, discrimination and harassment on the basis of religion or ethnicity.

178.    The Discrimination Policy provides: "Where allegations are made against students for possible violation of this policy, the matter will be investigated and resolved in accordance with the University Student Conduct Policy," and "[w]here allegations are made against employees for possible violation of this policy (including allegations that the University has engaged in retaliation), the matter will be investigated and resolved utilizing the procedures of the Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Employees."  Further, NYU's Student Conduct: Mission, Values, and Learning Goals policy states: "When [NYU's] policies are violated, students will be held accountable[.]"

179.    Throughout the afternoon of October 20, both Ingber, as the co-President of SSI, and Maslavi, as the Vice President of SSI, received a steady stream of email and text message updates from the Jewish students in the Library.  Those updates described the rally attendees' calls for violence, their exultation over the mass murder and maiming of Jews, and the participation of scores of faculty members.  Alarmed and sickened, Maslavi called NYU's Campus Safety.  A dispatcher answered and told Maslavi that NYU's Campus Safety did not have authority from NYU to halt the protest—even though it was taking place directly under the nose of NYU's president and her staff, whose office is on the Library's 12th floor.

180.    Over a half-hour after the protest began, Campus Safety finally instructed the faculty members to untie the posters.  After they untied the posters, however, they continued holding them in place, and the mob of faculty and students continued chanting for the destruction of Israel and in support of Hamas for another twenty-five minutes.

181.    Following the protest, another Jewish student who was in touch with Masalvi and other Jewish student leaders emailed Dean Rodriguez to complain about the rally and explain the anguish it was inflicting on the Jewish students who were in the Library studying for midterms. The student later received an email response from Dean Rodriguez that was filled with inaccuracies.  For example, Dean Rodriguez falsely stated that "our team members showed up immediately and responded to the situation.  They were asked to remove the banners and to conclude their demonstrations, which they did."  Of course, no such thing had occurred, as the demonstrators did not stop their antisemitic rally—a fact Maslavi and this student knew from the first-hand accounts they received in real-time.  Campus Safety did not show up immediately; in fact, the rally was well underway and gathering steam by the time NYU's Campus Safety showed up.  Even then, NYU's Campus Safety did nothing to stop, halt, or interfere with the rally; to the contrary, the members of NYU's Campus Safety who arrived at the Library stood idly by its entrances, watching the hate-fest proceed uninterrupted from the time they arrived until nearly 4:00 p.m., when the rally-goers left on their own volition.

182.    That NYU students and faculty members were permitted to hold an antisemitic rally only steps from President Mills's office without any consequence sent a clear and alarming message to the NYU community, including both its Jewish students and their antisemitic tormentors: NYU does not and will not discipline students and faculty who flagrantly violate applicable policies by engaging in antisemitic abuse, harassment, and intimidation.

183.    Individual Plaintiffs and SAA members were deeply shaken by these events. Maslavi was both enraged and terrified, in disbelief that NYU had permitted professors and students to take over the Library to extol and endorse Hamas's massacre and call for the annihilation of Israel and its inhabitants.  For Maslavi, the antisemitic Library rally not only reflected NYU's utter indifference to the sense of fear and isolation felt by Jewish students forced to endure NYU's pervasive and hostile anti-Jewish environment, but also confirmed that NYU was deliberately seeking to make that environment even more hostile and more threatening for Jewish students.

184.    Ingber was equally traumatized by the Library rally.  She had an upcoming midterm exam and had intended to print out an exam outline at the Library on the day of the rally.  Learning about the rally, she was afraid to enter the Library, and emailed Dean Rodriguez seeking his assistance in getting her an extension.  Dean Rodriguez did not respond to her until October 23, the day of her exam.  While he reported that he was able to accommodate her request for an extension, she continued to be extremely shaken by the rally, and could not bring herself to go to the Library to study for her next two midterm exams.

185.    Yemini learned of the antisemitic Library rally the same day.  As a dual Israeli-American citizen and Zionist, chants such as "death to Zionists" represent direct threats to his physical safety.  Yemini, who had classes at the Library, learned to brace himself for rallies where his fellow students called for his death, which became a regular occurrence at and around the Library during the fall 2023 semester.

186.    The Library was not the only building coopted by antisemitic NYU students and faculty members.  On the afternoon of October 23, 2023, as Maslavi walked past the Stern

School of Business building, she was greeted with signs urging passersby to "honor the martyrs of Palestine."

### vii.     SJP Holds a National Student Walkout and Calls for Violence Against Jews

187.     On October 25, NYU's SJP held an event called "National Student Walkout."  In the early afternoon that day, Maslavi passed hordes of NYU students and faculty screaming the following antisemitic chants in support of violence against Jews: "We want all of it!"; "Intifada Revolution!"; and "Long Live the Intifada!"  People in the crowd held signs stating that "Resistance is Justified When People Are Occupied" and "Palestinian return by any means necessary."  Each of these slogans is an explicit antisemitic entreaty for violence against Jews. At no point did NYU attempt to stop or interfere with this antisemitic rally, or conduct an investigation to identify the NYU students and faculty members who engaged in this antisemitic activity.

188.     Also on October 25, at 10:21 a.m., President Mills and Jason Pina, NYU's Vice President for University Life, released a statement titled "Plans for Student Safety and Well-Being," which stated:

> Over the past few weeks our university has been experiencing a great deal of turmoil in response to events affecting our community both near and far.  We have heard from many of you who are deeply concerned about your safety.  Confident we can be a foundation of civil discourse, we want to emphasize our university's standing as a place of reflection, free expression, shared respect and security. There is no place for hate at NYU, including antisemitism and Islamophobia.
>
> In light of this, we are implementing a ten-point plan that addresses both student safety and emotional well-being, always paramount values, particularly amid times of tragedy.

189.     Rather than condemning the virulent antisemitism that had gripped the NYU campus, the statement equivocated.  And, while the statement asserted that NYU would increase campus safety and enforce NYU's codes of conduct, neither has occurred.

**viii.     President Mills Gaslights Concerned Jewish Students and Attempts to Enlist Their Help in Downplaying the Virulent Antisemitism at NYU**

190.     The same day, President Mills held a meeting in her office on the 12th floor of the Library with student representatives from SSI, other Jewish groups at NYU, and the Bronfman Center's Rabbi Sarna.  At the meeting, recently appointed President Mills introduced herself and recounted her own experiences with antisemitism, and the fact that she was a daughter of Holocaust survivors.  The Jewish student representatives then gave their accounts of the rising antisemitism on campus they had experienced since October 7.  The meeting was then interrupted by the sounds of students participating outside in the National SJP Walkout. President Mills acknowledged that the events occurring outside her office could be perceived as threatening but encouraged her students to be brave.  President Mills indicated that NYU would do nothing about the events on campus, because, she said, SJP and others were engaging in "free speech."

191.     Because Jewish students had repeatedly advised President Mills that they were traumatized by bias-related incidents that included threats of violence, they reasonably believed that they would have an ally and protector in an NYU president whose academic career, according to NYU's website, had focused on trauma, bias, and violence.  They were wrong.  Far from responding to their concerns, President Mills gaslighted the Jewish students with a series of lies and evasions, further confirming NYU's deliberate indifference toward the antisemitic abuse, harassment, and intimidation that was a fact of their everyday life as Jewish students at NYU.

192.    At another meeting, on November 1 with President Mills, attended by eight Jewish students, including SAA Member #3, and Rabbi Sarna, the students presented President Mills with a petition signed by 4,000 members of the NYU community expressing concern over NYU's increasingly hostile antisemitic environment.  The students shared stories about the antisemitic harassment they had faced, the extent to which they felt unsafe on campus, especially given NYU's failure to take action to identify perpetrators of antisemitic activity and to curtail and prevent antisemitic gatherings by NYU students and faculty members.  While President Mills stated that she felt for the students' safety concerns, she falsely insisted that reports about antisemitism on campus were being blown "out of proportion."  Among other patently false statements, she further insisted that NYU was powerless to act because many incidents involved "non-NYU students" and took place "off-campus" (*i.e.*, at Washington Square Park).  President Mills's contention that the perpetrators were not NYU students was false, as the antisemitic Library rally goers included hundreds of NYU students and professors.  And similarly false were her statements concerning Washington Square Park, as NYU's policies expressly contemplate that NYU will take into account "off-campus" activities in evaluating violations of those policies, and on numerous occasions NYU has enforced disciplinary measures against students and faculty members whose misconduct and violations of those policies occurred off-campus. And in any event, NYU's website features Washington Square Park as the "heart of campus," and many official NYU events, including commencement, and events organized by student groups, such as the October 17 and October 23 rallies, are held at Washington Square Park.

193.    At the November 1 meeting, President Mills chided the Jewish students for being "alarmist," and turned the conversation to how the fearful Jewish students could help her navigate the crisis that was reflecting poorly on her leadership.  President Mills made the

outrageous request that the Jewish students help her "spread the message" that allegations of antisemitism at NYU were overblown and exaggerated, and that NYU was safe for Jewish students—in other words, to help her cover up and minimize the very campus antisemitism that was traumatizing them.  At no point during the November 1 meeting did President Mills discuss measures NYU would implement to combat antisemitism on campus, such as by disciplining NYU students and faculty members who engaged in antisemitic misconduct, as required under NYU's policies.

194.   On November 2, less than twenty-four hours after the meeting with President Mills, a number of student and faculty groups, including SJP and FJP, held a "Picket for Palestine" rally outside the Library that again featured antisemitic chants and posters.  One man held a sign reading, "Jewish Supremacy – Pure Evil" and "Religious killers," with a Star of David and the years "1948-2023."  At one point he ripped the sign, threw the part containing the word "Jewish" on the ground and spat at it, and then proceeded to spit in the direction of a group of Jews nearby.  At times he put his hand into the waistband of his pants, as if he held a gun, and stared threateningly at students walking by.  NYU administrators and members of Campus Safety were present but did nothing.  In fact, rather than disperse the aggressors, Campus Safety ordered a group of Jewish students, including SAA Member #3, who were standing nearby with an Israeli flag and hostage posters, to move across the street in order to "de-escalate" the situation.

195.   For SAA Member #4, Yemini, and other students to enter the Library, NYU's staff chose to create a separate entrance, rather than enforce the Jewish students' right to use the main entrance.  Once inside the Library, SAA Member #4 could hear threats such as "we're opposing genocide, we know you hear us, *come outside*!"

196.    SAA Member #4 was traumatized, could not concentrate on her school work, broke down in tears, and was effectively denied access to the Library due to the disruptive rally taking place outside.  Unable to study for midterms, she left the Library and spent the afternoon emailing Dean Courtney O'Mealley and other administrators to alert them to what had happened.  SAA Member #4 also filed a bias incident report the same day with the Bias Response Line, which asked whether "[p]rofessors at your institution should be allowed to participate in a protest so blatantly anti-Semitic. How are their Jewish students supposed to feel while sitting in that class? How can I concentrate on my work in your library when this chant is all I can hear through the doors?"  In response, SAA Member #4 received an email from Oliver Davis asking her for evidence in support of the allegations.  SAA Member #4 promptly complied, sharing with Mr. Davis details, pictures, and videos, but has yet to receive a substantive response to her report.

197.    Later that day, another student sent an email to Angie Kamath, Dean of NYU's School of Professional Studies ("SPS"), expressing fear about being at NYU as a Jewish student in light of the antisemitic climate.  In a response email, Dean Kamath stated that the safety of students was a priority, and that SPS would be issuing a campus-wide email addressing "Safety and Wellbeing at NYU."  No such email was ever sent.

198.    On November 4, hostage posters hanging on a traffic controller system, located directly outside the Library, were defaced.  Vandals covered pictures of the hostages with pictures of people, who purportedly were Palestinian, that contained the word "Murdered" superimposed over a Jewish star.  When Jewish students reported this vandalism to NYU, they received emails from the bias hotline advising that because the posters were "off campus," NYU could take no action.

199.     On November 7, 2023, a group of Jewish students, including Maslavi, Ingber, and SAA Members #2 and #3, held a "silent sit-in," in support of Israel and in opposition to antisemitism, an event that President Mills had endorsed during the November 1 meeting.  This event occurred on the Library's ground floor, and was supposed to last from noon to 8:00 p.m. As Jewish students began preparing the site of the event shortly before noon, an NYU student, Elias Lopez, approached Maslavi, and gave her a death stare.  When she asked him if he had a question, the student berated her, asking "What is all this Zionist shit doing in my school?" When the event began, Ingber, Maslavi, and the other Jewish students were draped in combined American and Israeli flags and sat at tables featuring pictures of the hostages and posters stating "#EndJewHatred."

200.     At approximately 3:55 p.m., Lopez again approached the students and began to stare at Maslavi.  When Maslavi asked if Lopez had a problem, he responded, "Yeah, you and Israel."  He then left.

201.     Approximately 30 minutes later, Lopez returned, asking Maslavi to explain the flag she was wearing.  Maslavi and Ingber stated that the flag represented the relationship between the United States and Israel.  Lopez then snapped his fingers at Ingber's face and proceeded to clap his hands in front of her and the other students' faces, saying "Palestine will be free from you eventually."  A freelance photographer, known to the Jewish students as Benny, filmed the incident.

202.     The Library exit has a metal security gate that people must pass through as they exit.  As Lopez walked toward the Library exit, he turned toward Ingber, made a comment about whether she was "indigenous," and told her that she should get skin cancer.  Ingber was now right behind him.  Lopez then jammed the metal security gate onto Ingber's right hand, which

caused her sharp pain.  Members of Campus Safety guarding the entrance of the Library witnessed Lopez slamming the gate onto Ingber's hand, but even after Ingber pleaded for help, the security personnel ignored her.  Ingber followed Lopez as he left the Library and, while standing on the street outside the Library, told Lopez that his slamming the gate on her hand had been recorded on video by Benny.  In response, Lopez turned around and punched Benny in the face and threw his phone on the street.  As Lopez lunged toward Ingber, Benny tackled and restrained him.  When Campus Security finally intervened, they apprehended Benny.  When the NYPD arrived several minutes later, officers interviewed several eyewitnesses, including Ingber, and arrested Lopez for assault.

203.    Approximately 20 minutes after Lopez's arrest, Dean Rodriguez and Melissa Carter, Senior Director for Global Spiritual Life at NYU, arrived at the Library. Notwithstanding that the silent sit-in was to continue until 8:00 p.m., as NYU administrators had expressly authorized, Dean Rodriguez told the group of Jewish students—who had been sitting silently—that they should "pack it up" and "disperse."  When the Jewish students asked Dean Rodriguez why they had to leave, he stated because their staying "wouldn't look good" given that NYU "can't guarantee your safety."

204.    Dean Rodriguez's shutting down the silent sit-in held by Individual Plaintiffs and SAA members, and other Jewish students stands in stark contrast to NYU's stunning inaction in response to the rallies and other actions of SJP and FJP members, whose antisemitic and other misconduct violated numerous provisions of numerous NYU codes and policies.  Whereas NYU has repeatedly failed to prevent, shut down, or otherwise interfere with NYU students who protest Israel and engage in antisemitic and other acts that violate NYU's codes and policies, NYU forced the Jewish students to abandon their silent sit-in, even after those students were

subjected to verbal and physical assault.  Moreover, even though President Mills had expressly urged the Jewish students to hold their silent sit-in, NYU failed to provide sufficient security to protect them, and, instead, ordered them to disperse precisely because NYU was refusing to protect them.

205.    In response to the unprovoked, antisemitic assault resulting in Lopez's arrest, NYU spokesperson John Beckman stated that "[t]he university is disturbed by this episode; physical violence is rare on our campus, and NYU has zero tolerance for violence."  He also outrageously suggested that Ingber, the victim, was to blame, stating that "we recommend that all members of the NYU community take steps to de-escalate situations in which they find themselves, and that they take special care both to avoid engaging in or rising to provocations."

206.    NYU has not suspended or expelled Lopez, or taken any other disciplinary action against him, instead permitting him to continue as an NYU student and to attend classes with Ingber, his victim.  And when it was time for Ingber to take her American Constitution final exam, Lopez was sitting a few feet away.  Meanwhile, NYU called Ingber into a disciplinary meeting, based on alleged "violations" of the student conduct code.

### ix.    Campus Antisemitism Continues Unabated Through Finals

207.    On November 16, 2023, SAA Member #2 attended an SJP-organized rally in Washington Square Park.  SAA Member #2 decided to attend the demonstration with her roommate to stand in solidarity with her Jewish classmates and others who supported Israel and opposed terrorism.  When she arrived in the early evening, she was met with a traumatizing scene.  A mob of protesters were inching closer to a small group of Jewish students, with some yelling antisemitic taunts such as "go back to the gas chambers" and "go back to Poland where you came from!"  Leading the group was Professor Amin Husain, surrounded by other keffiyeh-obscured protesters.  SAA Member #2 and her roommate trembled with fear, worried that the

mob would breach the police barrier separating the mob from the Jewish students, and her roommate began crying.  Seeing the roommate's tears, one protester yelled, "that's right, keep crying bitch."  One keffiyeh-clad student aggressively stuck her phone in SAA Member #2's face and announced: "The world needs to see what Zionists look like."  Another told the Jewish students, "I bet your bubbie's [the Yiddish word for grandmother] matzah balls suck dick," which caused other student protesters to cheer and laugh at the harassment.  SAA Member #2 was shocked and dejected that this abuse was permitted to occur at a school-sponsored event barely 200 feet from her dorm room.

208.    After SAA Member #2 had witnessed an hour of abuse and threats, the protesters began to disperse.  SAA Member #2 was warned by a friend to be careful leaving the protest, as violent activists were attempting to provoke Jewish students into fights.  SAA Member #2 asked a male friend to escort her home for her safety before she felt comfortable leaving the protest.

209.    Once SAA Member #2 was home, she filed a report with the Bias Response Line, and would later meet with an investigator from the NYU Office of Equal Opportunity, Bianca Kodzoman, on November 28 to discuss the November 16 rally and Professor Keshavarzian. Kodzoman offered SAA Member #2 counseling services through the Wellness Exchange but said she could not do anything about the protest because it occurred off school grounds, even though it was organized by NYU student groups and even though NYU policies expressly apply to off-campus events.

210.    As part of her complaint against Keshavarzian, SAA Member #2 sent Kodzoman two of his social media posts.  In one, a Twitter post, Keshavarzian reposted an October 26 message stating that "those mass-produced hostage posters, which I find an offensive effort to parlay grassroots grief that followed 9/11 . . . , were made with the intention of filming someone

ripping them down."  In the second post, Keshavarzian praised someone else's post quoting Henry Kissinger as stating (apparently facetiously): "[I]f it were not for the accident of my birth, I would be antisemitic. Any people who has been persecuted for two thousand years must be doing something wrong."

211.    After days of silence from NYU concerning her complaint against Keshavarzian, on December 7, SAA Member #2 asked Kodzoman for an update.  On December 12, Kodzoman told SAA Member #2 that she did not have any updates at that time, but that she hoped to be able to let her know before the end of the semester whether NYU would investigate the matter.  On December 22, Kodzoman notified SAA Member #2 that NYU would follow up with her after winter break.  SAA Member #2 has heard nothing since.

212.    On November 16, Teiler attended a class lecture at which the professor, Lekeisha Dawkins, played a video on "white fragility and white supremacy" and asked the class to share their reflections on the topic.  When it was Teiler's turn to speak, she stated that as a Jew, her perspective may be unique, because, she said, Jews are discriminated against as an "other" and labeled "non-white," but excluded from diversity, equity, and inclusion initiatives, which regard them as "white."  She provided an example, from just days earlier, when protestors at an NYU student rally were holding signs to "keep the world clean of Jews."  Professor Dawkins responded, "besides Hitler and Abby, does anyone else think Judaism is a race?"  One student asked, "are you saying it is harder to be Jewish than to be black?"  Another student commented, "it is hard to be empathetic to the Jewish experience right now."  After a slew of similar comments, a large group of students walked out of the class. The remaining students scolded Teiler, "look what you did; you made everyone uncomfortable!"

213.    Dawkins silently watched until Teiler explained that she was not trying to invalidate the black experience but simply expressing her perspective, as she was asked to do. Dawkins then chastised her, stating that "You do tend to bring all your papers back to antisemitism, Abby."  Teiler, devastated by the humiliation and public shaming, left the class in tears.  Dawkins' response stands in stark contrast to how she treats other students and the "safe space" she often attempts to facilitate during class discussions.

214.    On November 27, SJP organized an antisemitic protest in the Kimmel Center for University Life.  Students carried banners to "honor the  martyrs" and called for the genocide of Jews.  Despite breaking school rules forbidding banners from being hung on university property, the protest continued for approximately one hour.  SAA Member #3 walked by and witnessed the event.  The next day, Ingber was studying in the Library when another demonstration against Israel broke out in violation of NYU's policies.

215.    On December 5, a week before Hillel's annual Hanukah menorah lighting event, NYU rescinded its approval for Hillel to use the Kimmel Center lobby, where the event had taken place for years, instead offering a small classroom away from public view.  And while NYU's Jewish community was relegated to hiding their ceremony, antisemitic protestors were permitted to occupy NYU's public spaces.  On the same day  the menorah lighting was scheduled, for example, students occupied the Paulson Center lobby, calling for NYU to close its Tel Aviv site.  The group continued to occupy the lobby for the entire week.  NYU did nothing to remove them.

216.    SAA Member #2 had class three times a week at the Paulson Center, and regularly goes there to study.  The week before finals, SAA Member #2 was disturbed to see daily protests in the building, which she had no choice but to pass on her way to class.  The

protesters displayed banners such as "NYU HAS BLOOD ON ITS HANDS" and "NYU out of Palestine."  SAA Member #2 found it difficult to concentrate in class while the protests were ongoing.  Rather than condemn the disruptive protestors, NYU professor Sahar Romani offered her students excused absences to attend the anti-Israel event or if they felt uncomfortable entering the building.  NYU has taken no action in response.

      **x.**    **Spring Semester Starts with Week-Long Strikes**

217.    In the first few hours of the spring 2024 semester, NYU student organizations announced their endorsement of a one-week "global strike for Palestine," including ShutItDownNYU, a student organization devoted to demanding "an urgent ceasefire and non-cooperation with NYU Tel Aviv."  ShutItDownNYU's strike agenda encourages NYU students to wear a keffiyeh on campus, avoid class or work, stop buying "stuff" from the University, and boycott Starbucks.

218.    On January 25, 2024, another disruptive rally, led by NYU professors, occurred at the Library.  NYU did not check the protesters' IDs or discipline them in any manner. Emboldened by NYU's inaction, on January 31, faculty and students held another rally at the Library.  Demonstrators disrupted students trying to study, unimpeded by Campus Safety members who were present.  When the protestors finally left the Library, they moved outside, blocking the main entrance.  Given the frequency of the rallies, the Individual Plaintiffs and SAA members are effectively excluded from studying in and using NYU's Library.

219.    NYU has permitted endemic antisemitism to exclude Jewish and Israeli students from full and equal participation in, and to deprive them of the full and equal benefits of, their educational experience at NYU, and has invidiously discriminated against them by, among other things, failing to protect them in the same way NYU has protected other groups—all based on their race, ethnicity, religion, and/or national origin.  That NYU has done so for many years and

continues to this day—even in the face of its own agreement three years ago to remedy its endemic antisemitism—further confirms that it has responded with at best deliberate indifference, that NYU cannot be left to its own devices, and that its response has been clearly ineffective and clearly unreasonable.

220.    In response to a survey distributed to NYU Jewish groups, other students recounted egregious acts of antisemitism, including:

- Professor Sara Garzon—during an art history class—defended the teachings of a Nazi, "equated being a nazi to the faults found in 99% of humans" and "bystander in America to children in cages on the Mexican/American border." Many students have refused to attend class since this incident.

- Professor Valerie Forman insisted on discussing in class the conflict in the Middle East, which was completely unrelated to the subject she was teaching, and asserted that "Hamas was a military group, not a terrorist organization, and Israel was a group of colonizers." Professor Forman also claimed that not many Jews had been killed, and that there was no proof of babies being beheaded and nodded in agreement at the statement the "Israeli people . . . deserve what had happened to them."

- A few days after Hamas's October 7 attack, Professor Marie Cruz Soto addressed her class, asserting that Israel is a colonizing power and deserves to be destroyed, Hamas is part of the resistance, violence from Israel permeates the entire world and directly causes violence in America and for people of color globally and "rich Jewish donors that control NYU" are trying to silence her.

- Professor Mustafa Saifuddin ended one of his classes early to enable the students to attend an anti-Israel rally.

- Professor Andrew Ross spoke at the Walkout for Solidarity with Palestine, formed FJP, and has supported BDS since the 1990s.

- A student recounted:  "As I held the poster of 9-month old Kfir, one of the 200 Jewish hostages taken by Hamas in the October 7th Massacre of Israelis, a fellow student yelled at me: 'I support the abduction of Zionist babies.'"

- A student recounted: "Students yelled at me calling me a 'Nazi.'"

- One student reported that a classmate called Israelis "animals," said the Israeli victims on October 7 deserved to die because they are "settlers on illegal

land," and repeatedly yelled "free Palestine," even if the topic being discussed had nothing to do with the Israeli-Palestinian conflict.

• While recording a group of students taking down posters (which contained facts about Hamas), the student recording said, "Can you please not do that? That's factual information." The group of students began walking behind this student and her friend, calling them "Zionist," saying "you support genocide," and calling them "white." The student reported that after she stopped recording, the group continued to taunt and follow them. Further, there was no campus security outside, and the student felt unsafe and concerned the group would continue chasing them or get physical.

## E.    NYU's Double Standard in Addressing Antisemitism

221.    NYU has failed to investigate and address the antisemitic incidents described above, which occurred at NYU after the October 7 Hamas terrorist attack, even though such incidents violate numerous provisions of NYU's policies. NYU's deliberate indifference in response to these antisemitic incidents, in which Jewish students are victims, is dramatically at odds with how NYU readily takes action to enforce its codes and policies to investigate and address bias-related incidents when the victims are not Jewish. This discriminatory double standard has helped to create, and has contributed to, aggravated, and exacerbated, the hostile educational environment, and the antisemitic abuse and harassment, that Individual Plaintiffs, SAA members, and other Jewish and Israeli students have been forced to endure at NYU.

222.    For example, NYU frequently invokes purported free speech concerns to support and protect students and faculty members who support Hamas terrorists and antisemitism, even as it condemns and disciplines faculty members for trivial reasons, or who espouse viewpoints and take positions that NYU selectively deems inappropriate.

223.    In September 2016, NYU censured Professor Michael Rectenwald after he made a number of social media posts that criticized campus trends such as "safe spaces" and "trigger warnings," arguing that they were symptoms of a broader movement of political correctness. NYU did not hesitate to issue a forceful condemnation and mete out harsh discipline: NYU

forced Rectenwald to take a leave of absence for the rest of the semester.  Yet none of the professors who have engaged in the antisemitic acts described above, including abuse, harassment, and intimidation of Jewish students, and calling for violence against Jews and the annihilation of Israel, have been subjected to similar discipline.

224.    NYU has seen fit to terminate professors for offenses that are orders of magnitude less serious than antisemitic abuse, harassment, and intimidation directed at Jewish students.  In October 2023, NYU terminated a renowned professor of the chemistry department, Maitland Jones, who for decades had taught a popular organic chemistry class and had authored an influential textbook on the subject.  Jones' offense, which NYU deemed sufficiently severe to warrant termination, was that students had complained that his organic chemistry class was too difficult.

225.    NYU's appalling double standard is also reflected in its faculty hiring decisions. Other than with respect to Jews and Israel, it would be unimaginable for NYU to recruit and hire faculty members who call for violence against a minority group or citizens of a particular country, or for the annihilation of any other country in the world.  Yet NYU routinely recruits, hires, promotes, and touts faculty members who express antisemitic views, endorse violence against Jews, call for Israel's destruction, and justify, encourage, and celebrate violence against Israel and its citizens.

226.    For example, on October 9, 2023, only two days after the Hamas massacre—as Israel was still defending against the Hamas death squads on Israeli territory and still extinguishing burning corpses and finding decapitated heads and mutilated body parts strewn throughout its southern region—NYU proudly announced that it had hired a notorious antisemite who cheered Hamas's savage attack.  That professor was Eve Tuck, who purported to specialize

in so-called "critical race and indigenous studies" at the University of Toronto.  Professor

Tuck—hired to establish a so-called "Center for Indigenous Studies" at NYU—has a well-

documented history of antisemitic and anti-Israel statements.  On October 7, 2023, Professor

Tuck issued the following statement: "Unprovoked is a dishonest framing. A free Palestine is

possible because of how Palestinians have worked to keep alive and remake other framings,

other futures."  Tuck also wrote on Bluesky, a microblogging social platform, that the

"[r]esistance …is life and future affirming."  Less than three weeks later, Tuck doubled down on

her rhetoric, signing a letter (along with another NYU professor, Lou Cornum, from the

Department of Social and Cultural Analysis) blaming Israel for Hamas's barbaric attack while

erasing millennia of Jewish history and of the Jewish people's connection to the land of Israel:

"Colonized peoples have the right to defend themselves and to resist colonial violence. We

support Palestinian liberation and their right as an oppressed people to resist colonialism and

genocide."

227.    Far from condemning Professor Tuck's anti-Israel and antisemitic rhetoric,

NYU's Interim Provost Georgina Dopico released a statement proclaiming that "[i]t's an

honor . . . to welcome Professor Tuck to NYU . . . Professor Tuck's collaborative approach will

strengthen NYU and bring together scholars from multiple disciplines and geographies to

advance innovative and important research."

228.    The plaudits NYU saw fit to bestow upon Tuck were in stark contrast to NYU's

responses when it decided that other faculty members had disparaged and discriminated against

other minority groups.  For example, in the July 2020 publication of the academic journal

*Society*, Professor Lawrence Mead, of the NYU Department of Politics, asserted that the

economic gap between whites and racial minorities is driven by the cultural differences between

European and non-Western cultures.  NYU's reaction was swift, decisive, and severe: It immediately released a statement emphatically condemning him.

229.    NYU is unstinting in condemning or disciplining those who make what it deems are offensive and inappropriate statements about race or political correctness, or who grade students too harshly on their organic chemistry exams.  Yet NYU not only tolerates but promotes and touts faculty members who spew antisemitic views, support the murder of Jews, and demand the annihilation of Israel.

230.    NYU's double standard is also on full display when comparing its correct response to the attacks against other groups to the attacks against Jews on its campus.  For example, in February 2022, following a surge in violence against Asian Americans that was the focus of national attention, NYU's Office of Global Inclusion, Diversity, and Strategic Innovation issued a "Statement on Surge in Anti-Asian Violence and Rise in Hate Crimes Against Historically Marginalized Groups – Resources Included" forcefully (and appropriately) condemning such unacceptable conduct, stating that:

> We must always firmly repudiate acts of violence, racism, bias, and any manifestation of -isms.  They are counter to the values of New York University.  Especially now, we must recognize that many of our NYU students, faculty, staff, and alumni do not feel safe—and have not felt safe—just going about their routines of daily life in New York City. . . . It is each of our responsibility to condemn all acts of discrimination as we recognize and proactively address the ongoing impact on historically marginalized groups.

231.    A few weeks later, on March 29, 2022, then-President Hamilton sent an email to students reading in part:

> Even as COVID-19 seems to have abated somewhat, the odious, accompanying rise in anti-Asian prejudice and violence remains seemingly undiminished . . .  Almost as troubling are the pervasive, random attacks of the kind we saw around our own campus in February, to say nothing of the jostling, verbal affronts, or other forms of harassment that Asian New Yorkers describe confronting

77

on a daily basis.  []Our most potent weapons for combating anti-Asian bias are our collective and unequivocal denouncement of anti-Asian racism and violence; our determination to act together to oppose it; our reassurance to the Asian and Pacific Islander members of our community that we understand their fear, that we stand with them, and that we will continue to strive to make NYU a place where they feel welcome and safe here[.]

232.     Similarly, following George Floyd's murder, NYU's President was quick to condemn the act, stating that "[o]nce again, we find ourselves filled with sorrow, outrage, and grief over a loss of yet another Black person's life at the hands of law enforcement that was tragic, unjust, and avoidable."  A year later, the President followed up that "[t]his afternoon, a jury of Minnesotans convicted former police officer Derek Chauvin on all counts.  It is an example of justice from a system that all too often delivers injustices, especially to people of color and the poor."

233.     And following the Colorado Springs night club shooting, the President again unwaveringly supported the community that was attacked: "[o]n behalf of the NYU community, I want to express our collective heartbreak at the horrific slaughter at Club Q.  Fueled by a lethal mix of gun violence and hatred . . . we [] offer our deepest sympathies . . . and our compassion and solidarity to the LGBTQ+ community, who have been made to suffer so much from bigotry, bloodshed, injustice, and ignorance."

234.     Yet NYU has issued no such statement to condemn the soaring and alarming increase in antisemitism and antisemitic violence that has plagued NYU's Jewish students following the October 7 Hamas massacre.

235.     At the beginning of the current school year, on September 1, 2023, NYU sent an email about Asian students harassed at an off-campus, public transportation station.  The email, from Fountain Walker, NYU's Vice President of Global Campus Safety, was addressed to the

"NYU Community" with the subject line, "Incident at the 9th Street PATH Station – Asian

Students Harassed."  It read in part:

> The Department of Campus Safety has received reports that at about
> 11:40 p.m. on Wednesday night, three NYU students of Asian
> descent were harassed and threatened at the 9th St. PATH station.
> The incident appears to be racially motivated.  Thankfully, no one
> was physically injured.   Still, it was a scary episode for those
> involved, one that is emblematic of the increase in racially
> motivated incidents aimed at people of Asian origin in New York
> and nationally, a trend that is troubling and shameful. . . . We have
> reported the incident to both the NYPD and the Port Authority
> Police Department, and we have conveyed our concerns to both
> departments about the fact that this incident occurred in a transit
> location that is frequented by NYU commuters.

236.    Again, in sharp contrast, NYU has not sent any similar email alerting the

community to anti-Jewish abuse and harassment, of the sort that Jewish students experienced.

The above email concerning harassment of Asian students was sent less than two months before

October 7, but when a Jewish student reported to NYU that he was harassed in front of an NYU

building, there was no such email or warning to Jewish students, or any students at all.

237.    NYU's failure and refusal to discipline antisemitic students and student groups

like SJP also stands in stark contrast to the discipline NYU has meted out in response to bias

incidents against other minority groups.  For example, in May 2020, NYU suspended a fraternity

indefinitely after "racist GroupMe messages" were leaked on Twitter.  According to an NYU

spokesperson, the messages were "not in line with NYU's community values" and "[t]he

sentiments expressed in the[] posts are abhorrent, at odds with [NYU] community's values, and

counter to the inclusive community we seek to create for everyone at NYU."  But NYU has not

taken any disciplinary action at all against the perpetrators of the antisemitic abuse and

harassment detailed herein, much less disciplinary action analogous to the indefinite suspension

of a fraternity.

238.    In September 2020, a group of NYU students gathered in Washington Square Park without wearing masks or practicing social distancing.  NYU seized on the incident to promptly and readily threaten disciplinary action, sending an email to all students that "[w]e are investigating the circumstances from last night and any students who have violated our expectations will be subject to disciplinary action."  In October 2020, NYU suspended students for violating social-distancing policies.  By contrast, NYU took no action against a student who engaged in violence against a Jewish student in the Library; to the contrary, the student was permitted right back into the Library the very next day.

239.    Every single incident of antisemitic behavior—every instance of abuse, harassment, and intimidation—detailed herein flagrantly violates NYU's policies.  Yet time and again, antisemitic incident after antisemitic incident, NYU has taken no disciplinary action.  As a result of such discrimination and deliberate indifference, NYU has created, nurtured, and fostered a hostile educational environment for Jewish students.

**F.    Plaintiffs Have Been Denied Equal Access to NYU's Educational Opportunities**

240.    As Individual Plaintiffs and SAA members navigate NYU's campus and attempt to participate as members of NYU's community, by attending classes, engaging in extracurricular activities, and interacting with other NYU students and faculty members, each of them is acutely aware that, solely because of their Jewish identity and ancestry, NYU views and treats them as second-class citizens within the NYU community, undeserving of the protections that NYU affords to non-Jewish students.  As a result of NYU's persistent and unlawful failure and refusal to comply with its obligations to prohibit discrimination and harassment against Jewish students, Individual Plaintiffs and SAA members, unlike other NYU students, have been deprived of the benefits that those other students enjoy at NYU, including but not limited to physical protection; emotional support; the sense of belonging and inclusion; the ability to speak

freely in class and in written course work concerning their Jewish identities; their rights as individual human beings to express their identities; their rights as American citizens to freely express their viewpoints, including but not limited to their views of Israel; and their right to express their love and admiration for Israel, their ancestral homeland, where they have many friends and family members. To the contrary, as a result of NYU's actions and inactions alleged herein, Individual Plaintiffs and SAA members have been made to feel that they are different from and less important than other students, some of whom, along with certain NYU faculty members, are able, with impunity and without consequence, to mock, taunt, jeer, deride, malign, castigate, ridicule, demonize, vilify, assault, abuse, harass, intimidate, isolate, ostracize, exclude, and marginalize them.

241.    The antisemitic events and incidents described herein have devastated the ability of Individual Plaintiffs and SAA members to participate in NYU's educational and other programs. NYU's actions and inactions concerning antisemitism and anti-Jewish abuse, intimidation, harassment, and discrimination, as described herein, have created and fostered a hostile environment that has traumatized Individual Plaintiffs and SAA members and made their college life at NYU unbearable. Individual Plaintiffs and SAA members do not feel physically safe on NYU's campus or in NYU's classrooms or other facilities. Each of them fears the harassment, abuse, and intimidation they might face, on any given day, from the professors who are supposed to teach them, and who are required to treat them with respect and dignity pursuant to the policies that NYU is required to enforce equally for all students. Each of them likewise fears the physical violence, harassment, abuse, and intimidation they might face, on any given day, from the students who are required to treat them with respect and dignity pursuant to those policies.

242.     As a result of NYU's actions and inactions as alleged herein, the Individual

Plaintiffs and SAA members do not feel safe walking the campus, being in NYU facilities, or

going to class.  Maslavi is often late to or absent from class because of the anxiety she suffers as

a result of the abuse, harassment, intimidation, and assault that she and other Jewish students are

forced to endure.  She is afraid that other students and faculty members might identify her as

Jewish and, as a result, target her because of her Jewish identity.  Her ability to participate in her

education at NYU has suffered, and she is frequently unable to focus, study, and perform her

course work to the best of her ability.  Most alarming, Maslavi suffers from the fear that at any

given moment at NYU, she will be subjected to physical violence at the hands of other students

and faculty members, because of her Jewish ancestry.

243.     As the co-president of SSI, Ingber suffers from anxiety that students and faculty

will recognize her, as she frequently draws dirty looks and taunts from other students on campus.

As a result of the harassment and abuse she has suffered, she does not wear jewelry and

accessories that might signal her Jewish identity around campus.  Because many SJP members

hide their faces with keffiyehs, she is anxious and frightened in class, unable to know if the

student sitting next to her are the same people who taunt her with genocidal chants.  Once a

straight A student with a 3.86 GPA, her constant fear has caused her grades to slip precipitously.

When Ingber engages in activity central to her life and her Jewish identity, such as visiting Hillel

or Chabad on the Jewish Sabbath, she is terrified for her safety.  Her constant anxiety, triggered

by NYU's hostile antisemitic environment, has been aggravated by the fact that she is still

mourning friends and family who were the victims of Hamas's October 7 massacre.

244.     As a dual Israeli-American citizen, Yemini considers Zionism an especially

crucial component of his Jewish identity.  Yemini grew up in Israel and still has family and

friends living there.  Yemini was directly affected by the terrorist attack on October 7—his cousins and several friends were murdered.  As a result of NYU's actions and inactions alleged herein, Yemini does not feel safe walking the campus, being in NYU's facilities, or going to class.  Yemini wears a Star of David around his neck, which he feels he needs to hide on NYU's hostile campus and from its antisemitic professors.  When students and faculty members chant "from the river to the sea," Yemini understands this to be a call for his homeland to be annihilated, and for his family and friends to be murdered.

245.    Teiler has also been deeply affected by the antisemitism on campus and in her classes.  She is taught by NYU professors who say that, as a Jew, she needs to check her purported "privilege" and stay silent about antisemitism.  When she tries to speak up, she is ostracized and silenced.  She observes that professors take pains to foster a safe space for other minorities, but not for Jewish students.  Teiler no longer feels comfortable expressing her Jewish identity to her classmates or professors.  As a result of their conduct, including what they say in class and how they treat her and their attendance at and support for protests and strikes violative of NYU policies—with no response from NYU—Teiler justifiably fears that her professors, including for courses she must take to complete her degree, would not fairly evaluate her work if they become aware of her Jewish identity.  After enduring anti-Jewish abuse and harassment, she has missed classes and struggled to focus on her coursework or otherwise benefit from her educational experience at NYU.

246.    SAA Member #1 is in his third year of his JD/MBA Program.  He feels unsafe and unwelcome on campus and is vilified by students who are celebrated by the NYU community.  SAA Member #1 does not feel comfortable attending Jewish events on campus, as he believes that regardless of whether the context of the event has to do with Israel, students will

find a reason to protest. After witnessing the hostile environment that NYU fostered on its campus during his first two years of law school, SAA Member #1 felt so unsafe after October 7 that he decided to fly home to Florida, and only returned to campus to attend mandatory in-person classes.

247. SAA Member #2 came to NYU eager to proudly practice her Judaism, identify as a Jew, and show her support for Israel. Yet since she arrived on campus, she has been unable to do so with the same freedom from harassment and fear as non-Jewish students. She has dropped classes for fear that her professors and classmates will treat her unequally due to their anti-Jewish and anti-Israel animus. She feels unsafe on campus and is treated like she should be ashamed of her heritage. As a result of the antisemitic mobs on campus and antisemitic ravings of professors, SAA Member #2 has not been able to appropriately or fully engage in her studies or NYU's social experiences.

248. SAA Member #3 has been told by the administration that he is an "alarmist" for raising allegations of antisemitism on campus and was asked for his help in spreading the lie that NYU is safe for Jews to his fellow Jewish students. Yet SAA Member #3 has experienced such persistent and virulent antisemitism that he fears for his physical safety on campus. He watched as his friend was physically attacked while wearing an Israeli flag, and has realized based on NYU's actions and inaction that it is not safe for him to celebrate his Jewish identity publicly. He was not surprised that the administration relegated the Hanukah menorah lighting to a hidden away classroom this past year, rather than the public ceremony that has historically taken place, as NYU is no longer safe for Jewish students.

249. SAA Member #4 has been taunted, by students and professors alike, to "come outside" and face her antisemitic harassers, when all she wants to do is study at the Library. She

has been effectively denied the opportunity to use campus facilities, as she cannot concentrate when there are protests calling for the death of Jews in and around university buildings. She feels vulnerable expressing her Jewish identity and support for Israel.

250. These Jewish students have spent their time at NYU fearing for their physical safety, enduring anti-Jewish abuse and harassment, and fruitlessly pleading with NYU administrators to protect them. They have been unable to focus on their coursework or otherwise benefit from their NYU experience. NYU's actions and inactions described above not only deprive Individual Plaintiffs and SAA members of their right to the educational and extracurricular opportunities afforded other students—which have led and will continue to lead to adverse academic, social, and professional consequences—but also severely adversely affect their health, mental well-being, and sense of security.

## <u>COUNT I</u>
### (Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*)

251. Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

252. NYU receives financial assistance from the United States Department of Education and is therefore subject to suit under Title VI of the Civil Rights Act of 1964.

253. Discrimination against Jews and/or Israelis—including based on actual or perceived shared ancestry, race, ethnic characteristics, or national origin—is prohibited under Title VI, as reflected not only in decades of Title VI jurisprudence, but also in the written policies of the Office of Civil Rights of the United States Department of Education.

254. Individual Plaintiffs are and identify as Jewish and/or Israeli, and their status and identification as Jews and/or Israelis brings them within the scope of Title VI's protections.

Individual Plaintiffs are currently enrolled as students at NYU. SAA's members include Jewish and/or Israeli students at NYU, who are also within the scope of Title VI's protections.

255.    Title VI prohibits a recipient of federal funds from intentionally treating any individual worse, even in part, because of his or her ancestry, race, ethnic characteristics, or national origin.

256.    The acts and omissions of NYU and its administrators have subjected, and continue to subject, Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members to discrimination and harassment on the basis of their actual and/or perceived shared Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin.

257.    NYU and its administrators had actual notice that such discrimination and harassment, over which NYU had substantial control and the authority to remediate, was, and continues to be, so severe, pervasive, and objectively offensive that it created and continues to create a hostile environment based on shared Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin that deprives Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members of full access to NYU's educational programs, activities, and opportunities.

258.    NYU and its administrators intentionally discriminate against Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members on the basis of their actual and/or perceived shared Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin, as exhibited by NYU and its administrators' deliberate indifference to the antisemitic abuse, harassment, and intimidation of Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members, in violation of Title VI. Specifically, NYU and its administrators clearly and unreasonably failed, and continue to fail, to cure or otherwise adequately, appropriately, and

meaningfully address, ameliorate, or remedy the discrimination against Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members and the hostile environment that they and other Jewish and Israeli students are forced to endure at NYU because of their ancestry, race, ethnic characteristics, or national origin.  Additionally, NYU continues to grossly fail to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment, and prevent the harassment from recurring.  Such unlawful deliberate indifference causes Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members to be subjected to a hostile educational environment.

259.    The environment at NYU, which has been rendered hostile for Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members as a result of their Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin, is sufficiently severe, pervasive, persistent, and offensive such that it  deprives Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members of equal access to the educational opportunities and benefits that NYU provides to non-Jewish and/or non-Israeli students.

260.    NYU and its administrators actively and intentionally engage in this pattern of severe and/or pervasive discrimination.

261.    NYU and its administrators also directly and intentionally discriminate against Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members, with their actual or perceived shared Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin a substantial or motivating factor in NYU's actions.

262.    NYU continues to unreasonably fail to act, or to act grossly inadequately and discriminatorily, and with leniency, tolerance, deliberate indifference, and/or unjustifiable delay, in applying its policies to known or reported incidents involving antisemitism or where the

victim or complainant is a Jewish or Israeli student, including Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members. As detailed above, NYU's actions, inactions, and conduct were, and continue to be, intended to treat Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members differently as Jewish and Israeli students as compared to other similarly situated non-Jewish and/or non-Israeli students.

263.    NYU's  acts and omissions are the actual, direct, and proximate causes of Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members' injuries.

264.    As a result of the foregoing, Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members have suffered, and continue to suffer, substantial damages in amounts to be determined at trial.

265.    Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members have been and will continue to be injured because NYU has and will continue to deny them equal access to the educational opportunities and benefits provided to other students, and has and will continue to intentionally discriminate against them on the basis of Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin.

266.    Plaintiffs are entitled to injunctive relief under Title VI, because NYU has knowledge of, and has been and continues to be deliberately indifferent to, a hostile environment that is severe, persistent, and pervasive; there is no adequate or speedy remedy at law to prevent NYU from continuing to discriminate against its students on the basis of Jewish and/or Israeli ancestry, race, ethnic characteristics, or national origin in violation of Title VI; and the harm Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members will otherwise continue to suffer is irreparable.

267.    Plaintiffs are entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

<u>**COUNT II**</u>
**(New York Executive Law (Human Rights Law) § 296 *et seq.*)**

268.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

269.    Educational institutions like NYU are prohibited, under New York Executive Law § 296, from discriminating against or permitting the harassment of students, even in part, because of their actual or perceived race, religion, national origin (defined to include "ancestry"), citizenship, or immigration status.

270.    Individual Plaintiffs are and identify as Jewish and/or Israeli, and their status and identification as Jews and/or Israelis brings them within the scope of Executive Law § 296's protections.  Individual Plaintiffs are currently enrolled as students at NYU.  SAA's members include Jewish and/or Israeli students at NYU, who are also within the scope of Executive Law § 296's protections.

271.    The acts and omissions of NYU and its administrators have subjected, and continue to subject, Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members to discrimination and harassment on the basis of their actual and/or perceived Jewish and/or Israeli race, religion, national origin, citizenship, or immigration status.

272.    NYU and its administrators had actual notice that such discrimination and harassment, over which NYU had substantial control and the authority to remediate, was and continues to be so severe, pervasive, and objectively offensive that it created and continues to create a hostile environment based on shared Jewish and/or Israeli race, religion, national origin, citizenship, or immigration status that deprives Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members of full access to NYU's educational programs, activities, and opportunities.

273.    NYU and its administrators intentionally discriminate against Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members on the basis of their actual and/or perceived shared Jewish and/or Israeli race, religion, national origin, citizenship, or immigration status, as exhibited by NYU and its administrators' deliberate indifference to the antisemitic abuse, harassment, and intimidation of Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members, in violation of Executive Law § 296.  Specifically, NYU and its administrators clearly and unreasonably failed, and continue to fail, to cure or otherwise adequately, appropriately, and meaningfully address, ameliorate, or remedy the discrimination against Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members and the hostile environment that they and other Jewish and Israeli students are forced to endure at NYU because of their race, religion, national origin, citizenship, or immigration status.  Additionally, NYU continues to grossly fail to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment, and prevent the harassment from recurring.  Such unlawful deliberate indifference causes Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members to be subjected to a hostile educational environment.

274.    The environment at NYU, which has been rendered hostile for Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members as a result of their Jewish and/or Israeli race, religion, national origin, citizenship, or immigration status, is sufficiently severe, pervasive, persistent, and offensive such that it  deprives Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members of equal access to the educational opportunities and benefits that NYU provides to non-Jewish and/or non-Israeli students.

275.    NYU and its administrators actively and intentionally engage in this pattern of severe and/or pervasive discrimination.

276.     NYU and its administrators also directly and intentionally discriminate against Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members, with their actual or perceived shared Jewish and/or Israeli race, religion, national origin, citizenship, or immigration status a substantial or motivating factor in NYU's actions.

277.     NYU's actions or conduct had, and continue to have, an unjustifiable differential or disparate impact upon Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members, as Jewish and/or Israeli students.

278.     NYU continues to unreasonably fail to act, or to act grossly inadequately and discriminatorily, and with leniency, tolerance, deliberate indifference, and/or unjustifiable delay, in applying its policies to known or reported incidents involving antisemitism or where the victim or complainant is a Jewish or Israeli student, including Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members.  As detailed above, NYU's actions, inactions, and conduct were, and continue to be, intended to treat Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members differently as Jewish and Israeli students as compared to other similarly situated non-Jewish and/or non-Israeli students.

279.     NYU's acts and omissions are the actual, direct, and proximate causes of Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members' injuries.

280.     As a result of the foregoing, Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members have suffered, and continue to suffer, substantial damages, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, in amounts to be determined at trial.

281.     NYU's actions and omissions towards Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members amount to willful or wanton negligence, recklessness, and/or a conscious disregard of the rights of others.

282.     Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members have been and will continue to be injured because NYU has and will continue to deny them equal access to the educational opportunities and benefits provided to other students, and has and will continue to intentionally discriminate against them on the basis of Jewish and/or Israeli race, religion, national origin, citizenship, or immigration status.

283.     Plaintiffs are also entitled to injunctive relief under New York Executive Law § 296, because NYU has knowledge of, and has been and continues to be deliberately indifferent to, a hostile environment that is severe, persistent, and pervasive; there is no adequate or speedy remedy at law to prevent NYU from continuing to discriminate against its students on the basis of Jewish and/or Israeli race, religion, national origin, citizenship, or immigration status in violation of Executive Law § 296; and the harm Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members will otherwise continue to suffer is irreparable.

284.     Plaintiffs are entitled to attorneys' fees and costs pursuant to N.Y. Exec. Law § 297(10).

## <u>COUNT III</u>
### (New York Civil Rights Law § 40-c)

285.     Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

286.     New York Human Rights Law § 291 provides that the opportunity to obtain education and use places of public accommodation, such as NYU, without discrimination because of race, creed, or national origin, is a civil right.

287.    New York Civil Rights Law § 40-c ("NYCRL") prohibits NYU from subjecting Jewish and/or Israeli students to discrimination or harassment—including based on their actual or perceived race, creed, or national origin.

288.    Individual Plaintiffs are and identify as Jewish and/or Israeli, and their status and identification as Jews and/or Israelis brings them within the scope of NYCRL's protections. Individual Plaintiffs are currently enrolled as students at NYU.  SAA's members include Jewish and/or Israeli students at NYU, who are also within the scope of NYCRL's protections.

289.    The acts and omissions of NYU and its administrators have subjected, and continue to subject, Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members to discrimination and harassment on the basis of their actual and/or perceived Jewish and/or Israeli race, creed or national origin.

290.    NYU and its administrators had actual notice that such discrimination and harassment, over which NYU had substantial control and the authority to remediate, was and continues to be so severe, pervasive, and objectively offensive that it created and continues to create a hostile environment based on shared Jewish and/or Israeli race, creed, or national origin that deprives Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members of full access to NYU's educational programs, activities, and opportunities.

291.    NYU and its administrators intentionally discriminate against Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members on the basis of their actual and/or perceived shared Jewish and/or Israeli race, creed, or national origin, as exhibited by NYU and its administrators' deliberate indifference to the antisemitic abuse, harassment, and intimidation of Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members, in violation of NYCRL.  Specifically, NYU and its administrators clearly and unreasonably failed, and continue

to fail, to cure or otherwise adequately, appropriately, and meaningfully address, ameliorate, or remedy the discrimination against Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members and the hostile environment that they and other Jewish and Israeli students are forced to endure at NYU because of their race, creed, or national origin.  Additionally, NYU continues to grossly fail to take prompt and effective steps reasonably calculated to end the harassment, eliminate any hostile environment, and prevent the harassment from recurring.  Such unlawful deliberate indifference causes Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members to be subjected to a hostile educational environment.

292.    The environment at NYU, which has been rendered hostile for Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members as a result of their Jewish and/or Israeli race, creed, or national origin, is sufficiently severe, pervasive, persistent, and offensive such that it  deprives Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members of equal access to the educational opportunities and benefits that NYU provides to non-Jewish and/or non-Israeli students.

293.    NYU and its administrators actively and intentionally engage in this pattern of severe and/or pervasive discrimination.

294.    NYU and its administrators also directly and intentionally discriminate against Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members, with their actual or perceived shared Jewish and/or Israeli race, creed, or national origin a substantial or motivating factor in NYU's actions.

295.    NYU's actions or conduct had, and continue to have, an unjustifiable differential or disparate impact upon Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members, as Jewish and/or Israeli students.

296.     NYU continues to unreasonably fail to act, or to act grossly inadequately and discriminatorily, and with leniency, tolerance, deliberate indifference, and/or unjustifiable delay, in applying its policies to known or reported incidents involving antisemitism or where the victim or complainant is a Jewish or Israeli student, including Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members.  As detailed above, NYU's actions, inactions, and conduct were, and continue to be, intended to treat Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members differently as Jewish and Israeli students as compared to other similarly situated non-Jewish and/or non-Israeli students.

297.     NYU's acts and omissions are the actual, direct, and proximate causes of Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members' injuries.

298.     As a result of the foregoing, Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members have suffered, and continue to suffer, substantial damages and are entitled to statutory damages of $500 per violation pursuant to NYCRL § 40-d.

299.     Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members have been and will continue to be injured because NYU has and will continue to deny them equal access to the educational opportunities and benefits provided to other students, and has and will continue to intentionally discriminate against them on the basis of Jewish and/or Israeli race, creed, or national origin.

300.     Plaintiffs are also entitled to injunctive relief under NYCRL, because NYU has knowledge of, and has been and continues to be deliberately indifferent to, a hostile environment that is severe, persistent, and pervasive; there is no adequate or speedy remedy at law to prevent NYU from continuing to discriminate against its students on the basis of Jewish and/or Israeli

race, creed, or national origin; and the harm Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members will otherwise continue to suffer is irreparable.

301.     By this action, plaintiffs seek to vindicate the public interest by enforcing fundamental civil rights protections for students, including students who face discrimination and harassment at school based on race, creed, or national origin.

302.     Plaintiffs have complied with the procedural requirements of NYCRL § 40-d by serving notice of this Complaint upon the State Attorney General at or before the commencement of the action.

## COUNT IV
**(New York City Human Rights Law – N.Y.C. Admin. Code § 8-107(4), (17))**

303.     Plaintiffs repeat and reallege the allegations of the preceding paragraphs above as though fully set forth herein.

304.     New York City Admin. Code § 8-107(4) prohibits NYU from subjecting Jewish and/or Israeli students to discrimination or harassment—including based on actual or perceived race, creed, national origin, immigration or citizenship status.

305.     The acts and omissions of NYU and its administrators and other employees have subjected, and continue to subject, Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members to discrimination and harassment on the basis of their actual and/or perceived Jewish and/or Israeli race, creed, national origin, immigration or citizenship status that is severe and pervasive.

306.     NYU has refused, withheld from, and denied Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members the full and equal enjoyment, on equal terms and conditions, of NYU's accommodations, advantages, services, facilities or privileges, in violation

of N.Y.C. Admin. Code § 8-107(4), including by treating them less favorably than similarly situated non-Jewish and/or non-Israeli students based on their protected characteristics.

307.    NYU's actions or conduct had, and continue to have, an unjustifiable differential or disparate impact upon Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members, as Jewish and/or Israeli students, in violation of N.Y.C. Admin. Code § 8-107(17).

308.    NYU's acts and omissions are the actual, direct, and proximate causes of Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members' injuries.

309.    As a result of the foregoing, Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members have suffered, and continue to suffer, substantial damages, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, in amounts to be determined at trial.

310.    NYU's actions and omissions towards Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members amount to willful or wanton negligence, recklessness, and/or a conscious disregard of the rights of others.

311.    Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members have been and will continue to be injured because NYU has and will continue to deny them equal access to the educational opportunities and benefits provided to other students, and has and will continue to intentionally discriminate against them on the basis of Jewish and/or Israeli race, creed, national origin, immigration or citizenship status.

312.    Plaintiffs are also entitled to injunctive relief, because NYU has knowledge of, and has been and continues to be deliberately indifferent to, a hostile environment that is severe, persistent, and pervasive; there is no adequate or speedy remedy at law to prevent NYU from continuing to discriminate against its students on the basis of Jewish and/or Israeli race, creed,

national origin, immigration or citizenship status; and the harm Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members will otherwise continue to suffer is irreparable.

313.    By this action, plaintiffs seek to vindicate the public interest by enforcing fundamental state civil rights protections for students, including students who face discrimination and harassment at school based on their actual or perceived race, creed, national origin, immigration or citizenship status.

314.    Plaintiffs have complied with the procedural requirements of N.Y.C. Admin. Code § 8-502 by serving notice of this Complaint upon the City Commission on Human Rights and the Corporation Counsel.

315.    Plaintiffs are entitled to attorneys' fees and costs pursuant to N.Y.C. Admin. Code § 8-502(g).

**COUNT V**
**(Breach of Contract)**

316.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

317.    At all relevant times, an implied or express contractual relationship existed between NYU and Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members by virtue of their enrollment at NYU and as defined by and through NYU codes, policies, and procedures governing student conduct, including but not limited to the Discrimination Policy and the Student Conduct Policy.  Through the documents and materials it publishes and provides to students, NYU makes express and implied contractual commitments to its students concerning bias-related abuse, harassment, intimidation, and discrimination.

318.    New York law recognizes that the relationship between a student and a college is contractual in nature, and that the terms of student handbooks, university bulletins, regulations, codes, policies, and procedures become part of that contract.

319.    Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members complied with their obligations under these contracts.

320.    NYU breached its agreements with Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members, and failed to comply with their obligations under these contracts, throughout the course of their enrollment at NYU, including by, among other things, failing to comply with the following provisions, among others:

- "Where allegations are made against students for possible violation of this policy, the matter will be investigated and resolved in accordance with the University Student Conduct Policy[.]" (Discrimination Policy at Investigation and Resolution Procedures section.)

- "Where allegations are made against employees for possible violation of this policy (including allegations that the University has engaged in retaliation), the matter will be investigated and resolved utilizing the procedures of the Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Employees." (*Id.*)

- "Upon receipt of a report of alleged misconduct, the Office of Student Conduct shall review the matter and determine an appropriate forum for resolution based on its assessment of potential sanctions for the conduct in question and whether the nature of the conduct, taking into account the seriousness of the allegations, can be adequately addressed through an in-formal resolution."  (Conduct Procedures at Section III.)

- "As members of the NYU community, students are expected to uphold their responsibilities to maintain a safe and productive campus community, which includes adherence to NYU policies.  When these polices are violated, students will be held accountable and are expected to recognize how their actions and decisions affect the larger community."  (Student Conduct: Missions, Values, and Learning Goals at Values section.)

- "The University does not discipline social media content writ large, however the University will take student disciplinary action for conduct occur-ring outside the University context, including online, when such conduct substantially disrupts the regular operation of the University; threatens the

health, safety, or security of the University community; or results in a violation of the NDAH (such as a hostile environment)."  (Guidance at Section 8.)

- "The University has zero tolerance for any form of violence, threats, or intimidation.  This includes, but is not limited to, using language advocating for killing people or groups of people, and all relevant synonyms (e.g. eradicate, destroy, massacre, exterminate, etc.)."  (*Id.* at Section 2.)

321.    NYU also has breached the implied covenant of good faith and fair dealing implied in its contracts with students, including Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members.  Among other things, NYU selectively applies or enforces its student handbooks, university bulletins, regulations, codes, policies, and procedures in a bad faith and discriminatory way—improperly motivated by shared ancestry, race, ethnic characteristics, religion, national origin, citizenship, or immigration status bias—treating incidents of abuse, harassment, intimidation, or discrimination against Jewish and/or Israeli students, including Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members, in a more lenient, tolerant, forgiving, and nonchalant manner than it treats similar incidents against other minority groups.

322.    As a direct, proximate, and foreseeable consequence of the foregoing breaches, Individual Plaintiffs and SAA's Jewish and/or Israeli NYU student members have been damaged, and continue to sustain substantial damages, in amounts to be determined at trial.

## <u>COUNT VI</u>
### (New York General Business Law §§ 349, 350)

323.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs above as though fully set forth herein.

324.    Section 349(a) of the General Business Law provides consumer protection by declaring as unlawful "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York.  Section 350 similarly prohibits

"false advertising in the conduct of any business, trade or commerce or in the furnishing of any service" in New York.

325.    NYU's conduct, statements, and representations described above, were consumer-oriented and were aimed at, and had a broad impact on, a large consumer group, namely, prospective and current students of NYU.  These statements include those reflected, embodied, and set forth in NYU's (i) Non-Discrimination and Anti-Harassment Policy; (ii) Student Conduct:  Mission, Values, and Learning Goals; (iii) Guidance and Expectations on Student Conduct; (iv) Student Conduct Policy; (v) Student Conduct Procedures; (vi) Faculty Handbook; (vii) Code of Ethical Conduct; (viii) Rules for the Maintenance of Public Order; and (ix) and website, including its Mission Statement and University Initiative pages.

326.    NYU has not acted in accordance with, and has not followed through on, its statements against discrimination, abuse, and harassment, and has instead knowingly engaged in the following false acts or practices that are deceptive or misleading in a material way, that were aimed at the consumer public (namely, prospective and current students), and that were likely to mislead a reasonable prospective or current student acting reasonably under the circumstances:

- By falsely leading Individual Plaintiffs to believe that NYU would apply, enforce, and follow the rules and policies, and the commitments contained therein, reflected, embodied and set forth in NYU's (i) Non-Discrimination and Anti-Harassment Policy; (ii) Student Conduct:  Mission, Values, and Learning Goals; (iii) Guidance and Expectations on Student Conduct; (iv) Student Conduct Policy; (v) Student Conduct Procedures; (vi) Faculty Handbook; (vii) Code of Ethical Conduct; (viii) Rules for the Maintenance of Public Order, copies of which were available on NYU's website; and (ix) website, including its Mission Statement and University Initiatives pages; and

- By falsely causing Individual Plaintiffs to believe that if they paid tuition and fees to NYU, then NYU would uphold, adhere to, abide by, and comply with its stated rules and policies, and the commitments contained therein, to foster, ensure, maintain, and create an environment free of discrimination, abuse, harassment, and intimidation, and provide an adequate and appropriate setting and environment in which all students, of whatever ancestry, race, ethnic

characteristics, religion, national origin, citizenship, or immigration status could freely express their identity and ancestry, could learn and grow, and could participate fully and meaningfully in NYU's educational and other programs.

327.   Individual Plaintiffs saw, heard, and were aware of NYU's false and misleading statements and representations described above before they enrolled at NYU, and after they were enrolled in NYU.

328.   NYU's false and misleading statements and practices described above caused Individual Plaintiffs injury by causing them to enroll at NYU, and to pay tuition and fees to NYU, and to continue to maintain enrollment at NYU and continue to pay tuition and fees to NYU, based on the reasonable understanding that NYU would apply, enforce, and follow through on its codes and policies, and the commitments contained therein, concerning protecting students from harassment, abuse, intimidation and discrimination based on their ancestry, race, ethnic characteristics, religion, national origin, citizenship, or immigration status, would otherwise seek to protect students from such hateful and bigoted conduct, and would take actions and implement measures to adequately, appropriately, and sufficiently address such misconduct to foster, ensure, and maintain a safe educational and campus environment.  NYU did not take such actions.

329.   NYU's failure, refusal, lack of ability and intention, and lack of commitment to combating, addressing, and ameliorating these deplorable actions, and to making good on and complying with its aforementioned statements, constitute deceptive practices and/or false advertising, and have caused Individual Plaintiffs to sustain actual damages and not obtain the benefit of their bargain with NYU, including the loss of the value of the tuition and fees they have paid NYU, extreme emotional distress, loss of educational and extracurricular opportunities, economic injuries, and other direct and consequential damages.

330.    Accordingly, Individual Plaintiffs are entitled to statutory and/or actual damages in amounts to be determined at trial and to treble damages pursuant to General Business Law § 349(h), based on NYU's willful or knowing violations.

331.    Plaintiffs are entitled to attorneys' fees and costs pursuant to General Business Law § 349(h).

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a jury trial for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray and request that a judgment be entered in each of their favor, and against NYU awarding them:

A. Injunctive relief enjoining NYU and its agents from establishing, implementing, instituting, maintaining, or executing policies, practices, procedures, or protocols that penalize or discriminate against Jewish students, including plaintiffs and SAA's members, in any way, and ordering NYU to take all necessary, adequate, and appropriate remedial, corrective, and preventative measures including, but not limited to, the following: (i) disciplinary measures, including the termination of, deans, administrators, professors, and other employees responsible for antisemitic discrimination and abuse, whether because they engage in it or permit it; (ii) disciplinary measures, including suspension or expulsion, against students who engage in such conduct; (iii) declining and returning donations, whether from foreign countries or elsewhere, implicitly or explicitly conditioned on the hiring or promotion of professors who espouse antisemitism or the inclusion of

antisemitic coursework or curricula; (iv) adding required antisemitism training for NYU community members; and (v) appointing a neutral expert monitor to oversee compliance with this Court's order;

B.   Compensatory, consequential, and punitive damages in amounts to be determined at trial;

C.   Statutory penalties, including treble damages, for violations of General Business Law § 349(h) and N.Y. Civ. Rights Law § 40-c, pursuant to N.Y. Civ. Rights Law § 40-d;

D.   Reasonable attorneys' fees, the costs of suit, and expenses;

E.   Pre-judgment interest and post-judgment interest at the maximum rate allowable by the law; and

F.   Such other and further relief as the Court deems just and proper.

Dated:   New York, New York
         January 31, 2024

                              Respectfully submitted,

                              KASOWITZ BENSON TORRES LLP

                              By: */s/ Marc E. Kasowitz*
                                  Marc E. Kasowitz
                                  Daniel R. Benson
                                  Mark P. Ressler
                                  Andrew L. Schwartz
                                  Joshua E. Roberts
                                  Jillian R. Roffer
                                  Yarden Hodes
                                  William Wolfe Taub
                                  1633 Broadway
                                  New York, New York 10019
                                  Tel:  (212) 506-1700

                              *Attorneys for Plaintiffs*