# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

BELLA INGBER, SABRINA MASLAVI, NEVO YEMINI, AVIGAIL TEILER, and STUDENTS AGAINST ANTISEMITISM, INC.,

                    Plaintiffs,

          -against-

NEW YORK UNIVERSITY,

                    Defendant.

Case No. 1:23-cv-10023-LAP

Hon. Loretta A. Preska

**NEW YORK UNIVERSITY'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(1), (6) AND TO STRIKE PURSUANT TO FED. R. CIV. P. 12(F)**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND .................................................................................................... 4

    A.    NYU's Longstanding and Robust Response to Antisemitism. ................. 4

    B.    Plaintiffs' Lawsuit. ................................................................................. 7

STANDARD OF REVIEW ................................................................................... 11

ARGUMENT ........................................................................................................ 13

I.    THE COURT SHOULD DISMISS UNDER RULE 12(B)(1)
PLAINTIFFS' SWEEPING REQUESTS FOR INJUNCTIVE RELIEF
AND ALL CLAIMS BY PLAINTIFF SAA FOR LACK OF STANDING. ...... 14

    A.    Plaintiffs Do Not Have Standing to Pursue Injunctive Relief. ............... 14

        1.    Plaintiffs Do Not Allege Facts Clearly Demonstrating an
Imminent Likelihood of Future Injury. ....................................... 15

        2.    Plaintiffs Do Not Allege Facts Clearly Demonstrating That
NYU Will Cause Any Future Injury. ............................................ 17

    B.    Plaintiff SAA Does Not Have Associational Standing. .......................... 19

        1.    SAA is an Organization Created Solely for Litigation and
Cannot Manufacture Standing on that Basis. ............................... 19

        2.    SAA Lacks Standing Because its Claims and Requested
Relief Require the Participation of its Individual Members
in this Lawsuit. ............................................................................. 20

II.    THE COURT SHOULD DISMISS UNDER RULE 12(B)(1) BECAUSE
PLAINTIFFS' CLAIMS RELATED TO NYU'S ONGOING RESPONSE
TO THE IMPACT OF THE OCTOBER 7 ATTACK ARE UNRIPE. ............... 22

III.    THE COURT SHOULD DISMISS PLAINTIFFS' TITLE VI CLAIM
UNDER RULE 12(B)(6) BECAUSE THE FAC ITSELF MAKES
CLEAR THAT NYU'S RESPONSE TO ANTISEMITIC CONDUCT
HAS BEEN UNEQUIVOCAL. ...................................................................... 25

    A.    Plaintiffs Fail to Plausibly Allege That NYU Was Deliberately
Indifferent to Harassment Directed at Them by NYU Students or
Faculty. ................................................................................................ 25

        1.    No Plaintiff Alleges Harassment Actionable Under Title
VI. ............................................................................................... 26

        2.    No Plaintiff Plausibly Pleads That NYU Responded
Unreasonably to Any Alleged Harassment in Light of
Known Circumstances. ................................................................. 31

            a.    NYU's Condemnation of Antisemitism—and
Robust Plan to Combat It—Refutes Any Inference
that NYU Is Deliberately Indifferent. ............................. 31

# TABLE OF CONTENTS
(continued)

                                                                          **Page**

      b.    NYU Responded Reasonably to All Alleged Incidents. ........................................................................ 33

  B.    Plaintiffs Fail to Plausibly Allege That NYU Directly Discriminated Against Any of Them. ...................................... 40

IV.    THE COURT SHOULD DISMISS PLAINTIFFS' STATE AND CITY LAW CLAIMS UNDER RULE 12(B)(6) BECAUSE THEY FALL FAR SHORT OF STATING A CLAIM. .................................................... 41

  A.    Plaintiffs Fail to State a Claim Under NYHRL § 296 and NYCRL § 40-c. ................................................................................. 41

  B.    Plaintiffs Fail to State a Claim Under NYCHRL §§ 8-107(4), (17). ........ 42

  C.    Plaintiffs Fail to State a Breach of Contract Claim. ................................. 42

  D.    Plaintiffs Fail to State a Claim Under General Business Law §§ 349, 350. ................................................................................................ 44

V.    THE COURT SHOULD STRIKE PLAINTIFFS' REQUEST FOR DISCIPLINARY MEASURES AND TERMINATION OF UNIVERSITY EMPLOYEES. ................................................................................. 45

CONCLUSION .................................................................................................... 45

# TABLE OF AUTHORITIES

**Cases**

*AB ex rel. EF v. Rhinebeck Cent. Sch. Dist.,*
   361 F. Supp. 2d 312 (S.D.N.Y. 2005) ........................................................ 30

*Adams v. Demopolis City Sch.,*
   80 F.4th 1259 (11th Cir. 2023) .................................................................. 38

*Amidax Trading Grp. v. S.W.I.F.T. SCRL,*
   671 F.3d 140 (2d Cir. 2011) ...................................................................... 11

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.,*
   28 F.4th 343 (2d Cir. 2022) ................................................................... 1, 12

*ASARCO Inc. v. Kadish,*
   490 U.S. 605 (1989) ................................................................................... 16

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) .............................................................................. 12, 32

*Bano v. Union Carbide Corp.,*
   361 F.3d 696 (2d Cir. 2004) ......................................................... 19, 21, 22

*Barker v. Bancorp, Inc.,*
   2022 WL 595954 (S.D.N.Y. Feb. 25, 2022) .......................................... 32, 34

*Barnett v. Johnson City Sch. Dist.,*
   2005 WL 8178066 (N.D.N.Y. Feb. 2, 2005) ............................................ 21

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ................................................................................... 12

*Bernheim v. N.Y. City of Dep't of Education,*
   2020 WL 3865119 (S.D.N.Y. July 9, 2020) ............................................. 42

*Blum v. Yaretsky,*
   457 U.S. 991 (1982) ................................................................................... 37

*Blunt v. Lower Merion Sch. Dist.,*
   767 F.3d 247 (3d Cir. 2014) ...................................................................... 21

*Carabello v. N.Y. City Dep't of Educ.,*
   928 F. Supp. 2d 627 (E.D.N.Y. 2013) ....................................................... 27

*Chacko v. Dynair Servs. Inc.,*
   1998 WL 199866 (E.D.N.Y. Mar. 15, 1998) ............................................. 45

## TABLE OF AUTHORITIES

*(continued)*

**Page(s)**

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983) .................................................................................. 16, 17

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ................................................................................. 14, 15

*Clark v. Martinez,*
543 U.S. 371 (2005) ........................................................................................ 37

*Cortec Indus., Inc. v. Sum Holding L.P.,*
949 F.2d 42 (2d Cir. 1991) ............................................................................. 32

*Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.,*
526 U.S. 629 (1999) ................................................................................ *passim*

*Demoret v. Zegarelli,*
451 F.3d 140 (2d Cir. 2006) ........................................................................... 21

*Dfinity Found. v. N.Y. Times Co.,*
2023 WL 7526458 (S.D.N.Y. Nov. 13, 2023) ................................................ 12

*Disabled in Action of Metro. N.Y. v. Trump Int'l Hotel & Tower,*
2003 WL 1751785 (S.D.N.Y. Apr. 2, 2003) .................................................. 22

*Do No Harm v. Pfizer Inc.,*
-- F.4th --, 2024 WL 949506 (Mar. 6, 2024) ................................................ 22

*Doe v. NYU,*
537 F. Supp. 3d 483 (S.D.N.Y. 2021) ............................................................ 35

*Doe v. Sacks,*
2024 WL 402945 (S.D.N.Y. Feb. 2, 2024) ................................................ *passim*

*Doron Precision Sys., Inc. v. FAAC, Inc.,*
423 F. Supp. 2d 173 (S.D.N.Y. 2006) .............................................. 1, 12, 32, 34

*Draper v. Healey,*
827 F.3d 1 (1st Cir. 2016) .............................................................................. 22

*Faggionato v. Lerner,*
500 F. Supp. 2d 237 (S.D.N.Y. 2007) ......................................................... 1, 11

*Felber v. Yudof,*
851 F. Supp. 2d 1182 (N.D. Cal. 2011) .......................................................... 39

*Freckleton v. Mercy Coll. NY,*
2023 WL 2648827 (S.D.N.Y. Mar. 27, 2023) ................................................ 40

# TABLE OF AUTHORITIES

*(continued)*

**Page(s)**

*Frey v. Nigrelli*,
  661 F. Supp. 3d 176 (S.D.N.Y. 2023)......................................................................... 17

*Gally v. Columbia Univ.*,
  22 F. Supp. 2d 199 (S.D.N.Y. 1998).......................................................................... 43

*Gebser v. Lago Vista Indep. Sch. Dist.*,
  524 U.S. 274 (1998)................................................................................................... 37

*Gill v. Whitford*,
  585 U.S. 48 (2018)..................................................................................................... 18

*Grandison v. U.S. Postal Serv.*,
  696 F. Supp. 891 (S.D.N.Y. 1988)............................................................................ 45

*Harary v. Allstate Ins. Co.*,
  983 F. Supp. 95 (E.D.N.Y. 1997) ............................................................................. 44

*Harm Reduction Coalition v. Bratton*,
  1995 WL 271766 (S.D.N.Y. May 9, 1995) .............................................................. 33

*Healy v. James*,
  408 U.S. 169 (1972 .................................................................................................... 36

*Hunt v. Washington State Apple Advert. Comm'n*,
  432 U.S. 333 (1977)....................................................................................... 19, 20, 22

*In re Google Dig. Advert. Antitrust Litig.*,
  627 F. Supp. 3d 346 (S.D.N.Y. 2022)....................................................................... 15

*In re Merrill Lynch Auction Rate Sec. Litig.*,
  704 F. Supp. 2d 378 (S.D.N.Y. 2010)....................................................................... 12

*In re Merrill Lynch Auction Rate Sec. Litig.*,
  851 F. Supp. 2d 512 (S.D.N.Y. 2012)................................................................... 12, 32

*In re New York City Policing During Summer 2020 Demonstrations*,
  548 F. Supp. 3d 383 (S.D.N.Y. 2021)....................................................................... 33

*J.S. ex rel. N.S. v. Attica Cent. Sch.*,
  386 F.3d 107 (2d Cir. 2004)...................................................................................... 12

*Johnson v. NYU*,
  2018 WL 3966703 (S.D.N.Y. Aug. 20, 2018) ..................................................... 40, 41

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
  385 U.S. 589 (1967).............................................................................................. 3, 36

**TABLE OF AUTHORITIES**
*(continued)*

**Page(s)**

*Koumantaros v. City Univ. of New York,*
2007 WL 840115 (S.D.N.Y. Mar. 19, 2007) ......................................................... 40

*L. L. v. Evesham Twp. Bd. of Educ.,*
710 F. App'x 545 (3d Cir. 2017) .......................................................... 21

*Langadinos v. Appalachian Sch. of L.,*
2005 WL 2333460 (W.D. Va. Sept. 25, 2005) ......................................................... 40

*Leibovitz v. N.Y. City Transit Auth.,*
252 F.3d 179 (2d Cir. 2001) ......................................................... 30, 31

*Liu v. U.S. Congress,*
834 Fed. Appx. 600 (2d Cir. 2020) ......................................................... 17

*Lokai Holdings LLC v. Twin Tiger USA LLC,*
306 F. Supp. 3d 629 (S.D.N.Y. 2018) ......................................................... 45

*Lulac Councils 4433 & 4436 v. City of Galveston,*
942 F. Supp. 342  (S.D. Tex. 1996) ......................................................... 21

*Mahanoy Area Sch. Dist. v. B.L.,*
141 S. Ct. 2038 (2021) ......................................................... 36

*Makarova v. United States,*
201 F.3d 110 (2d Cir. 2000) ......................................................... 11

*Mandel v. Board of Trustees of California State University,*
2018 WL 1242067 (N.D. Cal. Mar. 9, 2018) ......................................................... 40

*Manolov v. Borough of Manhattan Cmty. Coll.,*
952 F. Supp. 2d 522 (S.D.N.Y. 2013) ......................................................... 39

*Mogul Media, Inc. v. City of New York,*
2017 WL 6594223 (S.D.N.Y. Dec. 22, 2017) ......................................................... 11

*Murillo-Roman v. Pension Bds. – United Church of Christ,*
2024 WL 246018 (S.D.N.Y. Jan. 23, 2024) ......................................................... 42

*N.Y.C.L. Union v. Grandeau,*
528 F.3d 122 (2d Cir. 2008) ......................................................... 22, 23, 24

*Novio v. N.Y. Academy of Art,*
286 F. Supp. 3d 566 (S.D.N.Y. 2017) ......................................................... 42

*Nungesser v. Columbia Univ.,*
244 F. Supp. 3d 345 (S.D.N.Y. 2017) ............................................................. *passim*

**TABLE OF AUTHORITIES**

*(continued)*

**Page(s)**

*Oden v. N. Marianas Coll.*,
440 F.3d 1085 (9th Cir. 2006) ............................................................ 38

*Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*,
647 N.E.2d 741 (1995).......................................................................... 44

*Padmanabhan v. N.Y. Inst. of Tech. Campus, N.Y.*,
2019 WL 4572194 (S.D.N.Y. Sept. 20, 2019)....................................... 42

*Papish v. Board of Curators*,
410 U.S. 667 (1973).............................................................................. 37

*Platform Real Est. Inc. v. United States Sec. & Exch. Comm'n*,
2020 WL 4482632 (S.D.N.Y. Aug. 3, 2020).................................... 11, 12

*Pratt v. Indian River Cent. Sch. Dist.*,
2012 WL 13172930 (N.D.N.Y. Nov. 5, 2012) ...................................... 30

*Rodriguez v. NYU*,
2007 WL 117775 (S.D.N.Y. Jan. 16, 2007) .......................................... 28

*Roe v. St. John's University*,
91 F.4th 643 (2d Cir. 2024) ........................................................ *passim*

*Roskin-Frazee v. Columbia Univ.*,
474 F. Supp. 3d 618 (2019) ............................................................ 35, 39

*Rothbein v. City of New York*,
2019 WL 977878 (S.D.N.Y. Feb. 28, 2019)........................................... 42

*Rudolph v. Hudson's Bay Co.*,
2019 WL 2023713 (S.D.N.Y. May 7, 2019) .......................................... 17

*Saxe v. State Coll. Area Sch. Dist.*,
240 F.3d 200 (3d Cir. 2001)................................................................... 36

*Shain v. Ellison*,
356 F.3d 211 (2d Cir. 2004)............................................................ 14, 15

*Simmonds v. INS*,
326 F.3d 351 (2d Cir. 2003)................................................................... 25

*Sorenson Comms., LLC v. Fed. Comms. Comm'n*,
897 F.3d 214 (D.C. Cir. 2018) .............................................................. 19

*Soule v. Connecticut Ass'n of Schs., Inc.*,
90 F.4th 34 (2d Cir. 2023) ........................................................ 15, 18, 19

## TABLE OF AUTHORITIES

*(continued)*

**Page(s)**

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) .................................................................. 14, 16, 17

*Strujan v. Lehman Coll.*,
   2008 WL 11422126 (S.D.N.Y. Aug. 12, 2008) ............................... 26, 28

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
   600 U.S. 181 (2023) ........................................................................ 15, 20

*Tesoriero v. Syosset Cent. Sch. Dist.*,
   382 F. Supp. 2d 387 (E.D.N.Y. 2005) ................................................... 41

*United Prob. Officers Ass'n v. City of New York*,
   2022 WL 875864 (S.D.N.Y. Mar. 24, 2022) ......................................... 42

*United States v. Miami Univ.*,
   294 F.3d 797 (6th Cir. 2002) ................................................................. 6

*Utah Physicians for a Healthy Env't v. Diesel Power Gear LLC*,
   374 F. Supp. 3d 1124 (D. Utah 2019) .................................................. 19

*Valley Forge Christian College v. Am. United for Separation of Church & State*,
   454 U.S. 464 (1982) ............................................................................ 22

*Vincent v. Winski*,
   2018 WL 1441370 (S.D.N.Y. March 22, 2018) ..................................... 33

*Ward v. NYU*,
   2000 WL 1448641 (S.D.N.Y. Sept. 28, 2000) ................................. 42, 43

*Washington Legal Found. v. Leavitt*,
   477 F. Supp. 2d 202 (D.D.C. 2007) ..................................................... 20

*Weinstock v. Columbia Univ.*,
   224 F.3d 33 (2d Cir. 2000) .................................................................. 41

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings*, *LLC*,
   127 F. Supp. 3d 156 (S.D.N.Y. 2015) ......................................... 1, 12, 34

*Xiaolu Peter Yu v. Vassar Coll.*,
   97 F. Supp. 3d 448 (S.D.N.Y. 2015) .................................................... 43

*Zeno v. Pine Plains Cent. Sch. Dist.*,
   702 F.3d 655 (2d Cir. 2012) ........................................................ *passim*

**Statutes**

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ..................... 11

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

New York City Human Rights Law § 8-107(17)...............................................................11, 42

New York City Human Rights Law § 8-107(4).................................................................11, 42

New York Civil Rights Law § 40-c ..................................................................................11, 41

New York Executive Law § 296........................................................................................11, 41

New York General Business Law § 349............................................................................11, 44

New York General Business Law § 350............................................................................11, 44

**Rules**

Fed. R. Civ. P. 12(b)(1)................................................................................................*passim*

Fed. R. Civ. P. 12(b)(6)................................................................................................*passim*

Fed. R. Civ. P. 12(f)....................................................................................................1, 4, 45

Defendant New York University ("NYU" or "the University") respectfully submits this Memorandum in support of its Motion to Dismiss Pursuant to Federal Rules of Civil Procedure 12(b)(1), (6) and to Strike Pursuant to Rule 12(f) ("Motion"): [1]

## INTRODUCTION

New York University does not tolerate antisemitism on its campus, let alone respond to it with "deliberate indifference," *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999). That commitment starts at the top, with University leaders who have "unequivocally condemn[ed] antisemitism" and who act decisively every day to promote "a campus environment where all can study . . . free from the fear of bigotry." Ex. A. And it carries through to NYU's more than 60,000 students and 19,000 employees, the vast majority of whom act consistently with NYU's mission to make campus a safe and inclusive place to live and learn.

This case arises out of events in the wake of the October 7, 2023 terrorist attack on Israel, an unprecedented attack that resulted in "the deadliest day for Jews since the Holocaust." FAC ¶¶ 3, 121-23. While "[a]ntisemitism was on the rise even before October 7," the global increase in such hate since has been "truly terrifying." Ex. A; FAC ¶¶ 36, 38. The individual Plaintiffs—

---

[1] In support of its Rule 12(b)(1) motion, NYU relies on the Declaration of Jason Pina and Exhibits A-L to the Declaration of Daniel L. Cantor. *See Faggionato v. Lerner*, 500 F. Supp. 2d 237, 243 (S.D.N.Y. 2007) (Preska, J.) ("In resolving the question of subject matter jurisdiction, the district court may refer to evidence outside the pleadings"). As explained below in Parts I and II, Plaintiffs' allegations related to standing and ripeness implicate "disputed" facts about NYU's efforts to respond to the aftermath of the October 7, 2023 terrorist attack in Israel. *See id.* (quotation omitted). Unless otherwise specified, NYU does not rely on these exhibits or the Pina Declaration in support of its Rule 12(b)(6) motion. For that motion, NYU relies on Exhibits A, B, K, and M-Q. As explained below, the Court may properly consider these exhibits (except Exhibit O) because the Amended Complaint ("FAC") "incorporate[s] [them] by reference" or fairly implicates them, *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 n.3 (2d Cir. 2022); and all (except Q and O) were "publicly announced on [NYU's] website," *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) (quotation omitted). Exhibit O can be considered as a "document[] filed with governmental entities." *See Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015). All exhibits are attached to the Cantor Declaration.

1

four Jewish students, including one of Israeli descent—allege that they have experienced or witnessed incidents of antisemitism, primarily in the weeks immediately following the October 7 attack.  FAC ¶¶ 5, 8.  Plaintiffs are "sickened by the virulent antisemitic hate speech" they have seen on and off campus.  *Id.* ¶ 8.  NYU is too.  Any instance of antisemitism against one of its thousands of Jewish students is unacceptable and "heartbreaking," Ex. A, particularly for the University president, Linda G. Mills, whose family was directly and deeply impacted by the Holocaust, *see* FAC ¶ 190.

That is why NYU has moved decisively to root out antisemitism on its campus, and that is why Court intervention is unwarranted.  Following the October 7 attack, NYU was the first major university to adopt a 10 Point Plan to promote the safety and well-being of its students, *see* FAC ¶ 188; Ex. B.  This plan of action guides NYU's steps every day.  Ex. C.  The University increased campus security, adding tens of thousands of patrol hours.  *Id.*  The University affirmed—early and unequivocally—that its non-discrimination policies prohibit antisemitism, including calls for genocide.  Exs. D, D-1.  And when policy violations occur, the University has held disciplinary proceedings and imposed sanctions, including suspensions.  Pina Decl., ¶¶ 3-6.

These efforts are working, even while ongoing.  The University has already seen a sharp decline in complaints of antisemitism, a trend that should only continue as its reforms take firmer root.  *See infra* at 6-7.  But NYU will not stop there.  While the University cannot "purg[e]" all the pain and anxiety stemming from current events, protests on city streets, and social media increasingly filled with hate, it has and will respond to the needs of its community, far beyond the legal floor of "deliberate indifference."  *See Davis*, 526 U.S. at 648.  The University's responses will continue to evolve based on feedback from NYU's faculty, students, including Plaintiffs, and the new Center for the Study of Antisemitism dedicated to addressing this pernicious form of hate.

This lawsuit interferes with that ongoing process.  Federal, state, and city discrimination laws were never meant to strip schools of the "flexibility they require to function," *Davis*, 526 U.S. at 648, nor to curtail the country's "deep[ ] commit[ment] to safeguarding academic freedom," *Keyishian v. Bd. Of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967).  But Plaintiffs seek to do exactly that.  They cherry pick incidents across a decade, perpetrated by a few students or professors among the University's tens of thousands, and request injunctive relief that would have this Court oversee all NYU "policies, practices, procedures, [and] protocols," as well as its hiring, firing, and disciplinary decisions.  FAC, Prayer for Relief, (A), (A)(i)-(ii).  This goes far beyond the type of "second guessing" of educational institutions that the Supreme Court has cautioned against.  *See Davis*, 526 U.S. at 648.  The FAC asks the Court—or a "neutral expert monitor" it oversees—to superintend an entire university.  *See* FAC, Prayer for Relief, (A).

The Court should reject the invitation.  It should dismiss the suit under Rule 12(b)(1) because (i) the four individual Plaintiffs lack standing to pursue the sweeping injunctive relief they request; (ii) Plaintiff Students Against Antisemitism, Inc. ("SAA")—the newly created entity added to the FAC—lacks standing to proceed at all; and, (iii) this litigation is not ripe: NYU's efforts are ongoing, and it has already done much of what Plaintiffs ask—and far more than the law requires.  There is no need for this Court's intervention now, and likely never will be.

In all events, the Court should dismiss the FAC under Rule 12(b)(6).  NYU recognizes that the past few months have been profoundly challenging for many members of its community, including its Jewish and Israeli students, but Plaintiffs' allegations do not state a claim against NYU under the controlling legal standards.  Far from plausibly alleging that NYU has violated the rights of any plaintiff under federal, state, or city law, the FAC confirms—while understating— NYU's deep concern for and consistent efforts to stamp out antisemitism on campus.  Certainly,

Plaintiffs cannot plausibly allege that NYU responded with "deliberate indifference" to their injuries. *See Davis*, 526 U.S. at 648. At minimum, the Court should strike under Rule 12(f)(1) many of the FAC's remedial demands, which cut to the heart of NYU's autonomy as an academic institution and ability to protect the interests of all its community members.

## BACKGROUND

### A.     NYU's Longstanding and Robust Response to Antisemitism.

NYU seeks to promote a safe, productive, and inclusive campus community where all students have the opportunity to live and learn in peace. FAC ¶¶ 45, 47. Consistent with that mission, NYU has long unequivocally condemned antisemitism, *id.* ¶¶ 46-48, including through policies that explicitly prohibit "antisemitic . . . discrimination and harassment," *id.* ¶ 48; *see also id.* ¶ 44 (NYU's policies "incorporate[] the widely accepted definition of antisemitism promulgated by the [International Holocaust Remembrance Alliance]").

NYU's efforts have become all the more important—and urgent—in recent months. On October 7, 2023, Hamas perpetrated an unprecedented terrorist attack on Israel. *Id.* ¶¶ 121-22. This horrific attack sparked a significant rise in antisemitism across the country, and NYU was not entirely spared from this disturbing upswell. *See id.* ¶¶ 3-8; Ex. A. The University quickly made arrangements to evacuate students who were studying at NYU's Tel Aviv campus. Ex. E. And President Mills and NYU Board of Trustees Chair Evan Chesler "condemn[ed]" the October 7 attack in a University-wide statement, calling "the indiscriminate killing of civilian non-combatants and the taking of hostages" "reprehensible." *Id.*; *see* FAC ¶ 128. The University reminded students of the "24/7" resources available and reiterated its commitment to "peaceful discourse." Ex. E.

The University did not stop there. On October 25, NYU announced a robust 10 Point Plan to promote the safety and well-being of its students, *see* FAC ¶ 188; Ex. B. This plan, the first of

its kind among major universities, has been praised by the independent non-profit Academic Engagement Network and become a model for other universities.  Ex. C.  In its announcement, NYU acknowledged students' "deep concern[s]" for their safety and reiterated that "[t]here is no place for hate at NYU, including antisemitism and Islamophobia."  FAC ¶ 188.  The 10 Point Plan included enhanced security measures on campus and emphasized that NYU "ha[s] and will continue to discipline those who violate" its policies against harassment and discrimination, "while keeping individual cases confidential."  Ex. C.  It also outlined prevention measures, including preparing University members to have "difficult conversations" and educating them about antisemitism and Islamophobia; creating advocacy and resource spaces; launching a campaign for mutual respect; and fostering community engagement.  Ex. B.

The University takes steps every day to fulfill these commitments.  It quickly ramped up security, adding over 28,000 patrol hours from October 7 to March 1, including strengthening its partnership with NYPD to provide more than 6,000 hours of NYPD police officer patrols on campus.  Ex. F.  The University president and other senior leaders have met with hundreds of members of the NYU community to hear and respond to their concerns.  *See, e.g.*, FAC ¶¶ 190, 192.  Through these conversations and campus-wide communications, NYU has reaffirmed that it will foster an environment that promotes free discourse, while remaining clear that "[a]dvocacy on current events is not a license to discriminate," and it will not tolerate antisemitic harassment or intimidation.  *Id.* ¶ 48.  And it has issued guidance as early as November 1 making clear that "the University has zero tolerance for any form of violence, threats, or intimidation."  Ex. D-1.  "This includes, but is not limited to, using language advocating for killing people or groups of people," including "[c]alls to genocide."  *Id.*; *see also* FAC ¶ 48.

NYU expects students, faculty, and employees to adhere to University policies and refrain from discrimination.  *See* FAC ¶ 40.  The vast majority do so.  But despite the University's longstanding—and continuing—efforts, *see supra* at 4-5, it has yet to entirely prevent each incident of antisemitism in a school of more than 60,000 students and 19,000 employees.  When NYU receives complaints that community members have violated University policies, those individuals are subject to the University's disciplinary procedures.  FAC ¶¶ 45, 53, 56-57; Ex. C.  While "conduct proceedings take time and are private,"[2] the University is holding individuals "accountable when student conduct violations occur."  Ex. C.  In particular, since October 7, NYU's Office of Student Conduct has reviewed more than 160 cases involving alleged violations of its conduct policies, including those related to antisemitism.  Exs. C & F.  A number of these cases have resulted in student suspensions, campus restrictions, or other forms of discipline, and others are still pending at various stages in the disciplinary process.  Pina Decl., ¶¶ 3-6.  Similarly, over the same time, NYU's Office of Equal Opportunity has reviewed more than 70 cases involving employees, many of which are still being investigated and some of which have resulted in interim measures, like suspensions.  Ex. F; Pina Decl., ¶¶ 4, 7.  In short, the University's multi-faceted response to antisemitic conduct on campus is robust, steadfast, and ongoing.

These efforts have been working.  The University saw a surge in complaints following the October 7 attack, as well as an uptick following NYU's effort to raise awareness of its centralized reporting option, the Bias Response Line ("BRL"), Exs. C & F.  But as NYU's initiatives to reduce antisemitism have taken root, incidents reported to the BRL have declined—as reflected in the chart below—even as tensions related to events in the Middle East have remained high.  Ex. F.

---

[2] The Family Education Rights and Privacy Act limits NYU's ability to share details about disciplinary investigations, proceedings, or measures involving University students.  *See United States v. Miami Univ.*, 294 F.3d 797, 806, 812 (6th Cir. 2002).



NYU's efforts are also ongoing.  On November 15, 2023, NYU announced the creation of a new center to study antisemitism and "develop programmatic initiatives to address it," Ex. A, and it has announced the inaugural director of that Center, Ex. F.  To mark the start of the new semester, President Mills personally reminded all students that they must "abide in all instances by the University's guidance and expectations as to the time, place, and manner in which demonstrations" take place, Ex. G, and on February 2, the University reinforced expectations as to student conduct, Ex. H.  In February, NYU launched "NYU In Dialogue" to provide students the practical tools for difficult conversations.  Ex. F.  And beginning in the fall, all first-year residential students will be required to attend trainings "on antisemitism, Islamophobia, and other programs to engage across differences."  *Id.*

**B.     Plaintiffs' Lawsuit.**

On January 31, 2024, Plaintiffs filed the FAC, which includes as Plaintiffs four Jewish students at NYU (Bella Ingber, Sabrina Maslavi, Avigail Teiler, and Nevo Yemini) and a newly created non-profit corporation (SAA), whose members consist of students nationwide who have been "personally aggrieved or otherwise impacted by antisemitism and discrimination in higher education," including four anonymous NYU students (SAA Members #1-4).  FAC ¶¶ 16-24.[3]

---

[3] Plaintiffs first filed suit on November 14, 2023, on behalf of Ingber and Maslavi, ECF No. 1, as well as a student who voluntarily withdrew from the suit on December 5, 2023, ECF No. 16.

While Plaintiffs file this action in a single suit, each individual Plaintiff's claims (as well as those of the four anonymous SAA Members) are based on the discrete incidents of antisemitic harassment that he or she allegedly experienced or witnessed personally, most of which took place in the weeks immediately following the October 7 attack.  Specifically:

**Ingber.**  Ingber, a student in the College of Arts and Sciences, has attended NYU since September 2021.  *Id.* ¶ 17.  She alleges that she personally experienced three incidents of student-on-student harassment, all following the October 7 attack.  *First*, Ingber alleges that on October 17, she attended a vigil for victims of the October 7 attack off-campus in Washington Square Park, where she witnessed a rally sponsored by Faculty for Justice in Palestine (FJP) and Students for Justice in Palestine (SJP) and heard unidentified individuals chant antisemitic slogans and threaten the Jewish students present.  *Id.* ¶ 147.  *Second*, Ingber alleges that on November 7, another student verbally assaulted harassed her at an NYU library and closed a metal security gate on her hand as she left.  *Id.* ¶ 202.  *Third*, Ingber alleges that while studying in the library, she saw another anti-Israel demonstration.  *Id.* ¶ 214.  Ingber also alleges that she received updates about (but did not attend) a separate rally at the library, which allegedly included chants calling for the destruction of Israel and that "resistance is justified when people are occupied."  *Id.* ¶¶ 162-79.

**Maslavi.**  Maslavi has attended NYU since September 2023 as a student in the Gallatin School of Individualized Study.  *Id.* ¶ 18.  She alleges that she personally experienced three incidents of student-on-student harassment, each of which occurred in the weeks following the October 7 attack.  *First*, Maslavi alleges that on October 16, students and others tore down and vandalized posters depicting Israeli hostages that she had distributed and hung on the NYU campus.  *Id.* ¶ 141.  *Second*, Maslavi alleges that on October 17, she witnessed the same threatening and antisemitic attacks as Ingber at an off-campus rally.  *Id.* ¶¶ 147-48.  *Third*, Maslavi alleges

that on October 25, she passed "hordes" of unidentified students and faculty during an SJP rally at an unidentified location, and that "people in the crowd" were screaming "antisemitic chants." *Id.* ¶ 187.  Like Ingber, Maslavi also alleges that she received updates about the October 20 rally that she did not attend. *Id.* ¶¶ 162-79.  And she alleges that she saw distressing social media messages, including a post from SJP calling the October 7 attack a "response to decades of colonial violence and oppression," as well as antisemitic messages from unidentified commenters. *Id.* ¶ 133.  She also alleges that she saw a "picture" of the Washington Square Park fountain "with the water dyed red, and 'Free Palestine' written on the ground in front of it." *Id.* ¶ 158.

*Teiler.*  Teiler, a graduate student at the Silver School of Social Work, has attended NYU since September 2022. *Id.* ¶ 20.  She alleges that she personally experienced one incident of harassment:  on November 16, 2023, Teiler attended a lecture where her professor played a video and led a discussion that included allegedly discriminatory statements. *Id.* ¶¶ 212-213.

*Yemini.*  Yemini has attended NYU since September 2020 as a student in the School of Professional Studies. *Id.* ¶ 19.  He alleges two incidents of harassment.  *First*, in spring 2023, Yemini saw in the lobby of the Paulson Center signs reading "Free Palestine" and "end genocide," as well as a group of unidentified protestors chanting these slogans. *Id.* ¶ 115.  *Second*, on November 2, a group allegedly "including SJP and FJP" members held a rally on the public sidewalk outside an NYU library, where "[o]ne man" held an antisemitic sign and pantomimed having a gun. *Id.* ¶¶ 194-95.  Yemini alleges that NYU staff created a "separate entrance" for students to enter the library. *Id.* ¶ 195.  He also alleges that he was "horrified that hostage posters were defaced," though he does not allege that he reported such acts to NYU. *Id.* ¶ 142.

*SAA Member #1.*  SAA Member #1 is enrolled in the NYU School of Law and the Stern School of Business. *Id.* ¶ 21.  He alleges that he experienced one incident of harassment: in April

2022, the Law School's SJP chapter issued a statement with anti-Zionist rhetoric, prompting students on a listserv to which he subscribed to call out "Ashkenazi Jewish whiteness" and another to say, "to all the Zionists, we're keeping receipts." *Id.* ¶ 104.  He alleges that he and a group of Jewish students were subject to "expletives and threats" by unidentified students(s) after they circulated a petition condemning these remarks.  *Id.* ¶ 106.

**SAA Member #2.**  SAA Member #2 is enrolled in the College of Arts and Sciences.  *Id.* ¶ 22.  She alleges that she personally experienced three incidents of harassment.  <u>First</u>, at the start of the fall 2023 semester, she alleges that one of her professors stated that she did not consider Israel part of the Middle East because it is not an Islamic country, and the next day, the teaching assistant listed Palestine but not Israel as a country in the Middle East.  *Id.* ¶¶ 117-119.  <u>Second</u>, SAA Member #2 alleges that on November 16, she attended an off-campus rally, led by Amin Husain, who has taught as an adjunct professor at NYU, where unidentified protestors subjected her to antisemitic chants and threats.  *Id.* ¶¶ 207-208.  <u>Third</u>, SAA Member #2 alleges that the week before finals, she observed daily protests at the Paulson Center, as well as banners stating that "NYU HAS BLOOD ON ITS HANDS" for its perceived pro-Israel stance.  *Id.* ¶ 216.

**SAA Member #3.**  SAA Member #3 is enrolled in the Tisch Center of Hospitality.  *Id.* ¶ 23.  He alleges that he experienced two incidents of student-on-student harassment.  <u>First</u>, he was among the group, along with Yemini and SAA Member #4, who allegedly witnessed the November 2 rally on the public sidewalk outside the library; he also alleges that, while participating in a counterprotest to that rally, Campus Safety told him to move across the street to deescalate the situation.  *Id.* ¶¶ 194-95.  <u>Second</u>, he alleges that he "walked by" an SJP-organized "antisemitic protest in the Kimmel Center" that lasted for "approximately one hour."  *Id.* ¶ 214.

*SAA Member #4.*  SAA Member #4 is enrolled in the Silver School of Social Work.  *Id.* ¶ 24.  She alleges that she was among the group who saw the November 2 rally on the sidewalk outside the library, and that she could hear antisemitic threats once inside.  *Id.* ¶¶ 194-195, 249.

Based on these allegations, Plaintiffs bring causes of action asserting violations of (1) Title VI of the Civil Rights Act of 1964 ("Title VI"), 42 U.S.C. § 2000d *et seq.* (Count I); (2) New York Executive Law ("NYHRL") § 296 (Count II); New York Civil Rights Law ("NYCRL") § 40-c (Count III); New York City Human Rights Law ("NYCHRL") §§ 8-107(4), (17) (Count IV); Breach of Contract (Count V); and New York General Business Law §§ 349, 350 (Count VI).  In addition to monetary relief, Plaintiffs request prospective relief in the form of a sweeping injunction that would, among other things, require "(i) the termination of deans, administrators, professors and other employees responsible for antisemitic discrimination, whether because they engage in it or permit it;" and (ii) disciplinary measures against any students who engage in such conduct.  FAC, Prayer for Relief.  They also request the Court "appoint[] a neutral expert monitor to oversee compliance."  *Id.*

## STANDARD OF REVIEW

Under Rule 12(b)(1), a complaint must be dismissed "when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing Fed. R. Civ. P. 12(b)(1)).  A plaintiff "must allege facts that affirmatively and plausibly suggest that it has standing to sue."  *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011).  Likewise, a suit must be dismissed under Rule 12(b)(1) where it is unripe.  *See, e.g.*, *Mogul Media, Inc. v. City of New York*, 2017 WL 6594223, at *3 (S.D.N.Y. Dec. 22, 2017).  Where the challenge to standing is fact-based, "the district court may refer to evidence outside the pleadings" to resolve disputed factual issues.  *Faggionato v. Lerner*, 500 F. Supp. 2d 237, 243 (S.D.N.Y. 2007) (Preska, J.); *Platform Real Est. Inc. v. United States Sec. & Exch.*

*Comm'n*, 2020 WL 4482632, at *2 (S.D.N.Y. Aug. 3, 2020) (Preska, J.).

Under Rule 12(b)(6), a complaint must be dismissed if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   This requires pleading "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While the Court must accept all well-pleaded facts as true, it need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *id.*, nor "draw inferences from the complaint favorable to plaintiffs."  *See J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004).  The Court "may permissibly consider documents other than the complaint for the truth of their contents if they are attached to the complaint or incorporated by reference," as well as documents that are "integral" to the pleading.  *Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 352 n.3; *see also In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 385 n.4 & n.5 (S.D.N.Y. 2010) (Preska, J.).  Likewise, "[f]or purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination."  *Doron*, 423 F. Supp. 2d at 179 n.8 (quotation omitted); *see also Dfinity Found. v. N.Y. Times Co.*, 2023 WL 7526458, at *1 (S.D.N.Y. Nov. 13, 2023) (same); *Wells Fargo Bank*, 127 F. Supp. 3d at 167  (holding that courts could properly consider "printouts from [the party's] websites" for purposes of Rule 12(b)(6), particularly where there is no dispute as to the "factual material reflected in these websites," and collecting cases).  Finally, the Court may "take[] judicial notice" of any statement offered "for the purpose of demonstrating the existence of information" rather than "for the truth of the matters asserted therein."  *In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d 512, 526 n.4 (S.D.N.Y. 2012) (Preska, J.) (courts may consider even non-party news articles for this purpose).

## ARGUMENT

The FAC's allegations and requested relief are sweeping, but the scope of the dispute between the parties is narrow. Each Plaintiff alleges that he or she was subject to discrete incidents of antisemitic harassment on and/or off NYU's campus. The incidents cited are alarming and of deep concern to NYU, but they involve just a few of NYU's 60,000 students and 19,000 employees over a short period of time (largely the weeks following the unprecedented October 7 attack in Israel). On that basis, Plaintiffs request that the Court indefinitely superintend nearly every aspect of NYU's operations, overseeing broad policy and personnel changes throughout the school.

This suit cannot proceed. Most basically, it fails to state a claim under Rule 12(b)(6). Title VI, similar to its state- and city-law counterparts, imposes a "high standard" to hold a university liable for the actions of its students or teachers. *See Davis*, 526 U.S. at 643. To comply with Title VI, schools need not "purg[e]" themselves of "actionable peer harassment." *Id.* at 648. Nor do Plaintiffs have any right to "particular remedial demands." *Id.* Instead, the University can be held liable for the conduct of students or faculty only if it (1) entirely fails to respond to that conduct; (2) responds only "after a lengthy and unjustified delay"; or (3) responds in a manner that was "clearly unreasonable." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 666 (2d Cir. 2012) (quotations omitted); *see infra* Part IV (similar for state and city law claims). Plaintiffs cannot make that showing, as NYU has *already* responded—consistently and forcefully—to each incident that they allege, as is evident from the FAC and the documents it fairly implicates. Certainly, Plaintiffs have not plausibly pled that NYU's response has been "clearly unreasonable," and that alone requires dismissal. *See, e.g.*, *Doe v. Sacks*, 2024 WL 402945, at *6 (S.D.N.Y. Feb. 2, 2024).

But before the Court even reaches Rule 12(b)(6), it should dismiss the FAC under Rule 12(b)(1). Precisely because NYU has been proactive in redressing antisemitism on its campus, Plaintiffs can only speculate that they will suffer any future injury, and therefore lack standing to

pursue prospective relief.  For similar reasons, Plaintiffs filed suit too soon.  They brought this action in the weeks following the October 7 attack, but NYU has been taking many of the steps they sought—and doing far more than the law requires—even as its efforts continue.  The Court should decline to intervene in a dispute that narrows every day.

## I.  THE COURT SHOULD DISMISS UNDER RULE 12(B)(1) PLAINTIFFS' SWEEPING REQUESTS FOR INJUNCTIVE RELIEF AND ALL CLAIMS BY PLAINTIFF SAA FOR LACK OF STANDING.

### A.  Plaintiffs Do Not Have Standing to Pursue Injunctive Relief.

Plaintiffs have no standing to seek any prospective relief, much less the sweeping injunction they request.  At the pleading stage, Plaintiffs must "clearly [] allege facts demonstrating" that they "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  Even where a plaintiff has standing to pursue damages, "standing to seek injunctive relief is a different matter."  *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004).  To seek injunctive relief, they must face a risk of future injury that is "certainly impending."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

In light of NYU's dedicated—and successful—efforts to combat antisemitism on campus, no Plaintiff's allegations satisfy that legal standard.  There is, at minimum, a significant mismatch between Plaintiffs' alleged injuries—premised on discrete instances of harassment involving a handful of students—and the indefinite, University-wide prospective relief they seek.  FAC, Prayer for Relief, A.  While Title VI "permits a plaintiff to recover damages when *he or she* is subjected to a hostile environment," *Roe v. St. John's University*, 91 F.4th 643, 661 (2d Cir. 2024) (emphasis added), it is not a vehicle for individual students to obtain prospective relief targeted at every conceivable future incident of harassment, against any student, indefinitely, *see infra* at 16-17.

### 1.    Plaintiffs Do Not Allege Facts Clearly Demonstrating an Imminent Likelihood of Future Injury.

No Plaintiff has alleged facts that come close to clearly demonstrating that he or she faces "certainly impending" injuries absent the prospective relief requested.  *See Clapper*, 568 U.S. at 410.  Plaintiffs do not challenge any existing NYU policy as a violation of federal, state, or city law, as is typically true when courts impose injunctive relief in discrimination cases.[4]  Instead, Plaintiffs say they are entitled to prospective relief based on *past* alleged incidents of harassment, primarily in the weeks following October 7.  *See supra* at 7-10.  But these allegations of "past exposure" to harm—even if true—do not suffice to "show a present case or controversy regarding injunctive relief."  *Shain*, 356 F.3d at 215 (quotations and alterations omitted).  Instead, Plaintiffs must plausibly allege an "immediate" threat of *future* injury, *id.*, such that any cognizable injuries are "certain[]" to reoccur, *Clapper*, 568 U.S. at 410; *see also In re Google Dig. Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 403 (S.D.N.Y. 2022).

They fall far short of that showing because NYU's proactive efforts to combat antisemitism preclude it.  The October 7 attack was unprecedented, and Plaintiffs themselves admit that it sparked an increase in antisemitic conduct at colleges across the country, including NYU.  FAC ¶ 33.  But as the global response to the horrific attack evolves, so too will NYU's campus climate.  That is especially true in light of the actions that NYU has taken—and continues to take—since the October 7 attack.  These efforts have been extensive—increasing patrol hours, enhancing reporting options, hosting regular listening sessions, and emphasizing and enforcing codes of conduct.  *See supra* at 4-7; Exs. G, H, I.  And as these efforts have taken root, the number of

---

[4] *See, e.g.*, *Soule v. Connecticut Ass'n of Schs., Inc.*, 90 F.4th 34, 46 (2d Cir. 2023) (en banc) (injunctive relief as to school "[p]olicy" governing track races); *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023) (injunctive relief blocking university-wide affirmative action policies).

reported incidents on campus has dropped precipitously.  While reports of hate-based (and other) incidents to the BRL peaked the week of October 20 to nearly 20 times the weekly average for the past year (since March 1, 2023), since the start of the 2024 semester, the reports have returned to (or even been below) the weekly average.  Ex. F.  The University expects this downward trend will continue as it implements new initiatives to raise awareness about antisemitism and to promote sharing views in ways that align with, rather than harm, community values, Exs. A & F, further reducing the risk of future injury to *all* NYU students.

Certainly, no Plaintiff can plausibly plead that he or she *personally* faces an imminent risk of a cognizable future injury.  "For an injury to be particularized," the Supreme Court has explained, "it must affect the plaintiff[s] in a personal and individual way."  *Spokeo*, 578 U.S. at 339 (quotation omitted); *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (plaintiff cannot surmount standing by "aggregating the allegations of different kinds of plaintiffs").  But Plaintiffs offer no basis to infer that any of them face an imminent risk of injuries of the same nature on which they predicate their requests for relief, let alone injuries that would implicate Title VI.  *See Spokeo*, 578 U.S. at 339.  After all, no Plaintiff alleges a recurring pattern of activity targeted at them, and many of the incidents alleged occurred off-campus or were perpetrated by unidentified individuals.  Thus, while no college campus can entirely "purg[e]" themselves of "actionable peer harassment," *Davis*, 526 U.S. at 648, "it is surely no more than speculation" to assert that any Plaintiff "*himself* will again be involved in one of those unfortunate instances," as is necessary to seek injunctive relief, *City of Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983) (emphasis added).

Nor can Plaintiffs paper over their standing deficiencies with subjective, speculative fears of injuries that "they *might* face," FAC ¶¶ 241-42, 245-48 (emphasis added).  "It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective

apprehensions." *Lyons*, 461 U.S. at 107 n.8.  While NYU takes seriously the sincere "emotional consequences" of Plaintiffs' alleged prior harm, such acts "simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant." *Id.*  Plaintiffs therefore fail to satisfy the injury prong of standing.  *Id.* at 107; *Rudolph v. Hudson's Bay Co.*, 2019 WL 2023713, at *6 (S.D.N.Y. May 7, 2019) (plaintiff did not establish standing because "[a] 'subjective fear' or 'speculative threat' is not enough to identify injury").

### 2. Plaintiffs Do Not Allege Facts Clearly Demonstrating That NYU Will Cause Any Future Injury.

Plaintiffs have also failed to allege facts clearly demonstrating that NYU will be the *cause* of any actionable discrimination or harassment that they might face in the future.  *See Spokeo*, 578 U.S. at 338.  To make this showing, Plaintiffs cannot rely on injuries caused by third parties or point to events that occurred off campus.  Rather, "a plaintiff must establish some causal relationship between the defendant's conduct and the plaintiff's injury." *Liu v. U.S. Congress*, 834 Fed. Appx. 600, 604 (2d Cir. 2020); *see also Frey v. Nigrelli*, 661 F. Supp. 3d 176, 193-94 (S.D.N.Y. 2023).  Because they do not (and cannot) allege that NYU has *directly* harmed them, *see infra* Part III, Plaintiffs must plausibly plead that NYU's deliberate indifference will cause any future student- or teacher-on-student harassment they endure.

They cannot do so.  For one thing, NYU has not *ever* been deliberately indifferent, which belies any allegation that it will be in the future.  *See supra* at 4-7.  To take one example: in the weeks following October 7, NYU received hundreds of reports that students had defaced or removed posters of Israeli hostages.  *See* Ex. F.  Several Plaintiffs were understandably upset by these actions, and they base their claims in this lawsuit in part on the resulting mental distress.  *See* FAC ¶¶ 141-146.  NYU, however, moved quickly to respond to these violations of its policies, both through ███████████████████████████, *see* Exs. F & J; *see also* Pina Decl.

¶¶ 3-7, and the campus-wide initiatives described above, *see supra* at 4-7.  As a result, the University has seen a marked decline in such complaints, Ex. F, which is consistent with Plaintiffs' non-conclusory allegations, FAC ¶ 145 (citing November 10 as the last incident).  And to the extent isolated incidents crop up again, Plaintiffs could hardly attribute it to *NYU*, which has gone above and beyond to redress this conduct and will continue to do so, Exs. A & F.

In any event, Plaintiffs cannot plausibly allege that NYU will be deliberately indifferent to any future instances of third-party harassment.  *See* FAC ¶¶ 266, 283, 300, 312.  In addition to campus-wide initiatives, NYU responds to each complaint of harassment on a case-by-case basis.  The University imposes sanctions "with a thoughtfulness towards educational outcomes," after considering factors such as (i) the seriousness of the conduct, (ii) the learning opportunities for the student, (iii) the student's prior conduct record, and (iv) the safety and well-being of harmed individuals and the community.  Exs. K, K-1.[5]  Those criteria are fact-specific, and it is therefore wholly speculative for Plaintiffs to predict how NYU *might* respond to future injuries that they *might* sustain.  Plaintiffs thus lack standing to request the sweeping prospective relief that they seek, and the Court should dismiss their request for injunctive relief.

At the very least, Plaintiffs have not plausibly alleged that the relief they seek is "limited to the inadequacy that produced [their] injur[ies] in fact." *Gill v. Whitford*, 585 U.S. 48, 66 (2018); *Soule*, 90 F.4th at 50.  The FAC's requested relief sweeps far beyond the policies or persons who have injured—or even could conceivably injure—Plaintiffs themselves.  Instead, Plaintiffs ask this Court (or a "neutral expert monitor") to oversee the response to any allegations of antisemitism against any one of the University's 60,000 students or 19,000 employees, at any one of its 19

---

[5] The FAC incorporates by reference the University's Student Conduct Policy and Student Conduct Procedures.  *See* FAC ¶¶ 49-55.

colleges and schools.  To the extent Plaintiffs have standing to seek prospective relief at all, plainly it does not extend so far.  *See Soule*, 90 F.4th at 50; *Utah Physicians for a Healthy Env't v. Diesel Power Gear LLC*, 374 F. Supp. 3d 1124, 1136 (D. Utah 2019) (no standing to pursue "overbroad" request that was not "tied to . . . cognizable injury").

## B.   Plaintiff SAA Does Not Have Associational Standing.

Plaintiff SAA's claims should be dismissed for an additional, independent reason—it cannot satisfy the requirements for associational standing.  Associational standing is available only to "traditional voluntary membership organizations," such as trade associations, or to organizations that exhibit "all of the indicia of membership."  *See Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342, 344-45 (1977).  Plaintiff SAA—created solely for the purpose of litigation—has none of those hallmarks.  But even if the Court concludes otherwise, SAA still cannot proceed as its asserted claims and requested relief "require[] the participation of individual members in th[is] lawsuit."  *Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004) (quotation omitted).

### 1.   SAA is an Organization Created Solely for Litigation and Cannot Manufacture Standing on that Basis.

At the outset, SAA is not the sort of "traditional" membership organization that may sue on behalf of its members.  *Hunt*, 432 U.S. at 344.  To qualify for associational standing, an organization must be a genuine "traditional voluntary membership organization" or its members must otherwise exhibit "all of the indicia of membership" in such an organization.  *Id.* at 344-45.  SAA cannot make the first showing, and does not even attempt to make the second.[6]

---

[6] SAA does not allege, for example, that its members exert control over the organization, finance its activities, or elect its leadership.  *See, e.g.*, *Hunt*, 432 U.S. at 344-45 ("indicia of membership" includes electing leadership and "financ[ing]" an organization's "activities"); *Sorenson Comms., LLC v. Fed. Comms. Comm'n*, 897 F.3d 214, 225 (D.C. Cir. 2018) (no standing where organization "lack[ed] many of the 'indicia of a traditional membership' association").

SAA was created after this litigation commenced for the sole purpose of suing universities. According to Delaware public filings, SAA was incorporated on December 29, 2023 by a partner at Plaintiff's law firm, after the initial Complaint in this case was filed on November 14.  Ex. L; ECF No. 1.  But the organization cannot establish associational standing by "manufactur[ing] 'members' for the purposes of this lawsuit after the fact."  *Washington Legal Found. v. Leavitt*, 477 F. Supp. 2d 202, 211 (D.D.C. 2007).  These unusual facts distinguish SAA from traditional membership organization, with dozens of members "at the time" the lawsuit commenced, bringing litigation to represent those members in "good faith," *Students for Fair Admissions*, 600 U.S. at 200-01.  SAA turns associational standing on its head: rather than bring suit to "assert the rights of its members," *Warth*, 422 U.S. at 511, SAA has added members after the fact to establish its own right to bring suit.  That is no basis for standing.  *See Washington Legal Found.*, 477 F. Supp. 2d at 211 (no associational standing where an organization "first determined to bring th[e] suit and only then identified . . . persons on whose behalf it would litigate").

> ### 2.    SAA Lacks Standing Because Its Claims and Requested Relief Require the Participation of Its Individual Members in this Lawsuit.

Even if SAA were the type of organization that could qualify for associational standing, it still fails the *Hunt* test because its claims and requested relief "require[] the participation of individual members in th[is] lawsuit."  432 U.S. at 343.  The purpose of associational standing is to allow organizations that represent their members' "collective views" and protect their "collective interests" to litigate on behalf of their membership, *id.* at 345, such as where a university-wide policy inflicts the same injury on a group of students, *see, e.g.*, *supra* n.4 (describing examples).  But associational standing is improper where "the fact and extent of the injury that gives rise to the claims for injunctive relief would require individualized proof, or where the relief requested would require the participation of individual members in the lawsuit."  *Bano*,

361 F.3d at 714 (quotations and citations omitted).  And courts regularly decline to recognize associational standing where an entity fails to "explain[] how [its] claims of intentional discrimination could be prosecuted without the participation of the individual members." *Barnett v. Johnson City Sch. Dist.*, 2005 WL 8178066, at *5 n.6 (N.D.N.Y. Feb. 2, 2005); *see also, e.g.*, *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 289-90 (3d Cir. 2014) (no associational standing given "highly individualized" components of plaintiffs' claims); *Lulac Councils 4433 & 4436 v. City of Galveston*, 942 F. Supp. 342, 345 (S.D. Tex. 1996).

That is the case here—SAA's claims require "individualized proof" that NYU has intentionally discriminated against its unidentified members.  *See Bano*, 361 F.3d at 714.  Title VI, for instance, protects an individual student's "access to an education opportunity or benefit," *Davis*, 526 U.S. at 633, and therefore "permits a plaintiff to recover damages when *he or she* is subjected to a hostile environment," *Roe*, 91 F.4th at 661 (emphasis added).  That analysis requires a particularized inquiry into each student's educational environment, which is why deliberate-indifference claims ordinarily involve a single plaintiff.  *See, e.g.*, *id.*; *Davis*, 526 U.S. at 633; *Zeno*, 702 F.3d at 664.  In a multi-plaintiff suit, the court must proceed plaintiff by plaintiff, asking whether each experienced harassment that was sufficiently severe as to deprive *that plaintiff* of the ability to obtain an education.  *See, e.g.*, *Demoret v. Zegarelli*, 451 F.3d 140, 145-147, 150 (2d Cir. 2006) (separately analyzing plaintiffs' claims); *L. L. v. Evesham Twp. Bd. of Educ.*, 710 F. App'x 545, 549 (3d Cir. 2017) (allowing one plaintiff's claim to proceed, while granting summary judgment as to others').  Each SAA member's claim therefore depends on highly individualized allegations, requiring inquiries into different discriminatory conduct that implicate different actors across four different schools.  *See supra* at 9-11.

Likewise, NYU must be able to respond to allegations that it was deliberately indifferent to a particular student's injury, so that the Court can evaluate whether that response was "clearly unreasonable," *Zeno*, 702 F.3d at 666.  But NYU cannot do so en masse or where it cannot identify that student or must guess his or her identity.[7]  Necessarily, "each [SAA member] would have to be involved in the proof of his or her claims," and be identified—not anonymous—so that NYU can respond. *Bano*, 361 F.3d at 714-15.  To hold otherwise would contravene the very purpose of associational standing, and the long-held principle that a plaintiff "generally must assert his own legal rights and interests" rather than "rest his claim to relief on the legal rights or interests of third parties." *Valley Forge Christian College v. Am. United for Separation of Church & State*, 454 U.S. 464, 474 (1982).  Associational standing is improper.  *See Hunt*, 432 U.S. at 343.[8]

## II.   THE COURT SHOULD DISMISS UNDER RULE 12(B)(1) BECAUSE PLAINTIFFS' CLAIMS RELATED TO NYU'S ONGOING RESPONSE TO THE IMPACT OF THE OCTOBER 7 ATTACK ARE UNRIPE.

The ripeness doctrine allows courts "to avoid becoming embroiled in adjudications that may later turn out to be unnecessary" or "entangling themselves in abstract disagreements." *N.Y.C.L. Union v. Grandeau*, 528 F.3d 122, 130-31 (2d Cir. 2008).  This is such a dispute.

When Plaintiffs filed suit just weeks after the October 7 attack, NYU warned that this dispute was not ripe because its response was "ongoing."  ECF No. 19 at 1.  Each individual Plaintiff's claim implicates event(s) in the aftermath of that attack, and Plaintiffs primarily

---

[7] That is one reason why no later than the summary judgment stage, Plaintiffs must identify by name at least one named member (beyond the named Plaintiffs) to proceed.  *See Do No Harm v. Pfizer Inc.*, -- F.4th --, 2024 WL 949506, at *7-11 (Mar. 6, 2024); *see also Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (Souter, J.) ("[A]n affidavit provided by an association to establish standing is insufficient unless it names an injured individual."); *Disabled in Action of Metro. N.Y. v. Trump Int'l Hotel & Tower*, 2003 WL 1751785, at *10 (S.D.N.Y. Apr. 2, 2003) (associational plaintiff cannot "merely repeat[] the claims" of a named plaintiff to establish standing).

[8] At minimum, SAA cannot pursue *damages* through this litigation.  *See, e.g.*, *Bano*, 361 F.3d at 714 ("We know of no Supreme Court or federal court of appeals ruling that an association has standing to pursue damages claims on behalf of its members.").

challenge NYU's alleged failure to take "disciplinary actions" against certain faculty and students. *See, e.g.*, FAC ¶¶ 173-182, 189, 192-193, 196, 206, 222, 237-239.   Even were such claims cognizable (and they are not), *see infra* at 38, NYU explained that it takes time to complete the disciplinary process consistent with its policies.   Until those proceedings have run their course, "this Court cannot entertain a claim that is 'contingent on future events.'"   ECF No. 19 at 2-3 (quoting *Grandeau*, 528 F.3d at 133).   Sure enough, in the intervening months, there have been developments relevant to Plaintiffs' claims.   Maslavi and Yemini, for instance, were distressed when fellow students defaced and tore down posters depicting Israeli hostages.   ████████████

████████████████████████████████████████████████████

████████████████████████████ *See* Pina Decl., ¶ 5.   ████████████████

████████████████████████████████████████████████████

██████████████████████████████   *See id.* ¶ 6.   There are also ongoing investigations into allegations about professors.   Teiler's claim is based solely on an incident with a professor, FAC ¶¶ 212-213, but the professor has been subject to an interim measure and is not currently teaching any classes at NYU.   *See* Pina Decl., ¶ 7.   Likewise, the FAC repeatedly references Husain, *see* FAC ¶¶ 71, 207, but misses that he was recently "suspended and is not currently teaching any classes at NYU," Ex. J.

The same is true of the University's "*non-disciplinary* remedial actions," a critical component to the University's response to antisemitism.   *Zeno*, 702 F.3d at 669 (emphasis added); *see also Doe*, 2024 WL 402945, at \*6; *infra* at 32.   When Plaintiffs first filed suit on November 14, 2023, they criticized NYU for failing to "advis[e] [students] to be cautious and report incidents of [anti-Jewish] harassment," ECF No. 1 ¶ 136, or to issue a "statement to condemn" antisemitism, *id.* ¶ 201.   Those allegations were false even then, *see infra* at 31-32, as the FAC itself reflects, *see*

FAC ¶ 188 (acknowledging 10 Point Plan); Ex. B.  But NYU's actions in the ensuing weeks further

debunk them.  For instance:

- On November 15, 2023, President Mills "unequivocally condemn[ed] antisemitism" and the "truly terrifying" increase in it since October 7.  Ex. A.

- On November 30, 2023, NYU issued a comprehensive update to the 10 Point Plan to "address concerns about safety; antisemitism, Islamophobia, and other forms of bigotry," including to outline the reporting options available and the steps that NYU had taken to increase staff to shorten referral and response times.  Ex. C.

- On December 5, 2023, Vice President Jason Pina reiterated in a message to all students that "[h]arassment and threats"—including those that were "antisemitic"—violated NYU's Code of Student Conduct."  Ex. I.

- On January 23, 2024, President Mills reminded all students that they must "abide in all instances by the University's guidance and expectations as to the time, place, and manner in which demonstrations" take place, Ex. G, and Vice President Pina reiterated those expectations on February 2, 2024, Ex. H.

These steps reflect exactly the sort of advisories and "condemn[ations]" Plaintiffs seek through

this litigation, ECF No. 1 ¶ 201.  And efforts are continuing, with significant new developments

even since Plaintiffs amended their complaint on January 31, *see supra* at 7, including a new

comprehensive update on progress implementing the 10 Point Plan, Ex. F.  NYU is also nimble

and ready to address issues as they arise, including by "tap[ping] NYPD through [its] strong

partnership on an as needed basis as [it] move[s] forward."  *Id.*

All told, NYU has and will continue to do far more than Title VI requires, *see infra* Part

III, and in the process, it has significantly narrowed the dispute between the parties.  This Court

should dismiss what remains of the FAC for failure to state a claim.  *See infra* Parts III & IV.  But,

at minimum, the Court cannot hold that NYU's response to antisemitism is deficient at the same

time that the University is implementing that response, including rolling out new initiatives.  To

do so would not only "embroil[]" the Court in an unnecessary adjudication, it would also impose

an exceptional "hardship[]" on NYU, *Grandeau*, 528 F.3d at 130-32, as well as the students,

faculty, and community members who depend on the university's "flexibility" to function, *Davis*, 526 U.S. at 648-49.  Thus, to the extent Plaintiffs allege anything is lacking in NYU's response, the answer is not to rush to litigate these issues now.  "[F]urther factual development" may well narrow the scope of Plaintiffs' claims, or, at minimum, "better position [the Court] to adjudicate the issues."  *Simmonds v. INS*, 326 F.3d 351, 359 (2d Cir. 2003).

### III.   THE COURT SHOULD DISMISS PLAINTIFFS' TITLE VI CLAIM UNDER RULE 12(B)(6) BECAUSE THE FAC ITSELF MAKES CLEAR THAT NYU'S RESPONSE TO ANTISEMITIC CONDUCT HAS BEEN UNEQUIVOCAL.

The Court should dismiss each Plaintiff's Title VI claims under Rule 12(b)(6) for failure to state a claim.  The University's efforts to combat antisemitism, though ongoing, *see supra* Part II, already go far beyond what the law requires.  Even limited only to the FAC allegations, Plaintiffs cannot plausibly satisfy Title VI's "high standard," and the documents it incorporates or fairly implicates only confirm that dismissal is proper.  *See Davis*, 526 U.S. at 643.

### A.   Plaintiffs Fail to Plausibly Allege That NYU Was Deliberately Indifferent to Harassment Directed at Them by NYU Students or Faculty.

Plaintiffs principally seek to hold NYU liable for the alleged misconduct of its students and faculty members. Title VI, however, prohibits only "intentional" discrimination or harassment, and courts will therefore only hold a university accountable for the "actions of a third party"—*i.e.*, "teacher or peer harassment of a student"—in "narrow" circumstances.  *Zeno*, 702 F.3d at 664-65 (quotation omitted).  In particular, the Supreme Court has "cabin[ed] the range of [actionable] misconduct" to those rare cases in which a school's "own deliberate indifference effectively caused the discrimination."  *Davis*, 526 U.S. at 642-44 (quotation and alteration omitted).  In other words, a plaintiff must plausibly plead that she experienced "severe and discriminatory harassment," over which the University had "substantial control" and "actual knowledge," and to which it responded with "deliberate indifference."  *Zeno*, 702 F.3d at 665 (applying *Davis* to Title VI).

None of the Plaintiffs satisfies that "high standard." *Davis*, 526 U.S. at 643.  Each Plaintiff brings within this action his or her own separate deliberate-indifference claim.  *See supra* at 21-22.  Proceeding plaintiff-by-plaintiff, none has plausibly alleged actionable discrimination by NYU or that NYU's response to such incidents has been deliberately indifferent.

### 1.    No Plaintiff Alleges Harassment Actionable Under Title VI.

While NYU has no tolerance for any instance of antisemitism, under Title VI, "[n]ot all harassment is actionable" legally.  *Zeno*, 702 F.3d at 665.  As a threshold matter, the harassment must be so "severe, pervasive, and objectively offensive and discriminatory in effect" as to effectively deprive a student of an educational benefit.  *Id.* (quoting *Davis*, 526 U.S. at 650-51).  To make that showing, the plaintiff must "show not only that she subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive," *Strujan v. Lehman Coll.*, 2008 WL 11422126, at *4 (S.D.N.Y. Aug. 12, 2008).

This is a "high bar."  *Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345, 368 (S.D.N.Y. 2017).  The "most obvious" way to surmount it is by showing "an overt, *physical* deprivation of access to school resources."  *Id.* at 367 (quoting *Davis*, 526 U.S. at 650) (emphasis added).  Otherwise, a student must identify harassment that is "so severe" and "so undermines and detracts from the victim's educational experience" that it "*effectively*" denies them equal access.  *See Davis*, 526 U.S. at 651 (emphasis added).  This was true in *Davis*, where a student contemplated suicide after enduring offensive touching and harassment for "many months" from a student who ultimately pled guilty to the sexual battery.  *Id.* at 633-34.  Similarly, the Second Circuit has allowed a claim to proceed where a high school student was "harassed, menaced, and physically assaulted" for over three-and-half years; called a racial slur "nearly every day;" received express and implicit threats; and left school without completing his education.  *Zeno*, 702 F.3d at 666-67.

By contrast, as the Second Circuit recently reaffirmed, isolated or disparate incidents of harassment—even if offensive or targeted—do not implicate Title VI.  *See Roe*, 91 F.4th at 661. In *Roe*, a student challenged his university's inaction in response to the abuse he suffered on campus after an anonymous tweet alleged that he was a rapist.  *Id.* at 649-50.  This included a student "threaten[ing] him via phone calls and text messages" and another student "punch[ing] him in the face at a bar."  *Id.*  The court nevertheless rejected his Title IX claim "because the abuse that [plaintiff] claims to have suffered as a result of the tweet was not sufficiently severe or pervasive to support a hostile environment claim."  *See id.* at 661-62 & n.21.  While it recognized that in "extreme cases, such as a rape, a single incident of abuse can give rise to a hostile environment claim," the court affirmed that "generally incidents of harassment must be more than episodic to justify a hostile environment claim."  *Id.* at 662 (quotations and alterations omitted).

*Nungesser* is similarly instructive.  There, the plaintiff alleged that he was the target of persistent and false allegations of sexual assault by a fellow student, whose campaign to raise awareness—by carrying her mattress around Columbia's campus at all times—"received widespread media attention," often in coverage that expressly named plaintiff.  *See Nungesser*, 244 F. Supp. 3d at 351.  Fellow students allegedly harassed plaintiff in class and on social media— actions that caused him to "fear for his safety" on campus and "completely avoid[] being on campus" unless "absolutely" necessary.  *Id.* at 358.  His grades allegedly suffered as he endured "sleep deprivation, depression and feelings of isolation."  *Id.* at 360.  Yet none of this sufficed to survive a motion to dismiss.  *Id.* at 362.  While plaintiff's experience on campus was "neither pleasant nor easy," it fell short of the sustained harassment required to plead a hostile environment. *See id.* at 368.  Other cases are of a piece.  *See, e.g.*, *Carabello v. N.Y. City Dep't of Educ.*, 928 F. Supp. 2d 627, 643 (E.D.N.Y. 2013) (dismissing complaint where "the single incident of sexual

abuse that [plaintiff] suffered, although unfortunate, was not so severe . . . that it deprived her of access to educational opportunities"); *Strujan v. Lehman Coll.*, 2008 WL 11422126, at *4 (dismissing complaint where alleged harassment was not "so severe as to be abusive"); *Rodriguez v. NYU*, 2007 WL 117775, at *6 (S.D.N.Y. Jan. 16, 2007) ("[F]ailure to discipline a teacher for a single offensive remark does not constitute deliberate indifference.").

Plaintiffs' allegations do not meet that standard.  To start, most Plaintiffs (Teiler and each of the SAA Members) allege they personally experienced one or two instances of harassment on campus—remarks by a single professor on a single day, FAC ¶¶ 212-13 (Teiler), 117-19 (Member #2);[9] a troubling incident related to a law school listserv in April 2022, *id.* ¶¶ 104-05 (Member #1); or an allegedly antisemitic protest on the public sidewalk in front of a library that forced students to use a "separate entrance," *id.* ¶¶ 195-96 (Yemini, Members #3, #4), while one also heard antisemitic threats from the public streets outside the library, *id.* ¶¶ 195, 249 (Member #4). To be clear, a single antisemitic incident is one too many, and NYU is committed to responding to all discrimination and harassment on its campus.  *See infra* Part III.A.2.  But for purposes of Title VI, "[i]solated incidents" almost invariably fail to "rise to the level of a hostile [] environment." *Strujan*, 2008 WL 11422126, at *4 (quotation omitted); *see Roe*, 91 F.4th at 661-62.

The other named Plaintiffs' claims fail for similar reasons.  Yemini bases his injury on three incidents over the course of a year, including the distress he felt after learning that students had defaced posters depicting Israeli hostages.  *See supra* at 9.  Maslavi, too, was distressed when several NYU students pulled down hostage posters that she had put up on campus.  FAC ¶¶ 143-

---

[9] SAA Member #2 allegedly experienced two incidents of harassment in public areas, by individuals not alleged to be NYU students or faculty.  FAC ¶¶ 207-208, 216.  NYU cannot be held liable for such actions, *see infra* at 33-36, nor can such harassment meaningfully alter her educational environment *at NYU*.

44.[10]   But neither Plaintiff has alleged that these isolated incidents, even taken together, meaningfully altered the conditions of their education.   Their alleged injuries—"difficult[y] concentrat[ing] in his classes [for] the day," *id.* ¶ 115, tardiness or absence from class, *id.* ¶ 242, even safety fears on and off campus—are serious concerns for NYU and NYPD, but are also regularly deemed insufficient to plead a federal discrimination claim.  *See supra* at 27-28.

Ingber is the only plaintiff who alleges harassment involving physical aggression. *Cf. Nungesser*, 244 F. Supp. 3d at 368.  She alleges that on November 7, another student closed a security gate on her hand, causing her "sharp pain."  FAC ¶¶ 199-203.  NYU was not deliberately indifferent to that incident, *see infra* at 37-38, and in any event, as the Second Circuit recently affirmed, even physical altercations do not implicate Title VI if they are of a "sporadic and disconnected nature," *Roe*, 91 F.4th at 661 n.21.  The harassment must be so extreme that it impacts "the plaintiff's ability to receive an education," *Nungesser*, 244 F. Supp. 3d at 367 (quotations omitted).  Thus, while NYU has addressed Ingber's alleged injuries, *see infra* at 31-38, a "decline in grades" and "fear" of campus do not state a Title VI claim, *Nungesser*, 244 F. Supp. 3d at 369.

And Plaintiffs cannot salvage their Title VI claims by relying on alleged harassment that was not part of their own educational experience.  Much of the FAC is devoted to allegations of incidents that occurred long before Plaintiffs arrived on campus, including "incidents between 2014 and 2020," *id.* ¶¶ 66-92; 94-100.  Courts within this circuit, however, regularly hold that plaintiffs cannot "rely on incidents that allegedly occurred involving other students" before

---

[10] Maslavi alleges that she was subject to several instances of off-campus harassment perpetrated by unidentified individuals.  These incidents were outside of NYU's control and are therefore not pertinent to the Title VI inquiry.  *See infra* at 33-36.  In any event, the incidents—comments from unnamed individuals on social media, text updates about antisemitic chants, unidentified protesters on city streets, disturbing signs from non-NYUers at an off-campus location—still amount to a level of harassment courts regularly hold does not trigger Title VI.  *See supra* at 27-28.

plaintiff enrolled.  *See, e.g., AB ex rel. EF v. Rhinebeck Cent. Sch. Dist.*, 361 F. Supp. 2d 312, 316 n.5 (S.D.N.Y. 2005).  The relevant question under Title VI is whether plaintiff's *own* educational environment was hostile, and "any alleged incidents of harassment or discrimination that may have occurred to other individuals years before [the plaintiff] was enrolled" simply are "not part of [the plaintiff's] 'environment.'"  *Pratt v. Indian River Cent. Sch. Dist.*, 2012 WL 13172930, at *3 (N.D.N.Y. Nov. 5, 2012).  The Court should not consider these legally irrelevant allegations.

Nor can Plaintiffs establish a hostile environment based only on conduct they "experience[d] . . . by hearsay," even if the incidents in question occurred while they were on campus.  *Leibovitz v. N.Y. City Transit Auth.*, 252 F.3d 179, 182 (2d Cir. 2001).  In the Title VII context, for instance, the Second Circuit has rejected the relevance of harassment directed at employees "working in another part of the employer's premises, out of [plaintiff's] sight and regular orbit" when considering whether a hostile work environment existed.  *Id.* at 189.  "In these circumstances," the Court reasoned, a "plaintiff cannot demonstrate that she suffered harassment either in subjective or objective terms," as the "harassment might as well have been . . . the subject of an infuriating newspaper article[] or been a false rumor of a kind that would be upsetting if true."  *Id.*[11]  The same is true of many of the FAC allegations.  For one thing, not all allegations are relevant to all Plaintiffs.  An incident in a graduate class at the Silver School of Social Work, for instance, is relevant to Teiler's claim, but it has no bearing on the educational environment of the other Plaintiffs, who are not enrolled in that school.  *Cf.* FAC ¶¶ 17-20.  Many allegations are

---

[11] For purposes of Title VII, the court accepted that in an office setting, "harassment directed at other co-workers can be relevant to an employee's own claim of hostile work environment," and "an employee who knows that her boss is saying things of this sort behind her back may reasonably find her working environment hostile."  *Leibovitz*, 252 F.3d at 190 (quotation omitted).  Still, such evidence "may be of limited probative value," and an incident that did not "target" the plaintiff and occurred out of her "sight and regular orbit" is not relevant.  *Id.* at 189-90 (quotation omitted).

not relevant to *any* Plaintiff—they relate to alleged instances of antisemitism against one of NYU's thousands of Jewish students, allegedly perpetrated by one of the school's 60,000 students or 19,000 employees.  *See, e.g.*, *id.* ¶¶ 101-103, 109-114, 116, 138, 150-155, 167-172, 220.  These disparate incidents, while deeply concerning to the University, are simply not relevant to each student's "*own* claim of a hostile [educational] environment," *Leibovitz*, 252 F.3d at 190.

In sum, each Plaintiff falls short of establishing the type of severe or pervasive discrimination needed to trigger Title VI, and each Plaintiff's claim must therefore be dismissed.

### 2. No Plaintiff Plausibly Pleads That NYU Responded Unreasonably to Any Alleged Harassment in Light of Known Circumstances.

In all events, Plaintiffs fail to plausibly plead that NYU was deliberately indifferent to any alleged instance of harassment over which the University had actual knowledge and substantial control.  Under Title VI, a school can be held liable only if it "fail[ed] to respond" to harassment, responded "only after a lengthy and unjustified delay," or responded in a way that "amounts to deliberate indifference."  *Zeno*, 702 F.3d at 666 (quotations omitted).  Put otherwise, a school's response—or lack thereof—must be "clearly unreasonable in light of the known circumstances." *Id.* (quoting *Davis*, 526 U.S. at 648).  Conclusory allegations aside, Plaintiffs fail to allege a single instance where NYU's response was "clearly unreasonable," *id.*

#### a. *NYU's Condemnation of Antisemitism—and Robust Plan to Combat It—Refutes Any Inference that NYU Is Deliberately Indifferent.*

While the FAC focuses on concerns about NYU's campus climate, it does not deny—even as it downplays—NYU's extensive institutional efforts to combat antisemitism, and the documents it incorporates or fairly implicates only confirm as much.  President Mills immediately recognized the "multi-pronged and deadly terrorist attack in Israel," offering students and employees "24/7 support" to cope with this violence, and, shortly thereafter, expressly "condemn[ed] the attack," describing it as "reprehensible."  *See* Ex. E; FAC ¶¶ 127-128 (incorporating email by reference).

In the days that followed, University officials continued to "condemn the killing of civilians and acts of terrorisms," and to disavow any statements to the contrary.  FAC ¶ 132; Ex. M.  They said—"loud and clear"—that "[a]ny statement that does not recognize this brutality does not reflect" the University's values.  Ex. N; *see also* Ex. A.[12]  Far more than words, the University has also taken the actions described in its 10 Point Plan to protect its students' safety and well-being, including by substantially increasing the presence of Campus Safety and NYPD officers on and around campus.  *See* FAC ¶ 188.  President Mills and other senior administrators have repeatedly met with Jewish groups and students, including the Plaintiffs here.  *See id.* ¶¶ 140, 152-155, 159, 181, 190-192, 202, 209-211.

These "non-disciplinary" measures alone refute any inference that NYU has been deliberately indifferent to antisemitism on its campus.  *See Zeno*, 702 F.3d at 669-70; *Doe*, 2024 WL 402945, at *6.  Indeed, the FAC acknowledges NYU's commitment to "increase campus safety" and to "enforce [its] codes of conduct," alleging only conclusorily that "neither has occurred."  FAC ¶ 189.  The Court should not credit that threadbare recital, *Ashcroft*, 556 U.S. at 678, particularly where the allegations otherwise reflect NYU's top-to-bottom efforts to combat antisemitism, *see e.g.*, *Doe*, 2024 WL 402945, at *6.

---

[12] The Court may properly consider these statements because they are available from a "party's own website," *i.e.*, NYU's.  *See Doron*, 423 F. Supp. 2d at 178 n.8.  In addition, "the Second Circuit has cautioned district judges to be mindful of litigants who cherry-pick among relevant documents, and has clarified that district courts may consider relevant documents that are fairly implicated by a plaintiff's claims, irrespective of whether they are part of the pleadings."  *Barker v. Bancorp, Inc.*, 2022 WL 595954, at *6 (S.D.N.Y. Feb. 25, 2022); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991).  Here, Plaintiffs put at issue the October 10 statement of the law school dean, FAC ¶ 132, and claim NYU has "equivocated" in condemning antisemitism, FAC ¶ 189, but they fail to cite statements issued through the same public channels that plainly condemn such acts, including the dean's statement the next day.  *See* Ex. N.  Moreover, the Court can consider such statements "for the purpose of demonstrating the existence of information," *i.e.*, that NYU has publicly condemned antisemitism.  *In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F. Supp. 2d at 526 n.4.

        b.     *NYU Responded Reasonably to All Alleged Incidents.*

Plaintiffs have also failed to plausibly allege that NYU's response to *any* incident cited in the FAC was "clearly unreasonable." Their allegations fall into three categories. *First*, many of the allegations relate to incidents outside of NYU's control, including off-campus activity involving individuals unaffiliated with NYU. *Second*, Plaintiffs challenge student and teacher speech—speech that they (and NYU) find reprehensible but that NYU could not censor without infringing the "free discourse" and "academic freedom" that are key to NYU's "academic mission." Ex. K. *Third*, Plaintiffs allege discrete incidents of harassment to which the FAC itself demonstrates that the University has reasonably responded.

        i.     <u>Allegations Related to Off-Campus or Non-NYU Actors.</u>

NYU unequivocally condemns the antisemitism that is spreading throughout society, but this case focuses on NYU's liability for the actions of third parties. Under Title VI, NYU can be liable only when it "exercises substantial control over both the harasser and the context in which the known harassment occurs." *Zeno*, 702 F.3d at 665 (quoting *Davis*, 526 U.S. at 644-45). For many allegations, Plaintiffs fail to plausibly plead this element of a deliberate-indifference claim.

To start, much of the FAC concerns off-campus conduct by people unaffiliated with the University. Plaintiffs repeatedly cite activity in Washington Square Park, FAC ¶¶ 77, 79, 85, 138, 141-158, 207, 238, an off-campus public square, *id.* ¶ 174, owned by New York City, and a common spot for protests.[13] Plainly, NYU cannot control non-NYU individuals who engage in activity in this public space, yet the FAC often fails to specify whether the alleged assailants there were NYU community members. Maslavi, for instance, claims to have suffered distress after

---

[13] *See, e.g.*, *In re New York City Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 393 (S.D.N.Y. 2021); *Harm Reduction Coalition v. Bratton*, 1995 WL 271766, at *1-2, 3 n.6 (S.D.N.Y. May 9, 1995); *Vincent v. Winski*, 2018 WL 1441370, *2 (S.D.N.Y. March 22, 2018).

witnessing a "National Student Walkout," but the FAC does not specify the location of the rally or whether the "[p]eople in the crowd" holding abhorrent antisemitic signage were affiliated with the University. *See id.* ¶ 187.  (In fact, NYU issued a statement explaining that while these signs were "antisemitic, repugnant, and a disgrace," the individuals involved were "<u>not</u> NYU students."[14])  Likewise, Maslavi was "unnerved" by a picture of the Washington Square Park fountain, with its water dyed red and bearing the message "Free Palestine." *Id.* ¶ 158.  But the FAC does not attribute that act of protest to students or faculty or allege that NYU could have done anything about the water in a fountain on city-run property. *Id.* ¶ 158.  The same is true of references to the Paulson Center lobby. *See, e.g., id.* ¶¶ 115-116, 215-216.  NYU has historically made that space "open to the public" consistent with a restrictive declaration, Ex. O,[15] so there is no basis to assume that speakers there were necessarily NYU students.  The pattern repeats throughout the FAC.[16]

Even where the FAC alleges conclusorily that "students" or "faculty" were responsible for alleged incidents of harassment, *see, e.g.,* FAC ¶¶ 116, 147, 181, 207, such allegations do not plausibly plead that NYU had the "actual knowledge" necessary to respond to or discipline any individuals who participated in these off-campus events, *Zeno*, 702 F.3d at 665.  For one thing, it is hardly reasonable to infer, without more, that all individuals attending protests at an iconic New York City park in the heart of a densely populated neighborhood are affiliated with the University.

---

[14] Ex. P.  The Court can properly consider this statement because it was "publicly announced on a party's website," *Doron*, 423 F. Supp. 2d at 179 n.8, and because Plaintiffs "cherry-pick" the public statements available on the NYU website, *see Barker*, 2022 WL 595954, at *6.

[15] The Court may take judicial notice of this "document[] filed with governmental entities." *Wells Fargo*, 127 F. Supp. 3d at 166.

[16] *See, e.g.,* FAC ¶ 138 (describing "loud, menacing, anti-Israel protesters" at Washington Square Park); FAC ¶¶ 150-157 (describing "a screaming women" and "six men wearing keffiyehs"); FAC ¶ 207 (describing "mob of protestors" at Washington Square Park, and attributing one antisemitic remark to a "keffiyeh-clad student").

For another, while a "university must respond to *known* student harassment in a manner that is not clearly unreasonable," *Roskin-Frazee v. Columbia Univ.*, 474 F. Supp. 3d 618, 624 (2019), a plaintiff cannot proceed without alleging that the University "knew" *who* was responsible for his alleged harassment, even if he may "wish that [the university] had gone to greater lengths to identify and discipline" any alleged student assailants, *Doe*, 2024 WL 402945, at *6.

Moreover, the University is limited in the disciplinary action it may take for off-campus actions, even if they are plausibly alleged to have involved NYU community members.  The very student conduct policies that Plaintiffs cite (FAC ¶ 192) specify that the "University shall *not* use its powers to interfere with the rights of a student beyond the University environment."  Ex. K (emphasis added).  Rather, "[c]onduct that occurs off-campus, online, over social media, or outside the context of a University program or activity, should generally be subject only to the consequences of the applicable authority and/or public opinion."  *Id.*  While NYU regulates conduct that threatens the "health, safety, or security of the University community," *id.*, Plaintiffs have not offered more than conclusory allegations that any off-campus activity by any NYU-community member threatened on-campus safety or security.[17]

Plaintiffs' allegations related to social media suffer similar flaws.  *See, e.g.*, FAC ¶ 133 (citing posts by unnamed commenters on social media).  Title VI liability will not lie where, as here, a plaintiff cites "social media posts that allegedly made him fear for [her] safety, but [] does not allege any concrete facts suggesting that those messages were posted by members of the [university] community."  *See Nungesser*, 244 F. Supp. 3d at 367-368.  NYU, after all, "does not

---

[17] Plaintiffs cite (FAC ¶ 238) NYU's disciplinary actions in September 2020 against students who violated its COVID-19 protocols at off-campus events, but that public health guidance—issued to prevent the spread *on-campus* of a deadly pandemic at a time when there was no vaccine—is plainly distinguishable.  *See Doe v. NYU*, 537 F. Supp. 3d 483, 487 (S.D.N.Y. 2021).

exercise control over postings made on Facebook." *Id.* Moreover, even if NYU could "acced[e] to Plaintiff's demand to identify and to pursue disciplinary action against the students who allegedly" authored the posts, that would only place the University "in the precarious position of disciplining students for online speech on non-university accounts" where the speech is not plausibly alleged to have impacted campus safety or operations. *Doe*, 2024 WL 402945, at *7 (citing *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2046 (2021)).

Of course, none of this is to say that NYU stands idly by. Even where NYU cannot identify or otherwise hold perpetrators accountable, it has condemned and disavowed antisemitic acts and statements. *See supra* at 31-32. As explained below, NYU offers victims, including Plaintiffs, "mental health assistance," "victim's support services," and "academic accommodations," *Doe*, 2024 WL 402945, at *6; *see infra* at 38. That is what Title VI requires—that "NYU [take] the steps it [can] to respond to Plaintiff's reports" of misconduct. *Doe*, 2024 WL 402945, at *6.

ii.    Allegations Related to Speech.

Federal law does not—and could not—require the University to punish "unwelcome speech," even if the University disagrees with it. *See Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 210 (3d Cir. 2001). The "college classroom," after all, "is peculiarly the 'marketplace of ideas,'" *Healy v. James*, 408 U.S. 169, 180-81 (1972), and the Supreme Court has long professed a "deep[] commit[ment] to safeguarding academic freedom," *Keyishian*, 385 U.S. at 603. These principles are core to NYU's mission, too. Ex. K.

Many of Plaintiffs' allegations implicate these core principles. The FAC cites, for instance: (i) protestors criticizing NYU for its perceived Pro-Israel stance and "call[s] for NYU to close its Tel Aviv" campus, FAC ¶¶ 215, 216 ("NYU HAS BLOOD ON ITS HANDS" and "NYU out of Palestine"); (ii) the "sounds of student" protestors while President Mills "recounted her own experiences with antisemitism," *id.* ¶ 190; (iii) remarks between students on a law school listserv,

*id.* ¶¶ 104-107; and, (iv) a tenured professor's comments related to his field of study, *id.* ¶ 117-19. Far from condoning such rhetoric, NYU has disavowed such speech, *see, e.g.*, *id.* ¶ 107, making clear that it does not reflect the University's values, *supra* at 31-32, and reminding students that while "debate" may be acceptable, discriminatory remarks are not, FAC ¶ 107.[18]  But NYU does not act with deliberate indifference by adhering to its commitment to the "open discussion and free discourse," Ex. K.  NYU is not unreasonable—much less "clearly" so—for managing its response in a way that also does not "restrict[] students' speech-protected values" or the academic freedom of its tenured professors.  *Doe*, 2024 WL 402945, at *7;[19] *cf.* ECF No. 33 (Letter from Jonathan Wallace) (describing professors' interests in academic freedom).

### iii.   Other Allegations of Harassment.

Once this Court sets aside—as it must—allegations that occurred long before Plaintiffs set foot on campus, allegations involving incidents beyond the University's knowledge or control, and allegations based on political speech, all that remains of Plaintiffs' lengthy pleading are a discrete set of incidents involving just a few of the Plaintiffs.  But any effort to allege that the University was deliberately indifferent to these incidents is belied by the FAC itself.

***Ingber***.   The University has responded seriously to Ingber's individual allegations of injury, including that a student closed a metal security gate on her hand.  FAC ¶ 202; *id.* ¶ 184.  As the FAC reflects, Campus Security intervened, the NYPD arrested the student for the assault of a

---

[18] While SAA Member #1 says that "law students" received "threats" from fellow students, he does not clearly allege that he received or reported threats to NYU, FAC ¶ 106, such that it had "actual knowledge" of his injury, *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

[19] Any contrary interpretation of Title VI would be inconsistent with the First Amendment.  Title VI could not require public schools to punish political speech, *see Papish v. Board of Curators*, 410 U.S. 667, 667-71 (1973) (per curiam), and the same construction of its terms must apply to private schools, too, *see Clark v. Martinez*, 543 U.S. 371, 378 (2005).  Indeed, it would raise similar constitutional questions if a federal law "exercised coercive power" by forcing private schools to punish student speech or face liability.  *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

separate non-NYU affiliated individual, and the University publicly condemned the episode.  *Id.*

¶¶ 203-205.  While the FAC objects that NYU has not yet "suspended or expelled" the student, *id.*

¶ 206, Plaintiffs have no right to "particular disciplinary action,"  *Davis*, 526 U.S. at 642-44, nor

do they have visibility into the disciplinary measures imposed on other students, *see supra* at n.2.

At any rate, the FAC could not plausibly allege that any response has been unduly delayed at this

stage, *see, e.g.*, *Adams v. Demopolis City Sch.*, 80 F.4th 1259, 1272 (11th Cir. 2023) (eight-month

delay reasonable); *Oden v. N. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006) (nine-month

delay reasonable).  There is, accordingly, no basis to hold NYU deliberately indifferent.[20]

  *Maslavi*.  NYU's President and senior leaders have also met personally with Maslavi to

hear about her experiences since October 7.  FAC ¶¶ 190, 192.  They connected her with a range

of resources, including (1) Campus Safety, which offered to "create [a] personal safety plan[]," (2)

emotional counseling, (3) community support; and (4) academic support.  Ex. Q; FAC ¶ 140.[21]  In

every instance, the University has moved rapidly to respond to her complaints, and none of her

allegations plausibly allege deliberate indifference.  *See, e.g.*, FAC ¶¶ 179-80 (noting campus

safety officers dispatched to library within "half-hour" of her complaint); *id.* ¶ 143 (alleging only

that NYU did not respond to her email "that day").

  *Teiler*.  Teiler alleges that she was injured by discriminatory statements from a professor.

*Id.*  ¶¶ 212-213.  The FAC, however, fails to plead the basic elements of a Title VI claim, including

---

[20] Ingber also alleges that she saw "another demonstration against Israel" in the library.  FAC
¶ 214.  But the FAC does not allege that this particular protest was reported to NYU, nor provide
any allegations as to NYU's response.  *Id.* ¶ 214.  The same is true of the other protest alleged in
the same paragraph, which SAA Member #3 "walked by and witnessed."  *See id.*

[21] The FAC mistakenly says that "Dean Rodriguez has not responded to [Maslavi's] email," FAC
¶ 134, but later recognizes his response the next day to the same thread, *id.* ¶ 140, and incorporates
that email by reference.

whether NYU had "actual knowledge" of this incident or, if so, whether or how NYU has responded. *Zeno*, 702 F.3d at 665.

**Yemini**.   Like Maslavi, Yemini alleges that he was distressed that hostage posters were defaced, but unlike Maslavi, Yemini does not allege that he filed any complaint with NYU or otherwise contacted administrators about his concerns.  *Cf.* FAC ¶ 142.  NYU therefore had no "actual knowledge" of his specific injury or opportunity to offer him individualized resources. *Roskin-Frazee v. Columbia Univ.*, 474 F. Supp. 3d at 624; *Manolov v. Borough of Manhattan Cmty. Coll.*, 952 F. Supp. 2d 522, 533-34 (S.D.N.Y. 2013).  Yemini also cites (FAC ¶¶ 194-95) a protest that obstructed his access to the library on one occasion, but despite not alleging that the protestors were on NYU property or that the cited aggressor was a member of NYU's community, he acknowledges that NYU immediately responded to the incident: "NYU's staff chose to create a separate entrance."  That response was not "clearly unreasonable," *Zeno*, 702 F.3d at 666. [22]

All told, Plaintiffs' conclusory allegations (FAC ¶¶ 42, 149) that NYU "has done nothing" are inconsistent with the FAC itself.  Plaintiffs cannot insist that NYU "engage in particular disciplinary action," *Davis*, 526 U.S. at 648, and they also do not plausibly allege that NYU has made any decisions not to discipline those who violate NYU's policies.  And regardless of any disciplinary measures, the non-disciplinary measures that NYU has already put in place—and that the FAC reflects—are fatal to any claim of deliberate indifference.  *Doe*, 2024 WL 402945, at *6; *Felber v. Yudof*, 851 F. Supp. 2d 1182, 1188 (N.D. Cal. 2011) (where University engaged in "ongoing dialogue" with plaintiffs, the fact that "the University may not have acted as plaintiffs

---

[22] NYU cannot fully respond to allegations from the anonymous students represented by SAA— underscoring why SAA has no associational standing.  *See supra* Part I.B.  But as explained, none of these students has described actionable harassment that was known to and under the substantial control of NYU and to which it responded with deliberate indifference.  *See supra* at 28-37.

would prefer does not rise to 'deliberate indifference'"); *Mandel v. Board of Trustees of California State University*, 2018 WL 1242067, at \*19 (N.D. Cal. Mar. 9, 2018).

    **B.**    <u>**Plaintiffs Fail to Plausibly Allege That NYU Directly Discriminated Against Any of Them.**</u>

Finally, Plaintiffs cannot circumvent the "deliberate indifference" standard by refashioning allegations based on third-party harassment into a claim that NYU directly discriminated against them.  To proceed under a direct-discrimination theory, a plaintiff must plausibly allege that he or she was "treated differently from similarly situated students who are not members of the protected class."  *Koumantaros v. City Univ. of New York*, 2007 WL 840115, at \*8 (S.D.N.Y. Mar. 19, 2007).  That includes pleading that the school took some "adverse action" against him or her, such as dismissal or a suspension, *id.*, or a denial of readmission, *Freckleton v. Mercy Coll. NY*, 2023 WL 2648827, at \*11 (S.D.N.Y. Mar. 27, 2023); *Johnson v. NYU*, 2018 WL 3966703, at \*6 (S.D.N.Y. Aug. 20, 2018) (plaintiff must "suffer[] an adverse action in pursuit of [her] education by defendant").  Plaintiffs allege nothing of the sort.  Their allegations relate only to NYU's responses to the actions of *other* students or faculty, *see supra* at 8-11.[23]  But under Title VI, NYU cannot be liable for the "teacher or peer harassment of a student" unless it was deliberately indifferent to their discriminatory misconduct, *Zeno*, 702 F.3d at 665.  NYU was not, *see supra* Part III.A.2, and Plaintiffs cannot reframe such claims into one for direct discrimination, *Langadinos v. Appalachian Sch. of L.*, 2005 WL 2333460, at \*10 (W.D. Va. Sept. 25, 2005) ("omissions" in a defendant's response to third-party misconduct do not demonstrate the defendant's "intentional decision to discriminate").

---

[23] The FAC states that NYU "called Ingber into a disciplinary meeting" following her altercation with another student, based on her own violations of the student conduct code.  FAC ¶ 206.  It does not allege, however, that NYU has taken any adverse action against her in connection with those violations, nor allege any other facts that would suggest that disciplining Ingber for a "violation[] of the student code" was discriminatory, *id.* (quotations omitted).

In any event, even were a direct discrimination claim based on the sufficiency of a university's response to third-party conduct cognizable, Plaintiffs have not plausibly pled that NYU adopted a "double standard" in its response to alleged incidents of antisemitism compared to other forms of hate.  FAC ¶¶ 221-39.  NYU has regularly condemned antisemitism on its campus, *see supra* at 31-32, consistent with the statements Plaintiffs cite for other hate-based incidents, FAC ¶ 231-35.  Nor do Plaintiffs gain traction comparing disciplinary measures for students and teachers across different times and contexts.  Not only are comparisons unripe while investigations are ongoing, *see supra* Part II, Plaintiffs fail to plead any of the facts necessary to show that these individuals were "similarly situated in all material respects," including such relevant factors as disciplinary history for students, or tenure status for professors.  *Johnson*, 2018 WL 3966703, at *7.  These apples-to-oranges comparisons do not move the needle.

* * *

In all, the FAC reflects NYU's meaningful response to antisemitism and, when stripped of its dated and conclusory allegations, fails to allege anything approaching a Title VI violation.  The Court should dismiss each Plaintiff's Title VI claim under Rule 12(b)(6).

## IV.   THE COURT SHOULD DISMISS PLAINTIFFS' STATE AND CITY LAW CLAIMS UNDER RULE 12(B)(6) BECAUSE THEY FALL FAR SHORT OF STATING A CLAIM.

### A.   Plaintiffs Fail to State a Claim Under NYHRL § 296 and NYCRL § 40-c.

Plaintiffs' claims under NYHRL § 296 and NYCRL § 40-c fail for the same reasons as their Title VI claims.  These claims are subject to the same standard as analogous claims under federal discrimination laws.  *Tesoriero v. Syosset Cent. Sch. Dist.*, 382 F. Supp. 2d 387, 400 (E.D.N.Y. 2005); *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000).  New York courts therefore regularly dismiss these state discrimination claims where the plaintiff fails to plausibly allege a violation of federal discrimination law, and this Court should do the same.  *See,*

*e.g.*, *Padmanabhan v. N.Y. Inst. of Tech. Campus, N.Y.*, 2019 WL 4572194, at *5 (S.D.N.Y. Sept. 20, 2019); *Novio v. N.Y. Academy of Art*, 286 F. Supp. 3d 566, 580 (S.D.N.Y. 2017).

### B.      Plaintiffs Fail to State a Claim Under NYCHRL §§ 8-107(4), (17).

Plaintiffs' claims under NYCHRL fail for much the same reason.  Section 8-107(4) prohibits public accommodations from "treat[ing]" any person "less well" than others "because of a protected characteristic."  *Novio*, 286 F. Supp. 3d at 583-584.  Though Section 8-107(4), unlike Title VI, prohibits differential treatment even if not severe or pervasive, *Rothbein v. City of New York*, 2019 WL 977878, *9 (S.D.N.Y. Feb. 28, 2019), it still requires either direct discrimination, *Novio*, 286 F. Supp. 3d at 583, or "deliberate indifference," *Bernheim v. N.Y. City of Dep't of Education*, 2020 WL 3865119, at *5 (S.D.N.Y. July 9, 2020).  As explained, NYU's response to all harassment—regardless of whether it was severe or pervasive—went well beyond the federal floor, *see supra* Parts III.A.2 & B, which dooms Plaintiffs' Section 8-107(4) claim, too.

To bring a claim under Section 8-107(17), Plaintiffs must plausibly allege that "a policy or practice of a covered entity . . . results in a disparate impact to the detriment" of a "protected group."  *Id*.  The FAC, however, does not identify a specific facially-neutral policy or practice that has allegedly injured Jewish or Israeli students, let alone explain how that unknown policy caused a disparate impact.  *See Murillo-Roman v. Pension Bds. – United Church of Christ*, 2024 WL 246018, *11 n.5 (S.D.N.Y. Jan. 23, 2024); *United Prob. Officers Ass'n v. City of New York*, 2022 WL 875864, at *10 (S.D.N.Y. Mar. 24, 2022).

### C.      Plaintiffs Fail to State a Breach of Contract Claim.

Plaintiffs have also failed to state a cognizable claim for breach of contract against the University, as they fail to identify any "specifically designated and discrete promises" that could form the basis of such a claim.  *See Ward v. NYU*, 2000 WL 1448641, at *4 (S.D.N.Y. Sept. 28, 2000).  Plaintiffs cite, for instance, the University's "Missions, Values, and Learning Goals" for

"Student Conduct," which states that "students are expected to uphold their responsibilities to maintain a safe and productive campus community" and will be held accountable when University policies are violated, FAC ¶ 320, and the University's "Guidance and Expectations on Student Conduct," which explains that the University does not tolerate "any form of violence, threats, or intimidation," *id.*  But these sorts of "general promises about ethical standards" cannot form the basis of a breach-of-contract claim against a university. *See Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 207 (S.D.N.Y. 1998); *see also, e.g.*, *Nungesser*, 169 F. Supp. 3d at 370-71; *Ward*, 2000 WL 1448641, at \*4.  Indeed, even the *names* of these guidelines and statements ("Goals"; "Guidance") suggest that they are not the sort of "specifically designated and discrete promises" that can form the basis of a breach-of-contract claim.  *See Ward*, 2000 WL 1448641, at \*4.  Nor do they mandate "any specific outcome" for misconduct.  *See Nungesser*, 169 F. Supp. 3d at 371. On the contrary, they expressly afford the University discretion in determining how to approach discipline.  *See Ward*, 2000 WL 1448641, at \*5.  Plaintiffs cannot proceed with a breach-of-contract claim predicated on this sort of "broad and unspecified procedures and guidelines." *Id.* at \*4.

Likewise, Plaintiffs' claim for breach of the implied covenant of good faith "is duplicative of [their] breach of contract claim." *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 482 (S.D.N.Y. 2015).  This claim is based upon the same facts as their breach-of-contract claim—namely, allegations that "NYU selectively applies or enforces its [guidance], policies, and procedures in a bad faith and discriminatory way."  FAC ¶ 321.  Because "New York law 'does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing'" that is "based upon the same facts" as a plaintiff's breach-of-contract claim, this claim must be dismissed, too.  *See Nungesser*, 169 F. Supp. 3d at 372-73 (quotation omitted).

43

**D.**      **Plaintiffs Fail to State a Claim Under General Business Law §§ 349, 350.**

The Court should also dismiss Plaintiffs' attempt to transform a discrimination claim into consumer fraud.  To assert a claim under New York General Business Law § 349 or § 350, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Nungesser*, 169 F. Supp. 3d at 373.  The question of whether an act or practice is "objective," and such practices are "limited to those likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995); *see also Nungesser*, 169 F. Supp. 3d at 373 ("Practices courts have found to be deceptive include 'false advertising, pyramid schemes, deceptive preticketing" and the like).

Plaintiffs' allegations do not and cannot satisfy that standard.  To start, Plaintiffs claim that they were misled because they "believe[d] that NYU would apply, enforce, and follow the rules and policies, and the commitments contained" in its Student Handbook and other procedures and policies.  FAC ¶ 326.  But as explained, these claims are neither ripe, *see supra* Part II, nor plausibly pled, *see supra* Part III.  Independently, Plaintiffs do not point to any "consumer-oriented conduct" that is cognizable under Sections 349 and 350.  Consumer-oriented conduct must "have an impact on consumers generally" and does not include disputes that are "unique to the parties." *Harary v. Allstate Ins. Co.*, 983 F. Supp. 95, 98 (E.D.N.Y. 1997).  The allegations largely focus on their individual experiences and, notwithstanding their conclusory assertion to the contrary, FAC ¶ 325, do not involve conduct that impacted a large consumer group, *supra* at 8-11; *see also Nungesser*, 244 F. Supp. 3d at 373.  Nor do Plaintiffs cite any specific provision of the University's policies or procedures that is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Oswego*, 647 N.E.2d at 744.  The Court should reject this claim.

**V.   THE COURT SHOULD STRIKE PLAINTIFFS' REQUEST FOR DISCIPLINARY MEASURES AND TERMINATION OF UNIVERSITY EMPLOYEES.**

To the extent the Court concludes that this lawsuit is justiciable and that Plaintiffs have plausibly pled their claims, it should still strike, under Rule 12(f), Plaintiffs' request for specific disciplinary measures and the termination of University employees.

"Motions to strike serve 'to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters.'"  *Lokai Holdings LLC v. Twin Tiger USA LLC*, 306 F. Supp. 3d 629, 645 (S.D.N.Y. 2018) (quotations omitted).  Under Rule 12(f), a "court may strike from a pleading" any matter that is, *inter alia*, "immaterial" or impertinent," Fed. R. Civ. P. 12(f), including where the plaintiff requests a remedy that is not authorized by the statute under which the plaintiff seeks relief, *see, e.g.*, *Chacko v. Dynair Servs. Inc.*, 1998 WL 199866, at *2 (E.D.N.Y. Mar. 15, 1998); *Grandison v. U.S. Postal Serv.*, 696 F. Supp. 891, 896 (S.D.N.Y. 1988).

Here, Plaintiffs seek an injunction requiring specific disciplinary measures, including the termination of University employees and the suspension or expulsion of students, among other things.  *See* FAC, Prayer for Relief at A.  Title VI, however, does not create a "right to make particular remedial demands."  *Davis*, 526 U.S. at 648.  Indeed, the Supreme Court has cautioned courts against "second-guessing the disciplinary decisions made by school administrators," *id.* at 648, and the Second Circuit has explained that courts "must accord sufficient deference to the decisions of school disciplinarians," *Zeno*, 702 F.3d at 666.  Because "victims do not have a right to specific remedial measures" under Title VI, *id.*, the Court should strike Plaintiffs' request for disciplinary measures and termination.

**CONCLUSION**

For the foregoing reasons, the Court should grant the Motion to Dismiss under Rules 12(b)(1) and 12(b)(6) or, alternatively, to Strike under Rule 12(f)(1).

45

Dated:  March 18, 2024

Respectfully submitted,

*/s/ Daniel M. Petrocelli*
Daniel M. Petrocelli*
*Pro Hac Vice*
O'MELVENY & MYERS LLP
1999 Avenue of the Stars
8th Floor
Los Angeles, California 90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779
E-mail: dpetrocelli@omm.com

Daniel L. Cantor
Anton Metlitsky
Jennifer B. Sokoler
O'MELVENY & MYERS LLP
7 Times Square
30th Floor
New York, New York 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
E-mail: dcantor@omm.com
        ametlitsky@omm.com
        jsokoler@omm.com

*Counsel for Defendant New York University*