UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------------x
 BELLA INGBER, SABRINA MASLAVI,
NEVO YEMINI, AVIGAIL TEILER, and
STUDENTS AGAINST ANTISEMITISM, INC.,

                                          Plaintiffs,

                  -against--                                    1:23-cv-10023   (LAP)

NEW YORK UNIVERSITY,

                                          Defendant.
 -------------------------------------------------------------------------------------x

### MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE UNDER RULES 24(a0 and (b)

-

Jonathan Wallace
PO #728
Amagansett, NY 11930
917-359-6234
jonathan.wallace80@gmail.com
Attorney for Proposed Intervenors

1

# TABLE OF CONTENTS

Preliminary Statement

The Intervenors

The IHRA Standards

The Facts

Zero Tolerance

Argument

Point One--Plaintiffs Demand Adoption of the IHRA Standards as Law,
 in Disregard of the First Amendment

Point Two--Plaintiffs Ask This Court to Infringe the First Amendment

Point Three--Proposed Intervenors Meet the Rule 24 Criteria

Conclusion

**Table of Cases and Authorities**

*335-7 LLC v City of NY,* 2020 US Dist LEXIS 102425, at *8
(SDNY June 11, 2020)                                                                    p. 26

*Abdulhadi v. Wong,* 2019 U.S. Dist. LEXIS 139326 (ND Ca. 2019),               6 fn
*appeal dismissed,*  2022 U.S. App. LEXIS 11545 (9th Cir. 2022)

*Bair v. Shippensburg Univ.,* 280 F. Supp. 2D 357, 369 (M.D. Penn. 2003)        22

*Berutti v Wolfson,* 2023 US Dist LEXIS 14131, at *9, n 53                      26 fn
(DNJ Jan. 27, 2023, No. 2:22-CV-04661)

*Bursey v United States,* 466 F2d 1059, 1088 (9th Cir 1972)                     20 fn

*California Parents for the Equalization of Educ. Materials v Torlakson,*       23
 973 F3d 1010, 1016 (9th Cir 2020), *cert. den.*  141 S. Ct. 2583 (2021)

*College Republicans v. Reed,* 523 F. Supp. 2d 1005, 1011 (N.D. Ca. 2007)      22

*D.J.C.V. v. United States,* 605 F. Supp. 3d 571, 591 (SDNY 2022)              16

*Doe v Columbia Univ.,* 831 F3d 46, 57-58 (2d Cir 2016)                         9 fn

*Doyle v Nevada,* 2023 US Dist LEXIS 218504, at *11                            13 fn
 (D Nev June 9, 2023, No. 3:23-cv-00018-MMD-CSD)

*EEOC v. Local 638,* 2003 U.S. Dist. LEXIS 13190, *3 (SDNY 2003)              25

*Engdahl v. Kenosha*, 317 F.Supp. 1133 (E.D. Wis. 1970)                         19

*Fenner v News Corp.,* 2013 US Dist LEXIS 170187, at *47-48                     23
(SDNY Dec. 2, 2013)

 *Garcia v. Nursery,* 2023 U.S. Dist. LEXIS 222187, *8 (SDNY 2023)            25

*Hum. Servs. Council v City of NY,* 2022 US Dist LEXIS 178058, at *10          26
 (SDNY Sep. 29, 2022) *appeal withdrawn* 2022 U.S. App. LEXIS 35900 (2022)

*Johnson v Muelberger,* 340 US 581, 586, n 12 (1951)     26 fn

*Jones v. City of Philadelphia,* 893 A.2d 837, 844     21
(Commonwealth Ct. Pa. 2006), *appeal denied,* 589 Pa. 733 (2006)

*Koontz v. Watson,* 283 F. Supp. 3D 1007, 1022 (D. Kansas 2018)     22

*MANDELL v. COUNTY OF SUFFOLK & JOHN GALLAGHER,*     20
316 F.3d 368, 374 (2nd Cir. 2003)

*MPAA v. Spector,* 315 F.Supp. 824 (ED Pa. 1970)     20

*New York v United States Dept. of Educ.,*     24
477 F Supp 3d 279, 297 (SDNY 2020)

*New York ex rel. Am. Advisory Servs., LLC v. Egon Zehnder Int'l, Inc.,*
2022 U.S. Dist. LEXIS 125121, *7-8 (SDNY 2022)     25

*New York Times Co. v. Sullivan,* 376 U.S. 254, 265 (1964)     21

*Newman v Point Park Univ.,* 2022 US Dist LEXIS 60722, at *80, n 17
(WD Pa Mar. 31, 2022, No. 2:20-cv-00204)     23

*Payne v City of NY,* 27 F.4th 792, 801 (2d Cir 2022)     25

*Perry v. Schwarzenegger,* 591 F.3d 1126, 1139 (9th Cir. 2010)     22

*Rivera v. New York City Hous. Auth.,*
 1995 U.S. Dist. LEXIS 8617, *10 (SDNY 1995)     25

*Rosen v. Thornburgh,* 928 F.2d 528, 531 (2nd Cir. 1991)     21

*Reed v. Bryant,* 719 Fed. Appx. 771, 773-774 (10th Cir. 2017)     16

*Saxe v State Coll. Area Sch. Dist.,* 240 F3d 200, 206 (3d Cir 2001)     23

 *Seal v. Morgan,* 229 F.3d 567, 581 (6th Cir. 2000), *reh. denied,*
2000 U.S. App. LEXIS 34067 (6th Cir. 2000)     16

 *SEC v. Berman,* 2021 U.S. Dist. LEXIS 107221, *6  (SDNY 2021)     25

 *Shelley v. Kraemer,* 334 U.S. 1, 17-18 (1948)     22

*Swope v. Lubbers*, 560 F.Supp. 1328 (W.D. Mich. 1983)                              20

*Tappe v. Alliance Capital Mgmt. L.P.,* 177 F. Supp. 2D 176, 182  (SDNY 2001)       22

*T.E. v. Pine Bush Cent. Sch. Dist.,* 58 F. Supp. 3D 332, 341 (SDNY 2014)           20

*Thomas v Review Bd. of Indiana Empl. Sec. Div.,* 450 US 707, 715 (1981)            13 fn

*United States v. Buffalo,* 1985 U.S. Dist. LEXIS 21440, *4 (WDNY 1985)             25

*Yelling v. St. Vincent's Health Sys.,* 82 F.4th 1329, 1344-1345 (11th Cir. 2023)   22

**Preliminary Statement**

Proposed Defendants-Intervenors ("Intervenors")  file this Memorandum of Law in support of their Motion to Intervene to assure that critical issues in this case are fully addressed, particularly the definition of anti-Semitism applied by defendant New York University ("NYU") and the use of the International Holocaust Remembrance Alliance standards ("IHRA Standards") proposed by Plaintiffs and, at least to some extent, already implemented by NYU.

Without Intervenors' entry into and assertive participation in this matter,  critical issues of First Amendment protection and academic freedom will not be addressed before this Court. In today's extraordinary environment, universities, particularly private ones like NYU, are under unbearable pressure from Congress, right wing media, wealthy donors[1], and factions among students and alumni to institute viewpoint discrimination  and to differentiate between political speech in support of Israel which is deemed to be protected speech, and political speech criticizing Israel or supporting Palestinians ((which is equated to anti-Semitism and deemed per se unacceptable). Giving in to this pressure, NYU  now construes peaceful First Amendment-protected protest speech as anti-Semitic. For example, NYU has taken the position that accusing the state of Israel of committing "genocide" in Gaza is hate speech directed against the Jewish people.

 This very expansive and unconstitutional definition of anti-Semitism is exactly what the Plaintiffs are advocating by invoking the IHRA standards (paragraph 30 of the Amended Complaint): "Denying the Jewish people their right to self-determination, e.g., by claiming that the existence of a State of Israel is a racist endeavor"; "Applying double standards by requiring of [Israel] a behavior not

---

1   Intervenors will offer evidence at trial that NYU has in fact made reference in various administrative proceedings to mysterious "stakeholders" pressuring it to act against anti-Semitism, further impugning the neutrality and fairness of the process,  *Abdulhadi v. Wong,* 2019 U.S. Dist. LEXIS 139326 (ND Ca. 2019), *appeal dismissed,*  2022 U.S. App. LEXIS 11545 (9th Cir. 2022) ("Plaintiff has alleged a pattern of SFSU's reliance on anti-Palestinian outside donors for financial stability resulting in these donors have been able to pressure SFSU administrators, to stifle plaintiff's pro-Palestinian speech").

expected or demanded of any other democratic nation";  "Drawing comparisons of contemporary Israeli policy to that of the Nazis". It is disturbing if ironic that NYU has already gone quite far towards adopting the IHRA Standards, yet apparently not nearly far enough to satisfy the plaintiffs.

The issue here is not principally whether a private university could implement a speech code preventing students from, for example, comparing Israeli policy to that of the apartheid era in South Africa, or discussing Israeli discrimination against Arab citizens (thereby causing its own reputation for academic freedom great damage).  In this case, the Plaintiffs are going well beyond that, and asking this Court to intervene to establish an NYU speech code (as a matter of federal law) and to direct the censorship of First Amendment-protected speech at NYU.  Since this Court is a government actor, it is bound by the First Amendment, which forbids the grant of the very relief requested by Plaintiffs.

### The Intervenors

**Amene Husain** is a popular adjunct professor unceremoniously suspended and his courses canceled by NYU shortly before they were to begin for the spring semester. NYU then immediately issued a press release, still available on its web site, stating in full: "To be clear, Mr. Husain has been suspended and is not currently teaching any classes at NYU. All members of our community must adhere to the University's discrimination and anti-harassment policies; we investigate all complaints we receive and take appropriate action, which may include taking measures such as suspension." https://www.nyu.edu/about/news-publications/news/2024/january/statement-by-nyu-spokesperson-john-beckman-regarding-amin-husain.html

Professor Husain has a B.A. in Philosophy and Political Science, a J.D. from Indiana University School of Law, and an LL.M. from Columbia Law School.  He taught movement-generated theory and

practices of self-determination and decolonial aesthetics, which themselves comprise part of a critical field of intersectional and decolonial study. The two classes canceled at the last moment by NYU were *Justice Lab,* and *Art and the Practice of Freedom*.

Professor Husain is already, in the few months which have elapsed, an iconic victim of a new McCarthyism. He was not informed of any charges when suspended, but he has since been investigated by NYU's Office of Equal Opportunity for posts made years ago, not by him,  on a social media platform run by an art collective of which he is a member. These posts were First Amendment speech criticizing a nation-state, Israel, and supporting the Palestinian people. None were anti-Semitic. The harm to Professor Husain's reputation and career were proximately caused by NYU's adoption of the IHRA standards, conflating criticism of Israel with anti-Semitism.

Professor Husain is accused by name of anti-Semitism twice in the Complaint, once in paragraph 71, referencing statements he denies having made at an off campus demonstration, in Times Square, *eight years ago,[2]* and in paragraph 207, in connection with allegations of statements made by other protesters, again at an off campus demonstration, in November 2023. The Plaintiffs' allegations in the latter paragraph, that Professor Husain was "surrounded by....keffiyeh-obscured protesters" is emblematic of the profound Constitutional problems embodied in the entire Complaint. "The keffiyeh originated amongst Bedouins as a practical and protective covering for the head and face, especially in the arid desert climate in which they have traditionally lived, before adaptation as a symbol of Palestinian nationalism", https://en.wikipedia.org/wiki/Keffiyeh This language in the complaint is legally and ontologically indistinguishable from one referring to protesters wearing American flag scarves, and is a case study in the way the Complaint is pervaded by the Constitutional error inherent in

---

2  These statements, which have been circulating on the internet for years, have no connection to NYU and have not previously caused his students any concern or fear.  Plaintiffs use double or triple hearsay from anonymous or questionable sites, which weaponize accusations of anti-Semitism, as "evidence".  It is a sad historical moment, truly a new McCarthyism, in which NYU supports and encourages  these scurrilous, often anonymous attacks on academic freedom, as they have done here by suspending Professor Husain and canceling his courses.

the IHRA standards, in this case construing symbolic First Amendment-protected speech about Palestinian political aspirations as anti-Semitism.

Professor Husain has been deluged with death threats and threats of violence, and egregious hate speech, as a direct result of NYU's baseless suspension and Plaintiffs' false accusations that he is an anti-Semite.

Professor Husain's suspension, the cancellation of his classes, and the ensuing investigation into social media postings *by other people*, definitively answer the two most important criteria for Rule 24 intervention. He has already been grievously, in fact irreparably harmed, by the application of the unconstitutional IHRA standards implemented by NYU under the 2020 consent decree, which the Plaintiffs are asking this Court to declare the law of the land (effectively working a partial repeal of the First Amendment). Given Professor Husain's experience, any assertion by Plaintiffs or by NYU that NYU is adequately representing his interests in this case, or is capable of doing so, is not only false, but offensive.

NYU has in fact already complacently presented this Court with its press release about Professor Husain as purported proof it is acting aggressively against anti-Semitism (exhibit J to motion to dismiss).[3] If this Court persists in its surprising ruling from the bench on March 22, denying a motion to intervene which was not yet pending: the Plaintiffs will have been permitted to name him as an anti-Semite in the Complaint; NYU will have offered him as evidence that it is acting aggressively against anti-Semites; but this Court will have refused to listen to Professor Husain himself, thereby extending, exacerbating, and officially endorsing as state action, the suppression of Professor Husain's voice at NYU.

---

3    NYU's assertions, to this Court and on its website, that it is diligently rooting out anti-Semitism, raise an inference that actions and investigations such as that involving (and harming)  Professor Husain are mere public "virtue signaling" and lack substance,  *Doe v Columbia Univ.,* 831 F3d 46, 57-58 (2d Cir 2016) ("There is nothing implausible or unreasonable about the Complaint's suggested inference that the panel adopted a biased stance in favor of the accusing female and against the defending male varsity athlete in order to avoid further fanning the criticisms that Columbia turned a blind eye to such assaults").

**Andrew Ross** is a tenured NYU faculty member, Professor of Social And Cultural Analysis whose areas of research include "labor and work; urban and suburban studies; intellectual history; social and political theory; ecology and technology; cultural studies". https://as.nyu.edu/faculty/andrew-ross.html Professor Ross is chair of the local chapter of the American Association of University Professors, and has spoken, written and engaged in activism regarding Palestine.   The Complaint places him on a list of faculty committing "egregious acts of antisemitism" (paragraph 220) based on the following "evidence": he "spoke at the Walkout for Solidarity with Palestine, formed [Faculty for Justice in Palestine], and has supported BDS since the 1990s". A complaint filed against Professor Ross for speeches he made at a teach-in and a rally recently resulted in an interview with NYU's Office of Equal Opportunity. Such interviews have a chilling effect and leave NYU faculty questioning whether it is safe any longer to teach a nuanced history of the Middle East, or about colonialism.

**Rebecca Karl** is a tenured Professor of History at NYU, who has taught there for more than a quarter century. Her areas of research include modern Chinese history, social theory, gender theory and history, and political economics.  She is currently president of the NYU chapter of the American Association of University Professors (AAUP). Professor Karl says: "Disciplinary actions on the part of university administrations that defer to extremist definitions of antisemitism have already imposed a chill on our lecture halls and seminar rooms and on our educational mission more generally. Further deference will significantly impact how I shape my course curricula and discussions of the topic of colonialism, historical land and agrarian policies, and labor practices, and how I participate in larger

10

efforts to educate our students and community on issues of vital concern in our contemporary world. Because of a longstanding taboo against criticizing Israel's policies, I have heard that many colleagues already hesitate to assign texts or open discussion on topics of current and historical relevance. These forms of self-censorship will only intensify if institutional credence is given to the letter and spirit of the IHRA definition. My ability to host open and free discussions of Palestinian history, culture and politics in my own classes and for the university community more widely will be severely compromised."

Plaintiffs in their "Wherefore" clause request this Court to order NYU to perform "disciplinary measures, including the termination of, deans, administrators, professors, and other employees responsible for antisemitic discrimination and abuse, whether because they engage in it or permit it".[4]

## The IHRA Standards

IHRA, a NGO founded in 1998,  describes itself as deploying a "network of trusted experts [who] share their knowledge on early warning signs of present-day genocide and education on the Holocaust. This knowledge supports policymakers and educational multipliers in their efforts to develop effective curricula, and it informs government officials and NGOs active in global initiatives for genocide prevention". https://www.holocaustremembrance.com/about-us

Contrary to Plaintiffs' request for relief, the IHRA on its web site defines its standards as a "non-legally binding working definition". It also specifies that "criticism of Israel similar to that

---

4  The Court's statement from the bench on March 21 that harm to the Intervenors was merely "speculative" was not well taken.   In what already has all the dangerous signs of an enthusiastic new McCarthyism, the House Committee on Education and Workforce, utilizing the IHRA standards,  is sending "information letters" and now subpoenas to universities, demanding production of confidential disciplinary files regarding professors and students who criticize Israel, and has already forced the resignation of the U Penn and Harvard presidents for being too protective of academic freedom. Against this background, harm to professors' liberty and their careers is not speculative; it has started with a vengeance.  For a summary, see the undersigned's complaint in *Fakhreddine v. U Penn*  (ED Pa. 24-cv-1034).

leveled against any other country cannot be regarded as antisemitic".

https://www.holocaustremembrance.com/resources/working-definitions-charters/working-definition-antisemitism

Compare NYU's decision to hold students strictly liable-- to predetermine guilt-- for use of the word "genocide" with IHRA's own handbook for analyzing comparisons of other "mass atrocity crimes" with genocide or the Holocaust: "Does the choice of terms respect the historic particularity of each of the events that are being discussed?....Will different audiences understand a term in different ways? What background knowledge of the Holocaust, the Second World War, European history, or Jewish history is being assumed in your choice of terms?.... If you are translating terms into another language, are there any changes in meaning or tone? Should you consult with an expert in translation?" These are obviously recommendations for approaches to follow not in making laws but in critical thinking by nongovernmental actors-- or, as the organization itself states (above), which "support[] policymakers and educational multipliers in their efforts to develop effective curricula". A court using the above criteria to analyze a student's use of the word "genocide" in a flyer would obviously be engaging in flagrantly unconstitutional viewpoint discrimination under the First Amendment, intervening in nuances of First Amendment-protected speech about Israel and Palestine which it would not if the topic were, for example, speech about Russia and Ukraine. "IHRA Reflections on Terminology for Holocaust Comparison",

https://www.holocaustremembrance.com/resources/reports/terminology-holocaust-comparison

The stunning constitutional overbreadth and invalidity of the IHRA standards, and Plaintiffs' claims based on them, is also patent in their assumption that all Jewish people support Israel-- and the facile and immediate (and egregious) accusation of anti-Semitism levied against Jewish people who

criticize the state of Israel.[5]

Kenneth Stern, one of the drafters of the IHRA Standards, has since said: "It's not the definition that's the problem. It's the abuse of it....There was never any idea that this would be used as a de facto hate speech code on campus....[I]t sets up a system in which administrators have a reason to either condemn or try to suppress pro-Palestinian speech because their job is to keep the university from being sued under Title VI....A lot of this comes to whether anti-Zionism is anti-Semitism or not.... I don't like government putting its thumb on the scales inside of a debate inside the Jewish community....Do I think it's going to chill speech? Yeah, and I think that's the purpose. " Eric Cortelessa, "The scholar who wrote the definition of anti-Semitism says it's been subverted",   January 9, 2020 https://www.timesofisrael.com/the-scholar-who-wrote-the-definition-of-anti-semitism-says-its-been-subverted/

### The Facts

On December 11, 2019, then-president Donald Trump issued an "Executive Order on Combating Anti-Semitism", https://trumpwhitehouse.archives.gov/presidential-actions/executive-order-combating-anti-semitism/, which stated as follows:

"Sec. 2. Ensuring Robust Enforcement of Title VI. (a) In enforcing Title VI...all executive departments and agencies... charged with enforcing Title VI shall consider the following:

"(i) the non-legally binding working definition of anti Semitism adopted on May 26, 2016, by the International Holocaust Remembrance Alliance (IHRA), which states, 'Antisemitism is a certain

---

5   Plaintiffs therefore ask this Court to privilege one set of Jewish religious beliefs, involving a a God-granted right to the Holy Land, over the beliefs of other Jews who do not believe in such a right. The Court doing so would of course violate the Establishment Clause, *Doyle v Nevada,* 2023 US Dist LEXIS 218504, at *11 (D Nev June 9, 2023, No. 3:23-cv-00018-MMD-CSD) (Prison was alleged to "establish[] Orthodox/Rabbinic Judaism as a religious faith over that of Messianic Judaism"). "Intrafaith differences... are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences", *Thomas v Review Bd. of Indiana Empl. Sec. Div.,* 450 US 707, 715 (1981).

perception of Jews, which may be expressed as hatred toward Jews. Rhetorical and physical

manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their

property, toward Jewish community institutions and religious facilities'; and

"(ii) the 'Contemporary Examples of Anti-Semitism' identified by the IHRA, to the extent that any

examples might be useful as evidence of discriminatory intent.

"(b) In considering the materials described in subsections (a)(i) and (a)(ii) of this section, agencies shall

not diminish or infringe upon any right protected under Federal law or under the First Amendment."

      On September 19, 2020, NYU resolved Title VI Case No. 02-19-2174 with a "Resolution

Agreement" (available at www2.ed.gov) under which NYU voluntarily placed itself under the detailed

supervision of the Department of Education, which is responsible for administrative enforcement of

Title VI, which required that "the University will take appropriate action to address and ameliorate

discrimination and harassment based on shared ancestry and ethnic characteristics, including anti-

Semitism that involves student clubs".  In an October 5, 2020 news release, NYU said: "NYU agreed to

revise its policies to prohibit discrimination in line with section 2.a.i of the Executive Order on

Combating Anti-Semitism of December 11, 2019. As part of the agreement, we also agreed to prbhibit

discrimination on the bases of shared ancestry and ethnic characteristics, which would include anti-

Semitism....NYU will not use the examples of anti-Semitism cited in section 2.a.ii to implement its new

policies. Instead, it will devise its own examples to implement the new policies and, in a statement, will

affirm its long-held commitment to academic freedom and free speech". "Statement from NYU

Spokesman John Beckman About Resolution of DOE Review", https://www.nyu.edu/about/news-

publications/news/2020/october/JHBStatement_DOE_Review.html

      Israeli and other media reported at the time that "as a result of the settlement, NYU will use the

International Holocaust Remembrance Alliance's (IHRA) definition of antisemitism". Rachel Wolf,

"NYU adopts IHRA definition of antisemitism, settles antisemitism lawsuit", *Jerusalem Post* October 3, 2020 https://www.jpost.com/diaspora/antisemitism/nyu-dept-of-education-settle-antisemitism-lawsuit-with-student-644315

On March 10, President Linda Mills of NYU, defended the use of the IHRA standards in an email to Intervenor Rebecca Karl: "The IHRA definition has continued to be embraced by the Biden administration. It is used by the U.S. government, including in enforcement by the U.S. Department of Education that regulates all colleges and universities subject to Title VI, as well as the state of New York".

### "Zero Tolerance"

"The University has zero tolerance for any form of violence, threats, or intimidation. This includes, but is not limited to, using language advocating for killing people or groups of people, and all relevant synonyms (e.g. eradicate, destroy, massacre, exterminate, etc.)".  "NYU's Guidance and Expectations on Student Conduct", https://www.nyu.edu/students/student-information-and-resources/student-community-standards/nyu-guidance-expectations-student-conduct.html

NYU has apparently run its "zero tolerance" policy through the goalposts and into the next county. On information and belief, NYU president or general counsel sent a memorandum to staff conducting student disciplinary meetings, communicating a zero tolerance policy in any matters concerning support of Palestinians, and effectively tying their hands by depriving them of discretion to decide, based on information about facts, interactions and motives communicated in the meeting, to find the student not responsible or, in most cases, apply a lesser sanction than suspension. This of course constitutes a gross violation of the student procedural code and of due process, by prejudging guilt and making the student's explanations or defenses irrelevant.

NYU's implementation of a "zero tolerance" policy in response to perceived anti-semitism, has unfortunately resulted in sweeping within its ambit substantial speech which is mere political criticism and not anti-Semitic at all; caused NYU and its administrators not to listen to exculpatory information or examine the true complexity and nuances of many cases; and has resulted in outcomes that are arbitrary and capricious in their potential terrible impacts on studies and careers.

The phrase "zero tolerance" carries with it a lot of legal baggage. "Zero tolerance policies should shock the conscience of the court because of their devastating effects upon innocent students". *Reed v. Bryant,* 719 Fed. Appx. 771, 773-774 (10th Cir. 2017); *Seal v. Morgan,* 229 F.3d 567, 581 (6th Cir. 2000), *reh. denied,* 2000 U.S. App. LEXIS 34067 (6th Cir. 2000) ("We are also not impressed by the Board's argument that if it did not apply its Zero Tolerance Policy ruthlessly, ...this would send an inconsistent message to its students. Consistency is not a substitute for rationality"); *D.J.C.V. v. United States,* 605 F. Supp. 3d 571, 591 (SDNY 2022) ("[P]laintiffs have plausibly pled that the family separations pursuant to the Zero Tolerance policy violated their rights to both procedural and substantive due process").

 NYU itself has published scholarly work criticising zero tolerance policies. "Suspension and expulsion, the typical consequences demanded by zero-tolerance policies, disrupt a student's education by removing them from school. This disruption can often become a more permanent departure from education". Nina Passero, "THE IMPACT OF ZERO TOLERANCE POLICIES ON THE RELATION BETWEEN EDUCATIONAL ATTAINMENT AND CRIME", https://wp.nyu.edu/steinhardt-appsych_opus/the-impact-of-zero-tolerance-policies-on-the-relation-between-educational-attainment-and-crime/

NYU has in fact boasted on its web site, as of  November 30, 2023 , that, pursuant to zero tolerance,  "[t]o date, over 60 students have been involved in cases related to current events that have

been brought to our Office of Student Conduct (and related processes at the Law School)". "Executive

Summary: Updating our Community on the 10 Point Plan for Student Safety and Well-being",

 https://www.nyu.edu/about/leadership-university-administration/office-of-the-

president/comms/executive-summary-updating-our-community-on-the-10-point-plan.html#report

Although NYU has not released any specific data, students called to disciplinary meetings are reporting

that, with one exception, every case of which anyone has heard has resulted in suspension; also, no one

is aware of any disciplinary actions for Islamophobia, rampant at NYU today (and even in the

Complaint)-- nor has NYU spoken of any such cases. Finally, though the sample is relatively small, in

the majority of cases the undersigned has handled or heard about from colleagues, the student charged

with a violation has been non-white, including African Americans, Latinos, Arab people,   and Arab

Americans.


## ARGUMENT

### Point One

### Plaintiffs Demand Adoption of the IHRA Standards as Law, in Disregard of the First Amendment

 Plaintiffs make no attempt to conceal the extent to which they are asking this Court to decree

that the most  vague and overbroad elements of the IHRA Standards are the law of the land under Title

VI (with First Amendment completely ignored).[6] This Court, in its premature bench ruling on a motion

not yet filed, seemed to accept the premise that the IHRA standards are not central to the Plaintiffs'

case. This is false by their own admission. The Amended Complaint, after introducing the IHRA

standards at paragraph 30, then makes the following assertions:  "32. Anti-Zionism is discriminatory and

antisemitic when expressed in terms of, for example: applying double standards not applicable to other

---

6   Plaintiffs' counsel has stated in their two letters to the Court and in discussion at the March 21st conference their belief
    that the First Amendment has nothing to do with this case.

17

countries or peoples in assessing Israel's legitimacy and conduct; denying the Jewish people's right to self-determination or the right of the State of Israel to exist; denying that Israel has the right to self-defense against terrorism, invasion, or the murder, rape, and kidnapping of its citizens; accusing Israel of being inherently racist or comparable to the Nazis; or invoking classic antisemitic canards against Israel and its people. 'When people criticize Zionists,' Dr. Martin Luther King, Jr. explained, 'they mean Jews. You're talking antisemitism.

"33. The widespread anti-Israel hate that has gripped NYU and other colleges since October 7, 2023 confirms that anti-Zionism is antisemitism".

The Amended Complaint could not more clearly and centrally advance the theory, based on the IHRA standards, that First Amendment-protected criticism of Israel is anti-Semitic-- and that this Court should, as the essential relief requested in the Complaint, as a state actor formalize the requested partial repeal of the First Amendment.[7]

The Amended Complaint is pervaded everywhere with allegations targeting pure speech. "The so-called 'Palestinian Right to Return' is understood to be a call for the destruction of Israel" (paragraph 68); "[T]he NYU Politics Department, SJP, JVP, and the Young Democratic Socialists of America co-sponsored a talk entitled, 'The Time to Act is Now: A Talk and Open Discussion on the Urgent Situation in Gaza,'" (paragraph 76); " [T]hirty student groups pledged that their members would not apply to NYU's Tel Aviv program", alleging "Israel's targeted discrimination against activists and Palestinian and Muslim students"(paragraph 81); "[A] student graduation speaker... delegitimized Israel with the false accusation of 'apartheid'" (Paragraph 88);  "My professor compared the United States healthcare system to a  'concentration camp'" (Paragraph 91);  "They have accused Israel of:  'committing genocide' (even though the Arab population of Gaza has more than quadrupled since 1967); 'occupying

---

[7]   "Our constitutional tradition cannot tolerate an exception to the First Amendment simply because Palestinian human rights advocacy makes powerful listeners uncomfortable. The remedy for speech with which one disagrees is more speech, not enforced silence." https://palestinelegal.org/the-palestine-exception

Gaza' (even though Israel completely removed itself in 2005 from Gaza, which also shares a border with Egypt); 'targeting civilians' (even though Israel goes to great lengths to avoid civilian casualties while Hamas deliberately inflicts them); and 'apartheid' (even though, unlike virtually every other country in the Middle East, all citizens in Israel enjoy equal rights)" (paragraph 124)[8];   "'Free Palestine' [was] written on the ground" (paragraph 158)[9]; "The meeting was then interrupted by the sounds of students participating outside in the National SJP Walkout...  President Mills....said [that the protesters were engaging in 'free speech'" (Paragraph 190); "Professor Andrew Ross spoke at the Walkout for Solidarity with Palestine, formed F[aculty for] J[ustice in] P[alestine], and has supported BDS since the 1990s" (Paragraph 220). Plaintiffs, in opposing anti-Semitism, cast their net so wide it drags in numerous instances of obviously First Amendment protected speech, and then argue that President Mills has a duty to end all peaceful protest in and around campus, like the "walk out" sponsored by SJP, or to discipline or fire professors who criticize the political state of Israel, as many of the same individuals (Professor Ross, for example) once criticized South Africa.

By its own admission and its co-author's, the IHRA standards are a proposed private speech code, obviously not written (nor intended to be) with anywhere near the precision required for a statute. This will not be the first time in this country that laws have been implemented to enforce private speech

---

8   This paragraph deserves a second careful reading, as it makes no attempt to conceal the way in which Plaintiffs attempt to stack the deck. They make a number of assertions about political conditions in Israel which are highly debatable, and in fact questioned today not only by numerous Western countries and the United Nations, but by the United States government itself. While the evening news shows horrifying images of skeletal starving children in Gaza, against a flattened and splintered landscape, this paragraph asks the Court (without any First Amendment-protected discussion) to agree that "Israel goes to great lengths to avoid civilian casualties" (though more than 32,000 people have now died) and that "all citizens in Israel enjoy equal rights" (though Palestinians with Israeli citizenship have always complained of discrimination, and the present government is now retaliating against its Jewish citizens who oppose the war). However, Plaintiffs know that if the Court indiscriminately finds in their favor on these assertions, they are then secure in the claims which follow, that "Israel is killing too many civilians", or "Israel discriminates against some citizens", are necessarily anti-Semitic statements. The Court's uncritical acceptance of this manner of pleading would reward the Plaintiffs' project of creating a Palestinian exception to the First Amendment. And NYU is doing nothing to counter these assertions, as it has already implemented a Palestinian ex ception itself.  On a personal note, counsel, who is almost 70 years old, and has litigated a variety of controversial causes over four decades, does not recall a case where there was such a profound disconnect between the world-view given in a pleading and the actual conditions on the ground. Yet the "life of the law has not been logic—it has been experience", Oliver Wendell Holmes, *The Common Law* (1881) P. 1.
9   The phrase "Free Palestine"is invoked eight times in the Amended Complaint.

codes-- and been held unconstitutional. Various states passed legislation purporting to implement the private, and very subjective and vague, MPAA movie ratings, with predictable results, *MPAA v. Spector*, 315 F.Supp. 824 (ED Pa. 1970)  ("[H]owever well-intended, [the law] is so patently vague and lacking in any ascertainable standards and so infringes upon the  plaintiffs' rights to freedom of expression"); *Swope v. Lubbers*, 560 F.Supp. 1328 (W.D. Mich. 1983) ("[I]t is well-established that the Motion Picture ratings may not be used as a standard for a determination of constitutional status"); *Engdahl v. Kenosha*, 317 F.Supp. 1133 (E.D. Wis. 1970) ("[I]f the Motion Picture Association utilized any standards whatsoever in reaching its judgments as to what is an 'adult' movie, the defendants are not aware of what these standards are").

The IHRA standards are similarly a mysterious, subjective, confusing and contradictory private speech code, not ready for "prime time", for the role of a constitutional scalpel[10] tracing the line between discrimination and free speech.


A Lexis search of the term anti-Semitism turns up numerous cases considering specific acts, typically in the context of a discrimination claim: "When D.C. was in ninth grade, another student 'would constantly berate [D.C],' telling him that D.C.'s 'ancestors died in the Holocaust,' calling D.C. 'ashes,' and pantomiming the blowing of dust off his hands while telling D.C. that he was 'just ashes.' The same student would slap D.C. in the face as the student got off the bus and smirk at D.C.   Other students joined in this harassment, slapping D.C. in the face and telling him 'shut up, D., or I will burn you in an oven.' …. D.C. also witnessed students in the school cafeteria and classrooms performing 'Hitler salutes,' both to each other and to D.C.  *T.E. v. Pine Bush Cent. Sch. Dist.,* 58 F. Supp. 3D 332, 341 (SDNY 2014) (cleaned up). "He has repeatedly been a target of anti-Semitic remarks and taunting,

---

10 "When First Amendment interests are at stake, the Government must use a scalpel, not an ax". *Bursey v United States,* 466 F2d 1059, 1088 (9th Cir 1972).

such as being called 'that Jew'  and 'Jewboy' and being told that all Jews stick together, and was subjected to insulting and demeaning conduct by fellow officers.....Plaintiff claims also to have heard virulent anti-Semitic remarks directed at other Jews, such as 'f***ing Jews' and 'f***ing Jew lawyer'". *MANDELL v. COUNTY OF SUFFOLK & JOHN GALLAGHER,* 316 F.3d 368, 374 (2nd Cir. 2003). "ALJs allegedly made comments demonstrating overt animosity (e.g., Lee-Sang asking 'What's wrong with these [Jewish] people?' and Waltrous speaking of 'Jewish pig food')", *Jones v. City of Philadelphia,* 893 A.2d 837, 844 (Commonwealth Ct. Pa. 2006), *appeal denied,* 589 Pa. 733 (2006)  "Rosen also asserts that his counselors and instructors condoned the anti-semitic behavior of his DEA classmates. In particular, one trainee called Rosen a 'half-breed jew bastard' and made other religious slurs". *Rosen v. Thornburgh,* 928 F.2d 528, 531 (2nd Cir. 1991).

These cases all demonstrate what is uncontestably bias: de facto, prima facie, however you care to phrase it. And plaintiffs certainly have alleged instances of these kinds of interactions in their Complaint. However, they have also gone far beyond these to assert the IHRA Standards and claimed as evidence of anti-Semitism, as quoted above, that "[T]hirty student groups pledged  that their members would not apply to NYU's Tel Aviv program",  " 'Free Palestine' [was] written on the ground" or  "the sounds of students participating outside in the National SJP Walkout".  As a fundamental matter, "half-breed jew bastard" and "Free Palestine" are not the same-- ontologically, ethically or legally.

### Point Two

### Plaintiffs Ask This Court to Infringe the First Amendment

Although NYU is a private university, Plaintiff invokes the power of this Court to impose and enforce the full and over-inclusive sweep of the IHRA Standards against NYU (and Intervenors, by extension), while wholly disregarding the First Amendment. This it cannot do, *New York Times Co. v.*

*Sullivan,* 376 U.S. 254, 265 (1964)  ("Alabama courts....applied a state rule of law which petitioners claim to impose invalid restrictions on their constitutional freedoms of speech and press"); *Shelley v. Kraemer,* 334 U.S. 1, 17-18 (1948) (reviewing circumstances in which court orders in civil disputes are "state action of the sort prohibited by the Amendment's guaranties of freedom of discussion");  *Perry v. Schwarzenegger*, 591 F.3d 1126, 1139 (9th Cir. 2010) (Court enforcement of subpoena would violate First Amendment); *Yelling v. St. Vincent's Health Sys.,* 82 F.4th 1329, 1344-1345 (11th Cir. 2023) ("A court cannot enforce a law in a dispute between private parties if doing so requires it to impose invalid restrictions on [a person's] constitutional freedoms of   speech and press"; cleaned up);  *Tappe v. Alliance Capital Mgmt. L.P.,* 177 F. Supp. 2D 176, 182  (SDNY 2001) ("Thus, the Court, in interpreting the statute, becomes the 'government actor'").

In fact, the Constitutional over-breadth of the  IHRA Standards as already applied by NYU is already having a pernicious effect on Intervenors and other members of  the NYU community, as NYU increasingly takes the position, advanced by Plaintiffs,  that First Amendment-protected political speech may be punished merely because it is upsetting to others, like Plaintiffs, of contrary views.  But "the mere fact that someone might take offense at the content of speech is not sufficient justification for prohibiting it..... Thus, regulations that prohibit speech on the basis of listener reaction alone are unconstitutional....in the.... university setting", *Bair v. Shippensburg Univ.,* 280 F. Supp. 2D 357, 369 (M.D. Penn. 2003); *College Republicans v. Reed,* 523 F. Supp. 2D 1005, 1011 (N.D. Ca. 2007) ("[T]he goals and policies of a university, e.g., to promote respectful and reasoned discourse on issues of moment, might be in direct conflict with rights protected by the First Amendment, which can entitle people, in some settings, to express themselves in unreasoned, disrespectful and intensely emotional ways").

Implementation by this Court of the IHRA standards would legitimate and institutionalize the

viewpoint discrimination already informally being practiced by NYU, *Koontz v. Watson,* 283 F. Supp. 3D 1007, 1022 (D. Kansas 2018) (A "goal... to undermine the message  of those participating in a boycott of Israel...is either viewpoint  discrimination against the opinion that Israel mistreats Palestinians or subject matter discrimination on the topic of Israel. Both are impermissible goals under the First Amendment").

NYU's Office of Equal Opportunity has already asked professors to produce copies of their syllabi, an illegal demand in the context of a Title VI investigation, *California Parents for the Equalization of Educ. Materials v Torlakson,* 973 F3d 1010, 1016 (9th Cir 2020), *cert. den.*  141 S. Ct. 2583 (2021) ("Constitutional challenges to the content of curricula... must be adjudicated under...the First Amendment, not Equal Protection").

Plaintiffs are, whether intentionally or not, committing an egregious ontological error when they assert (in effect) that once you say the word "discrimination", you have definitively established you are *not* speaking about the First Amendment.[11] This case however is far from the first one in which federal courts have had to trace the boundaries (and contradictions) between discrimination law and the First Amendment, *Saxe v State Coll. Area Sch. Dist.,* 240 F3d 200, 206 (3d Cir 2001) ("But there is also no question that the free speech clause protects a wide variety of speech that listeners may consider deeply offensive, including statements that impugn another's race or national origin or that denigrate religious beliefs. When laws against harassment attempt to regulate oral or written expression on such topics, however detestable the views expressed may be, we cannot turn a blind eye to the First Amendment implications. Where pure expression is involved, anti-discrimination law "steers into the territory of the First Amendment" (cleaned up)); *Fenner v News Corp.,* 2013 US Dist LEXIS 170187, at *47-48 [SDNY Dec. 2, 2013) ("The Court recognizes the tension between the First Amendment protection of

---

11  The Court itself unfortunately at the March 21 conference appeared to be at risk of being drawn into the same error, for example when it said "Are you arguing that Title VI is unconstitutional?"

editorial decisions and Title VII's protection against a hostile work environment"); *New York v United States Dept. of Educ.,* 477 F Supp 3d 279, 297 (SDNY 2020) (DOE responsibility to enforce Title IX "consistent with the First Amendment").

Opposition to Israel's cruel war in Gaza is *not* anti-Semitism. "[T]his divergence of views on a matter of geopolitical debate and conflict does not, as the Plaintiff essentially posits, demonstrate as a matter of law unlawful discrimination against Plaintiff that violates Title VII", *Newman v Point Park Univ.*, 2022 US Dist LEXIS 60722, at *80, n 17 (WD Pa Mar. 31, 2022, No. 2:20-cv-00204).

### Point Three

### Proposed Intervenors Meet the Rule 24 Criteria

FRCP 24(a), "Intervention of Right",  states: "On timely motion, the court must permit anyone to intervene who:.... (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest". Intervenors' motion, made just weeks after the Complaint was filed, is clearly timely. Intervenors also obviously are already "impaired and impeded" by the  IHRA Standards, as advanced by Plaintiffs and already applied by NYU:  Professor Husain has been suspended and his courses canceled; Professor Ross has been the subject of a student complaint, and called in for an OEO investigation;  he and Professor Husain are both named in the Complaint as anti-Semites the plaintiffs are asking the Court to order the university to terminate; Professor Husain is named in the Motion to Dismiss as exemplary of NYU's efforts to investigate and punish its own people, to persuade this Court not to take over that effort; Professor Karl feels a profound chill in carrying out her teaching and research.  "It is clear that in this case all proposed intervenors have questions of law or fact in common with the [parties].  Rather

than confusing the action, their intervention adds factual variations which provide the court with a more complete understanding of the....claims", *Rivera v. New York City Hous. Auth.,* 1995 U.S. Dist. LEXIS 8617, *10 (SDNY 1995); *United States v. Buffalo,* 1985 U.S. Dist. LEXIS 21440, *4 (WDNY 1985); *EEOC v. Local 638,* 2003 U.S. Dist. LEXIS 13190, *3 (SDNY 2003).   *Payne v City of NY,* 27 F.4th 792, 801 (2d Cir 2022) is particularly of interest. The PBA was granted intervention as of right  to contest Plaintiffs' assertion that certain police behavior was unconstitutional: "The PBA seeks to contest the proposition that the challenged policies are unlawful and should be changed. The district court erred in denying intervention on the ground that this asserted interest amounts to a defense of unlawful policies".

Most importantly, it should be patently clear to this Court that NYU cannot and will not "adequately represent" Intervenors'  interests, *New York ex rel. Am. Advisory Servs., LLC v. Egon Zehnder Int'l, Inc.,* 2022 U.S. Dist. LEXIS 125121, *7-8 (SDNY 2022);  *Garcia v. Nursery,* 2023 U.S. Dist. LEXIS 222187, *8 (SDNY 2023); *SEC v. Berman,* 2021 U.S. Dist. LEXIS 107221, *6  (SDNY 2021). In 2020, NYU surrendered almost immediately in the face of a similar complaint, complacently accepting the  IHRA Standards and DOE supervision.   Today, NYU is putting all its time and energy into disciplining members of its community who express pro-Palestinian viewpoints, not defending their freedoms. NYU's overnight suspension of Professor Husain, its bragging on its website about having done so, and its remarkable reference to him in its motion to dismiss as proving it can carry out its own repression for disfavored speech, all make patently obvious that, despite its pious protestations, it not only lacks the ability, but any desire, to "defend" the Intervenors interests in this proceeding.

If this motion is not granted, this Court will not receive  any opposition to the  IHRA Standards.[12] NYU has now filed two versions of  a motion to dismiss, and does not even mention the

---

12  The spectacle of a case involving such a huge First Amendment issue, in which neither party even calls it to the Court's attention, establishes that the case is not being fully litigated without Intervenors. Both parties have an interest in finding Intervenors to be anti-Semites under the IHRA standards, and disagree only whether NYU has done so rapidly, effectively and cruelly enough. This case inevitably thus has an aura of being somewhat pre-arranged between the

First Amendment, or challenge the reach of the IHRA standards (which it consented to in 2020). Intervenors have made out a clear and compelling case they must be given leave to intervene as of right.

Out of an abundance of caution, Intervenors also note that, in the alternative, they meet (and exceed) the criteria for permissive intervention under Rule 24(b)(1)(b), that they have "a claim or defense that shares with the main action a common question of law or fact". Intervenors claim that the IHRA standards are vague, overbroad and barred by the First Amendment. Plaintiffs claim they are the law of the land under Title VI, and ask this Court, as a state actor, so to hold, a request NYU does not oppose. This Court should, in the alternative, exercise discretion to permit intervention, *Hum. Servs. Council v City of NY,* 2022 US Dist LEXIS 178058, at *10 (SDNY Sep. 29, 2022) *appeal withdrawn* 2022 U.S. App. LEXIS 35900 (2022) (Union intervenor shares question of "whether Local Law [87] is constitutionally sound and whether it is preempted by federal labor law"); *335-7 LLC v City of NY,* 2020 US Dist LEXIS 102425, at *8 (SDNY June 11, 2020) ('[T]here is no dispute that Proposed Intervenors' defenses share the same fundamental question of law with the main suit: the constitutionality of the RSL as amended in 2019"). "[C]ourts in this District routinely grant permissive intervention despite finding that an existing party adequately represents the proposed intervenor's interest", *Hum. Servs. Council v City of NY, supra,* at *11.

## CONCLUSION

It is respectfully respected that this Court grant the motion to intervene as of right.

Dated: Amagansett, NY
March 22, 2024

/s/ Jonathan Wallace

---

parties, like the Scopes trial, "largely a stunt to create publicity on the debate over teaching creationism in public schools", *Berutti v Wolfson,* 2023 US Dist LEXIS 14131, at *9, n 53 (DNJ Jan. 27, 2023, No. 2:22-CV-04661); or the foreign divorces of which the Supreme Court said that an important "interest may be foreclosed by an arranged litigation between the parties in which it was not represented", *Johnson v Muelberger,* 340 US 581, 586, n 12 (1951).

Jonathan Wallace
PO 728
Amagansett, N.Y. 11930
917- 359-6234
jonathan.wallace80@gmail.com
Attorney for Proposed Intervenors