**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------- X

BELLA INGBER, SABRINA MASLAVI,  :
NEVO YEMINI, AVIGAIL TEILER, and  :  Case No. 23-cv-10023-LAP
STUDENTS AGAINST ANTISEMITISM,  :
INC.,  :
 :
     Plaintiffs,  :
 :
   -against-  :
 :
NEW YORK UNIVERSITY,  :
 :
     Defendant.  :

------------------------------------------------------- X

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**<u>DEFENDANT'S MOTION TO DISMISS AND TO STRIKE</u>**

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

SUMMARY OF FACTS ....................................................................................... 6

ARGUMENT ......................................................................................................... 8

I.    PLAINTIFFS STATE A HOSTILE EDUCATIONAL ENVIRONMENT CLAIM
UNDER TITLE VI ........................................................................................ 9

    A.    Plaintiffs Sufficiently Allege Harassment .......................................... 10

    B.    Plaintiffs Sufficiently Allege Actual Knowledge ................................ 13

    C.    Plaintiffs Sufficiently Allege Deliberate Indifference .......................... 14

        1.    NYU's Conduct After October 7 Reinforces Its Deliberate
Indifference ............................................................................ 15

        2.    NYU's Supposed Remedial Measures Are Not Reasonably Calculated
to Remedy Antisemitism......................................................... 17

        3.    NYU Can Uphold Its Obligations Under Federal Law and Safeguard
Academic Freedom ................................................................. 20

    D.    Plaintiffs Sufficiently Allege Substantial Control ................................ 22

II.    PLAINTIFFS STATE DIRECT DISCRIMINATION CLAIMS UNDER TITLE VI..... 25

III.    PLAINTIFFS ADEQUATELY ALLEGE STATE AND LOCAL LAW CLAIMS ........ 26

    A.    Plaintiffs Sufficiently Plead City and State Discrimination Claims ..................... 26

    B.    Plaintiffs Sufficiently Plead a Breach of Contract Claim ..................... 27

    C.    Plaintiffs Sufficiently Plead Claims for Consumer Fraud .................... 28

IV.    THE COURT HAS SUBJECT MATTER JURISDICTION........................................... 29

    A.    Plaintiffs Have Standing to Pursue Injunctive Relief and SAA Has
Associational Standing........................................................................ 30

        1.    Plaintiffs Properly Allege Ongoing and Future Injury-in-Fact ................ 31

        2.    Plaintiffs Sufficiently Allege that NYU's Continuing Deliberate
Indifference Will Cause Future Injury..................................... 34

3.  SAA Is a Genuine Membership Organization That Has Standing to Sue ............................................................................................................... 35

B.  Plaintiffs' Claims Are Ripe ............................................................................... 39

1.  Plaintiffs' Claims Are Fit for Review ...................................................... 40

2.  This Case Will Not Impose Hardship on NYU ........................................ 42

V.  NYU'S MOTION TO STRIKE SHOULD BE DENIED ................................................. 44

CONCLUSION ................................................................................................................................. 44

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Amadei v. Nielsen*,
348 F. Supp. 3d 145 (E.D.N.Y. 2018) ....................................................................32

*Archibald v. Marshalls of MA, Inc.*,
2009 WL 3817404 (S.D.N.Y. Nov. 12, 2009) ...........................................................9

*Ass'n of Car Wash Owners Inc. v. City of New York*,
911 F.3d 74 (2d Cir. 2018) ....................................................................................30

*Bailey v. N.Y. Law Sch.*,
2017 WL 835190 (S.D.N.Y. Mar. 1, 2017) ............................................................28

*Banks v. Gen. Motors, LLC*,
81 F.4th 242 (2d Cir. 2023) ...................................................................................11

*Bano v. Union Carbide Corp.*,
361 F.3d 696 (2d Cir. 2004)....................................................................................37

*Barnett v. Johnson City Sch. Dist.*,
2005 WL 8178066 (N.D.N.Y. Feb. 2, 2005) .......................................12, 19, 20, 37

*Bldg. & Const. Trades Council v. Downtown Dev., Inc.*,
448 F.3d 138 (2d Cir. 2006)....................................................................................36

*Blunt v. Lower Merion School District*,
767 F.3d 247 (3d Cir. 2014)....................................................................................37

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm.*,
89 F.4th 46 (1st Cir. 2023)......................................................................................37

*Brown v. Arizona*,
82 F.4th 863 (9th Cir. 2023) ...................................................................................24

*Carabello v. NYC Dep't of Educ.*,
928 F. Supp. 2d 627 (E.D.N.Y. 2013) ....................................................................11

*Carter v. HealthPort Techs., LLC*,
822 F.3d 47 (2d Cir. 2016).........................................................................29, 33, 34

*Clapper v. Amnesty International USA*,
568 U.S. 398 (2013)................................................................................................31

*Crandell v. N.Y. Coll. of Osteopathic Med.*,
    87 F. Supp. 2d 304 (S.D.N.Y. 2000).................................................................10, 13

*Crawford v. Nat'l R.R. Passenger Corp.*,
    2015 WL 8023680 (D. Conn. Dec. 4, 2015)...................................................12

*Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
    526 U.S. 629 (1999)...............................................................................19

*Democratic Cong. Campaign Comm. v. Kosinski*,
    614 F. Supp. 3d 20 (S.D.N.Y. 2022)...........................................................32

*Do No Harm v. Pfizer Inc.*,
    96 F.4th 106 (2d Cir. 2024) ....................................................................38

*Doe v. Sacks*,
    2024 WL 402945 (S.D.N.Y. Feb. 2, 2024)..........................................15, 25, 41

*Doe v. Sarah Lawrence*,
    453 F. Supp. 3d 653 (S.D.N.Y. 2020)........................................................27

*Doe v. Univ. of Tenn.*,
    186 F. Supp. 3d 788 (M.D. Tenn. 2016).....................................................31

*Doe v. Yeshiva Univ.*,
    2023 WL 8236316 (S.D.N.Y. Nov. 28, 2023)..............................................27

*E.E.O.C. v. Lafond*,
    2009 WL 803150 (E.D.N.Y. Mar. 25, 2009) ..............................................10

*Eccleston v. Pine Bush Cent. Sch. Dist.*,
    2013 WL 12444443 (S.D.N.Y. Jan. 8, 2013) ..............................................26

*Emps. Committed for Just. v. Eastman Kodak Co.*,
    407 F. Supp. 2d 423 (W.D.N.Y. 2005) ......................................................38

*Evans v. SSN Funding, L.P.*,
    2017 WL 3671180 (S.D.N.Y. Aug. 23, 2017)..............................................29

*Feminist Majority Fund v. Hurley*,
    911 F.3d 674 (4th Cir. 2018) ..................................................................24

*Glob. Art Exhibitions, Inc. v. Kuhn &*
*Bülow Italia Versicherungsmakler GmbH*,
    607 F. Supp. 3d 421 (S.D.N.Y. 2022)........................................................29

*Goel v. Bunge, Ltd.*,
    820 F.3d 554 (2d Cir. 2016)................................................................9, 16

*In re Google*,
    627 F. Supp. 3d 346 (S.D.N.Y. 2022)....................................................................31

*Graham v. Long Island R.R.*,
    230 F.3d 34 (2d Cir. 2000)................................................................................25

*Green v. Jacob & Co. Watches, Inc.*,
    248 F. Supp. 3d 458 (S.D.N.Y. 2017)................................................................27

*Gregory v. Daly*,
    243 F.3d 687 (2d Cir. 2001)................................................................................9

*Hesse v. Godiva Chocolatier, Inc.*,
    463 F. Supp. 3d 453 (S.D.N.Y. 2020)................................................................29

*Hosp. Council of W. Pa. v. City of Pittsburgh*,
    949 F.2d 83 (3d Cir. 1991)................................................................................38

*Howley v. Town of Stratford*,
    217 F.3d 141 (2d Cir. 2000)..............................................................................12

*Hunt v. Washington State Apple Advertising Comm'n*,
    432 U.S. 333 (1977)..........................................................................................36

*Johnson v. Bryson*,
    851 F. Supp. 2d 688 (S.D.N.Y. 2012)................................................................43

*Joseph S. v. Hogan*,
    561 F. Supp. 2d 280 (E.D.N.Y. 2008) ...............................................................37

*Kamen v. AT&T Co.*,
    791 F.2d 1006 (2d Cir. 1986)............................................................................41

*Kaperak v. N.Y.S. Dep't of Corr. & Cmty. Supervision*,
    2022 WL 682633 (W.D.N.Y. Mar. 8, 2022)......................................................12

*Koch v. Greenberg*,
    14 F. Supp. 3d 247 (S.D.N.Y. 2014)..................................................................28

*Koumantaros v. City Univ. of N.Y.*,
    2007 WL 840115 (S.D.N.Y. Mar. 19, 2007) ............................................ *passim*

*Leibovitz v. N.Y.C. Transit Auth.*,
    252 F.3d 179 (2d Cir. 2001)........................................................................11, 12

*Lipsky v. Commonwealth United Corp.*,
    551 F.2d 887 (2d Cir. 1976)..............................................................................44

*Little v. Nat'l Broad. Co.*,
  210 F. Supp. 2d 330 (S.D.N.Y. 2002) ................................................................10

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ...........................................................................................32

*Lulac Councils 4433 & 4436 v. City of Galveston*,
  942 F. Supp. 342 (S.D. Tex. 1996) ....................................................................37

*Marsh & McLennan Agency LLC v. Williams*,
  2023 WL 4534984 (S.D.N.Y. July 13, 2023) .....................................................41

*Melendez v. City of New York*,
  16 F.4th 992 (2d Cir. 2021) ...............................................................................9

*Minto v. Molloy Coll.*,
  2021 WL 1394329 (E.D.N.Y. Jan. 21, 2021) ...............................................25, 26

*Moukengeschaie v. Eltman, Eltman & Cooper, P.C.*,
  2016 WL 1274541 (E.D.N.Y. Mar. 31, 2016) .................................................9, 16

*J.S. ex rel. N.S. v. Attica Cent. Schs.*,
  386 F.3d 107 (2d Cir. 2004) ...............................................................................30

*New York v. Pa. Higher Educ. Assistance Agency*,
  2020 WL 2097640 (S.D.N.Y. May 1, 2020) ......................................................43

*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*,
  875 F.3d 107 (2d Cir. 2017) ...............................................................................28

*Nungesser v. Columbia University*,
  244 F. Supp. 3d 345 (S.D.N.Y. 2017) ..........................................................11, 15

*NYCLU v. Grandeau*,
  528 F.3d 122 (2d Cir. 2008) ...............................................................................40

*Peters v. Molloy Coll. of Rockville Ctr.*,
  2008 WL 2704920 (E.D.N.Y. July 8, 2008) .......................................................28

*Plaintiffs #1-21 v. County of Suffolk*,
  2021 WL 11629176 (E.D.N.Y. Aug. 5, 2021) ....................................................33

*Playboy Enters.* v. *Pub. Serv. Comm'n*,
  906 F.2d 25 (1st Cir. 1990) .................................................................................38

*Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*,
  10 F.4th 87 (2d Cir. 2021) ..................................................................................39

*Robinson v. Blank*,
    2013 WL 2156040 (S.D.N.Y. May 20, 2013) ................................................................40, 42

*Roche Cyrulnik Freedman LLP v. Cyrulnik*,
    582 F. Supp. 3d 180 (S.D.N.Y. 2022)................................................................................29

*Roe v. St. John's University*,
    91 F. 4th 643 (2d Cir. 2024) ............................................................................................11

*Ronzani v. Sanofi S.A.*,
    899 F.2d 195 (2d Cir. 1990)..............................................................................................44

*Roskin-Frazee v. Columbia University*,
    474 F. Supp. 3d 618 (S.D.N.Y. 2019)..................................................................15, 16, 24

*Ross v. Bank of Am., N.A.(USA)*,
    524 F.3d 217 (2d Cir. 2008)..............................................................................................40

*Santiago v. ACACIA Network, Inc.*,
    634 F. Supp. 3d 143 (S.D.N.Y. 2022)................................................................................27

*Saxe v. State Coll. Area Sch. Dist.*,
    240 F.3d 200 (3d Cir. 2001)..............................................................................................21

*Schwapp v. Town of Avon*,
    118 F.3d 106 (2d Cir. 1997)........................................................................................11, 12

*SEC v. Fiore*,
    416 F. Supp. 3d 306 (S.D.N.Y. 2019)................................................................................23

*Shain v. Ellison*,
    356 F.3d 211 (2d Cir. 2004)..............................................................................................31

*Silva v. Farrish*,
    47 F.4th 78 (2d Cir. 2022) ................................................................................................30

*Simmonds v. I.N.S.*,
    326 F.3d 351 (2d Cir. 2003)..............................................................................................40

*Soule v. Conn. Ass'n of Schs., Inc.*,
    90 F.4th 34 (2d Cir. 2023) ..........................................................................................32, 34

*Strujan v. Lehman College*,
    2008 WL 11422126 (S.D.N.Y. Aug. 12, 2008)................................................................11

*Students for Fair Admissions, Inc. v.*
    *President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023)..........................................................................................................35

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ................................................................39, 43

*T.E. v. Pine Bush Cent. Sch. Dist.*,
    58 F. Supp. 3d 332 (S.D.N.Y. 2014) ................................... *passim*

*TC v. Valley Cent. Sch. Dist.*,
    777 F. Supp. 2d 577 (S.D.N.Y. 2011) ..........................9, 14, 17

*United States v. Apple Inc.*,
    992 F. Supp. 2d 263 (S.D.N.Y. 2014) ........................................33

*United States v. N.Y.C. Dep't of Educ.*,
    407 F. Supp. 3d 365 (S.D.N.Y. 2018) ........................................33

*Utah Physicians for a Healthy Env't v. Diesel Power Gear LLC*,
    374 F. Supp. 3d 1124 (D. Utah 2019) ........................................34

*Vega v. Hempstead Union Free Sch. Dist.*,
    801 F.3d 72 (2d Cir. 2015) ........................................................25

*Wahba v. New York Univ.*,
    492 F.2d 96 (2d Cir. 1974) ........................................................20

*Warth v. Seldin*,
    422 U.S. 490 (1975) ...................................................................36

*Washington Legal Found. v. Leavitt*,
    477 F. Supp. 2d 202 (D.D.C. 2007) ....................................35, 36

*Wiwa v. Royal Dutch Petrol. Co.*,
    626 F. Supp. 2d 377 (S.D.N.Y. 2009) ......................................29

*Zeno v. Pine Plains Cent. Sch. Dist.*,
    703 F.3d 655 (2d Cir. 2012) .................................................. *passim*

## Constitutional Provisions and Statutes

U.S. Const. amend. I ....................................................................20, 40

42 U.S.C. § 2000d et seq. ........................................................ *passim*

New York City Hum. Rights L. § 8-107 ....................................26, 27

New York Civ. Rights L. § 40-c ......................................................26

New York Exec. L. § 296 ................................................................26

New York Gen. Bus. L. § 349 ..........................................................28

**Rules**

Fed. R. Civ. P. 12(b)(1)...................................................................................................29, 30

Fed. R. Civ. P. 12(b)(6)...............................................................................................9, 16, 30

Fed. R. Civ. P. 12(f)...........................................................................................................44

Fed. R. Civ. P. 15...............................................................................................................44

Fed. R. Civ. P. 53........................................................................................................33, 34

Fed. R. Civ. P. 56..............................................................................................................9

**Other Authorities**

*"Dear Colleague" Letter on Shared Ancestry* (Nov. 7, 2023),
   https://www2.ed.gov/about/offices/list/ocr/letters/colleague-202311-
   discrimination-harassment-shared-ancestry.pdf ....................................................20

Holocaust Encyclopedia, *University Student Groups in Nazi Germany*,
   https://encyclopedia.ushmm.org/content/en/article/university-student-groups-
   in-nazi-germany ......................................................................................................5

Romina Ruiz-Goiriena, *Hamas and Iran Celebrate Anti-Gaza War Protests
   Taking US Colleges by Storm*, USA Today (Apr. 25, 2024 11:28 a.m.) ..................5

Plaintiffs respectfully submit this memorandum of law in opposition to the motion of defendant New York University ("NYU") to dismiss and to strike.[1]

## PRELIMINARY STATEMENT

NYU's arguments could hardly be more disingenuous. Antisemitism is sweeping our country's college campuses. In the wake of the worst attack on Jews since the Holocaust—Hamas's murder, rape, and kidnapping of hundreds of Israelis on October 7, 2023—college students and faculty at NYU and other campuses are rallying to celebrate Hamas, a U.S.-designated terrorist organization. Jewish students are being assaulted, met with genocidal chants—"Globalize the Intifada,"[2] "Zionism is racism," "Jews are settler colonialists," "Jewish civilization isn't indigenous to the land of Israel," "from the river to the sea Palestine will be free [of Jews]," "Hitler was right," "gas the Jews," "death to kikes," "go back to the gas chambers," "I bet your bubbie's matzah balls suck dick" and "get the fuck out of here, you dirty fucking Jew"—and threatened with rape. ¶¶ 3, 101, 129-31, 133, 147, 151, 169, 194-95, 207. Plaintiffs' complaint includes detailed allegations of years of antisemitic harassment, abuse, and invidious double standards targeting Jewish students at NYU, culminating in an even more egregiously hostile environment since the October 7 massacre. No other student group in recent memory has been made to live in such fear.

---

[1] Submitted herewith in opposition to the motion is the Declaration of Joshua E. Roberts ("Roberts Decl."), the Declaration of Bella Ingber ("Ingber Decl."), and the Declaration of SAA Member #2 ("Member Decl."), each dated April 29, 2024. "Ex. _" refers to exhibits to the Roberts Decl. Capitalized terms not defined herein have the meanings ascribed to them in the amended complaint ECF No. 25 ("complaint," cited herein as "¶ _"). "Plaintiffs" refers to Bella Ingber, Sabrina Maslavi, Nevo Yemini, Avigail Teiler, and the Students Against Antisemitism, Inc. ("SAA") members referred to in the complaint. "Mem." refers to NYU's memorandum of law in support of its motion. ECF Nos. 38, 42. All emphases added unless otherwise noted.

[2] The Intifadas were murderous campaigns in 1987 to 1993 and 2000 to 2005 of suicide bombings and shootings against Israeli civilians in buses, cafes, pizza shops, markets, and Passover Seders. ¶¶ 35, 71.

Meanwhile, seeking to evade all accountability for having facilitated the very antisemitism that has robbed plaintiffs and other Jewish students at NYU of their educational experience, NYU argues: that any antisemitism that plaintiffs experienced was comprised of "discrete," "isolated or disparate" incidents that would not be sufficiently "severe or pervasive to support a hostile environment claim" Mem. 8, 27; that, in any event, this lawsuit should be dispensed with because the University supposedly has a "10 Point Plan" to deal with antisemitism and its "efforts are working"; and that, as a result, plaintiffs lack standing to bring their claims, which NYU says are not ripe. Mem. 2, 14, 22, 32. Moreover, as Jewish students live in fear for their physical safety, NYU insists that *it* is the victim because allowing this civil rights lawsuit to proceed would impose an "exceptional hardship on NYU" by interfering with its "flexibility to function." *Id*. 24-25.

NYU's efforts to minimize the nature and extent of the antisemitism on its campus and to exaggerate the substance and efficacy of its purported efforts against antisemitism are contrived, groundless and, frankly, shameful. The complaint sets forth in detail the intensifying of NYU's pervasive hostile education environment—including no fewer than forty egregiously antisemitic incidents lasting for days or weeks—just in the four months between October 7 and the filing of the amended complaint. To assert, as NYU does, that such incidents are too "isolated" or "discrete" or "disparate" that they do not deserve redress is false and insulting to the Jewish student victims.

In addition, the University's response has been wholly and woefully insufficient. First, it is inconceivable that NYU would have permitted any other group to be targeted like this in the first place—it would not have insisted on "flexibility"; it would not have come up with amorphous "plans"; rather, it would have cracked down after the first epithet. And, in saying that its efforts are "working," and therefore that it has not been deliberately indifferent to antisemitism, NYU misstates the law and impermissibly relies on statements of purported fact. NYU even cites

unverified statistics purportedly showing that antisemitism complaints have declined, but those statistics could just as easily mean the opposite—that Jewish students have given up complaining because NYU has been so indifferent, or they fear retaliation in an increasingly hostile environment. Rather than support NYU's motion to dismiss, at most these purported facts raise myriad issues of fact that can be resolved only after discovery.

In fact, as the complaint makes clear, NYU cannot be trusted to carry out its purported plans to fight antisemitism. NYU for years has enabled pervasive antisemitism to fester, it selectively decides not to enforce its own policies governing student and faculty conduct when the targets are Jewish students, and has already failed to comply with its obligations under its 2020 agreement with the U.S. Department of Education's Office of Civil Rights ("OCR") in which it ostensibly committed to address antisemitism on its campus. In the face of rampant antisemitism on campus, NYU's response has ranged from nonexistent to ineffective.

In short, there is no "trust-us, we're-fixing-it" defense, a defense which, if available, would eviscerate Title VI, but especially so given that there is no end in sight to the intensifying antisemitism, as confirmed by the latest events—including NYU's faculty assembling *en masse* to try to prevent the police from clearing out an antisemitic encampment at NYU, and now the reestablishment of the encampment nearby. NYU's Jewish students, like any other victims of discrimination, do not have the luxury of giving NYU still more time to "fix" a problem it has permitted to fester and intensify. The law is clear that a school is deliberately indifferent to harassment where, as here, it has delayed its response, taken measures that were "little more than halfhearted" or "ignored the many signals that greater, more directed action was needed." *Zeno v. Pine Plains Cent. Sch. Dist.*, 703 F.3d 655, 669 (2d Cir. 2012) (affirming jury verdict under Title

VI, even though the defendant school had taken numerous remedial measures, including, among others, suspending offending students).

To fully appreciate how specious NYU's argument is and how empty NYU's pieties are, one need only imagine (or review NYU's history to see) what NYU's response would have been (or has been) if even a tiny fraction of the abuse NYU's Jewish students have endured had been directed against any other protected group. NYU would not have asked for "flexibility"—it would not have stood for the harassment for one minute. For example, it is impossible to conceive of NYU arguing to the Court "trust us, we're fixing" campus-wide, continuous, months'-long onslaughts against any other protected group. It is just as impossible to conceive of NYU arguing in a case brought by members of any other group that it should be dismissed because they were not personally present at enough of the onslaughts for the hostile campus-wide educational environment to have adversely affected them.

So-called "academic freedom" is also not an excuse—as plaintiffs also allege, ¶¶ 7, 124, 221-239, when it comes to discrimination against other groups, NYU does not give a fig for academic freedom. If faculty members need to be disciplined or dismissed to stop them from creating or contributing to the anti-Jewish hostile educational environment on NYU's campus, then that is what Title VI requires. If, on the other hand, NYU does not wish to comply with Title VI, if it wants its faculty and students to have the "academic freedom" to spew antisemitism, its path is clear—forego receiving federal taxpayer funds and return the funds it has received.

Nor is it an excuse to say that the antisemitism at NYU is really anti-Zionism or mere political disagreement with policies of Israel. Plaintiffs do not seek to deny anyone the right to criticize Israeli policies. But no other country or people in the world—including countries such as China, Syria, Sudan, Turkey, and the list goes on and on—has been subjected to anything close to

the kind of abuse on NYU's campus as Israel, abuse which goes far beyond mere political disagreements to the denial of its very right to exist and to defend itself, notwithstanding that those other countries have killed far more civilians and have "displaced" and violated the rights of far more people (including Arabs and Muslims) than Israel. As the Obama, Trump, and Biden administrations have recognized, what the campus mobs are doing is antisemitism, plain and simple. Even more outrageous is NYU's failure, in violation of Title VI, to put an end to the antisemitic abuse.

On German university campuses, during the 1930s, "[p]aramilitary student groups often interrupted lectures, provoked skirmishes, and physically intimidated Jewish students in actions tolerated by university administrations and encouraged by the Nazi party."[3] Now, at NYU and other American campuses, organized and disciplined mobs of supporters of the terrorist militia Hamas are disrupting campus life and harassing Jewish students in actions tolerated and enabled by university administrations. And their efforts are being encouraged by the leading murderous antisemites in the world today, the modern-day Nazis—Hamas and Iran's Ayatollah Khamenei.[4] This must be stopped now.

At an absolute minimum, all of NYU's purported defenses numerous issues of fact which cannot be resolved on a motion to dismiss. As shown further below, NYU's motion should be denied in its entirety.

---

[3]   Holocaust Encyclopedia, *University Student Groups in Nazi Germany*, https://encyclopedia.ushmm.org/content/en/article/university-student-groups-in-nazi-germany.

[4] Romina Ruiz-Goiriena, *Hamas and Iran Celebrate Anti-Gaza War Protests Taking US Colleges by Storm*, USA Today (Apr. 25, 2024 11:28 a.m.), https://www.usatoday.com/story/news/politics/2024/04/24/hamas-iran-support-college-protests/73447123007.

## SUMMARY OF FACTS

NYU has had a longstanding antisemitism problem and years to implement effective measures to cure it. ¶¶ 65-98. However, NYU has failed to do so and has even breached the commitments it specifically made to OCR four years ago to address the problem to resolve a Jewish student's complaint against NYU with OCR alleging violations of her civil rights, ¶ 93, arising from pervasive antisemitic incidents at NYU, such as the April 2018 disruption by members of the NYU chapter of the national organization Students for Justice in Palestine ("SJP") of a student-organized celebration of Israel's Independence Day in Washington Square Park, by among other things, intimidating and assaulting Jewish students, ¶¶ 77-80, and the December 2018 closure of the campus Jewish center forced by an NYU student's threatening messages on social media targeting NYU's "Zionists" and expressing "desire for [them] to die," ¶ 83.

Between NYU entering an agreement with OCR and Hamas's October 7, 2023 terrorist attack: NYU's campus has been defaced with antisemitic vandalism, ¶¶ 90, 101-02, 111; faculty have regularly espoused antisemitic, pro-terror rhetoric and allowed classrooms to be infected with antisemitism, ¶¶ 103, 109, 112, 117-19; and NYU students and student groups, including SJP, have held antisemitic events and intimidated and harassed Jewish students, ¶¶ 104, 114-16. Although every instance of antisemitic conduct alleged in the complaint is prohibited by one or more of NYU's policies, NYU took no effective measures to remedy or deter that conduct.

The complaint identifies no fewer than forty incidents of antisemitism since October 7, including incidents lasting for weeks, which have caused plaintiffs to endure a hostile environment at NYU. For instance, at an October 17, 2023 rally by SJP and FJP, which Ingber and Maslavi observed, protestors burned Israeli flags, made slit-your-throat gestures to the Jewish student attendees, and shouted chants such as "Hitler was right"; "Gas the Jews"; "Fuck the Jews"; and "Death to Kikes." ¶¶ 147-49. At the same rally, Jewish students were threatened with rape. ¶ 147.

On October 20, students and faculty used NYU's Library for an antisemitic rally filled with genocidal chants calling for the destruction of Israel. ¶¶ 162-81. On November 7, in response to numerous anti-Israel rallies at NYU, a group of Jewish students, including Maslavi, Ingber, and SAA Members #2 and #3, held a silent event in support of Israel, which NYU President Mills had endorsed during a meeting with Jewish students. ¶ 199. The event was disrupted by a student who slammed a metal security gate on Ingber's hand before being arrested for engaging in a physical altercation with Ingber's friend. ¶¶ 199-204. Though the event was supposed to continue until 8:00 p.m., as NYU administrators had authorized, Dean Rodriguez told the Jewish students that they should "pack it up" and "disperse"—because NYU "can't guarantee your safety." ¶ 203. At a November 16 rally, SAA Member #2 watched as a mob of students and faculty members approached several Jewish students while taunting "go back to the gas chambers" and "go back to Poland where you came from!" ¶¶ 207-08. On November 27, SJP organized a rally in the Kimmel Center that called for the genocide of Jews. ¶ 214. Beginning on December 12, students staged a two-week occupation of the Paulson Center lobby. ¶¶ 215-16. Ingber, Maslavi, and SAA Member #2 witnessed rallies led by SJP and FJP, at which, like the April 2018 SJP protest alleged in the 2019 OCR complaint, Jewish students were intimidated and assaulted. *E.g.*, ¶¶ 147, 207. Complaints were made to NYU about these protests, ¶¶ 160-161, 209, which NYU ignored.

NYU's professors also contribute to the antisemitic environment on campus. On October 9, NYU proudly announced that it had hired a professor who, two days earlier, had referred to Hamas's massacre as Palestinian "resistance" and "life and future affirming," ¶ 226. On October 20, another professor filmed a Jewish student as she sobbed while witnessing a rally in the Library. ¶¶ 171-73. On November 16, SAA Member #2 watched as another professor led a mob in harassing her and other students, yelling "that's right, keep crying bitch" and filming her

while stating that "the world needs to see what Zionists look like" and "I bet your bubbie's matzah balls suck dick." ¶ 207. That same day, Teiler's professor asked the entire class, "besides Hitler and [Teiler], does anyone else think Judaism is a race?" ¶ 212. Yet another professor offered students in her class excused absences to attend an anti-Israel rally. ¶ 216. On January 25 and 31, faculty and students held disruptive rallies in NYU's Library. ¶ 218.

Plaintiffs, on numerous occasions, pleaded with NYU to enforce its policies to prevent the harassment they were enduring, but NYU's responses were woefully inadequate. For example, on October 11, Maslavi told NYU Dean Rodriguez that she felt unsafe and apprehensive about coming to NYU during an SJP "day of resistance." In response, Dean Rodriguez merely directed Maslavi to a hotline for students coping with emotional challenges. ¶ 140. On October 18, Ingber and other Jewish students told NYU that they and other Jewish students felt unsafe on campus and were afraid to attend class. ¶¶ 159-61. Ingber stated, among other things, that she found it extraordinarily upsetting that NYU was not working to identify and discipline NYU students and faculty responsible for antisemitism, such as those who screamed "Gas the Jews!" ¶ 161. Dean Rodriguez responded that he would try to "get a handle on the situation," *id.*, but did nothing.

As a result of NYU's deliberate indifference, plaintiffs, rather than focus on their coursework, have spent the better part of two semesters navigating a hostile campus, avoiding students, professors, classes, and campus facilities, and foregoing courses of study that have an intolerant culture of harassment against Jews. *See, e.g.*, ¶¶ 5, 7-9, 11-12, 125, 133-34, 138-39, 147-48, 160, 183-84, 196, 207, 216, 240-50.

## ARGUMENT

On a motion to dismiss, "in determining if a claim is sufficiently plausible to withstand dismissal," courts must "accept all factual allegations as true," "draw all reasonable inferences in favor of the plaintiff[s]," and deny the motion "as long as the pleadings support more than a sheer

possibility that a defendant has acted unlawfully." *Melendez v. City of New York*, 16 F.4th 992, 1010 (2d Cir. 2021) (cleaned up). Courts are "mindful of the care exercised in this Circuit to avoid hastily dismissing complaints of civil rights violations." *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001).[5]

## I.  PLAINTIFFS STATE A HOSTILE EDUCATIONAL ENVIRONMENT CLAIM UNDER TITLE VI

To allege a hostile education environment under Title VI, a plaintiff must plead that: the "harassment was so severe, pervasive, and objectively offensive that it deprived the plaintiff of access to the educational opportunities or benefits provided by the school; the funding recipient had actual knowledge of the[]harassment; and the funding recipient was deliberately indifferent to the harassment." *TC v. Valley Cent. Sch. Dist.*, 777 F. Supp. 2d 577, 595 (S.D.N.Y. 2011) (cleaned up). "The hostile environment analysis is fact-specific and [] is best left for trial." *Koumantaros v. City Univ. of N.Y.*, 2007 WL 840115, at *15 (S.D.N.Y. Mar. 19, 2007).

---

[5] NYU relies on exhibits which may not be considered on a Rule 12(b)(6) motion. "[W]hen matters outside the pleadings are presented in response to a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material." *Archibald v. Marshalls of MA, Inc.*, 2009 WL 3817404, at *5 n.3 (S.D.N.Y. Nov. 12, 2009) (Preska, J.) (cleaned up). The only "narrow" circumstances in which courts consider such material is where documents are "incorporated by reference" or "integral" to the complaint. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). NYU argues that a number of exhibits to the Declaration of Daniel L. Cantor, ECF No. 39 ("Cantor Ex. _")—Cantor Exs. A (NYU news release), N (NYU statement), and P (NYU statement)—are so incorporated, Mem. 1 n.1, but these documents are not so much as referenced in the complaint, let alone "integral"— there is no evidence that "indicates that [plaintiffs] had seen the[m] . . . much less relied upon them in drafting the complaint." *Goel*, 820 F.3d at 559. NYU also attempts to argue that the majority of these exhibits—all besides Cantor Exs. Q and O—should be considered because they are available from NYU's own website. *E.g.*, Mem. 1 n.1, 32 n.12. But such information may not be used to challenge the plausibility of plaintiffs' allegations on a Rule 12(b)(6) motion, but at most, merely "to establish the existence of the [statements], and not for the truth of the facts asserted therein." *Moukengeschaie v. Eltman, Eltman & Cooper, P.C.*, 2016 WL 1274541, at *13 n.13 (E.D.N.Y. Mar. 31, 2016) (cleaned up).

### A.      Plaintiffs Sufficiently Allege Harassment

Plaintiffs allege an "atmosphere of anti-Semitism which permeate[s]" NYU, with no fewer than forty antisemitic incidents since October 7, 2023. As plaintiffs allege in detail, they are regularly "forced to run a campus gauntlet of verbal and physical harassment, threats, and intimidation." ¶ 5. Plaintiffs and other Jewish students are physically and verbally assaulted on campus and at school-sponsored and faculty-endorsed events, with genocidal threats such as "Hitler was right," "gas the Jews," and " death to kikes." *E.g.*, ¶¶ 101, 128-30, 142-62, 179-86.

Plaintiffs have sufficiently pled a hostile educational environment. NYU itself admits that, like plaintiffs, it is "'sickened by the virulent antisemitic hate speech' they have seen on and off campus," Mem. 2 (quoting ¶ 8), which it "recognizes" has been "profoundly challenging" for "Jewish and Israeli students," Mem. 3. Yet, NYU tries to downplay the sickening and profoundly challenging antisemitic incidents as merely "[un]pleasant," "isolated," and "insufficient[ly]" injurious and therefore not rising to the level of a hostile educational environment. *Id*. 26-31. But in "evaluating hostile environment claims, courts have adopted a 'totality of the circumstances' approach that rejects disaggregation of the allegations and requires only that the alleged incidents cumulatively have resulted in the creation of a hostile environment." *Crandell v. N.Y. Coll. of Osteopathic Med.*, 87 F. Supp. 2d 304, 319 (S.D.N.Y. 2000); *see also Little v. Nat'l Broad. Co.*, 210 F. Supp. 2d 330, 389 (S.D.N.Y. 2002) ("Evidence of harassment of other members of the protected group, if part of a pervasive or continuing pattern of conduct, is surely relevant to show the existence of a hostile work environment." (cleaned up)). NYU's disaggregation of the incidents, as if each occurred in a vacuum, "robs the incidents of their cumulative effect" and should be rejected. *E.E.O.C. v. Lafond*, 2009 WL 803150, at *4 (E.D.N.Y. Mar. 25, 2009).

For the same reason, plaintiffs need not allege—as NYU incorrectly argues, Mem. 28—that they personally experienced a certain minimum number or severity of harassing incidents.[6] *T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 357, 367 (S.D.N.Y. 2014) (whether there was an "atmosphere" amounting to "more than a collection of individual instances of bigotry" and therefore a hostile environment was a triable issue where plaintiffs "had anti-Semitic slurs repeatedly directed at them, witnessed swastika graffiti, and were subjected to anti-Semitic 'jokes,'" and two of the three plaintiffs were physically harassed); *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 264-65 (2d Cir. 2023) (reversing summary judgment dismissing claim where collection of racist and sexist incidents could "evince[] a culture of hostility towards Black and female employees"). Though NYU argues that some antisemitic incidents "are [not] relevant to all Plaintiffs," Mem. 30, it correctly acknowledges that "evidence of harassment directed at other[s]," *id.* at 30 n.11 (citing *Leibovitz v. N.Y.C. Transit Auth.*, 252 F.3d 179, 190 (2d Cir. 2001)). Indeed, "remarks made outside a plaintiff's presence can be relevant to a hostile [] environment claim," *Leibovitz,* 252 F.3d at 190;[7] *Schwapp v. Town of Avon*, 118 F.3d 106, 111-12 (2d Cir. 1997)

---

[6] Though plaintiffs have alleged, among others, numerous "personal" incidents of harassment, even "one incident of racial harassment, if sufficiently severe, can create a hostile educational environment." *Koumantaros*, 2007 WL 840115, at *15. NYU's cited cases, Mem. 26-28, were decided on summary judgment and otherwise inapposite because, unlike here, they involved much more limited incidents. *Strujan v. Lehman College*, 2008 WL 11422126, at *2 (S.D.N.Y. Aug. 12, 2008), involved a plaintiff who sued a single alleged harasser, a professor who allegedly "looked vulgar" at her, or touched her hand, and sent an email titled "FYI," which plaintiff mistakenly took to mean "Fuck You, Idiot." In *Nungesser v. Columbia University*, 244 F. Supp. 3d 345, 362-67 (S.D.N.Y. 2017), the plaintiff alleged harassment largely by only one other student. In *Roe v. St. John's University*, 91 F. 4th 643, 660, 661 (2d Cir. 2024), the plaintiff alleged harassment in the form of a "single anonymous tweet accusing him of sexual assault" and threating calls and texts from one student and being punched at a bar by another. In *Carabello v. NYC Department of Education*, 928 F. Supp. 2d 627, 643 (E.D.N.Y. 2013), a student suffered one incident of harassment that the court found not severe.

[7] Thus, NYU's contention that "not all allegations are relevant to all Plaintiffs" and that an incident of teacher-on-student harassment in one NYU school "has no bearing" on other plaintiffs, Mem. 30, is contrary to *Leibovitz* and should be rejected. *Leibovitz* holds that allegations based on hearsay

(finding "a racial epithet need not be directed at a plaintiff in order to contribute to a hostile work environment" and reversing due to trial court's "failure to consider the totality of the circumstances," including "racially-hostile comments" that "did not occur in [plaintiff's] presence"). And while NYU argues that incidents that occurred before plaintiffs enrolled at NYU should be disregarded, the Second Circuit has made clear that such incidents "cannot be ignored." *Schwapp*, 118 F.3d at 112.[8]

NYU, again trying to downplay the seriousness of plaintiffs' allegations, even while acknowledging that they are "sicken[ing]," also argues that plaintiffs' harms do not count as sufficient deprivations of educational benefits. Mem. 29. But plaintiffs detail how they have been and are being subject to an egregiously hostile environment and, to put it mildly, have been and are being "deprived of a supportive, scholastic environment free of racism and harassment"[9]—

---

should be considered as part of the hostile environment analysis, 252 F.3d at 190, and only that a hostile work environment claim "cannot be based *solely* on hearsay allegations." *Crawford v. Nat'l R.R. Passenger Corp.*, 2015 WL 8023680, at *7 (D. Conn. Dec. 4, 2015) (finding a defendant's contention that "allegations based on hearsay cannot support a hostile work environment claim" "patently misrepresent[ed] the holding of *Leibovitz* and the law in the Second Circuit" and that *Liebovitz* in fact, "held the opposite").

[8] Even if plaintiffs' experiences of campus-wide abuse are viewed individually, courts regularly find allegations of far less severe and pervasive verbal harassment sufficiently plead a hostile environment. *See Howley v. Town of Stratford*, 217 F.3d 141, 149-156 (2d Cir. 2000) (triable issue of harassment of a single firefighter based, in part, on an inferior "spreading untrue rumors"); *Kaperak v. N.Y.S. Dep't of Corr. & Cmty. Supervision*, 2022 WL 682633, at *2, 3, 7 (W.D.N.Y. Mar. 8, 2022) (triable issue of severe or pervasive harassment of a single teacher based on cumulative effect of several instances of lewd graffiti and two instances of graphic language); *Barnett v. Johnson City Sch. Dist.*, 2005 WL 8178066, at *2, 6 (N.D.N.Y. Feb. 2, 2005) (racially hostile educational environment adequately pled where the extent of one student's alleged harassment was being told by a school official to "act respectful, even if your parents aren't," after the student yelled at White students and their parents believing they were disrespecting her mother, and the student was disciplined but the White children were not).

[9] *See, e.g.*, ¶¶ 133-34, 148, 242 (Maslavi is often late to or absent from class, unable to focus, and fears violence); ¶¶ 184, 206, 243 (Ingber suffers from anxiety, receives taunts from other students, is anxious and frightened, and her grades have slipped); ¶¶ 213, 245 (Teiler is ostracized and silenced, is uncomfortable expressing her Jewish identity, fears her work will not be fairly evaluated, and has missed class and struggled to focus); ¶¶ 195, 244 (Yemeni feels unsafe and that

under *Zeno*, that is sufficient. 702 F.3d at 667; *Pine Bush*, 58 F. Supp. 3d at 356, 358 (deprivation of benefits was a triable issue, in part because "Plaintiffs report being emotionally distressed by the harassment").

### B.    Plaintiffs Sufficiently Allege Actual Knowledge

NYU does not dispute that it had "actual knowledge" of the vast majority of the incidents of harassment alleged in the complaint; it asserts that it "responded reasonably" to them, Mem. 33. NYU instead points to a handful of incidents on or near NYU's campus for which it claims plaintiffs did not plead actual knowledge. Mem. 34-35. But NYU need not have actual knowledge of every incident, only "enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based." *Crandell*, 87 F. Supp. 2d at 320. Here, "so ubiquitous throughout" NYU is the antisemitic conduct plaintiffs allege[10] that "it would be impossible for . . . administrators to miss," which "supports a finding that [NYU] administrators were aware of the . . . anti-Semitic harassment in general." *Pine Bush*, 58 F. Supp. 3d at 361. Indeed, that NYU touts its supposed "extensive institutional efforts to combat antisemitism," itself evidences its awareness of its extensive antisemitism problem. Mem. 31.

---

he needs to hide his Star of David); ¶ 246 (SAA Member #1 feels unsafe, is uncomfortable attending Jewish events on campus, and felt so unsafe after October 7 that he left New York and only returned for mandatory in-person classes); ¶¶ 118-19, 247 (SAA Member #2 dropped classes, feels unsafe on campus, and has been unable to engage with her studies); ¶¶ 194, 248 (SAA Member #3 fears for his physical safety on campus); ¶¶ 195-96, 249 (SAA Member #4 has effectively been denied the opportunity to use campus facilities, cannot concentrate, and feels vulnerable expressing her Jewish identity).

[10] *See e.g.*, ¶¶ 186, 194, 198 (antisemitic posters and graffiti littering campus); ¶¶ 147, 187 (rallies with mobs of students chanting for genocide of the Jewish people and screaming "Death to Kikes," "Gas the Jews," and "Intifada Revolution!"); ¶¶ 162-86, 215-16 (building takeovers).

NYU also tries to make much of a handful instances which plaintiffs personally did not report but of which NYU was nevertheless aware. Mem. 37-39. But only "actual knowledge of the harassment" is required, *Pine Bush*, 58 F. Supp. 3d at 357, even if someone other than the plaintiff reported it. *Zeno*, 702 F.3d at 668 (actual knowledge from faculty, staff, and third parties reporting harassment); *TC*, 777 F. Supp. 2d at 596 (administrators' reaction demonstrated knowledge).

### C.      Plaintiffs Sufficiently Allege Deliberate Indifference

Relying on impermissible, untested, and cherry-picked data, NYU asserts that its supposed "extensive institutional efforts to combat antisemitism," are working, and thus plaintiffs' allegations and experiences on campus indicating otherwise should be disregarded. Mem. 31. But NYU's response has been anything but "reasonably calculated to end harassment," *Zeno*, 702 F.3d at 669. Where, as here, a school "has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such [school] has failed to act reasonably in light of the known circumstances." *Id*. In *Zeno,* the Second Circuit affirmed the appropriateness of a deliberate indifference jury verdict under Title VI, holding that even though the school, like NYU claims to have done here, had taken remedial measures, the jury was entitled to find it delayed its response, took measures that were "little more than half-hearted," or "ignored the many signals that greater, more directed action was needed." *Id*. at 670-71. And because "[d]eliberate indifference will often be a fact-based question," *TC*, 777 F. Supp. 2d at 596, as here, it is inappropriate for resolution on this motion. Given the complaint's allegations, a jury could and would easily find that, as in *Zeno,* NYU's response was delayed, halfhearted, or ignored the need for much more. In fact, NYU's response has been all three.

NYU can only argue that it was not deliberately indifferent if it took steps "reasonably calculated to end harassment." *Zeno*, 702 F.3d at 669. But, again, NYU asks this Court to consider

its deliberate indifference on an incident-by-incident basis, rather than, as required, by considering the "totality of the circumstances," *Koumantaros*, 2007 WL 840115, at *14, thereby attempting to transform NYU's "institutional problem," ¶ 2, into mere "discrete incidents of harassment," Mem. 33. This case is not merely about isolated incidents of antisemitism; it is about the "atmosphere of anti-Semitism which permeate[s]" NYU, and "a culture of anti–Semitism" that is "more than a collection of individual instances of bigotry." *Pine Bush*, 58 F. Supp. 3d at 367.[11]

NYU's response has not been close to reasonably calculated to end harassment; it has been woefully insufficient. In fact, NYU has known of its culture of antisemitic harassment for some time, including since it promised to address the problem in its 2020 OCR Agreement, which NYU breached—in other words, anything it has purported to do since follows a "lengthy and unjustified delay." *Zeno*, 702 F.3d at 666.

## 1.   NYU's Conduct After October 7 Reinforces Its Deliberate Indifference

NYU contends that its official statements, announcement of a "10 Point Plan," and meetings with Jewish students "refute any inference that NYU has been deliberately indifferent to antisemitism on its campus." Mem. 32. But courts have found deliberate indifference despite far more stringent measures taken in response to far less harassment. *See, e.g.*, *Zeno*, 702 F.3d at 660-

---

[11] NYU cites inapposite cases involving vastly different circumstances, in which one student was harassed by one or a few perpetrators. Mem. 34-36. In *Doe v. Sacks*, 2024 WL 402945, at *1-2 (S.D.N.Y. Feb. 2, 2024), a single plaintiff was allegedly harassed by fellow NYU students who published a spreadsheet accusing him of sexual misconduct and publicized it. In *Nungesser*, 244 F. Supp. 3d at 371, a single plaintiff's deliberate indifference theory was that the university failed to rehabilitate his image after he was found "not responsible" for sexual assault. In *Roskin-Frazee v. Columbia University*, 474 F. Supp. 3d 618, 624-26 (S.D.N.Y. 2019), the plaintiff failed to adequately plead the university's actual knowledge of a heightened risk for her sexual assault under a Title IX pre-assault theory, and failed to allege that she reported the assault to a proper authority, instead making clear to those she raised it with that she did not want to report the assault or initiate a police or university investigation.

63, 669-71.[12] As the law makes clear, "[r]esponses that are not reasonably calculated to end harassment are inadequate." *Id*. at 669. In short, a "finding of deliberate indifference depends on the *adequacy* of a school['s] response," not the mere *existence* of nebulous condemnations and plans. *Pine Bush*, 58 F. Supp. 3d at 361. And "once a school is aware of its ineffective response, a delay before implementing further remedial action is no less problematic." *Zeno*, 702 F.3d at 669-70. NYU relies on five of its statements—four of which do not mention "antisemitism" and two of which were addressed solely to the NYU Law School community—between Hamas's October 7 terrorist attack and the filing of the complaint, as purported evidence of "NYU's extensive institutional efforts to combat antisemitism." Mem. 31-32.[13] Statements alone, however, are not "reasonably calculated to end [the] harassment" of plaintiffs and other Jewish students at NYU. This has been, and will continue to be, the case so long as NYU does not take effective action to back up its lip service.

---

[12] *Zeno* affirmed the sufficiency of a jury's finding of deliberate indifference to racial harassment of a single student despite the school immediately disciplining the harassers, the student obtaining orders of protection, and the school undertaking numerous non-disciplinary measures in attempts to remediate the hostile environment, including conducting bullying, sensitivity, and bias-specific trainings; making announcements that "addressed racism and prejudice"; sponsoring an extracurricular student group aimed at combating prejudice; providing the plaintiff an Individualized Education Program; hiring a consultant to conduct student focus groups and administer surveys to raise diversity awareness; facilitating mediation; meeting with stakeholders, including the student's mother and representatives from the NAACP; and holding assemblies that "discussed racism and racial harassment." *Id*.

[13] In support of this argument, NYU relies on Cantor Exs. A and N, neither of which are "incorporated by reference" or "integral" to the complaint, *Goel*, 820 F.3d at 559, and may not be considered on a Rule 12(b)(6) motion, *see supra* note 5. Though NYU attempts to justify its citation to these documents by arguing that "the Court can consider such statements 'for the purpose of demonstrating the existence of information,' *i.e.*, that NYU has publicly condemned antisemitism," Mem. 12, 32 n.12, rather than for their truth, NYU's argument that it has taken "extensive institutional efforts to combat antisemitism" necessarily depends on the truthfulness of the assertions in these documents. Thus, the Court should reject NYU's disingenuous attempt to slip these documents into its Rule 12(b)(6) argument. *See Moukengeschaie*, 2016 WL 1274541, at *13.

NYU also argues that because "President Mills and other senior administrators have repeatedly met with Jewish groups and students, including the Plaintiffs," there can be no inference that NYU is deliberately indifferent. Mem. 32. However, courts routinely find deliberate indifference even where the schools met with the harassed students. *See, e.g.*, *Pine Bush*, 58 F. Supp. 3d at 364; *TC*, 777 F. Supp. 2d at 596 ("[T]he complaint leads to the conclusion that the officials only spoke with the victim of the harassment, not the instigators."); *Koumantaros*, 2007 WL 840115, at \*15 ("[M]eetings between plaintiff and administrators in the Program show that plaintiff repeatedly complained of harassment by her colleagues."). Moreover, NYU ignores plaintiffs' allegations that during these meetings, plaintiffs' and others Jewish students' concerns were ignored or dismissed. *See e.g.*, ¶ 93 (complainant met regularly with NYU administrators before filing the OCR complaint), ¶ 161 (dean claimed during meeting he would try to "get a handle on the situation"), ¶¶ 190-93 (President Mills gaslights Jewish students during meetings calling them "alarmist").

## 2. NYU's Supposed Remedial Measures Are Not Reasonably Calculated to Remedy Antisemitism

NYU cites *Zeno*, as purported support for its contention that its "non-disciplinary" measures are sufficient. Mem. 31-32. But *Zeno* stands for the opposite conclusion—that where, as here, its purported remedial measures are "not reasonably calculated to end [the] harassment" and thus "inadequate," the school has been deliberately indifferent. *Zeno*, 702 F.3d at 669. Over the years, NYU has responded to antisemitic harassment with meaningless, empty promises. *See, e.g.*, *supra* p. 6. And NYU's response since October 7 has been equally if not even more ineffective. *See, e.g.*, ¶¶ 127-35.

As for NYU's 10 Point Plan, Mem. 32, only two of the ten points—"Enhanced Security Measures" and "Enforcing Codes of Conduct"—are "actions" at all; the remaining eight are largely

toothless platitudes (*e.g.*, "Promoting Understanding," "Campaigning for Mutual Respect," "Opening Difficult Conversations"). NYU's conclusory assertions that it is enforcing its codes of conduct, despite plaintiffs' allegations that it fails and refuses to do so, are plainly insufficient at the pleading stage. *See infra,* Arg. § IV.B.1. The *only* action item NYU has promised is increasing police and security presence generally, without even a mandate to focus on antisemitic conduct. This single measure—which is not specifically tailored to address antisemitic harassment that is not overtly criminal or in a classroom—has been predictably far from "reasonably calculated to end harassment," as shown by the ample allegations of worsening antisemitic conduct since NYU announced its 10 Point Plan. *See, e.g.*, ¶¶ 188-89, 194-95, 198-202, 207, 212-18.

NYU argues that plaintiffs "do not plausibly allege that NYU has made any decisions not to discipline those who violate NYU's policies." Mem. 39. That is not so. *See, e.g.*, ¶¶ 71, 145, 173-74, 206-07. What plaintiffs—and NYU—do "have visibility into," Mem. 38, is the result of any such discipline and as plaintiffs also allege, ¶ 11, whatever NYU claims to have done, publicly or otherwise, has been ineffective. Whether plaintiffs "have visibility into the disciplinary measures imposed on other students," Mem. 38, NYU "had knowledge that meting out discipline to the students who harassed Plaintiffs (to the extent there was such discipline) did not deter others from harassing [plaintiffs]," *Pine Bush*, 58 F. Supp. 3d at 363, and its failure to do more evidences its deliberate indifference. *Id*. ("[A]ttempts at disciplining students for harassment did not appear to have had an effect on the slurs, 'white power chants,' Hitler salutes, and swastika graffiti that Plaintiffs allege to have endured on a regular basis.").

NYU's failure, for years, to take any effective action against SJP, *e.g.* ¶¶ 65-67, 77-80, 149 (failing to discipline the organization and its members), for example, evidences NYU's failure to respond to "specific incidents of reported harassment" and its failure "to take steps as necessary to

combat the atmosphere of anti-Semitism which permeate[s]" NYU. *Pine Bush*, 58 F. Supp. 3d
at 367. NYU's failure to effectively respond not only has caused plaintiffs and countless other
Jewish students to endure harassment and abuse, *e.g.*, ¶¶ 147-49, 165-86, 207-09, but it has
emboldened and enabled other students and faculty to continue to engage in such misconduct, *see,
e.g.*, ¶¶ 146-47, 165.

NYU asserts that plaintiffs "cannot insist that NYU 'engage in particular disciplinary
action,'" Mem. 39 (citing *Davis Ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S.
629, 648 (1999)), but plaintiffs are not insisting on "particular disciplinary action"—they are
insisting on *effective* action. In any event, NYU's argument as to specific disciplinary action does
not provide a "shield against liability." *Zeno*, 702 F.3d at 671 n.15 (clarifying *Davis*, 526 U.S. at
648); *Barnett*, 2005 WL 8178066, at *2-3, 5 (denying motion to dismiss hostile educational
environment claim).

Plaintiffs also allege NYU's failure to respond to many other specific incidents of
harassment, including incidents that affected plaintiffs' access to an educational environment free
of harassment. *See, e.g.*, ¶ 157 (NYU's Office of Equal Opportunity and Office of Student Conduct
failed to respond to Jewish student's in response to report of harassment); ¶ 181 ("NYU's Campus
Safety did nothing to stop, halt, or interfere with the rally"); ¶ 196 (SAA Member #4 sends
evidence to support bias report but does not "receive a substantive response to her report"); ¶¶
207-09 (Office of Equal Opportunity investigator claims she could do nothing in response to
protest where SAA Member #2 was subjected to "go back to the gas chambers"); ¶ 218 ("NYU
did not check the protesters' IDs or discipline them in any manner"). Similarly, plaintiffs allege
NYU's deliberate indifference through its failure to properly investigate incidents. *See e.g.*, ¶¶ 149,
187, 192; *see also Zeno*, 702 F.3d at 671 (holding jury could have reasonably found that decision

not to investigate harassment, "which might have prompted an earlier and adjusted administrative response," contributed to deliberate indifference).

### 3. NYU Can Uphold Its Obligations Under Federal Law and Safeguard Academic Freedom

Finally, NYU contends that its *inaction* is excused because of its "adher[ance] to its commitment to the [*sic*] 'open discussion and free discourse.'" Mem. 37. Any suggestion that the First Amendment prevents NYU from disciplining its students or professors is a red herring, *see, e.g.*, *Wahba v. New York Univ.*, 492 F.2d 96, 98 (2d Cir. 1974) (finding professor could not sue NYU for abridging First Amendment rights), that ignores decades of decisions by the courts and the Department of Education holding both private and public institutions accountable for failing to stop verbal harassment. *See, e.g.*, *Barnett*, 2005 WL 8178066, at *2, 6 ("A racially hostile educational environment was adequately pled where the extent of one student's alleged harassment was being told by a school official to "act respectful, even if your parents aren't," after the student yelled at White students and their parents believing they were disrespecting her mother, and the student was disciplined but the White children were not."). And as plaintiffs allege, when it comes to discrimination against other groups, NYU does not give a fig for academic freedom. *See, e.g.*, ¶¶ 7, 124, 221-39. If faculty members need to be disciplined or dismissed to stop them from creating or contributing to the anti-Jewish hostile educational environment on NYU's campus, then that is what Title VI requires. Even public schools are required to address antisemitic speech that creates a hostile environment under Title VI.[14] *See, e.g.*, *Pine Bush*, 58 F. Supp. 3d at 357 (triable issue whether public school was deliberately indifferent in response to antisemitic slurs,

---

[14] Ass't Sec'y Catherine E. Lhamon, *"Dear Colleague" Letter on Shared Ancestry* (Nov. 7, 2023), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-202311-discrimination-harassment-shared-ancestry.pdf ("Harassing conduct can be verbal *or* physical and need not be directed at a particular individual.").

graffiti and taunts). If, on the other hand, NYU does not wish to comply with Title VI, if it wants its faculty and students to have the "academic freedom" to spew antisemitism, its path is clear—forego receiving federal taxpayer funds and return the funds it has received.

None of the cases NYU cites, all of which involve public schools, support its argument that it need not effectively address its hostile educational environment and discrimination.[15] Nor could they, because NYU *does* restrict speech it deems objectionable, it just *chooses not to do so* when the harassment is antisemitic. *See* ¶¶ 221-39; *infra* Arg. § II. For example, NYU censured a professor for social media posts criticizing "safe spaces" and "trigger warnings" and suspended a fraternity for "racist GroupMe messages." ¶¶ 223-24, 237.

NYU cites four examples that it claims implicate NYU's "deep commitment to safeguarding academic freedom." Mem. 36-37. NYU neglects, however, the context in which those statements were made. *See Koumantaros*, 2007 WL 840115, at *14 (hostile educational environment cases necessarily "combine objective and subjective elements" and considers a "totality of circumstances"). For instance, NYU cites allegations of "protestors criticizing NYU for its perceived Pro-Israel stance and 'call[s] for NYU to close its Tel Aviv' campus," Mem. 36 (citing ¶¶ 215-16), while ignoring the surrounding allegations that "while NYU's Jewish community was relegated to hiding their [menorah] ceremony[,] . . . students occupied the Paulson

---

[15] *See* Mem. 36. In *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200 (3d Cir. 2001), for example, the court, in reviewing the constitutionality of a public school's policies, noted that "preventing discrimination . . . in the schools . . . [is] a compelling[] government interest," "speech may be more readily subject to restrictions when a school . . . audience is 'captive' and cannot avoid the objectionable speech," and there is an exception for speech that creates a "substantial disruption or interference with the work of the school or the rights of other students." The court held that the challenged policies were broader than constitutionally permitted because they "prohibit[ed] harassment based on personal characteristics that are not protected under federal law" and "extends beyond harassment that objectively denies a student equal access to a school's education resources." *Id.* at 210. Here, by contrast, plaintiffs allege harassment based on protected characteristics that has deprived them of educational benefits.

Center lobby[.] The group continued to occupy the lobby for the entire week. NYU did nothing to remove them," ¶ 215. Indeed, because of the circumstances in which they were made, courts have determined that even language that does not involve overt racial elements can contribute to a hostile environment. *See Koumantaros*, 2007 WL 840115, at *15 ("Few would be so naive as to believe that racists subjecting a member of a disfavored group to abuse or harassment would preface every rude action with a racial epithet; given some evidence of clearly racial hostility, a reasonable fact-finder could conclude that other obnoxious behavior, which in another context could be ascribed simply to interpersonal friction, was similarly racially motivated."). When NYU's cherry-picked examples are viewed in context, plaintiffs are not seeking to "punish" "unwelcome speech" or hinder "academic freedom" or the "marketplace of ideas," Mem. 36, but to seek relief from discrimination.

Nor is it an excuse to say that the antisemitism at NYU should be protected by "open discussion and free discourse" and "academic freedom" principles. Mem. 36. As the Obama, Trump, and Biden administrations have all recognized, what the mobs are doing is antisemitism, plain and simple. *See, e.g.*, ¶¶ 29-30, 36-37, 43, 46. NYU's "academic freedom" argument underscores why court intervention is necessary here; without it, as NYU admits, it will continue to permit students and faculty to foster its hostile educational environment.

### D.    Plaintiffs Sufficiently Allege Substantial Control

NYU, disingenuously contending that "this case focuses on NYU's liability for the actions of third parties," Mem. 33, claims it cannot be liable for off-campus conduct, for example at Washington Square Park, because it does not "exercise[] substantial control" over such conduct.

Mem. 33.[16] But NYU's selective view of control ignores the law and its own policies and practices regarding "off-campus" conduct.

NYU cites a sentence in its Student Conduct Policy—that the "University shall not use its powers to interfere with the rights of a student beyond the University environment," Mem. 35—but tellingly glosses over the operative sentence in the same paragraph: the University "may take student disciplinary action for conduct occurring outside the University context which substantially disrupts the regular operation of the University or threatens the health, safety, or security of the University community." ¶ 49. Policies such as NYU's Non-Discrimination Policy also explicitly apply not only to "conduct occur[ring] on NYU premises," but also to conduct "in the context of an NYU program or activity" and "conduct [that] occurs outside the context of an NYU program or activity but (i) has continuing adverse effects on NYU premises or in any NYU program or activity or (ii) occurs in close proximity to NYU premises and is connected to violative conduct on NYU premises."[17]

Plaintiffs make detailed allegations of conduct in Washington Square Park by NYU groups, including SJP, FJP, and others, that both "substantially disrupts the regular operation of the

---

[16] Again, NYU improperly relies on new exhibits—Cantor Exs. P (NYU news release titled "Statement from NYU Spokesperson John Beckman on Photos of People in Washington Square Park Holding Offensive Signs") and O (portion of NYU Restrictive Declaration of Large-Scale General Development)—for the truth of the matter asserted therein. *See supra* note 5. Additionally, for Exhibit O, NYU admits that it is not referenced in or integral to the complaint, but states that "the Court may take judicial notice" because it was "filed with governmental entities." Mem. 34 n.15. Besides the fact that NYU offers two pages of a restrictive declaration that is over 300 pages, without its signature page, if the Court does consider the exhibit, it can only be for its alleged existence rather than its truth. *See SEC v. Fiore*, 416 F. Supp. 3d 306, 328-29 (S.D.N.Y. 2019).

[17] Ex. 1, Non-Discrimination and Anti-Harassment Policy and Complaint Procedures for Students; *see also* ¶¶ 61-62 (citing NYU's Rules for the Maintenance of Public Order).

University,"[18] and "threatens the health, safety, or security of" its Jewish students.[19] As NYU's own policies reflect, NYU asserts "substantial control" over the harassment and discrimination online and off-campus, including in Washington Square Park, alleged in the complaint. *See Pine Bush*, 58 F. Supp. 3d at 356 ("substantial control" requirement recognizes that a school's "authority to take remedial action lies in its longstanding disciplinary oversight over its students" (citing *Zeno*, 702 F.3d at 665)); *see also Brown v. Arizona*, 82 F.4th 863, 875 (9th Cir. 2023) (holding that a factfinder could find that university had control over off-campus assault because "a key consideration is whether the school has some form of disciplinary authority over the harasser in the setting in which the harassment takes place"); *Feminist Majority Fund v. Hurley*, 911 F.3d 674, 688 (4th Cir. 2018) (When a university has "the ability to punish those students who posted [] harassing and threatening messages online," it has "substantial control" over them.). In policy and in practice, NYU has that ability. *See, e.g.*, ¶ 48 (express grant of such authority), ¶ 223 (censuring professor for social media posts criticizing "safe spaces" and "trigger warnings"), ¶ 237 (suspending fraternity for "racist GroupMe messages").

Plaintiffs also sufficiently allege that for all incidents that occurred near campus or online, NYU either knew who was responsible for the alleged harassment (usually SJP or FJP members), or that NYU failed to sufficiently investigate who was responsible. ¶¶ 116, 131-35, 140, 143-44, 160, 196, 198; *see also Feminist Majority*, 911 F.3d at 688 ("The University cannot escape liability . . . when, according to the Complaint, UMW never sought to discern whether it could identify the harassers."). In the cases NYU cites, the plaintiff either repeatedly refused to share details about the alleged harassment, *Roskin-Frazee* 474 F. Supp. 3d at 625, or could not do so because the

---

[18] *See, e.g.*, ¶¶ 79, 85, 141-47, 150, 194-96, 207, 218, 238.

[19] *See, e.g.*, ¶¶ 48, 147-48, 150-51, 194, 207-08.

harassment was done anonymously, *Sacks*, 2024 WL 402945, at *6. Here, plaintiffs and other Jewish students regularly reported SJP and FJP's violative activity to administrators, and the harassment that occurred on campus, or off-campus in areas seen as de facto part of NYU's campus, like Washington Square Park or the Paulson Center lobby, in full view of administrators and the media. *See, e.g.*, ¶¶ 78-79, 84, 86, 140, 146-48. These groups also harassed and intimidated Jews on social media. *See, e.g.*, ¶¶ 77, 83, 131, 133, 137, 210.

## II.    PLAINTIFFS STATE DIRECT DISCRIMINATION CLAIMS UNDER TITLE VI

Plaintiffs allege separate Title VI intentional discrimination violations by NYU, including that NYU employs invidious double standards in addressing antisemitism compared to other forms of hate. ¶¶ 221-39. NYU says that those comparisons "do not move the needle," Mem. 41, but this argument is not proper on a motion to dismiss, *see, e.g.*, *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) ("Whether two [students] are similarly situated ordinarily presents a question of fact for the jury."); *Minto v. Molloy Coll.*, 2021 WL 1394329, at *11 (E.D.N.Y. Jan. 21, 2021), *R. & R. adopted*, 2021 WL 804386 (E.D.N.Y. Mar. 3, 2021), and is otherwise meritless.

On a motion to dismiss, there is a "temporary 'presumption' of discriminatory motivation," and plaintiffs "need only give plausible support to a minimal inference of discriminatory motivation." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015). Here, plaintiffs' allegations support an inference of discriminatory intent, which can be "inferred from the totality of the relevant facts." *Id*. at 88-89 (finding sufficient inference of discriminatory intent where plaintiffs' "other allegations of discrimination, even if they do not independently constitute adverse employment actions, provide 'relevant background evidence' by shedding light on Defendant's motivation and thus bolster his claim that Defendants treated him differently because of his ethnicity"); *see, e.g.*, ¶¶ 93-98, 110, 221-39.

Moreover, plaintiffs allege far more than is required—the way NYU responds to reports of antisemitic harassment, like plaintiffs', is *a fortiori* worse than its response to other forms of discrimination or disfavored speech. For example, NYU has censored professors over comments they made criticizing "safe spaces" and opining on cultural reasons for racial economic gaps, yet hired and praised a professor two days after she celebrated Hamas's October 7 terrorist attack. ¶¶ 223, 226-28. NYU also does not hesitate to discipline students who discriminate when the targets are not Jews—such as immediately condemning and reporting to the police an incident of harassment against Asian students that occurred off campus just a month before October 7, but failing to issue any statement when a Jewish student was harassed in front of an NYU building, ¶ 236; and indefinitely suspending a fraternity for racist messages, but failing to take effective action against the hordes of student groups that are responsible for near-daily antisemitic abuse on campus, ¶ 237.

## III.   PLAINTIFFS ADEQUATELY ALLEGE STATE AND LOCAL LAW CLAIMS

### A.   Plaintiffs Sufficiently Plead City and State Discrimination Claims

Under NYSHRL Section 296 and NYCRL Section 40-c, NYU is prohibited from discriminating against plaintiffs or subjecting them to a hostile educational environment. These claims are evaluated under the same standard as analogous claims under federal discrimination laws. *See Minto*, 2021 WL 1394329, at *10; *Eccleston v. Pine Bush Cent. Sch. Dist.*, 2013 WL 12444443, at *13 (S.D.N.Y. Jan. 8, 2013) ("the standard governing NYCRL § 40 claims is identical to the standard governing federal discrimination claims"). Because plaintiffs adequately plead a claim under Title VI, NYU's motion must be denied as to these claims as well.

Plaintiffs also adequately allege a hostile environment claim under NYCHRL Sections 8-107(4), (17), under which "[i]nterpretations of state and federal civil rights statutes can serve only as a floor below which the NYCHRL cannot fall" and that "[t]he NYCHRL should be construed

liberally for the accomplishment of the uniquely broad and remedial purposes thereof." *Green v. Jacob & Co. Watches, Inc.*, 248 F. Supp. 3d 458, 470 (S.D.N.Y. 2017). Accordingly, "[c]ourts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing its provisions 'broadly in favor of discrimination plaintiffs to the extent that such a construction is reasonably possible." *Id.*

Under the broader NYCHRL standard, plaintiffs need only show differential treatment—that they are treated "less well"—because of a protected characteristic. *Santiago v. ACACIA Network, Inc.*, 634 F. Supp. 3d 143, 155-56 (S.D.N.Y. 2022) (denying motion to dismiss hostile work environment claims under the NYCHRL). While NYU does not challenge plaintiffs' allegations that they were treated "less well" than other students because they are Jewish, it takes issue with plaintiffs' allegations that NYU's response to antisemitism was deliberately indifferent. Mem. 42. For the same reasons plaintiffs' allegations state a claim under Title VI, they also state a claim for discrimination under the broader standards of NYCHRL § 8-107(4). *Doe v. Yeshiva Univ.*, 2023 WL 8236316, at *19 (S.D.N.Y. Nov. 28, 2023).

## B. Plaintiffs Sufficiently Plead a Breach of Contract Claim

"When a university accepts a student for enrollment, an implicit contract is formed if the student complies with terms 'contained in the university's bulletins, circulars and regulations made available to the student.'" *Doe v. Sarah Lawrence*, 453 F. Supp. 3d 653, 668 (S.D.N.Y. 2020). "Implicit in the contract is the requirement that the institution 'act in good faith' in its dealing with its students." *Id.*

NYU erroneously argues that plaintiffs fail to "identify any specifically designated and discrete promises that could form the basis of [a breach of contract] claim," Mem. 42, but instead cites merely "guidelines and statements," *id.* 43. Plaintiffs in fact identify numerous specific and

discrete policies that ostensibly protect Jewish students from discrimination. *See* ¶¶ 317-22. But even if they had not, a college's general commitments not to discriminate sustain a breach of contract claim. *See, e.g.*, *Peters v. Molloy Coll. of Rockville Ctr.*, 2008 WL 2704920, *7-8 (E.D.N.Y. July 8, 2008) (denying motion to dismiss contract claim where plaintiff alleged breach based on college catalog promising plaintiff she "would not be treated in a discriminatory fashion on account of her race or ethnic background" and noting "[a] term of an implied contract between a University and a plaintiff is presumably the right to complete a degree without being subjected to discriminatory conduct").

### C.   Plaintiffs Sufficiently Plead Claims for Consumer Fraud

To state a claim under New York General Business Law Section 349, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Nick's Garage, Inc. v. Progressive Cas. Ins.*, 875 F.3d 107, 124 (2d Cir. 2017). Where the "acts complained of 'potentially affect similarly situated consumers,'" the consumer-oriented prong will be met." *Koch v. Greenberg*, 14 F. Supp. 3d 247, 261 (S.D.N.Y. 2014) (cleaned up), *aff'd*, 626 F. App'x 335 (2d Cir. 2015). Courts have held that representations made by schools in their advertising and marketing constitute consumer-oriented conduct sufficient to support a Section 349 claim. *Bailey v. N.Y. Law Sch.*, 2017 WL 835190, at *8 (S.D.N.Y. Mar. 1, 2017) (holding allegations that school "advertised and marketed the diversity of the School and reputation of its faculty to diverse and minority applicants like [plaintiff]" sufficient to state a Section 349 cause of action), *aff'd*, 2021 WL 5500078 (2d Cir. Nov. 24, 2021). Here, plaintiffs adequately allege that NYU engaged in consumer-oriented conduct by falsely advertising to students its commitment to prevent, investigate, and resolve discrimination, abuse, and

28

harassment. *See* ¶¶ 43-63, 323-31. Those statements were materially misleading. Whether an act is materially misleading is generally a question of fact not suited for resolution at the motion to dismiss stage. *Hesse v. Godiva Chocolatier, Inc.*, 463 F. Supp. 3d 453, 467 (S.D.N.Y. 2020).

## IV.   **THE COURT HAS SUBJECT MATTER JURISDICTION**

Through unverified, post-litigation statements and ambiguous, questionable, cherry-picked data, NYU manufactures Rule 12(b)(1) arguments for ripeness and standing. Under Rule 12(b)(1), courts must take "all uncontroverted facts in the complaint as true, drawing reasonable inferences in favor of the plaintiff, but can look to evidence outside the pleadings, including affidavits, to resolve disputed jurisdictional facts." *Glob. Art Exhibitions, Inc. v. Kuhn & Bülow Italia Versicherungsmakler GmbH*, 607 F. Supp. 3d 421, 429 (S.D.N.Y. 2022). Plaintiffs may still "rely on the allegations in the [p]leading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016). A claim may not be dismissed under Rule 12(b)(1) unless plaintiff fails to "allege facts that affirmatively and plausibly suggest that[] plaintiff has standing to sue." *Id.* at 56 (cleaned up).

Here, plaintiffs unquestionably allege facts sufficient to show standing—they allege that they are subject to ongoing injury requiring injunctive relief. But in any event, where as here, NYU's arguments regarding subject matter jurisdiction are "so intertwined with the merits that its resolution depends on the resolution of the merits," courts may dismiss only if "*no triable issues of fact* exist." *Evans v. SSN Funding, L.P.*, 2017 WL 3671180, at *5 (S.D.N.Y. Aug. 23, 2017) (cleaned up) (emphasis in original); *Wiwa v. Royal Dutch Petrol. Co.*, 626 F. Supp. 2d 377, 388– 89 (S.D.N.Y. 2009) (where disputed "facts necessary to resolve th[e] jurisdictional issue are

sufficiently intertwined with the merits" of the claim, the "Court must leave the determination of this jurisdictional issue to trial").

NYU's Rule 12(b)(1) standing and ripeness arguments cannot be resolved without resolving the merits of plaintiffs' hostile educational environment claims. Those arguments are based on the same arguments it raises on its Rule 12(b)(6) merits motion—its supposed "ongoing" response to antisemitism, Mem. 22-25, and its purported "proactive efforts to combat antisemitism [which] preclude" injunctive relief, Mem. 15. As "there are major factual contentions in dispute," and plaintiffs have not had an "opportunit[y] for pretrial discovery" on these issues, *Ass'n of Car Wash Owners Inc. v. City of New York.*, 911 F.3d 74, 83 (2d Cir. 2018), dismissal or summary judgment is inappropriate at this stage. Accordingly, the Court should proceed under Rule 12(b)(6) for its standing and ripeness arguments, disregarding Cantor Exs. A-L, and the Pina Declaration, as NYU cannot properly argue that they are incorporated by reference, integral to, or fairly implicated by the complaint. In any event, the Court should disregard the extrinsic materials that NYU offers for the truth of the matter asserted, as "conclusory or hearsay statements" in "materials beyond the pleadings" may not be relied on. *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004).

### A. Plaintiffs Have Standing to Pursue Injunctive Relief and SAA Has Associational Standing

NYU argues that plaintiffs lack standing to seek injunctive relief and that SAA lacks standing altogether. Mem. 14-22. Plaintiffs have standing when they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Silva v. Farrish*, 47 F.4th 78, 86 (2d Cir. 2022). Here, plaintiffs have more than adequately alleged facts—uncontroverted by NYU's self-serving exhibits—to demonstrate that they face ongoing and future imminent harm stemming directly from

NYU's deliberate indifference. And SAA has properly established associational standing such that it can represent the interests of its members.

### 1. Plaintiffs Properly Allege Ongoing and Future Injury-in-Fact

Plaintiffs' allegations make clear that given their ongoing enrollment and NYU's continuing ineffective response to rampant antisemitism, they will remain subject to a hostile environment. That is sufficient. *See, e.g.*, *Doe v. Univ. of Tenn.*, 186 F. Supp. 3d 788, 813 (M.D. Tenn. 2016) (injunctive relief appropriate where plaintiffs allege ongoing deliberate indifference while still enrolled in the defendant school). Plaintiffs remain personally subject to antisemitic harassment, intimidation, and threats, in a regularly recurring pattern of activity targeted at them as Jews.[20] *E.g.*, ¶¶ 129-30, 133, 146-58, 162-87, 190, 194, 207, 214-18. Among other things, plaintiffs have been and are being deprived of educational opportunities because of, among other things: near-daily unsanctioned (and unregulated) protests and antisemitic incidents which continue to cause plaintiffs, and many of NYU's Jewish and Israeli students, to avoid and fear campus, *e.g.*, ¶¶ 133, 139-40, 159, 161, 213, 240-50; professors' hateful vitriol that causes plaintiffs to avoid taking or attending certain classes, *e.g.*, ¶¶ 117-19, 220, 245; and needing to plead for protection from harassment at the hands of their peers and instructors, *e.g.*, ¶¶ 140, 160-61, 179, 181, 192-93, 196, 208-11.

---

[20] Accordingly, NYU's cases are inapposite. In *Shain v. Ellison*, 356 F.3d 211, 214 (2d Cir. 2004), the plaintiff, a former inmate challenging a jail policy, had already been released and the defendant county had ceased enforcing the challenged policy. In *Clapper v. Amnesty International USA*, 568 U.S. 398, 411 (2013), plaintiffs challenging a foreign surveillance statute lacked standing because they were "United States persons" not subject to the statute and were speculating on whether the government might target their communications in the future. In *In re Google*, 627 F. Supp. 3d 346, 402-03 (S.D.N.Y. 2002), antitrust plaintiffs lacked injunctive standing because the defendant had ended the challenged program, and plaintiffs did not allege ongoing or imminent harms flowing from the ceased program.

NYU argues that plaintiffs' "'past exposure' to harm" does not show a "present case or controversy" for injunctive relief, claiming that their injuries from NYU's hostile environment "offer no basis to infer that any of [the plaintiffs] face an imminent risk of injuries of the same nature." Mem. 15-16. But, as NYU's own authority holds, Mem. 15 n.4, prospective injunctive relief is appropriate when it "can . . . remedy the existing harms that flow from the past denial of equal opportunity," *Soule v. Conn. Ass'n of Schs., Inc.*, 90 F.4th 34, 49-50 (2d Cir. 2023).

NYU asserts that plaintiffs' many allegations of imminent future injury are merely "speculative," Mem. 16, but the complaint details how NYU's actions and inactions have created, and continue to sustain, a hostile environment subjecting plaintiffs to the essence of imminent personal "continuing, present adverse effects." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992). And, in light of NYU's longstanding failures and plaintiffs "repeated incidents" of documented harms, "[e]vidence of past injury becomes even more probative, and the threat of future injury less speculative," *Democratic Cong. Campaign Comm. v. Kosinski*, 614 F. Supp. 3d 20, 38 (S.D.N.Y. 2022); *see also Amadei v. Nielsen*, 348 F. Supp. 3d 145, 159 (E.D.N.Y. 2018) ("[A] plaintiff is more likely to experience a recurring injury when the plaintiff alleges that the defendant's challenged conduct is widespread and implicates a particular activity or location that the plaintiff engages in or travels to frequently.").

Moreover, NYU asks this Court to dismiss plaintiffs' injunctive claims before discovery based on its own impermissible, self-serving hearsay statements. For example, NYU relies on Cantor Ex. F, a March 11, 2024 message from NYU describing a chart purportedly showing that incident reports to a specific Bias Response Line have declined since the beginning of the January 2024 semester. But that in no way shows that any decline, even if true, was caused by NYU's supposed efforts against antisemitism. *See* Mem. 6-7. Among other things, any such decline could

have resulted from students learning that NYU will do little or nothing in response to student complaints, or from students increasingly fearing retaliation for reporting, or from students avoiding campus to escape the harassment. *See, e.g.*, ¶¶ 7, 143-44, 148, 150-57, 184, 190-91, 196, 209-11, 242-46. NYU's proffered extrinsic materials should be rejected as "immaterial because [they] do[] not contradict plausible allegations that are themselves sufficient to show standing." *Carter*, 822 F.3d at 57. And NYU's assertion—based on extrinsic documents that prove nothing— that its "dedicated" efforts against antisemitism have been "successful" only confirms that NYU does not understand its problem and absent injunctive relief cannot be trusted to solve it. Mem. 14-16.

NYU contends that victims of discriminatory *practices* cannot seek injunctive relief unless they challenge an "existing NYU policy." Mem. 15. This is also not the law. *See, e.g.*, *Plaintiffs #1-21 v. County of Suffolk*, 2021 WL 11629176, at *1 (E.D.N.Y. Aug. 5, 2021) (denying summary judgment dismissing Title VI claim requesting injunction based on allegations of "systemic discrimination and unconstitutional policing policies, *patterns*, and *practices*"). Plaintiffs have more than adequately alleged that intentional discrimination through NYU's pattern and practice of failing to enforce its policies when Jews and Israelis are victims is NYU's "standard operating procedure." *United States v. N.Y.C. Dep't of Educ.*, 407 F. Supp. 3d 365, 417-18 (S.D.N.Y. 2018).

NYU also argues that plaintiffs cannot request that the court eventually appoint a "neutral expert monitor." Mem. 18-19. But the Court's authority to appoint a monitor is well established under Rule 53, the inherent power of the Court, and numerous decisions. *See, e.g.*, Fed. R. Civ. P. 53 (court authority to appoint monitor); *United States v. Apple Inc.*, 992 F. Supp. 2d 263, 280-82 (S.D.N.Y. 2014) (court has both inherent authority and power under Rule 53 to appoint monitor "to assist in framing and enforcing complex decrees . . . particularly when a party has proved

resistant or intransigent"). Given NYU's long history of refusing to act to effectively combat antisemitism, including its failure to comply with its own commitment in the OCR Agreement, a monitor will be necessary and appropriate.

### 2. Plaintiffs Sufficiently Allege that NYU's Continuing Deliberate Indifference Will Cause Future Injury

NYU argues that plaintiffs have not alleged facts tracing their risk of future injury to NYU. Mem. 17-19. Establishing causation for standing purposes requires only that "the plaintiff's injury be fairly traceable to the challenged action of the defendant." *Carter*, 822 F.3d at 55 (cleaned up). Here, as alleged throughout the complaint, NYU's longstanding deliberate indifference to and failure to stop antisemitic harassment is the direct cause of plaintiffs' injuries. *E.g.*, ¶¶ 140, 156-61, 203-06, 256-66.

NYU also argues that plaintiffs' requested remedy suffers a "significant mismatch" to their injuries. Mem. 14, 17-18. But the injunctive relief plaintiffs seek is designed precisely to "redress the alleged denial of equal . . . opportunity," *Soule*, 90 F.4th at 48—that NYU be ordered to comply with its obligations to protect its Jewish and Israeli students, including by enforcing its own policies, practices, procedures, and protocols equally when discrimination and harassment is directed at Jewish and Israeli students. *See infra* Arg. § V. NYU's cases, Mem. 19, provide it no support, as each involved a request for relief untethered to plaintiffs there.[21]

---

[21] *Soule*, 90 F.4th at 50, rejected injunctive relief standing for student athletes where the requested relief would not redress plaintiffs' injuries, but found plaintiffs have standing to seek alteration of public records that would impact their athletic standing). *Utah Physicians for a Healthy Env't v. Diesel Power Gear LLC*, 374 F. Supp. 3d 1124, 1136 (D. Utah 2019), rejected an injunction ordering used car dealership to fix all polluting cars as "overbroad because it [was] not tied to the geographic area" where plaintiffs suffered injury.

### 3.   SAA Is a Genuine Membership Organization That Has Standing to Sue

NYU incorrectly contends that SAA is not a "traditional voluntary membership organization," and thus must establish that it exhibits "indicia of membership" to have associational standing to sue. Mem. 19. NYU's argument is contrary to the Supreme Court's holding just last year—in a Title VI case brought by an organization against Harvard on behalf of its members, anonymous prospective Harvard students—that where "an organization has identified members and represents them in good faith, our cases do not require further scrutiny into how the organization operates." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 201 (2023) [*SFFA*]. SAA satisfies those requirements, as explained in the Ingber and Member Declarations.

In *SFFA*, the Supreme Court expressly confirmed that the case NYU cites to argue that SAA must meet the alternative "indicia of membership" test, Mem. 19, has "no applicability" to an organization, like plaintiff there and SAA here, that represents actual members. *Id.* (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 344-45 (1977)). Like SFFA, SAA is a duly registered not-for-profit "composed of voluntary members . . . includ[ing] current Jewish and Israeli NYU students," which represents its members (who joined SAA before it joined as a plaintiff in this action) in good faith. ¶ 16; Ingber Decl. ¶¶ 2-13; Member Decl. ¶¶ 7-11. Indeed, SAA refers to specific members throughout its pleading who are current NYU students experiencing a hostile educational environment. *E.g.*, ¶¶ 104-08, 117-19, 192, 194, 195-96, 199, 207-11, 214, 216, 246-49. This should end the inquiry.

NYU asserts that SAA purportedly "manufactur[ed] 'members' for the purposes of this lawsuit after the fact." Mem. 20 (quoting *Washington Legal Found. v. Leavitt*, 477 F. Supp. 2d 202, 211 (D.D.C. 2007)). First, SAA did not "manufacture" any members; each member referred to in the complaint is an NYU student who voluntarily joined SAA and who did so at least in part

so that it could represent his or her interests in suing NYU. Ingber Decl. ¶ 10; Member Decl. ¶ 8. Second, *Washington Legal*, decided years before *SFFA*, is inapposite—there, the organization admitted that its purported standing members were not members as defined in the organization's governing documents, necessitating the alternative *Hunt* "indicia of membership" test, which questions whether an organization that does not have formal members is "the functional equivalent" of a membership organization. 477 F. Supp. 2d at 208. Thus, SAA is a traditional voluntary membership organization, with formal members who have affirmatively chosen to join and who play an active role in the organization, including voting for SAA's leadership. Ingber Decl. ¶¶ 10, 12; Member Decl. ¶¶ 7, 10. Accordingly, SAA would easily pass the "indicia of membership" test, even if it applied.[22]

NYU next argues that, even if SAA is a traditional membership organization (it is), and even if SAA exhibits "indicia of membership" (it does, though it does not have to), SAA would lack standing to pursue its requested relief because it would "require[] the participation of individual members" or "individualized proof." Mem. 20. NYU misunderstands the law. The Supreme Court has held that "so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party *indispensable* to proper resolution of the cause, the association may be an appropriate representative of its members entitled to invoke the court's jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). The SAA members are not "indispensable" here—this action challenges a widespread practice of discrimination against Jewish and Israeli students in violation of NYU policies, Title VI, and similar statutes and seeks injunctive relief that would remedy that discrimination. It is entirely appropriate for SAA to seek

---

[22] NYU also takes issue with the fact that a corporate attorney at plaintiffs' firm helped incorporate SAA. Mem. 20. There is nothing unusual about an attorney assisting a client with filing corporate governance documents. NYU cites no case to the contrary.

this prospective equitable relief, which "will inure to the benefit of those members of the association actually injured." *Id.* at 515; *see also Bldg. & Const. Trades Council v. Downtown Dev., Inc.*, 448 F.3d 138 (2d Cir. 2006) (when an organization seeks "civil penalties and injunctive relief only, not monetary damages, its claims do not require 'individualized proof'"). It does not matter that some member participation may later be useful to "demonstrate the general manner in which defendants fail to ensure that" Jewish and Israeli students are protected from discrimination and harassment by virtue of NYU's "discriminatory policies and practices," because the "focus of plaintiffs' proof will be on *defendants'* actions," making SAA's members not indispensable. *Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 308-09 (E.D.N.Y. 2008).[23]

NYU nonetheless argues that associational standing is never appropriate in hostile environment cases because they depend on "highly individualized allegations," and because plaintiffs allegedly do not challenge a "university-wide policy." Mem. 20-21. NYU's proffered rule, for which it relies on cases that *do not* involve associational standing,[24] is contrary to the law—courts regularly find that organizational plaintiffs can bring discrimination claims on behalf of their members, and that such organizational plaintiffs can bring hostile environment claims based on patterns and practices, rather than written policies. *See, e.g., Bos. Parent Coal. for Acad.*

---

[23] NYU cites four inapposite cases. In *Bano v. Union Carbide Corp.*, 361 F.3d 696, 715 (2d Cir. 2004), the district court held that an organization "lacked standing to pursue *money damages* on behalf of their members," because they sought individualized relief including "reimbursement for the costs of medical monitoring" and "remediation" of members' "private properties." Similarly, in *Blunt v. Lower Merion School District*, 767 F.3d 247, 289 (3d Cir. 2014), plaintiffs sought "monetary reimbursements" that would vary depending on each student's needs. In *Barnett*, 2005 WL 8178066, at *5, the organization alleged "conjectural [and] hypothetical injuries" to unnamed non-plaintiff students who were not alleged to be members of the organization. Similarly, in *Lulac Councils 4433 & 4436 v. City of Galveston*, 942 F. Supp. 342, 345 (S.D. Tex. 1996), none of the named plaintiffs were members of the organization as required for organizational standing.

[24] *See* Mem. 21 (citing *Demoret v. Zegarelli*, 451 F.3d 140 (2d Cir. 2006); *L. L. v. Evesham Twp. Bd. of Educ.*, 710 F. App'x 545 (3d Cir. 2017)).

*Excellence Corp. v. Sch. Comm.*, 89 F.4th 46, 55 (1st Cir. 2023) (organization had standing even though the "requested remedy would certainly require some factual showing that [] students would have been [affected]"); *Hosp. Council of W. Pa. v. City of Pittsburgh*, 949 F.2d 83, 89-90 (3d Cir. 1991) (finding associational standing because "participation by 'each allegedly injured party' would not be necessary" to "challenge to alleged practices that would probably have to be proven by evidence regarding the manner in which the defendants treated individual member[s]"); *Playboy Enters.* v. *Pub. Serv. Comm'n*, 906 F.2d 25, 35 (1st Cir. 1990) ("[J]ust because a claim may require proof specific to individual members of an association does not mean the members are required to participate as parties in the lawsuit."); *Emps. Committed for Just. v. Eastman Kodak Co.*, 407 F. Supp. 2d 423, 434 (W.D.N.Y. 2005) (finding hostile environment claim would "not hinge" on proof from individuals, "but rather the existence of a pervasive system-wide pattern or practice or discrimination that is equally harmful and applicable to all members").

NYU argues that it cannot respond to allegations that it was deliberately indifferent where it cannot identify the SAA members discussed in the complaint. Mem. 22. NYU at least acknowledges that the Second Circuit recently clarified that organizational plaintiffs must "identify by name at least *one* named member" "no later than the *summary judgment stage*." *Id.* 22 n.7 (citing *Do No Harm v. Pfizer Inc.*, 96 F.4th 106, 114-19 (2d Cir. 2024)). But NYU neglects to mention that the member must be named only "*to the court*." *Do No Harm*, 96 F.4th at 119. NYU's argument is all the more disingenuous here, as it is well aware of the identities of all the anonymous SAA members identified in the complaint—each has communicated directly with NYU regarding their antisemitic incidents. *E.g.*, ¶ 105 (Member #1); ¶ 119 (Member #2); ¶¶ 192, 248 (Member #3), ¶ 196 (Member #4). In any event, both NYU and the Court currently have the names of the named plaintiffs, all of whom are also SAA members. ¶¶ 17-20. Plaintiffs will meet

any obligation to disclose names of anonymous members by summary judgment, *Do No Harm*, 96 F.4th at 118, and discloses one such member contemporaneously with this motion, *see* Member Decl.

## B.      Plaintiffs' Claims Are Ripe

Through unjustifiably self-congratulatory and unverified proclamations regarding its supposed success to date in combating antisemitism, NYU argues that plaintiffs' federal civil rights claims are not prudentially ripe because NYU's efforts are still "ongoing" and plaintiffs' injuries are "contingent on future events." Mem. 22-25. According to NYU, there is no "rush to litigate" the concerns of its Jewish students. *Id.* 25. Instead, NYU argues that the lawsuit would impose a "hardship" on the school's supposed efforts to address what NYU acknowledges are "sicken[ing]" problems it created. *Id.* 2. Aside from not being grounded in any law, NYU's arguments are divorced from reality. Accepting NYU's argument—that any institution could simply avoid liability for an admitted discrimination problem by proclaiming belated plans to fix it—would eviscerate the civil rights statutes.

NYU's argument that plaintiffs' claims are not prudentially ripe, Mem. 22-25, should be rejected, first, because the doctrine has been all but abandoned and should be abandoned: the "continu[ed] vitality" of the entire prudential ripeness doctrine has been placed into serious doubt. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014) (noting the doctrine stands "in some tension with our recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging"); *see also Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*, 10 F.4th 87, 102 (2d Cir. 2021) (reversing finding that case was prudentially unripe) ("[W]e have not directly addressed whether the prudential ripeness doctrine remains good law. . . . Assuming that it does, however, the Supreme Court's cautious

approach to prudential ripeness is a reminder that the doctrine constitutes a narrow exception to the strong principle of mandatory exercise of jurisdiction.").

But, even assuming the continued vitality of the prudential ripeness doctrine, a ripeness analysis considers whether the issues are fit for review and the hardship the parties will suffer in the absence of review. *Robinson v. Blank*, 2013 WL 2156040, at *3 (S.D.N.Y. May 20, 2013). A case is ripe when the plaintiffs' injuries are not "conjectural or hypothetical," but are instead "present, ongoing harms." *Ross v. Bank of Am., N.A.(USA)*, 524 F.3d 217, 226 (2d Cir. 2008). As shown below, plaintiffs' claims are based on past and continuing civil rights violations and are plainly ripe for adjudication.

### 1. Plaintiffs' Claims Are Fit for Review

NYU asserts that "this Court cannot entertain a claim that is 'contingent on future events.'" Mem. 23. Relying on *NYCLU v. Grandeau*, 528 F.3d 122 (2d Cir. 2008), NYU seeks to argue that recent "developments" concerning plaintiffs' claims warrant dismissal, such as unspecified disciplinary proceedings and messages from the administration to all students. Mem. 24 (citing Cantor Exs. A, C, I, and H).[25] But *Grandeau* does not hold that a defendant facing a civil rights lawsuit can successfully argue that claims are not ripe because the defendant has not had enough time to remedy violations. There, the Second Circuit held that plaintiff's claim challenging defendant-agency's policy under the First Amendment was not ripe because it was "at best unclear to what extent an agency has actually adopted a policy or how stringently the agency will enforce it." *Grandeau*, 528 F.3d at 130. But, unlike *Grandeau*, plaintiffs' claims here do not require the Court to guess how NYU will implement and enforce future policies not yet in place—plaintiffs'

---

[25] NYU also cites *Simmonds v. I.N.S.*, 326 F.3d 351 (2d Cir. 2003), Mem. 25, which concerned a state prisoner's habeas corpus petition and is completely far afield.

allegations already explain how NYU fails to enforce its current policies to protect its Jewish and Israeli students and in doing so, subjects them to an invidious double standard.

In support of its ripeness argument, NYU cites the declaration of its own Senior Vice President for University Life, Jason Pina, and mentions "a number of" disciplinary actions. Mem. 6, 23. The Pina Declaration, which contains vague statements of purported fact, which are in dispute (*e.g.*, "NYU *swiftly* took a number of steps," NYU "moved *quickly*," and NYU "has responded as *appropriate*"), should not be relied on.[26] While NYU touts that some students have faced some discipline, it ignores plaintiffs' allegations that antisemitic harassment is ongoing and fails to state how it plans to address the conduct moving forward. NYU's supposed "developments" concerning professors are just as vague. Mem. 23. NYU states that one professor (of the 70 being investigated, see Pina Decl. ¶ 4), has faced an "interim measure"—although she is still listed on the course catalog as teaching a class this upcoming fall 2024 semester, *see* Ex. 2—and another who was only recently suspended, Mem. 23, but was first publicly reported engaging in antisemitic harassment in 2016. ¶ 207.

Similarly, NYU's "non-disciplinary remedial actions"[27] do not support NYU's position

---

[26] "In accord with principles of fundamental fairness," it would be "improper for the district court, in ruling on the 12(b)(1) motion, to have considered the conclusory and hearsay statements contained in the affidavits submitted by defendants, and to deny plaintiff limited discovery on the jurisdictional question." *Kamen v. AT&T Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986). Here, "discovery is necessary, as it appears that the evidence solely in the possession of [NYU]" and is "relevant to Plaintiff's ability to respond to [NYU's] motion." *Marsh & McLennan Agency LLC v. Williams*, 2023 WL 4534984, at *1 (S.D.N.Y. July 13, 2023) ("[A] court should take care to give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction.").

[27] *Zeno*, 703 F.3d 655, and *Sacks*, 2024 WL 402945, which NYU cites in support of its argument that its non-disciplinary remedial actions, such as the 10 Point Plan, have been a "critical component to [its] response to antisemitism", do not discuss ripeness and are irrelevant to that argument.

that there is no "rush to litigate these issues now." Mem. 23. Of the five "actions" NYU cites, four were created after plaintiffs filed their initial complaint and were arguably created for the purpose of litigation. Mem. 31-32. The fifth, the 10 Point Plan dated October 25, *id.* 32, is plainly insufficient, as is shown by the litany of antisemitic incidents that ensued after it was announced by NYU. NYU's contention that these developments evidence an appropriate response to antisemitism such that plaintiffs lack standing, *id.* 31-32 is belied by plaintiffs' allegations and ignores the damage plaintiffs have suffered, including recent antisemitic events reported by Member #2, *Robinson*, 2013 WL 2156040, at *18 (finding discrimination case ripe where plaintiffs "alleg[ed] a longstanding, and allegedly continuing, policy" of discrimination); Member Decl. ¶ 6.

### 2.  This Case Will Not Impose Hardship on NYU

NYU's argument that this case will "impose an exceptional hardship" on *NYU* if plaintiffs' claims are not dismissed, should likewise be rejected. Mem. 24. As an initial matter, NYU does not even explain what "hardships" it will face if this lawsuit proceeds. Instead, NYU asserts that it "has and will continue to do far more than Title VI requires," and that "further factual development may well narrow the scope of Plaintiffs' claims, or, at minimum, better position the court to adjudicate the issues." Mem. 24-25. NYU does not cite any case remotely similar to this civil rights case in which such purported speculative considerations justified denying or delaying the plaintiffs' right to seek relief or the court shirking its "virtually unflagging" obligation to hear and decide the case.

But, given its history, there is no reason to believe that NYU, if left to its own devices, will implement necessary changes to protect its Jewish and Israeli students. *See*, *e.g.*, ¶¶ 93-98 (breaching its 2020 OCR Agreement promises to take remedial measures to address antisemitism);

ECF No. 19 (claiming in December 2023 that it "would be premature to evaluate [NYU's antisemitism] response that is ongoing and continues to evolve"); ECF No. 23 (claiming in January 2023, that "the Court cannot evaluate the sufficiency of NYU's response [to antisemitism] while that response is ongoing."). Indeed, months after NYU first suggested that its response is ongoing and working (and plaintiffs' claims were, as a result, not ripe), antisemitism still persists throughout campus. Member Decl. ¶ 6.

NYU's argument ignores that what is at issue is "what hardship the parties will suffer in the *absence* of review," *Johnson v. Bryson*, 851 F. Supp. 2d 688, 702 (S.D.N.Y. 2012), not whether *hearing* the case will cause hardship to the defendant. NYU cites no case supporting the proposition that a court can disregard its "virtually unflagging" obligation "to hear and decide cases" simply because a defendant claims it will be inconvenienced by the continuance of litigation. *Susan B. Anthony List,* 573 U.S. at 167 (questioning the "continuing vitality" of the prudential standing doctrine given its tension with "a federal court's obligation to hear and decide cases within its jurisdiction" (cleaned up)).

Even if there were a "trust-us, we're-fixing-it" defense to discrimination claims (there is not), NYU would certainly be undeserving of it. As described above, absent court-ordered resolution, plaintiffs have and will continue to be harmed by NYU's violations of Title VI. *See New York v. Pa. Higher Educ. Assistance Agency*, 2020 WL 2097640, at *12 (S.D.N.Y. May 1, 2020) (finding plaintiff "would suffer hardship by delaying a resolution of its contentions that PHEAA has already violated the laws it is tasked with enforcing"); *Johnson*, 851 F. Supp. 2d at 702 (finding case ripe where the fact that "the challenged policies have been in place . . . and will likely again be applied" made it "distinguishable from cases in which courts have determined that pre-enforcement challenges to agency decisions are unripe").

## V.     NYU'S MOTION TO STRIKE SHOULD BE DENIED

NYU's request to strike plaintiffs' request for injunctive relief should be rejected. Motions to strike are highly disfavored, and should be granted only if "there is a strong reason for so doing." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976). Plaintiffs' request does not come within any of the bases for striking pleadings—it is not "redundant, immaterial, impertinent or scandalous," Fed. R. Civ. P. 12(f), and NYU does not, as it cannot, show otherwise.

NYU argues that plaintiffs' requested injunctive relief involves specific disciplinary measures against particular students or faculty, Mem. 45, but plaintiffs make no such request in the complaint. In fact, nowhere in plaintiffs' 104-page complaint, which contains hundreds of allegations of antisemitic conduct, do plaintiffs request "specific remedial measures." Rather, plaintiffs seek to compel NYU, among other things, to discipline perpetrators of antisemitism with the same degree of enforcement as it does other forms of discrimination and hatred. NYU has not, and cannot, explain how enjoining NYU from applying its policies in a discriminatory manner would amount to "second-guessing the disciplinary decisions made by school administrators." Mem. 45. NYU's motion to strike should be denied.

## CONCLUSION

The Court should deny defendant's motion in its entirety.[28]

---

[28] Should any portion of NYU's motion be granted, Plaintiffs respectfully request leave to amend the complaint. Leave to amend should be "freely give[n] . . .when justice so requires," Fed. R. Civ. P. 15; *see also Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990) ("When a motion to dismiss is granted, 'the usual practice is to grant leave to amend the complaint.'").

Dated:   New York, New York
         April 29, 2024

Respectfully submitted,

KASOWITZ BENSON TORRES LLP

By: */s/ Marc E. Kasowitz*
      Marc E. Kasowitz
      Daniel R. Benson
      Mark P. Ressler
      Andrew L. Schwartz
      Joshua E. Roberts
      Jillian R. Roffer
      1633 Broadway
      New York, New York 10019
      Tel: (212) 506-1700
      mkasowitz@kasowitz.com
      dbenson@kasowitz.com
      mressler@kasowitz.com
      aschwartz@kasowitz.com
      jroberts@kasowitz.com
      jroffer@kasowitz.com

*Attorneys for Plaintiffs*